# 24-1908

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL PHILLIPS, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

SEAN HECKER
JENNA M. DABBS
DAVID GOPSTEIN
TREVOR W. MORRISON
ANNE R. YEARWOOD
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iv

INTRODUCTION ............................................................................1

STATEMENT OF ISSUES ..............................................................5

STATEMENT OF THE CASE..........................................................7

    A.   Procedural History ..............................................................7

    B.   Factual Background .............................................................8

          1.   Glen Point Established a South Africa Position ......................8

          2.   Phillips Exchanged Delta on Options ....................................11

          3.   Phillips Monitored Delta.........................................................12

          4.   Phillips Rejected an $11 Million Profit on the Option ...........12

          5.   Ramaphosa Won the Election, but the Results
              Were Uncertain .....................................................................12

          6.   Phillips Continued to Monitor the Election ...........................13

           7.   Phillips Bought $625 Million in Rand Before the Option
              Triggered................................................................................14

          8.   Phillips Bought $100 Million of Rand After the Option
              Triggered................................................................................18

           9.   USD/ZAR Remained Below 12.50 for Several Months.........19

          10.  Phillips Unwound Most of the USD/ZAR Spot Position
              for a $14 Million Profit..........................................................19

    C.   The Trial..............................................................................19

i

D. The Disputed Jury Instructions ...................................................22

E. Post-Trial Motions and Sentencing................................................24

SUMMARY OF THE ARGUMENT ...........................................................25

STANDARD OF REVIEW ..........................................................................28

ARGUMENT ..............................................................................................28

I. THE DISTRICT COURT IMPROPERLY CHARGED THE JURY REGARDING SECTION (2)(I)...........................................................28

    A. Applicable Law .............................................................................29

        1. The Presumption Against Extraterritoriality Limits the Application of U.S. Law to Foreign Conduct........................29

        2. Section 2(i)'s Extraterritoriality Provision Applies to Foreign Conduct in Narrow Circumstances .......................30

    B. The Meaning of "Significant" Refers to the Risk Posed to the U.S. Financial System .............................................................32

    C. Section 2(i) Addresses Conduct, Not Entities.................................36

    D. The District Court Erred in Its Instruction on "Significant"...........38

    E. The Erroneous Instruction Affected Phillips' Substantial Rights...41

II. EVEN IF THE SECTION 2(I) INSTRUCTION WAS NOT ERROR, THERE WAS INSUFFICIENT EVIDENCE OF A "DIRECT AND SIGNIFICANT" CONNECTION TO ACTIVITIES IN U.S. COMMERCE ...................................................................................42

    A. The "Direct and Significant" Instruction .......................................43

    B. The Connections to JPMorgan and Morgan Stanley Were Insufficient ...................................................................................43

        1. Morgan Stanley.......................................................................44

2. JPMorgan ...................................................................47

C. The District Court Improperly Converted Section 2(i) to an
Entity-Focused, Causation Test ....................................................50

III. THE DISTRICT COURT ERRED IN INSTRUCTING THE
JURY ON "BUT FOR" INTENT INSTEAD OF SOLE INTENT ........52

A. The District Court's "But For" Intent Instruction Was Erroneous .52

1. The "But For" Standard Is the Lowest Standard of Actual
Causation....................................................................53

2. The "But For" Standard Cannot Establish Intent in this
Context .....................................................................54

B. The District Court Should Have Required the Jury to Find
a Sole Intent to Deceive ................................................60

C. The District Court's Error Was Not Harmless................................63

IV. THE DISTRICT COURT ERRED BY NOT REQUIRING
PROOF OF ARTIFICIAL PRICE ..........................................66

V. THERE WAS INSUFFICIENT PROOF OF MATERIALITY.............70

VI. THE INDICTMENT AND CONVICTION VIOLATED PHILLIPS'
RIGHT TO DUE PROCESS ................................................73

CONCLUSION...................................................................76

CERTIFICATE OF COMPLIANCE.........................................77

CERTIFICATE OF SERVICE .................................................78

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
　600 U.S. 412 (2023) ................................................................. 29, 30

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
　677 F.3d 60 (2d Cir. 2012) ..................................................................49

*Anza v. Ideal Steel Supply Corp.*,
　547 U.S. 451 (2006) ..................................................................54

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
　493 F.3d 87 (2d Cir. 2007) ................................................................. 62, 68

*Bostock v. Clayton Cnty.*,
　590 U.S. 644 (2020) ..................................................................53

*Boyde v. California*,
　494 U.S. 370 (1990) ..................................................................55

*Burger King Corp. v. Rudzewicz*,
　471 U.S. 462 (1985) ..................................................................45

*Burrage v. United States*,
　571 U.S. 204 (2014) ................................................................. 51, 53, 54

*Carcieri v. Salazar*,
　555 U.S. 379 (2009) ..................................................................62

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
　589 U.S. 327 (2020) ..................................................................53

*Commodity Futures Trading Comm'n v. Gorman*,
　No. 21 Civ. 870, 2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) .. 32, 33, 34, 67

*Commodity Futures Trading Comm'n v. Wilson*,
  No. 13 Civ. 7884, 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ..................67

*Dunn v. CFTC*,
  519 U.S. 465 (1997) .......................................................................................62

*Francis v. Franklin*,
  471 U.S. 307 (1985) .......................................................................................55

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
  41 F.4th 71 (2d Cir. 2022) .............................................................................59

*GFL Advantage Fund, Ltd. v. Colkitt*,
  272 F.3d 189 (3d Cir. 2001).........................................................................63

*In re Amaranth Nat. Gas Commodities Litig.*,
  730 F.3d 170 (2d Cir. 2013).........................................................................66

*Johnson v. United States*,
  No. 23 Civ. 5600, 2024 WL 1740916 (E.D.N.Y. Apr. 23, 2024)...................58

*Keller Found./Case Found. v. Tracy*,
  696 F.3d 835 (9th Cir. 2012).........................................................................30

*Kerson v. Vermont L. Sch., Inc.*,
  79 F.4th 257 (2d Cir. 2023)...........................................................................32

*Loginovskaya v. Batratchenko*,
  764 F.3d 266 (2d Cir. 2014).........................................................................49

*Markowski v. S.E.C.*,
  274 F.3d 525 (D.C. Cir. 2001) ................................................................ 61, 68

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ............................................................................... 29, 40

*Motorola Mobility LLC v. AU Optronics Corp.*,
  775 F.3d 816 (7th Cir. 2015).........................................................................40

*Neder v. United States*,
    527 U.S. 1 (1999) ..................................................................70

*New York Legal Assistance Grp. v. Bd. of Immigr. Appeals*,
    987 F.3d 207 (2d Cir. 2021)...................................................30

*Panjiva, Inc. v. United States Customs & Border Prot.*,
    975 F.3d 171 (2d Cir. 2020)...................................................31

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007) ...............................................................31

*Rayner v. E\*TRADE Fin. Corp.*,
    899 F.3d 117 (2d Cir. 2018).............................................. 58, 59

*Rehaif v. United States*,
    588 U.S. 225 (2019) ...............................................................61

*SEC v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007).............................. 60, 63

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021).......................................... 62, 68, 69

*Sullivan & Long, Inc. v. Scattered Corp.*,
    47 F.3d 857 (7th Cir. 1995).....................................................60

*Truck Ins. Exch. v. Kaiser Gypsum Co.*,
    602 U.S. 268 (2024) ........................................................ 31, 32

*United States v. Applins*,
    637 F.3d 59 (2d Cir. 2011)......................................................28

*United States v. Calderon*,
    944 F.3d 72 (2d Cir. 2019)................................................ 54, 70

*United States v. Chanu*,
    40 F.4th 528 (7th Cir. 2022).....................................................59

*United States v. Desposito,*
    704 F.3d 221 (2d Cir. 2013).........................................................28

*United States v. Edwards,*
    101 F.3d 17 (2d Cir. 1996)............................................................56

*United States v. Epskamp,*
    832 F.3d 154 (2d Cir. 2016).........................................................28

*United States v. Gramins,*
    939 F.3d 429 (2d Cir. 2019).........................................................72

*United States v. Landesman,*
    17 F.4th 298 (2d Cir. 2021).........................................................28

*United States v. Lanier,*
    520 U.S. 259 (1997) ............................................................. 27, 73

*United States v. Litvak,*
    808 F.3d 160 (2d. Cir. 2015).......................................................72

*United States v. Mulheren,*
    938 F.2d 364 (2d Cir. 1991)............................................... *passim*

*United States v. Ramos,*
    401 F.3d 111 (2d Cir. 2005).........................................................28

*United States v. Royer,*
    549 F.3d 886 (2d Cir. 2008).........................................................60

*United States v. Siddiqui,*
    699 F.3d 690 (2d Cir. 2012).........................................................56

*United States v. Silver,*
    864 F.3d 102 (2d Cir. 2017).................................................. 41, 65

*United States v. Walli,*
    785 F.3d 1080 (6th Cir. 2015)......................................................56

*Walden v. Fiore*,
  571 U.S. 277 (2014) ........................................................................45

*Wickard v. Filburn*,
  317 U.S. 111 (1942) ........................................................................35

**STATUTES**

7 U.S.C § 2 .......................................................................... 5, 25, 30, 41

7 U.S.C. § 1a ....................................................................................34

7 U.S.C. § 6 ......................................................................................35

15 U.S.C. § 6a ..................................................................................36

15 U.S.C. § 78dd-2 ..........................................................................36

18 U.S.C. § 32 ..................................................................................36

18 U.S.C. § 37 ..................................................................................36

18 U.S.C. § 38 ..................................................................................36

18 U.S.C. § 112 ................................................................................36

18 U.S.C. § 175 ................................................................................36

18 U.S.C. § 229 ................................................................................36

18 U.S.C. § 878 ................................................................................36

18 U.S.C. § 1116 ..............................................................................36

18 U.S.C. § 1201 ..............................................................................36

18 U.S.C. § 1203 ..............................................................................36

18 U.S.C. § 2332 ..............................................................................36

18 U.S.C. § 2441 ..............................................................................36

18 U.S.C. § 3231 ................................................................................5

21 U.S.C. § 960A .............................................................................36

28 U.S.C. § 1291 ................................................................................5

**REGULATIONS**

17 C.F.R. § 1.3 ......................................................................... 34, 49

17 C.F.R. § 180.1 ................................................................ 6, 54, 66

17 C.F.R. § 180.2 .............................................................................66

17 C.F.R. § 240.3a ...........................................................................49

Cross-Border Application of the Registration Thresholds and Certain
    Requirements Applicable to Swap Dealers and Major Swap Participants,
    85 Fed. Reg. 56,924 (Sept. 14, 2020)................................... 33, 35, 49

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010)............................. 32, 33

**FEDERAL RULES**

Federal Rule of Criminal Procedure 29 ...................................................21

Federal Rule of Criminal Procedure 33(a)...............................................24

**OTHER AUTHORITIES**

156 Cong. Rec. S5818 (July 14, 2010) (statement of Sen. Lincoln)......................33

156 Cong. Rec. S5905 (July 15, 2010) (statement of Sen. Stabenow)...................35

Brief of the U.K. of Great Britain and Northern Ireland as Amicus Curiae
    Supporting Respondents, *Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ..........................................................................40

Charge Conference, *United States v. Tuzman*,
No. 15 cr. 536 (S.D.N.Y. Jan. 11, 2018).........................................................61

Christopher Whittall, *Prime Brokerage: the Multi-Billion Dollar Cash Cow Redefining Banks' Trading Divisions*, IFR (Mar. 2, 2024), https://www.ifre.com/story/4433586/prime-brokerage-the-multi-billion-dollar-cash-cow-redefining-banks-trading-divisions-t0rfw1br05...................50

*Connection*, American Heritage Dictionary (5th ed. 2022)....................................35

*Effect*, American Heritage Dictionary (5th ed. 2022)..............................................35

Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation*, 68 Duke L.J. 479 (2018)..............................................60

Jury Charge, *United States v. Tuzman*,
No. 15 Cr. 536 (S.D.N.Y. Jan. 11, 2018).........................................................61

Lloyd Dixon et al., *Hedge Funds and the Financial Crisis of 2007–2008*, in *Hedge Funds and Systemic Risk*, RAND Corporation (2012), http://www.jstor.org/stable/10.7249/j.ctt1q60xr.12.........................................42

*Love v. U.S.A.*,
[2018] EWHC 172 (Admin) [22] (Eng.).........................................................40

Market Regulation Advisory Notice, Disruptive Practices Prohibited, CME Group RA2107-5 (July 19, 2021).....................................................................59

Sand, Modern Federal Jury Instructions-Criminal 5.04 (2024)...............................56

*Scott v. U.S.A.* [2018],
EWHC 2021 (Admin) [23] (Eng.)..................................................................40

*Significant*, American Heritage Dictionary (5th ed. 2022).....................................32

*Significant*, Black's Law Dictionary (10th ed. 2014)...............................................32

## INTRODUCTION

Appellant Neil Phillips, a foreign national (United Kingdom), traded on a decentralized and unregulated exchange (the foreign exchange, or FX, spot market), from a foreign location (South Africa), through a foreign intermediary (Singapore) of a foreign bank (Japan), for the alleged purpose of deceiving his foreign counterparty (United Kingdom), on an option brokered by a foreign intermediary (United Kingdom), for which a foreign branch served as prime broker (United Kingdom).

Phillips' trades involved willing counterparties and real risk transfers. And they were nearly mirrored by the alleged victim in this case, Morgan Stanley: Phillips and Morgan Stanley traded at the same time, in the same amounts, with the same expectation that their trades would affect an unregulated exchange rate. Yet Phillips was convicted of commodities fraud and Morgan Stanley was, according to the government, the defrauded victim, albeit one that disclaimed having lost any money and sought no restitution. What differentiated the two trade counterparties, other than the government's decision to charge Phillips? According to the district court, just one thing: the evidence established that Phillips would not have traded at the time and in the amounts that he did "but for" an intent to move the exchange rate.

This case sounds unusual because it was. The district court observed that it was a "novel" and "first of its kind" prosecution; that it turned on "a vexing issue of

1

federal law"; and that there was "a paucity of precedent interpreting" the extraterritoriality provision upon which the verdict rests. Novelty, of course, is not legal error. But the lack of guidance on multiple elements in a criminal case that turned on open market trades in an unregulated market, coupled with the case-dispositive interpretation of a never-before-tested statute, raises serious questions of fair notice.

This is particularly so when the statute addresses the threshold question of whether this case could even have been brought in a U.S. courtroom. That question—what does it mean for foreign swap activities to have a "direct and significant connection" with "activities in commerce of the United States" under Section 2(i) of the Commodity Exchange Act ("CEA")—was so complex that, even after extensive briefing and a lengthy pretrial charge conference, the district court did not settle on the basic elements of the instruction until a few days before closing arguments.

It is one thing for aspects of a jury instruction to be modified; that happens routinely. It is quite another for the basic requirements of a statute upon which a criminal conviction turns to be entirely unclear to the judge and the government— not to mention a foreign national trading in an unregulated global market. Indeed, even if this Court affirms the district court's conclusion that a jury could have found a "direct and significant" connection to "activities in U.S. commerce" under Section

2(i)—and it should not—it cannot follow that, as due process requires, such an application of the statute was fairly disclosed to market participants, especially those in foreign countries.

The district court's application of Section 2(i) was not just novel. It was also legal error. Specifically, the district court erred by failing to instruct the jury that, under Section 2(i), a "significant" connection to activities in U.S. commerce is one that can pose a *systemic risk to the U.S. financial system*, and "significance" in this context must be determined from the perspective of U.S. commerce, not a defendant's own conduct. The district court's instruction would improperly permit the U.S. government to prosecute a wide swath of insignificant foreign swap activities, in contravention of the history, purpose and structure of Section 2(i).

 The district court's instruction on intent was also error. In an open market manipulation case, where intent is the only thing that separates entirely legitimate trading from criminal conduct, the government should have been required to prove that Phillips' *sole intent* was to move the exchange rate. Instead, the court instructed the jury to find that Phillips' trading was manipulative if, "but for" an intent to deceive, he would not have traded at the same time and in the same amounts. This unprecedent and self-affirming instruction suffered from two flaws: first, the "but for" standard derives from causation and asks a factfinder to presume two events occurred and determine whether the first was an "actual cause" of the second. It does

3

not have a place in determining criminal intent. Second, the district court improperly inserted two (and only two) characteristics of trading activity—the timing and amounts of trades—into the intent instruction. These characteristics are not in the statute; were necessarily impacted by the conduct of others; and should not have been elevated over other characteristics of Phillips' trading conduct, such as the period of time that Phillips held on to the risk he acquired from the allegedly manipulative trades (two full days).

All of this was against the backdrop of a theory of criminal prosecution (open market manipulation where a trader's (sole) intent is to affect the price of a security about which this Court has already expressed "misgivings." *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991). This case, however, stretched that theory even further because the market that Phillips allegedly manipulated *is not regulated*. In other words, even if this Court sets aside its misgivings about open market manipulation—and it should not—trading to affect an exchange rate would still not be a crime. Indeed, the only reason the government could even bring this case was because it alleged that Phillips' otherwise entirely legitimate open-market trades were "in connection with" a swap he entered into two months earlier. Especially in this context, where a false signal to the market *is not a crime*, this Court should not endorse a theory where nothing more than intent is required to criminalize

open market trades. The district court should have required the government to prove that Phillips caused an artificial price. It erred by not doing so.

Finally, even under the district court's instructions, no reasonable jury could have found either a "direct and significant" connection under Section 2(i) or materiality beyond a reasonable doubt. At most, the trial evidence established (i) fortuitous and indirect connections to two of the largest financial institutions in the world that happen to have a U.S. presence; and (ii) that those two institutions generally do not expect their counterparties to violate the law. Neither was sufficient to support the jury's verdict.

For these reasons, and those set forth below, the Court should vacate the sole count of conviction and direct the district court to enter a not guilty verdict or, in the alternative, order a new trial.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. The judgment of conviction was entered on June 28, 2024. Phillips filed a notice of appeal on July 12, 2024. A.2348. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

This appeal presents six issues:

1. Whether the district court erred by failing to instruct the jury that, under 7 U.S.C § 2(i), a "significant" connection with activities in "commerce of

the United States" is one that can pose a systemic risk to the U.S. financial system, and that significance in this context must be determined from the perspective of U.S. commerce, not a defendant's own conduct.

2. Whether the district court erred by finding the corporate presence in the U.S. of a party to a swap sufficient to confer criminal jurisdiction under Section 2(i), when Congress designed that provision to be conduct, not entity, based.

3. Whether the district court erred by instructing the jury that open market trades in an unregulated market are manipulative if, "but for" an intent to deceive, a defendant would not have traded at the time and in the amounts that he did, even if he also traded for a legitimate purpose and his trades were expected by market participants.

4. Whether the district court erred by not requiring the jury to find that Phillips had the ability to, and did, create an artificial price where, as here, the allegedly fraudulent device under Section 6(c)(1) of the CEA and Rule 180.1 promulgated thereunder was open market manipulation of an unregulated market.

5. Whether general testimony about how Morgan Stanley and JPMorgan price options and expect counterparties to trade was sufficient to find that

Phillips' alleged scheme would be material to a decision by someone in the position of the option counterparty.

6. Whether, when the judiciary and the executive branches of the U.S. government have widely different views of what foreign conduct Congress intended to cover under Section 2(i), Phillips, a U.K. citizen located in South Africa, had fair notice of how the statute would be applied, as due process requires.

## STATEMENT OF THE CASE

### A.  Procedural History

On March 3, 2022, Neil Phillips was charged in a four-count indictment with commodities fraud, wire fraud, and conspiracies to commit the same. The Indictment alleged a scheme in which Phillips manipulated the FX spot market, where global currency is bought and sold, to send a false price signal to an option counterparty in order to fraudulently trigger a $20 million payout to his hedge fund, Glen Point Capital LLP ("Glen Point") and a client fund, Quantum Partners LP ("Quantum"). Rather than attempt to extradite Phillips from the U.K., where he is a citizen, the government kept the Indictment sealed for almost six until Phillips traveled to Spain on a family vacation, where he was arrested, detained for a month, and ultimately extradited to the U.S.

Phillips moved to dismiss. A.49. As relevant here, he argued that the commodities fraud counts alleged an impermissible extraterritorial application of the CEA and did not allege that Phillips caused an artificial price. He also argued the Indictment violated the Due Process Clause's fair-notice requirement. The motion was denied "without prejudice subject to [Phillips] making a Rule 29 motion for judgment of acquittal." SPA.1.

The court set trial for October 16, 2023. Three weeks before trial, the government informed the court that it would not proceed on the wire fraud counts because "the jury and the Court may well find" Phillips not guilty. A.228-29.

## B.     Factual Background

Phillips was the co-founder and co-Chief Investment Officer of Glen Point, a U.K.-based hedge fund. A.749, A.994, A.1056. Glen Point focused on macroeconomic trends and made directional trades based on events within its areas of expertise. A.680-81, A.2860. One such geography was South Africa, where Phillips was born, raised, and maintained a home. A.680-83, A.812-13.

### 1.     Glen Point Established a South Africa Position

In July 2017, Glen Point established a position in the FX market tied to the African National Congress ("ANC") leadership election later that year. A.2487-89. As South Africa's dominant political party, the ANC election would effectively determine the country's next president. A.778. Phillips believed the reform

candidate, Cyril Ramaphosa, would oust the incumbent, Jacob Zuma. A.2489, A.813-14.

Glen Point's position anticipated that a Ramaphosa victory would strengthen the South African rand against the U.S. dollar—meaning that the USD/ZAR exchange rate would decrease. Phillips predicted the USD/ZAR, then trading over 14.00, would drop as low as 12.00 if Ramaphosa won. A.2542, A.2532, A.788-89, A.813.

Phillips structured his position primarily through a series of derivatives called one touch options. A one touch option triggers and the holder receives a payout when an exchange rate touches a specified level (the "barrier") before its expiration date, however briefly. A.650-51, A.1078. Beginning in July 2017, Glen Point purchased several USD/ZAR one touch options with different barrier levels, payouts, and expiration dates. A.2842.

On October 30, 2017, Glen Point purchased the one touch option central to this case (the "Option"), through J.B. Drax Honoré ("J.B. Drax"), a U.K.-based broker. A.2808, A.2812-22, A.675. J.B. Drax found a seller in Morgan Stanley & Co. International PLC ("MS International"), also a U.K. entity, and brokered the transaction. A.649-57, A.2808, A.2810-22, A.988-89. J.B. Drax's intermediary function permits option counterparties to remain anonymous from one another. A.667-68. Glen Point paid approximately $2 million for the Option, which had a

barrier of 12.50, an expiration date of January 2, 2018, and a payout of $20 million. A.2808, A.2816-17, A.649. When Glen Point purchased the Option, the USD/ZAR rate was 14.08. A.2808.

The Option consisted of several contractual relationships. First, Glen Point and Quantum each entered into a contract with the U.K. branch of J.P. Morgan Chase Bank, N.A. ("JPMorgan"), Glen Point's prime broker. The contracts stated that "[t]he Office of JPMorgan for this Transaction is London." A.2826, A.2833. As prime broker, JPMorgan processed trade confirmation and settlement. A.1027-28.

Separately, MS International contracted with J.B. Drax, using Royal Bank of Scotland ("RBS") as its prime broker. A.2826-40. That contract provided that MS International's office for the transaction was London. A.2836-37. JPMorgan then executed an offsetting option with RBS and served as intermediary between Glen Point and RBS. A.1032, A.2157-60.

MS International's contract disclosed that, as the option seller, it may increase trading in the underlying asset "as market prices approach the barrier price." A.2838. The disclosure explained that this activity related to hedging practices and "may affect the likelihood of [an option triggering]." A.2826, A.2833. In other words, Morgan Stanley explained that it might trade USD/ZAR in a way that moved the exchange rate and affected the likelihood of a payout. JPMorgan's contracts made similar disclosures. A.2826, A.2833.

10

As a general matter for Morgan Stanley's options business, MS International typically executed an internal, offsetting transaction with a U.S.-based Morgan Stanley entity, Morgan Stanley Capital Services LLC ("MS Capital"), for "risk manag[ing] [its] options business." A.988-90. This took the form of a "back-to-back trade [that] would involve [MS Capital] buying exactly the same contract, and then a different Morgan Stanley legal entity selling this contract to a client." A.989. In such cases, the risk on the option "reside[d] on a different legal entity" than the one that sold the option. A.989.

### 2. Phillips Exchanged Delta on Options

An option's delta refers to its exposure to changes in the underlying asset. A.782-84. Delta changes in response to several variables, including price of the underlying asset and time to an option's expiry. A.664. When a one touch option triggers, its delta disappears. A.722-23.

Most one touch options are unwound before they either trigger or expire. A.966-68, A.1306-07. In those circumstances, the parties routinely exchange delta to replace the exposure to the underlying asset that they held. A.682. If an option triggers and its delta disappears, a trader can replace lost delta by trading in the underlying asset—here, by buying rand in the FX spot market. A.683-85.

11

### 3. Phillips Monitored Delta

Phillips closely monitored the delta on his options through daily risk reports. A.1065, A.1126-27. Glen Point also routinely generated customized risk reports that included only the delta for certain options, typically those with barrier levels in striking distance or close to expiry. A.780-82, A.1089, A.1124-26. Consistent with that practice, as the South African election neared, Phillips received customized intraday risk reports with only the delta for certain USD/ZAR options. A.2587-90, A.2606, A.2847-57.

### 4. Phillips Rejected an $11 Million Profit on the Option

On December 18, Morgan Stanley offered to unwind the Option for $13.1 million, with delta exchange. A.694-95, A.697-98, A.2546-49. At that point, USD/ZAR was approximately 12.825. A.694-95. Had Phillips accepted the offer, Glen Point would have made an $11 million profit on the Option it purchased for about $2 million. Phillips rejected the offer. A.701-03, A.2546-49.

### 5. Ramaphosa Won the Election, but the Results Were Uncertain

On December 18, Ramaphosa won the leadership race, but the election returned a split between Ramaphosa and Zuma allies for the top six ANC positions. A.2635-38, A.2518-20. The rand appreciated, and USD/ZAR dropped from roughly 13.25 to 12.52. A.2859-63, A. 2518-20. However, the results immediately became clouded in uncertainty over vote counting and whether and when Zuma would cede

power. A.2635-38, A.2651-52, A.815, A.1118-20; *see also* A.2518-20 (noting the concerns over vote counting and allocation of top 6 positions").

The next morning, Phillips—while in South Africa—profitably sold four USD/ZAR options: a one touch option with three digital options.[1] A.791-92, A.2769-70, A.2843. Phillips also purchased approximately $1.5 billion in new USD/ZAR options. These new positions reduced his portfolio's risk while maintaining its existing exposure to the rand. A.790-92, A.1667-69, A.2671-2724, A.2768-69, A.2843.

### 6. Phillips Continued to Monitor the Election

During the following week, Phillips monitored election-related events, including a report that, per "[c]hurch insiders," the "Anglican Church Archbishop [of Cape Town] [was] expected to exert pressure on Ramaphosa to force Zuma out" in his Christmas sermon, which was broadcast nationwide. A.2521-24, A.2562-66.[2] Further, a Christmas Eve news report indicated a potential "conflict-free exit" for Zuma. A.1120-21, A.2559-60.

These developments were "very positive news" for Glen Point's position, and appreciation of the rand appeared imminent. A.817, A.2550-53, A.2725-27 (noting

---

[1] Digital options payout if the rate is below the strike price on the date of expiry. A.644, A.790-91, A.1269.

[2] David Coratti, a Glen Point trader, testified that "[Phillips] would have been very focused on" this news in managing Glen Point's risk. A.1121.

13

the weekend's "good news" portending "zumexit [i.e. Zuma's exit]"), A.803-84, A.816-17.[3] On Friday, December 22, Phillips received the last end-of-day risk report he received prior to the trading at issue. That report listed the Option's delta as $759 million. A.2848, A.1127-29.

### 7. Phillips Bought $625 Million in Rand Before the Option Triggered

There was almost no trading over the holiday weekend. A.2935 (showing only $11 million traded between December 23 and 25 on Refinitiv trading platform). Indeed, exchange rate remained essentially static from its Friday close of 12.60 to when the Asia market opened on December 26 at 12.62. A.2844. When markets opened that day, Phillips, still in South Africa, started trading. A.1122-23, A.2782.[4]

In an 18-participant Bloomberg chat (the "Boxing Day Chat"), Phillips gave trading directions to a Nomura salesperson in Singapore to buy rand (*i.e.*, sell USD/ZAR). That salesperson passed those directions to an unknown Nomura trader, also in Singapore, who executed trades on Glen Point's behalf. A.858, A.918.[5]

---

[3] *See also* A.817 (Glen Point analyst Nicholas Croix testimony that Zuma's ouster "was very significant to Glen Point's bet on the rand").

[4] December 26 was Boxing Day, a holiday in London and South Africa. Those markets were closed; the U.S. and other markets remained open. A.801.

[5] Phillips used Nomura's trading desk because hedge funds like Glen Point did not have direct access to (and could not see) the FX spot market order book. A.1338-39. The Nomura trader who placed the trades divided the orders into many separate transactions as small as $1 million. A.858, A.1601-05.

At 6:49 AM in Singapore, Phillips asked if his primary Nomura contact was available; he was not. A.860, A.2782. The covering salesperson, Rahul Kamath, offered to assist. Phillips directed Kamath to buy $25 million rand by "giving bids." A.2782. A "bid" is the price at which a buyer is willing to pay. A.1086, A.1319. Phillips' instruction to "giv[e] bids" is a common trading method that allows a trader to transact quickly by selling to existing bids in an order book. A.898, A.1080, A.1085-86. Kamath stated, "liquidity [was] very thin" and that "[w]e will have to [trade] very slowly to minimize impact," but Phillips disagreed and told Kamath that he would "find liquidity." A.2782.

Generally, the more liquidity there is, the less a market moves in response to trading activity, and vice-versa. A.821. One predicter of liquidity relates to price points called "technical levels." For USD/ZAR, 12.50 was a technical level at which market participants would expect to find liquidity. A.710-11, A.819-20, A.1115-16, A.1929-30, A.2570. The existence of liquidity around a technical level was "very likely" and "entirely predictable" to experienced traders. A.820-21, A.1115, A.1359-60, A.1631. Market participants also watched technical levels because of another common market dynamic: price-gapping. A.820-21. This refers to when a rate drops rapidly, or "gaps down," from one technical level to the next, due to lower liquidity between them. A.820-21; *see also* A.1631-32, A.2570.

As Phillips predicted, there was liquidity right above 12.50, including several $200 million, $150 million, and $100 million bids. A.1318-19, A.2845. Those bids were placed by Morgan Stanley, Glen Point's counterparty to the Option. A.1614-17, A.2575, A.2845. During the approximately one-hour period during which Phillips traded on Boxing Day, Morgan Stanley, consistent with its disclosure regarding its hedging requirements, *supra*, *sold* over $550 million of rand, about $300 million of it from Phillips (via Nomura), A.2572-73, and *added* over $1 billion in USD/ZAR bids at and above the 12.50 barrier, A.2574-75. Further, after selling hundreds of millions of rand just above the 12.50 barrier, Morgan Stanley cancelled almost all its remaining bids at and above the 12.50 barrier (about $800 million) eleven seconds *after* the Option triggered. A.1614-17, A.2574-76.

Against this backdrop, Phillips, "who [was] experienced in this market," A.820-21, directed Kamath to buy the $25 million by hitting existing bids. A.2782-83. Phillips asked if he can "do a reasonable size [ticket]," and Kamath replies that "liquidity was better than [I] expected, [I] think we can get more done if you need." A.2783-84. He explains that "if we stick with same pace as first 25 it should be ok," and Phillips responds, "[nothing] more right now then." A.2784.

Minutes later, Phillips directed Kamath to buy another $50 million rand, saying his "aim[ ]is to trade thru 50." A.2785. To "trade through" in this context means to trade through a technical or market level—that is, to continue trading until

the rate has passed through that level. A.1081-82. After Kamath reported having bought $45 million, Phillips directed him to buy another $50 million and reiterated his stated "aim." A.2785 ("Need to get it thru 50. Now. 4990.").

On the second order, Kamath reported that "it's very well bid here," and "we are hitting all bids." A.2785. Phillips inquired about the liquidity around the 12.50 technical level; Kamath said there would be "much more depth on the bid" closer to 12.50. A.3150. Phillips then directed Kamath to buy "Up[ ]to 200" million rand. A.2786. Kamath subsequently reported that "there was a large amount on the bid at 12.5200" that was "not budging." A.2787. Almost all of those bids were placed by Morgan Stanley. A.1613-15, A.2574-2181.

Phillips then asked what the lowest price was at which USD/ZAR had traded; Kamath indicated the low was 12.5075. A.2787. Phillips directed Kamath to buy another $100 million and "[g]et it thru." A.2787. Kamath reported that 12.5050 was the new bidding level and speculated that there would be about $100 million in bids there. A.2787. Phillips predicted (correctly) that "[t]here will be more[]all the way down." A.2787.

With Phillips total trading on the day at $425 million, the low rate was 12.5050. Phillips then asked, "How much more u think to break 50[?]"; Kamath responded, "at least another [$200 million]." A.2788. In response, Phillips instructed Kamath to buy only $100 million. A.2788.

17

One minute later, with $515 million rand purchased, Phillips again asked for the low; Kamath responded 12.5025. A.2788. Phillips instructed Kamath to buy another $100 million. A.2788. A few minutes later, Kamath reported that the bid-ask spread was "5022/50"—meaning that there were offers to buy at 12.5022 and to sell at 12.5000. A.2788-89.

Seconds later, at 7:42 AM in Singapore, Kamath wrote that the rate was "bid at the figure now [and] we just sold 10 there." A.2789; *see also* A.916, A.1603 ("the figure would mean … that the price is 12.5000"). That is, Phillips bought $10 million USD/ZAR at 12.5000 and the Option triggered. Phillips asked again: "So [12.50] [l]ow?" Kamath confirmed: "low print has been 12.5000 [and] we gave 10 there but reuters not showing that yet." A.2789.

### 8. Phillips Bought $100 Million of Rand After the Option Triggered

After the Option triggered, Phillips directed Kamath to buy another $100 million rand. *Id.* Phillips said, "Try get it thru now," and Kamath replied that he would update him once they sold "below the figure." A.2789-90. About one minute later, Kamath wrote "we just [bought] at 4990." A.2790. Phillips requested "pro[o]f of the print" and instructed Kamath to stop. A.2790. Phillips' additional $100 million purchase on the Option, which had already triggered. But it increased the delta he had acquired through spot trades (the "Boxing Day Trades") to $725 million. A.2850, A.725, A.1311, A.1356-57.

### 9. USD/ZAR Remained Below 12.50 for Several Months

On December 27, when the London market opened, the USD/ZAR exchange rate dropped near the 12.25 technical level—a 2 percent drop. A.2846. It stayed around that level for the next five months. A.1222-23, A.1330, A.2846. Glen Point's December 2017 investor letter, signed by Phillips, noted the "idiosyncratic political news in South Africa" and "media reports" that drove the fund's performance that month, highlighting the election result uncertainty and the impact of media reports about Zuma's exit. A.2492.

### 10. Phillips Unwound Most of the USD/ZAR Spot Position for a $14 Million Profit

Phillips held the $725 million of rand he purchased for two days, during an "extremely volatile" period. A.1129-30; *see also* A.695-96. On December 28, Phillips sold most of his spot position, resulting in an approximately $14 million profit. A.1620, A.2577. Phillips' sale of rand, effectively buying back dollars, reduced Glen Point's exposure to South Africa and was consistent with Glen Point's "normal practice" of buying back dollars across multiple currencies at year-end "to take risk off, "close off some positions to derisk" and "have less volatility" A.1130; *see also* A.2491-94; A.2858.

### C. The Trial

The six-day trial commenced on October 16, 2023. The government called fourteen witnesses:

- David Coratti and Nicholas Croix, former Glen Point employees. Neither witness had any involvement in the Boxing Day Trades. A.802, A.1078. They testified regarding their understanding of the South Africa position and about Glen Point's risk management practices. A.803-04, A.811-17, A.1110-13, A.1116-21.

- Srinivasan Iyer, a former salesperson at Nomura. Iyer had no involvement with the Option or the Boxing Day Trades. A.860-61. Nonetheless, Iyer testified regarding the meaning of certain terms Phillips used when placing orders on Boxing Day. A.874-908, A.916.

- Samer Oweida, the current global head of FX and emerging markets at Morgan Stanley. Oweida was not involved with the Option or Boxing Day Trades. He testified that, in general, Morgan Stanley does not expect a counterparty to trade with intent to trigger an option, and said it would be important to know because Morgan Stanley does not "price in" that intent when it sells an option. A.976-77.

- Maria Silveira, the chief compliance officer for swap dealers at JPMorgan, which served as Glen Point's prime broker. A.1032. Silvera had no involvement in that relationship, the Option, or the Boxing Day Trades. She testified regarding the flow of payments relating to the Option. A.1027-42.

- Krista Santoro, the North America head of currencies and emerging markets compliance at JPMorgan. A.1366. She, too, was not involved with any fact in this case. She testified that in general, knowledge of a counterparty's trading designed to trigger a barrier "could" affect JPMorgan's willingness to pay a settlement amount as prime broker and would be an "important factor." A.1368-69.

- An FBI agent who introduced demonstrative timelines. A.1807-08. The agent did not know the significance of the words on the timelines, who the individuals were who were referenced in them, what country's election he was testifying about, what the acronym in the timeline's title meant, why words were omitted

20

from quotes in the timeline, or whether those omissions were intentional, misleading, or both. A.1832-83.

- An FBI analyst who introduced transcripts. A.727-45.

- An engineer from Bloomberg, who testified that all Bloomberg messages sent from anywhere in the world at some point get replicated on servers in the United States. A.852-54.

- Representatives of the trading platforms Refinitiv and Fastmatch, both of whom testified about the locations of servers. A.457-74.

- A National Futures Association ("NFA") employee, who testified about NFA requirements and Phillips' NFA registration. A.1792-1805.

- Richard Lyons, an expert witness on the FX market, who testified about the mechanics of the FX spot market and the Boxing Day Trades. A.1152-1246, A.1262-84. Lyons testified that the Boxing Day Trades were consistent with an effort to lower the USD/ZAR rate.

- Graeme Henderson, a salesperson at J.B. Drax who brokered the Option. A.636. He testified about his firm's role as an intermediary. A.659-70.

As discernible from the descriptions above, only one witness, Henderson, had any involvement with the Option. None had any involvement with the Boxing Day Trades.

At the close of the Government's case, Phillips moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). The court reserved decision. A.1902-03.

21

Phillips called one witness, Andrew Newman, an expert on FX markets. Newman testified that Phillips' conduct was consistent with a strategy to replace the delta he would lose when the Option triggered. A.1597, A.1631-33.

On October 25, 2023, the jury returned a verdict acquitting Phillips of conspiracy to commit commodities fraud and finding him guilty of commodities fraud. A.481.

### D.     The Disputed Jury Instructions

Before trial, Phillips requested a charge conference to clarify how the instructions on extraterritoriality, intent, and manipulation. The court granted that request. A.9, A.359 (noting that "[t]here are reasonable arguments that both sides have made with respect to the charges," and "a number of the issues are [neither] easy issues," nor "issues that have been resolved by charges in previous cases or by Second Circuit law"), A.230, A.280; *see also* SPA.68, SPA.79.

On intent, Phillips argued that the government had to prove that Phillips "traded solely to affect the USD/ZAR exchange rate, and not for any investment purpose." A.302, A.333-34. The government argued that "a defendant forms the requisite intent if the intent to commit the crime was *any* of his objectives." A.322.

On extraterritoriality, Phillips argued that, under Section 2(i) of the CEA, foreign swap-related activities do not have a direct and significant connection with activities in, or effect on, U.S. commerce "unless they pose a systemic risk to the

United States financial system." A.304-06, A.341-42. The government proposed that "conduct that causes people or entities in the United States to make payment pursuant to a swap has a direct and significant effect on, or connection with, commerce in the United States." A.259-60.

On manipulation, Phillips argued that the government must prove, in addition to intent, the traditional requirements of price manipulation, including artificial price. A.292-93, A.351-53. The government argued that scienter alone was sufficient. A.314-15.

Before jury selection, the district court issued a draft jury charge that rejected Phillips' request for instructions on sole intent and artificial price and left a placeholder for extraterritoriality. A.2354-55, A.2369-79. The court explained that it was "still working through the issues on that" first-of-its-kind instruction. A.551; *see also* A.518 (describing the Section 2(i) instruction as "a challenging issue … that is potentially [] dispositive"). After the jury was empaneled, the court held another conference focused on the other disputed instructions and noted that the parties "have all made [their] objections." A.582-85

On Saturday, October 21, after the government rested, the court issued a revised charge that included an extraterritoriality instruction, entitled "Relationship to the United States." A.2419-21. That instruction omitted the systemic-risk

requirement requested by Phillips as to Section 2(i)'s "connection," but included it as an example of a "significant" effect. *Compare* A.304-06 *with* A.2419-21.

On October 23, the government indicated it would not "argue to the jury that there was a direct and significant effect in [its] summation." A.1748. Phillips thus consented to striking the "effects" prong of that instruction, and the court removed it.

On intent, the court rejected Phillips' proposed instruction requiring proof of sole intent and instead instructed that Phillips' trades were manipulative if, "but for an intent to deceive," he would not have made them at the time and in the amounts he did. A.1551-52. The court also declined to include an instruction that the government must prove that Phillips created an artificial price. A.1549.

### E.    Post-Trial Motions and Sentencing

On December 8, 2023, Phillips renewed his Rule 29 motion and alternatively sought a new trial pursuant to Rule 33(a). A.1951, A.2111. The court denied those motions. SPA.35. Regarding extraterritoriality, the court found that there was insufficient evidence from which a rational jury could have found a domestic application of the CEA, and that almost all of the government's attempts to satisfy Section 2(i) failed. But the court held that the jury could have found a direct and significant connection because Phillips sent a false signal that triggered legal obligations by U.S. entities, MS Capital and JPMorgan. SPA.72-78.

On June 26, 2024, Phillips was sentenced to time served (accounting for his month in a Spanish prison under extremely harsh conditions), two years of supervised release, and a $1 million fine.

## SUMMARY OF THE ARGUMENT

**I.** The jury could have convicted Phillips only if it found that his foreign swap activities had a "direct and significant connection with activities in … commerce of the United States." 7 U.S.C. § 2(i)(1). The district court's instruction, however, misstated the government's burden for making this showing in two critical ways. *First*, the instruction omitted that a "significant" connection to activities in U.S. commerce is only one that can pose a systemic risk to the U.S. financial system. *Second*, it required the jury to determine whether the connection was significant by looking to its relationship to the foreign swap activities themselves, as opposed to its relationship to activities in U.S. commerce. These errors resulted in an instruction that misstated Section 2(i)'s requirements, was incompatible with its legislative purpose, and would bring a wide swath of entirely foreign conduct within the U.S. government's grasp, including (as was the case here) isolated conduct that poses little to no risk to anyone.

**II.** Even if the jury was properly instructed on Section 2(i), no reasonable jury could have found a "direct and significant" connection to activities in U.S. commerce. In holding otherwise, the district court relied exclusively on evidence

that a "false price signal" was received by MS Capital and JPMorgan in the United States. SPA.72-78. That signal was neither direct nor significant under the court's instruction. And the district court's reliance on the existence of *entities* located in the U.S. as opposed to *conduct* in the U.S. was a category mistake: Section 2(i) focuses on the former, not the latter.

**III.** The district court's "but for" intent instruction erred in two respects. First, it improperly imported a causation standard that invited the jury to presuppose manipulative intent and then determine whether it was a "but for" cause of the trades. Second, by instructing the jury to determine whether the "timing" and "amounts" of Phillips' trades would have been the same but for an intent to move the exchange rate, it improperly elevated two characteristics of Phillips' conduct above others and, in so doing, risked criminalizing widely accepted trading practices designed to conceal the true nature of supply and demand from the market. The district court should have required the government to prove that Phillips' sole intent was to move the exchange rate. Its failure to do so was error.

**IV.** The government should have been required to prove that Phillips' trading created an artificial price. Where an alleged scheme to defraud under Section 6(c)(1) of the CEA is price manipulation, the government should be required to prove the traditional elements of price manipulation, including artificial price. This is

26

particularly true where, as here, the trading occurred in an unregulated market and could not, on its own, be criminal.

**V.** No reasonable jury could have found that the scheme was material to a decision by a counterparty in the position of Morgan Stanley. The general testimony of Morgan Stanley and JPMorgan employees who had no involvement in or knowledge of the underlying transaction boiled down to the proposition that those financial institutions do not expect their option counterparties to violate the law. But it did not support the conclusion that Glen Point's execution of expected trades around the barrier in connection with a one-off $20 million swap would be material to any option counterparty in the position of Morgan Stanley and JPMorgan *in this case*.

**VI.** Finally, the Indictment and conviction violated Phillips' due process right to fair notice. Due process "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). This case involved multiple novel applications of statutes, most notably with regard to extraterritoriality. If two branches of the U.S. government can have such fundamental disagreements about what the third branch intended to do, as was the case here with respect to Section 2(i), a U.K. citizen in South Africa cannot be said to have had fair notice that his one hour of trades in an unregulated market six years

27

ago could bring him into a U.S. courtroom under a never-before tested application of the CEA. If fair notice means anything, it is more than that.

## STANDARD OF REVIEW

This Court reviews de novo challenges to jury instructions, *United States v. Applins*, 637 F.3d 59, 72 (2d Cir. 2011), sufficiency of the evidence, *United States v. Desposito*, 704 F.3d 221, 226 (2d Cir. 2013), questions of statutory interpretation, *United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016), and the determination of whether Phillips' due process rights were violated, *United States v. Ramos*, 401 F.3d 111, 115 (2d Cir. 2005). In challenging the sufficiency of the evidence, the evidence must be viewed "in the light most favorable to the government." *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021).

## ARGUMENT

### I. THE DISTRICT COURT IMPROPERLY CHARGED THE JURY REGARDING SECTION (2)(I)

The district court's instruction on Section 2(i) misstated the meaning of a "significant" connection in two ways. *First*, it omitted that a "significant" connection to activities in U.S. commerce is only one that can pose a systemic risk to the U.S. financial system. *Second*, it failed to require the jury to determine whether the connection was significant by looking solely to its relationship to activities in U.S. commerce. These errors were highlighted by the court's application of the statute. In denying Phillips' motion for acquittal, the court found a sufficient connection

28

under Section 2(i) because U.S. entities were the "victim" and the broker. SPA.77. This too was error: Section 2(i) is narrowly focused on conduct—not the identity of the entities who engage in that conduct or who feel its downstream effects.

### A.     Applicable Law

#### 1.     The Presumption Against Extraterritoriality Limits the Application of U.S. Law to Foreign Conduct

It is axiomatic that "foreign conduct is generally the domain of foreign law." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023). Courts, therefore, typically refrain from applying U.S. law "to conduct in the territory of another sovereign." *Id.* This "presumption against extraterritoriality" is a canon of statutory construction that (1) "serves to avoid the international discord that can result when U.S. law is applied" to foreign conduct, and (2) reflects the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Id.*

Congress can express a contrary intent. That situation arises when Congress has "affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct." *Id.* at 417-18 (cleaned up). But even "when a statute provides for some extraterritorial application," the presumption plays an important role by "limit[ing] that provision to its terms." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010). In those circumstances, actions targeting foreign conduct may proceed, "subject to 'the limits Congress has (or has not) imposed on the

statute's foreign application.'" *Abitron Austria*, 600 U.S. at 418. And "courts must find clear and independent textual support—rather than relying on mere inference— to justify the nature and extent of each statutory application abroad." *Keller Found./Case Found. v. Tracy*, 696 F.3d 835, 845 (9th Cir. 2012). Thus, even when it is clear from the text of a statute that it is intended to have some extraterritorial application, ambiguity about the extent of that application must be resolved in favor of less extraterritoriality, not more.

### 2. Section 2(i)'s Extraterritoriality Provision Applies to Foreign Conduct in Narrow Circumstances

Section 2(i) contains an express extraterritorial provision. It provides that certain parts of the CEA relating to swaps "shall not apply to activities outside the United States unless those activities have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1). Section 2(i) thus allows for two distinct applications—when foreign swap activities have either "a direct and significant connection with activities in," or "a direct and significant … effect on, commerce of the United States." The Government abandoned reliance on the latter below. A.1748. This appeal thus turns on the scope of the former.

"Every exercise in statutory construction must begin with the words of the text." *New York Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 216 (2d Cir. 2021). Moreover, the "canon against surplusage" requires "courts to 'give

effect, if possible, to every clause and word of a statute.'" *Panjiva, Inc. v. United States Customs & Border Prot.*, 975 F.3d 171, 178 (2d Cir. 2020). In conducting this exercise, courts do not consider the words of the text in isolation. *See Id.* Instead, a word's meaning will turn on the "text, structure, context, history, and purpose of [the] statutory provision[]." *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 279 n.4 (2024).

Properly understood, the terms "direct" and "significant" in Section 2(i) play important gatekeeping roles. First, they prevent the provision from reaching foreign conduct that has any kind of connection with activities in, or effect on, U.S. commerce. Second, because "direct" and "significant" are distinct terms linked by "and," they have distinct meanings and carry distinct requirements, each of which must be met for the statute to apply. Finally, the meanings of the two terms must be the same whether they modify "connection" or "effect"—nothing in Section 2(i)'s sentence structure indicates that the meaning of either "direct" or "significant" changes based on the noun it modifies. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should normally be given the same meaning.").

Against this backdrop, the extent of Section 2(i)'s extraterritorial reach depends on the meaning of "direct" and "significant." And here, the district court

erred in its interpretation of "significant." The correct interpretation places Phillips' conduct beyond Section 2(i)'s grasp.

### B. The Meaning of "Significant" Refers to the Risk Posed to the U.S. Financial System

Congress did not define "significant" in Section 2(i). Dictionary definitions provide some guidance, capturing the commonsense understanding that for something to be "significant" it must be "[o]f special importance; momentous, as distinguished from insignificant." *Significant*, Black's Law Dictionary (10th ed. 2014); *see also Significant*, American Heritage Dictionary (5th ed. 2022) (defined as "[h]aving or likely to have a major effect; important"). But these definitions do not shed light on what "momentous," or "major" means in this context *or to whom*. Accordingly, the answer must come from Section 2(i)'s "structure, context, history, and purpose." *Truck*, 602 U.S. 268, 279 n.4; *accord Kerson v. Vermont L. Sch., Inc.*, 79 F.4th 257, 265 (2d Cir. 2023) (consulting these interpretive tools when terms are "ambiguous or unclear"). As discussed below, those sources make clear that "significant" is measured by the level of risk the foreign conduct poses to the U.S. financial system as a whole.

Section 2(i) was a product of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), a sweeping financial regulation passed in response to the 2008 financial crisis to mitigate banking risks that threatened the American economy. *See Commodity Futures*

*Trading Comm'n v. Gorman*, No. 21 Civ. 870, 2023 WL 2632111, at *9 n.9 (S.D.N.Y. Mar. 24, 2023) ("*Gorman II*") (noting that this provision addresses risks posed by "foreign affiliates of U.S. institutions engag[ing] in risky swap trades that 'result[ed] in or contribute[d] to substantial losses to U.S. persons and threaten[ed] the financial stability of the entire financial U.S. system'"). Dodd-Frank's focus on lessening *systemic* threats is apparent from its stated goals: "To promote the financial stability of the United States by improving accountability and transparency in the financial system," "to protect consumers from abusive financial services practices," and "to protect the American taxpayer by ending bailouts." 124 Stat. 1376; *accord* Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, 85 Fed. Reg. 56924, 56925 (Sept. 14, 2020) (recognizing that Dodd-Frank's purpose was to "reduce systemic risk," "increase transparency," and "promote market integrity within the financial system").[6]

Consistent with this focus on systemic risk, Dodd-Frank implemented a new framework to oversee the previously unregulated swaps market, but exempted swaps

---

[6] Dodd-Frank's legislative history only reinforces this understanding. *See, e.g.*, 156 Cong. Rec. S5818 (July 14, 2010) (statement of Sen. Lincoln) ("In 2008, our Nation's economy was on the brink of collapse. America was being held captive by a financial system that was so interconnected, so large, and so irresponsible that our economy and our way of life were about to be destroyed.").

dealers with only "de minimis" activities. 7 U.S.C. § 1a(33)(A)(i).[7] To the extent that market participants do not qualify as swaps dealers, they can be subject to regulation as "major swap participants" if they maintain a "substantial position" of certain swaps. 7 U.S.C. § 1a(33)(A)(i). Congress left it to the CFTC to determine the meaning of "substantial position," but instructed that it should be "the threshold that the Commission determines to be prudent for the effective monitoring, management, and oversight of entities that are *systemically important or can significantly impact the financial system of the United States*." 7 U.S.C. § 1a(33)(B). That threshold is currently between $1 and $6 billion depending on the category of swap and its risk exposure. *See* 17 C.F.R. § 1.3. Market participants can also qualify as "major swap participants" if their "outstanding swaps create substantial counterparty exposure that could have serious adverse effects on the financial stability of the US banking system or financial markets." 7 U.S.C. § 1a (33)(ii).

The context of Dodd-Frank's enactment and its structure both confirm that a "significant" connection under Section 2(i) is one that can pose a systemic risk to the U.S. financial system. *See Gorman II*, 2023 WL 2632111, at *9 n.9. Accordingly, the CFTC has stated that a direct and significant connection under Section 2(i) is one that, "through such connection present[s] the type of risks to the U.S. financial

---

[7] Notably, CFTC regulations provide that de minimis activities are those that involve less "than $8 billion in swap dealing" in the "preceding 12 months." 17 C.F.R. § 1.3.

system and markets that [Dodd-Frank] directed the Commission to address." 85 Fed. Reg. at 56,929-30;[8] *see also* Gary Gensler, CFTC Chairman, Opening Statement: Open Meeting to Consider Cross-Border Guidance and Exemptive Order (July 12, 2013).

Here, "connection" differs from "effect" in that the potential harms resulting from the nature of the risk tied to the connection need not be realized. *Compare Connection*, American Heritage Dictionary (5th ed. 2022) ("a link"), *with Effect*, American Heritage Dictionary (5th ed. 2022) ("a result"). This allows Dodd-Frank's prophylactic measures, such as those accompanying the swap dealer designation discussed above, to reach foreign conduct that can pose the potential to create those harms. *See* 7 U.S.C. §§ 6s(a), 6s(g), 6s(j)(2), 6s(j)(5), 6s(k); *see also, e.g.*, 156 Cong. Rec. S5905 (July 15, 2010) (statement of Sen. Stabenow) (discussing

---

[8] Although the CFTC reached the correct interpretation of "significant" in Section 2(i), it erred by concluding that an "aggregation effects" approach can satisfy this standard. 85 Fed. Reg. at 56,930. This approach contemplates that a single swap could suffice merely because a hypothetical scheme involving an enormous volume of such swaps could have a systemic impact. This would render Section 2(i) meaningless: every individual swap with any connection to the United States would be covered by the CEA, depriving the phrase "direct and significant connection" of meaning. Derived from the Supreme Court's approach to Congress's legislative authority under the Interstate Commerce Clause, *see Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942), the aggregation approach states the outer boundary for Congress to regulate domestic activity without violating the Constitution. It does not state the test for the reach of a particular statute's use of more demanding language, especially in the context of extraterritorial applications of the law.

"interconnectedness" as a distinct concern). But the use of "significant" indicates that the nature of the interconnectedness must still cross the "systemic risk" threshold before it falls within Section 2(i)'s scope.

### C. Section 2(i) Addresses Conduct, Not Entities

Section 2(i)'s limited reach is underscored by the fact that, unlike countless other extraterritorial provisions, it does not cover broad categories of conduct by, or directed at, a given class of persons or entities, but instead covers only certain, narrowly defined conduct. Congress has enacted numerous extraterritorial provisions to reach conduct committed abroad (i) by U.S. persons, *see, e.g.*, 15 U.S.C. § 78dd-2(i)(1) (Foreign Corrupt Practices Act); *see also, e.g.*, 18 U.S.C. §§ 1116(c) (murder), 1201(e) (kidnapping); (ii) that injures U.S. persons, *see, e.g.*, 18 U.S.C. §§ 37(b)(2) (violence committed at airport), 175(a) (use of biological weapons);[9] or (iii) that has an effect on a person engaged in certain conduct in the United States, *see, e.g.*, 15 U.S.C. § 6a.

---

[9] *See also, e.g.*, 18 U.S.C. §§ 32 (offense committed aboard aircraft with U.S. national on board), 38 (related offense), 112 (assault against an "internationally protected person"), 229 (chemical weapons offense), 878 (extortion), 1203 (hostage taking), 2332a (use of weapon of mass destruction), 2332f, (bombing), 2332g (missile-related offense), 2332h (use of radiation weapon), 2332i (nuclear terrorism), 2441 (war crimes); 21 U.S.C. § 960A (pecuniary support for terrorist offense). Most of these provisions also apply when the offender is a U.S. person.

Congress did not take any of those approaches here. Instead, Section 2(i) addresses conduct—not the identity of the entities or individuals who engage in that conduct or feel its effects.

As described below, the district court ultimately found a sufficient connection under Section 2(i) because U.S. entities were the "victim" of the scheme and the broker of the Option. SPA.77. In doing so, the court transformed Section 2(i) into an entirely different provision that extends U.S. criminal jurisdiction to any swap involving a U.S. entity. The district court justified this victim-centered approach by suggesting that Congress must be able to protect U.S. entities from fraud. SPA.78.

That was a category mistake. The question is not whether Congress possesses the constitutional authority to protect U.S. persons and entities from all swap-related harms emanating from conduct abroad, but whether, in enacting Section 2(i)—a provision manifestly designed to protect U.S. markets against certain kinds of systemic risks—Congress in fact went that far. In other words, the question is not whether Congress *could* have reached Phillips' conduct; it is whether Congress *did* reach that conduct in enacting Section 2(i). Plainly, it did not. Congress easily could have used language to establish jurisdiction whenever a U.S. entity is involved in a

foreign swap transaction, whether as a broker or counterparty or anything else. It chose not to.[10]

### D. The District Court Erred in Its Instruction on "Significant"

The district court instructed the jury that "significant," as used in Section 2(i), meant "meaningful or consequential." A.1564. The court explained that the "significant" requirement was satisfied if the "relationship between the activity outside the United States to the commercial activity in the United States" was "of importance" and not "random, fortuitous, attenuated, or merely incidental," and if the U.S. activities were "integral, rather than ancillary." A.1565. But the court's definition of "significant" was mistaken; it disregards Section 2(i)'s text, context, and purpose, introduces absurdities, and fosters extraterritorial overreach.

*First*, the district court erred by failing to instruct the jury on the correct measure of "significant" in this context: that a significant connection under Section 2(i) is one that can pose a systemic threat to the U.S. financial system. For all the reasons set forth above, that instruction was required.

*Second*, the instruction placed the emphasis for answering the question of to whom or what the conduct must be significant in the wrong place. The instruction

---

[10] A proper reading of Section 2(i) does not mean, as the district court suggested, that individuals could defraud U.S. counterparties from abroad with "impunity." SPA.78. It simply means that certain conduct is not covered by the CEA. It says nothing about Congress's power to legislate or whether conduct is covered by other laws in effect.

stated that Section 2(i) applies if the "activities in" U.S. commerce were "integral," and therefore significant, to the foreign swap activities.[11] A.1564. But this has it backwards. The question is not whether the connection was significant to the foreign conduct, but rather whether it was significant to commerce of the United States, as Congress contemplated.

Moreover, the district court's definition of "significant," when used with Section 2(i)'s "effects" prong, would make no sense. Under the district court's formulation, foreign swap activity would have a "significant … effect on" activities in U.S. commerce if the effect was "integral to" to the foreign swap activity itself, rather than that activity being "integral to" its U.S. effect.

Indeed, determining significance by asking whether a connection with U.S. commerce is important or integral to foreign activity, would yield absurd results. For example, it would mean that if a foreign entity buys an option valued at $5, and a U.S. entity holds a $3 liability if the option is triggered, then Section 2(i) could reach the foreign conduct because $3 is integral to a $5 payout. This takes Section 2(i)'s focus entirely away from requiring a certain level of potential harm or risk to the

---

[11] On its face, the district court's instruction does not clearly identify to whom or to what the conduct must be "integral," or even "meaningful or consequential" to satisfy the "significance" requirement. A.1564. But in denying Phillips' Rule 29 motion, the court applied an interpretation of the instruction that placed the emphasis on significance to the foreign conduct. SPA.73.

United States financial system. The nonsensical nature of that result confirms the error of the interpretation that causes it.

This interpretation of Section 2(i) would result in extraterritorial overreach. *See Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 824 (7th Cir. 2015) (Posner, J.) (noting that such overreach "creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs").[12] Foreign countries regulate their financial markets and transactions that occur within their jurisdictions. *See Morrison*, 561 U.S. at 269. And those regulations often differ, even when it comes "to what constitutes fraud." *Id.* Interpreting Section 2(i) to apply under the standard adopted by the district court will lead to "U.S. judicial interference in [regulatory] decisions" that "risks damaging the mutual respect that comity is meant to protect and could be perceived as an attempt to impose American economic, social and judicial values." Brief of the U.K. of Great Britain and Northern Ireland as Amicus Curiae Supporting Respondents at 25-26, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). That concern is heightened in the context of the FX spot market, which, even after Dodd-

---

[12] The U.K. has rejected U.S. efforts to extradite U.K. citizens for conduct that largely took place and affected people or entities in the U.K. *See Scott v. U.S.A.* [2018] EWHC 2021 (Admin) [23] (Eng.) (citing *Love v. U.S.A.* [2018] EWHC 172 (Admin) [22] (Eng.)). The United States prevented the U.K. from having that opportunity here, keeping the indictment sealed for almost six months until Phillips left the U.K. for Spain.

Frank, Congress left unregulated. 7 U.S.C. § 2(c)(1)(A). These considerations further counsel against the district court's interpretation.

### E.    The Erroneous Instruction Affected Phillips' Substantial Rights

A jury instruction is "erroneous 'if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017). For the reasons set forth above, the Section 2(i) instruction was erroneous. That error was not harmless. An erroneous instruction is harmless "only if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *Silver*, 864 F.3d at 119. On this, the government bears the burden of demonstrating that the jury would have convicted Phillips under the standard for extraterritoriality contained in Section 2(i), had it been instructed properly. *Id.* The government could not make this showing because Phillips' conduct, and its connection to activities in U.S. commerce, could not pose a systemic risk to the U.S. financial system. Indeed, it did not even pose a risk to Morgan Stanley, the purported victim.

Morgan Stanley's U.K. entity's $20 million liability on the Option could not, as a matter of law, constitute a potential systemic risk, especially considering that swap dealers do not incur certain of Dodd-Frank's regulatory requirements generally until their qualifying swap activities reach into the billions, with swap activities below that threshold characterized as "de minimis." *See supra* at 34. Moreover,

Morgan Stanley fully hedged against any potential losses through its own Boxing Day trading in the spot market. A.1601-08. Unsurprisingly, Morgan Stanley has never identified any losses suffered and declined restitution after trial. A.2306, A.2329, A.2345. In short, the $20 million payout, and any risk associated with it, was not significant to Morgan Stanley, let alone the U.S. financial system. A.973, A.987. Similarly, JPMorgan, Glen Point's prime broker, had no real exposure at all, as it served only as an intermediary between the counterparties. A.1031-32, A.2864-67.[13] Because the government cannot show that the jury would have convicted Phillips under the correct Section 2(i) instruction, the Court should vacate the verdict.

## II. EVEN IF THE SECTION 2(I) INSTRUCTION WAS NOT ERROR, THERE WAS INSUFFICIENT EVIDENCE OF A "DIRECT AND SIGNIFICANT" CONNECTION TO ACTIVITIES IN U.S. COMMERCE

In denying Phillips' Rule 29 motion, the district court found one fact sufficient to satisfy Section 2(i): a false price signal which the court ruled created a direct and

---

[13] As is standard industry practice, JPMorgan held sufficient collateral from Glen Point to cover any payment dispute. *See* A.2753-54 (providing that JPMorgan held a "security interest" it could exercise in the event that Glen Point defaulted under certain obligations to its prime broker); *see also* Lloyd Dixon et al., Hedge Funds and the Financial Crisis of 2007–2008, in *Hedge Funds and Systemic Risk*, Rand Corporation (2012) at 43, http://www.jstor.org/stable/10.7249/j.ctt1q60xr.12 (noting that hedge fund losses during the financial crises did not appear to lead to significant losses at prime brokers because "[i]t appears that prime brokers … required adequate margin and collateral to protect themselves against hedge fund losses").

significant connection between Phillips' conduct and (1) "JPMorgan, as [Phillips'] prime broker and formal counterparty," and (2) "[MS] Capital, as the substantive counterparty to the [Option]." SPA.72. This holding was error. Neither connection could satisfy either the "direct" or "significant" requirement, let alone both.

## A.    The "Direct and Significant" Instruction

The district court instructed the jury that Phillips' foreign activity satisfied Section 2(i)'s "significant" connection requirement if its connection to activities in U.S. commerce was "meaningful or consequential," "of importance," not "random, fortuitous, attenuated, or merely incidental," and "integral, rather than ancillary." A.1564-65.

With regard to a "direct" connection, the instruction said that Phillips' foreign activity satisfied that requirement if it "directly and immediately affected activity in commerce of the United States, without deviation or interruption," as opposed to being "indirect or attenuated." A.1564. The instruction stated that "direct" meant "immediate." A.1564.

## B.    The Connections to JPMorgan and Morgan Stanley Were Insufficient

The district court concluded that Phillips' conduct sent a false price signal that "established a meaningful relationship between Phillips's trading activities and the activities of JPMorgan and MS Capital," and "had a direct and significant connection to the performance both by JPMorgan and MS Capital of their contractual

obligations under that option." SPA.77. But the court disregarded the attenuated nature of those relationships, a characteristic that made the connection both indirect and insignificant under the instruction given.

### 1. Morgan Stanley

MS International, a U.K. entity, sold the Option to Glen Point. Glen Point used JPMorgan's London branch as its broker, while MS International used RBS. J.B. Drax served as an intermediary between the two counterparties, who did not know each other's identities. When the Option triggered, MS International initiated payment—which went which went to RBS, JPMorgan, and ultimately Glen Point— from its bank account in the U.K. A.991-92, A.2841. After MS International sold the Option, it chose to transfer its risk—through a separate contract—to a U.S.-based entity, MS Capital. *See supra* at 10.

The only evidence of the connection between, on the one hand, Phillips' foreign swap activity and, on the other hand, MS Capital's commercial activities in the U.S., was testimony from Oweida, who had no involvement in or personal knowledge of the transaction. Instead, he testified that Morgan Stanley's "standard practice" is to "risk manage our options business off of a different legal entity. So what happens is client-facing trades are then back-to-back between the original entity, in this case MS International, back to a different entity, which is [MS] Capital." A.989. Oweida described this process as a "back-to-back trade [that] would

involve this legal entity buying exactly the same contract, and then a different Morgan Stanley legal entity selling this contract to a client. So that the firm has the same shape of risk, but that risk resides on a different legal entity." A.989.[14]

On these facts, the connection to MS Capital was not significant, even under the district court's instruction because it was clearly "attenuated" by an intervening decision by Morgan Stanley. A.1564-65. Moreover, the fact that MS Capital may have been on the hook for the ultimate liability for the Option was quintessentially "random" and "fortuitous." This connection to the United States was simply the result of chance.

The district court relied, in part, on principles of personal jurisdiction to define "significant" under Section 2(i). SPA.64. But the court ignored the fact that the law of personal jurisdiction requires that the relevant connections to the United States come from the actions of the party over whom jurisdiction is sought—not anyone else. *See Walden v. Fiore*, 571 U.S. 277, 286 (2014). When those connections instead come from others, they are generally considered "random," "fortuitous," and "attenuated." *Id.*; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Because the connection to MS Capital was not the direct result of Phillips' conduct—but instead the result of a separate contract entered into by to other

---

[14] Oweida did not testify that the Option's risk had in fact been transferred in this way, but rather that this process "would" have been done for the Option. A.989.

entities—it cannot establish a "significant" connection, even under the district court's instruction.

Nor was it direct. To the extent MS Capital engaged in any activity in the United States, it was the result of a contract negotiated entirely outside of the Option and without Phillips. Morgan Stanley's independent decision to enter into "back-to-back" contracts is what created MS Capital's liability. Accordingly, the connection between Phillips' conduct abroad and MS Capital was not "immediate" in any sense of the word. A.1564-65.

The district court committed an analytical error in concluding otherwise. On one hand, as discussed further below, it found the connection to *JPMorgan* "direct" because JPMorgan was the formal counterparty on the Option, and its payment obligation was "not contingent on the receipt of funds from" Morgan Stanley (via RBS). SPA.74. In this regard, the court considered this contractual relationship an independent, "direct" and "significant" part of the series of events after the Option triggered, fully discounting any of the actions taken by others or JPMorgan's status as an intermediary with respect to the Option's risk. SPA.73.

But the other hand, the court found the connection to *MS Capital* "direct" by ignoring these kinds of intervening steps. The court found that the 12.5 rate triggered a separate contract between the two Morgan Stanley entities immediately. SPA.75. But if such an attenuated connection can be considered "direct," what would be

"indirect"? Indeed, the district court highlighted the "winding path" of the various option transfers as a basis to find the payments themselves indirect,[15] but disregarded that convoluted process in holding that there was a direct and significant connection simply because Morgan Stanley used a U.S. entity to manage all of its option risk. Those two holdings are irreconcilable.

Put together, the chain of contracts between Phillips and MS Capital were both independent events and not, legally relevant and irrelevant. For the reasons stated above and below, the more straightforward (and consistent) conclusion is that the connection could satisfy Section 2(i).

### 2. JPMorgan

JPMorgan was Phillips' prime broker for the Option. Phillips dealt only with JPMorgan's London office, which the Option contract listed as Glen Point's counterparty. A.2826. That contract was negotiated and executed in the United Kingdom. A.1031, A.2823-28. And all of JPMorgan's commercial "activities" related to the Option occurred abroad, through its London office. *Id.* This London

---

[15] *See* SPA.69-70 ("Morgan Stanley, with a London based 'internal party' account and New York-based "external party" account, transferred the payment to RBS's bank account in New York …. That payout reached Phillips only after a JPMorgan account in London transferred funds to a JPMorgan account in New York and then further transmitted those funds to the accounts of Glen Point and its client in New York. … No reasonable jury could find that this sinuous set of funds transfers constituted a direct connection sufficient to apply the commodities fraud statute to Phillips's swap-related activities abroad." (internal citations omitted)).

office was responsible only for facilitating payment from the ultimate counterparty when the Option triggered.[16]

At the outset, no reasonable jury could find that Phillips' foreign conduct, through its connection to JPMorgan's London office, constituted a "direct" connection to activities in U.S. commerce. Simply put, Phillips' connection to JPMorgan was not to any office in the United States. The district court nonetheless found this non-U.S. connection "direct" by relying on the notion that a foreign branch is not a separate legal entity from its parent, highlighting the inclusion of JPMorgan's U.S. address on the Option contract,[17] and concluded that the connection to JPMorgan's U.S. entity was therefore "uninterrupted." SPA.73. The district court was mistaken—JPMorgan's foreign branch cannot carry the load the court gave it.

As discussed above, Section 2(i) is a conduct-based, rather than entity-based, extraterritorial provision. The district court identified no commercial activity that JPMorgan undertook *in the U.S.* that was connected to Phillips' swap-related

---

[16] The district court correctly held that the facilitation of payments relating to the Option was insufficient to under Section 2(i). SPA.69-70.

[17] The Option contract between Glen Point and JPMorgan listed JPMorgan's U.K. branch address in the header, and stated in its disclosures, "The Office of JPMorgan for this Transaction is London." A.2826. The district court relied on a generic footer at the bottom of the contract that listed several JPMorgan entities and their addresses, including the location of JPMorgan Chase Bank, NA in the U.S. SPA.73.

activities beyond corporate presence. Instead, it relied on the fact that JPMorgan Chase NA's brokerage services are generally "part of the U.S. economy." SPA.73 This distinction is crucial: when determining where a given transaction occurred, a "party's residency or citizenship is irrelevant." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012); *accord Loginovskaya v. Batratchenko*, 764 F.3d 266, 274 (2d Cir. 2014). Rather, the relevant issue is the actual commercial activity with respect to the Option. This is especially true because Section 2(i) targets conduct, rather than entities. And here, all of that *activity* was undertaken abroad. *See supra* at 47-48.

Although CFTC guidance is non-binding, it is instructive that the CFTC has treated foreign branches of U.S. banks differently from their U.S. counterparts in material respects. For example, according to the CFTC, foreign entities must register as "swap dealers" if they engage in more than a "de minimis" level of swap dealing with U.S. entities. 85 Fed. Reg. at 56,952; *see also* 17 C.F.R. § 1.3 (defining "de minimis," in part, as dealing less than $8 billion). That is because this level of trading activity with U.S. entities results in a "direct and significant connection with activities in, or effect on, U.S. commerce." 85 Fed. Reg. at 56,955. But the CFTC has instructed that non-U.S. entities need not include swap transactions with *foreign branches* of U.S. entities in calculating their relevant swap dealings in certain circumstances. 17 C.F.R. § 240.3a71-3(b)(1)(ii)(A); *see also* 85 Fed. Reg. at 56,952-

53. Those connections with foreign branches thus do not contribute to the necessary "direct" or even "significant" connections mandated by Section 2(i). The same is true here.

Finally, the district court was wrong to find that the connection to JPMorgan was significant because it was "the sole entity contractually obligated to pay Glen Point … when the [Option] triggered." SPA.74. A contractual obligation to pay does not alter the practical reality is that brokers play an ancillary role in swap transactions; they "find a buyer and … a seller," and to "broker that deal by putting those two counterparties together." A.637. And that is what JPMorgan did here: it facilitated payments between Glen Point and Morgan Stanley and faced no real economic risk of its own. In other words, its role was quintessentially "ancillary."[18]

## C. The District Court Improperly Converted Section 2(i) to an Entity-Focused, Causation Test

The district court's analysis of the connections between Phillips' conduct abroad and the conduct of Morgan Stanley and JPMorgan in the United States was based on two incorrect interpretations of Section 2(i). First, for the reasons stated

---

[18] The odds of Phillips using a prime broker having some tie to a U.S. entity were high. "Goldman Sachs, JP Morgan and Morgan Stanley hold a market share of nearly 60% in prime." Christopher Whittall, *Prime Brokerage: the Multi-Billion Dollar Cash Cow Redefining Banks' Trading Divisions*, *IFR* (Mar. 2, 2024), https://www.ifre.com/story/4433586/prime-brokerage-the-multi-billion-dollar-cash-cow-redefining-banks-trading-divisions-t0rfw1br05. If using a prime broker with a U.S. parent is all that is required under Section 2(i), it would be the rare case where the U.S. government could not exercise jurisdiction.

above, the fact that there was a U.S. "victim" was legally irrelevant to the analysis, which should have been focused on conduct, not entities.

Second, the district court's framing of the false price signal as a sufficient connection essentially reduced its "direct and significant" instruction to a minimal causation test in which Phillips' conduct was "the cause of [a] result" in the U.S. *Burrage v. United States*, 571 U.S. 204, 211 (2014). Put differently, the court found that Phillips' foreign conduct caused U.S.-based JPMorgan and Morgan Stanley entities to perform under the Option contracts, and that alone was *per se* a direct and significant connection under Section 2(i). SPA.77 ("By triggering the One Touch Option's barrier, Phillips's Boxing Day Trades had a direct and significant connection to the performance both by JPMorgan and [MS Capital] of their contractual obligations under that option."). The numerous intervening transactions that led to a U.S. entity actually bearing the risk on the Option are ignored. The locations of the commercial activity relating to the Option—including its negotiation, execution, the alleged manipulative trading, and the subsequent payment—are ignored. *See supra* at 44-48. So long as Phillips' conduct caused a U.S. entity to legally incur a liability—even in the absence of any evidence that a U.S. entity actually paid that liability, *see supra* at 44—the test is satisfied.

Indeed, to affirm the district court would mean that every swap purchased by a non-U.S. person or entity that either uses a foreign branch of a U.S. bank to broker

the swap, or that purchases a swap whose counterparty is a foreign subsidiary of a U.S. bank that manages its firmwide option risk through a U.S. entity, necessarily creates a direct and significant connection to U.S. commercial activities under Section 2(i). Had Congress sought to extend U.S. jurisdiction to all such swaps, it would have written a very different extraterritoriality provision.

## III.   THE DISTRICT COURT ERRED IN INSTRUCTING THE JURY ON "BUT FOR" INTENT INSTEAD OF SOLE INTENT

### A.   The District Court's "But For" Intent Instruction Was Erroneous

There is no precedent for the district court's instruction that Phillips' trades were manipulative if, but for an intent to deceive, he would not have traded at the time and in the amounts that he did. A.1551-52. And for good reason: "but for" is a causation standard derived from tort law and, even there, is considered so broad and overinclusive as to require a secondary causation showing (proximate cause) to establish liability. In a criminal context, it improperly reduces the government's burden to prove intent, conflates motive with intent, and criminalizes a wide swath of permissible conduct.

This error was exacerbated by the district court's instruction that the jury determine whether the "times" and "amounts" of Phillips' trades would have been the same but for an intent to move the exchange rate. *See* A.1551-52. These two characteristics have no basis in the statute and should not have been elevated over other characteristics of Phillips' conduct—including, for example, how long he held

his spot position. Further, the instruction incorrectly required the jury to determine whether Phillips had criminal intent based on certain characteristics of his conduct which necessarily were affected by the conduct of others.

Intent was the *only* thing in this case that distinguished criminal defendant from purported victim, criminal trading from entirely routine conduct. In such a case, the jury should have been instructed that it had to find that Phillips' sole intent was to move the exchange rate. The district court's failure to do so was error.

### 1.     The "But For" Standard Is the Lowest Standard of Actual Causation

The "but for" standard is used to determine "actual causality" and is "the minimum requirement for a finding of causation." *Burrage*, 571 U.S. at 210-11. It requires "proof that the harm would not have occurred in the absence of … the defendant's conduct." *Id.* at 211 (cleaned up). Thus, a "but for" analysis assumes two events occurred and asks the factfinder to determine whether the first caused the second. This is an "ancient," "textbook tort law" test with few internal limits. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 331-32 (2020). For example, a single event can have multiple "but for" causes, and a specific cause need not be the "sole" or even "primary" cause to satisfy this standard. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 656, 665 (2020). Because this analysis can be "sweeping," *id.* at 656, it is generally supplemented by proximate causation, which courts use to "limit a person's responsibility for the consequences of that

person's own acts," *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 464 (2006) (Thomas, J., concurring in part); *see also United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2019).

In the criminal context, the "but for" standard is used when a statute includes language like "because of," "results from," and "based on" to connect conduct to a specified outcome. *Burrage*, 571 U.S. at 213-14 (collecting examples). Section 6 of the CEA contains no such language, nor does Rule 180.1. *See* 17 C.F.R. § 180.1.

### 2. The "But For" Standard Cannot Establish Intent in this Context

Against this backdrop, it is not surprising that this Court has never adopted a "but for" standard for determining scienter in the criminal context. The Court should not endorse the use of one here.

*First*, the instruction invited the jury to presuppose intent and then determine whether it was a "but for" cause of the trades. This is evident from the court's instruction on dual intent, which said in relevant part:

> The question you should ask is whether the defendant acted with the intent to deceive or defraud others by sending a false pricing signal into the market. If there are two purposes for a transaction, one of which is legitimate, and if the transaction would have been done at the same time and in the same manner for the legitimate purpose, it is not manipulative even if the defendant also had an intent to deceive or to send a false price signal into the market. On the other hand, if the transaction would not have been done at the same time and in the same manner, except for the intent to mislead, then the transaction is manipulative. Thus, if but for an intent to deceive, the defendant would not have conducted the transactions in the dollar-rand foreign exchange spot market at the

times and in the amounts he did, then those transactions were manipulative.

A.1551-52.

This formulation results in a circular and self-affirming instruction to find manipulative intent if Phillips traded at particular times and amounts as a result of that same intent. It encouraged the jury to presume that criminal intent existed and amounted to impermissible burden shifting. "Because a reasonable juror could have understood the challenged portions of the jury instruction in this case as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent," the "charge did not comport with the requirements of the Due Process Clause." *Francis v. Franklin*, 471 U.S. 307, 325 (1985). And given the complexity of the facts and extensive evidence inconsistent with manipulative intent, "there is a reasonable likelihood that the jury … applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).

*Second*, the error of importing a causation standard into the intent instruction is underscored by how many other things were "but for" causes of the timing and amount of Phillips' trades, yet were not referenced in the instruction. These include: the timing and volume of Morgan Stanley's trades; the trading of other market participants; Phillips' (correct) prediction of substantial liquidity just above the barrier; the conduct of the Nomura trader (an individual whose identity was

unknown to Phillips, not disclosed to the jury, and who determined the exact timing and amount of the individual trades entered on Phillips' behalf); and countless others. *See supra* at 14-19. "But for" any of these occurrences, Phillips would not have traded "at the times and in the amounts" that he did. That establishes actual causation—not criminal intent.

*Third*, the instruction improperly invited the jury to determine Phillips' motive for trading, rather than his intent. Intent and motive are distinct concepts. "Motive is what prompts a person to act." Sand, Modern Federal Jury Instructions-Criminal 5.04 (2024). Although motive is often "relevant," it does not "bear directly on the charged elements of a crime." *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012); *cf. United States v. Edwards*, 101 F.3d 17, 19 (2d Cir. 1996). By contrast, "[i]ntent refers only to the state of mind with which the particular act is done." Sand, Modern Federal Jury Instructions-Criminal 5.04 (2024); *see also United States v. Walli*, 785 F.3d 1080, 1088 (6th Cir. 2015).

*Fourth*, the error in a "but for" instruction was exacerbated by the directive that the jury consider the "time" and "amounts" of Phillips' trades. As a preliminary matter, we are aware of no intent instruction that requires a jury to determine intent by considering certain specified components, and only those components, of a defendant's actions. Moreover, the district court's instruction improperly required the jury to consider the "timing" and "amounts" of Phillips' trades when determining

56

whether Phillips' trading was manipulative. But why? And if certain components of Phillips' conduct somehow could be determinative of criminal intent, why those two and only those two? Why not require the jury to consider whether Phillips would not have held his positions for the amount of time that he did—two full days holding more than $700 million in real risk in a volatile market—but for criminal intent? At trial, the parties pointed to various aspects of Phillips' conduct as evidence of intent (or a lack thereof). But the court erred by inserting two of those elements into the instruction and making them alone dispositive.

Consider Morgan Stanley, which executed nearly the mirror image of Phillips' Boxing Day Trades. On Boxing Day, Morgan Stanley purchased hundreds of millions of USD/ZAR, including $300 million from Glen Point. A.1319, A.1607, A.1918. It also placed nearly $1 billion in bids just above the 12.5 exchange rate—then cancelled about as much within 11 seconds of the Option triggering. A.1610, A.1616; *see also* A.804 (Nicholas Croix testifying on direct regarding the "high likelihood that banks were sitting just above the 12.50 level to buy back dollar/rand to prevent that barrier from hitting.") It did so to manage its own risk against the Option triggering. *See* A.1003-04. But it no doubt also preferred for the Option to not trigger and knew that placing approximately *$1 billion* in bids just above the barrier made it less likely to happen. A.709-12, A.2838.

Thus, even though Morgan Stanley had a legitimate intent to manage its risk, its trading around the barrier begs the question: would it have traded at exactly the same time and in exactly the same amounts *but for* an intent to prevent the Option from triggering? Common sense and the government's own witnesses suggest that the answer to that question is no. A.818-19, A.2838. And yet, under the district court's "but for" instruction, Morgan Stanley—the purported victim—likely committed fraud too. A "sole intent" instruction, discussed below, would have avoided this perverse scenario.

*Finally*, the consequences of the "but for" instruction are wide-ranging, potentially criminalizing routine trading practices. Consider, for example, a common trading practice wherein a financial institution purchases large volumes of a stock or commodity by placing dozens or even hundreds of smaller trades. These smaller transactions, executed over time, do not immediately alert the market to the true volume of demand, and may prevent the price from moving against the trader. In such a scenario, the trader has traded at particular times and in particular amounts for the purpose of not disclosing to the market its true demand. Yet this practice is routine, and indeed can constitute "best execution." *See, e.g.*, *Johnson v. United States*, No. 23 Civ. 5600, 2024 WL 1740916, at *3 (E.D.N.Y. Apr. 23, 2024) (describing a financial institution's "'best execution' duty not to influence the market adversely with the [client's] trade"); *see also Rayner v. E*TRADE Fin.*

*Corp.*, 899 F.3d 117, 121 (2d Cir. 2018). The district court's "but for" instruction could criminalize this conduct.

The district court's instruction could also capture the routine practice of placing "iceberg" orders, in which a trader "obscure[s] the full size of his or her intended trade" by showing "only a preset fraction of the total intended trader order" to "mitigate market movement and detrimental price impacts." *United States v. Chanu*, 40 F.4th 528, 532 (7th Cir. 2022); *see also* e.g., Market Regulation Advisory Notice, Disruptive Practices Prohibited 4, CME Group RA2107-5 (July 19, 2021) (explaining that "the use of iceberg orders, in and of itself, is not considered" manipulative conduct); *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 75 & n.1 (2d Cir. 2022) (observing the prevalence and benefits of iceberg orders). This routine conduct would fall within the district court's instruction because the trader would not have entered the trades at the same time and in the same manner absent an intent to impact market price.

As discussed below, a sole intent instruction is the only way to capture fraudulent conduct without catching a broad range of legitimate conduct in its net. That these trading methods seek to prevent, rather than cause, price movement does not alter the fact that each seeks to project a false impression to the marketplace and create a price that does not reflect the natural forces of supply and demand. Under the court's instruction, they would be construed as criminal.

**B.    The District Court Should Have Required the Jury to Find a Sole Intent to Deceive**

Traditional market manipulation cases concern conduct that is inherently deceptive, such as making false statements about a stock, *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008), and "wash sales," where "parties fictitiously trade the same shares back and forth at higher and higher prices to fool the market." *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (Posner, C.J.). The common thread is that the conduct "serve[s] *no purpose* other than to transmit false information to the market and artificially affect prices." *SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (emphasis added).

By contrast, Phillips was convicted for open-market trades with real and willing counterparties. Such "open market manipulation" cases present the unusual situation where guilt turns entirely on the subjective intent of the defendant. *See* Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation*, 68 Duke L.J. 479, 538 (2018).

This Court has expressed skepticism that open market transactions alone can be the basis of a criminal conviction. In *United States v. Mulheren*, the defendant was convicted of securities fraud based on large day trades he made that had the effect of increasing the price of a stock, thereby triggering a contract held by his friend. 938 F.2d 364, 368 (2d Cir. 1991). Under the government's theory (and the district court's charge) in that case, the defendant could be convicted of market

manipulation when he purchased transactions "solely to affect the price of [the] security," but not if those transactions were "effected for an investment purpose." *Id.* This Court expressed "misgivings" about that theory but assumed for purposes of the appeal that it was valid. *Id.* Nevertheless, the Court overturned the defendant's conviction for *insufficient evidence of sole intent. Id.* at 368-69; *see also Markowski v. S.E.C.*, 274 F.3d 525, 528 (D.C. Cir. 2001) (explaining that legality in these circumstances "depend[s] entirely on whether the investor's intent was 'an investment purpose' or 'solely to affect the price of [the] security.'" (quoting *Mulheren*, 938 F.2d at 368)).[19] Consistent with this Court's precedent, a sole intent standard should be required where, as here, intent is all that distinguishes criminal from routine trades.

*First*, a sole intent standard is essential to distinguish criminal conduct when the trades at issue are otherwise permissible, desirable, and expected by market participants. As the Supreme Court recently explained, the purpose of scienter" is to help "separate wrongful from innocent acts." *Rehaif v. United States*, 588 U.S. 225, 232 (2019). Where open market manipulation is concerned, a sole intent standard is

---

[19] Whereas we are aware of no precedent in this Circuit for the district court's intent instruction, there is precedent for a sole intent instruction. *See United States v. Tuzman*, No. 15 Cr. 536 (S.D.N.Y. Jan. 11, 2018), ECF 706 (requiring proof that defendant acted with sole intent to create an artificial price "rather than for legitimate investment purposes"). Notably, the government agreed to this instruction. ECF 702.

the only way to draw a clear line between routine trading activity and criminal conduct. *Cf. Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021) (noting that "short selling or other hedging activity is not, by itself, manipulative"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) (in some cases, "scienter is the only factor that distinguishes legitimate trading from improper manipulation").[20]

*Second*, requiring sole intent is particularly important where, as here, the trades occurred in an unregulated market. Unlike traditional open market manipulation, where a defendant defrauds *the market*, Phillips did not defraud the FX spot market. Indeed, his open-market trades in an unregulated market were not—and could not be—criminal on their own. The only reason this case could even be brought under the CEA was because Phillips entered into the Option months earlier. Allowing Phillips' conviction to stand based on no more than a partial intent to affect an exchange rate circumvents the choice that Congress made to leave certain markets unregulated. *See Dunn v. CFTC*, 519 U.S. 465, 471 (1997); *see also Carcieri v. Salazar*, 555 U.S. 379, 392 (2009) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

---

[20] For the reasons explained in Part IV, scienter alone should not have been enough to distinguish criminal from legitimate trading in this case. *See infra* at 65-69.

*Third*, courts have expressed concerns about whether even sole intent is sufficient on its own to support a market manipulation charge, requiring that "the alleged manipulator inject[] 'inaccurate information' into the market or create[] a false impression of market activity." *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 204-05 (3d Cir. 2001). That additional step "cures [the] problem" of "differentiat[ing] between legitimate trading activities that permissibly may influence prices … and 'ingenious devices that might be used to manipulate securities prices.'" *Id.* at 205 (citation omitted). Indeed, as noted above, this Court has expressed "misgivings" about the government's view that nothing more than intent is needed to support a criminal market manipulation charge. *Mulheren*, 938 F.2d at 368. Against this backdrop, any further dilution of the evidentiary standard required to sustain an open market manipulation claim is particularly misguided.[21]

## C. The District Court's Error Was Not Harmless

The district court's failure to give a sole intent instruction was not harmless. First, there was extensive evidence that, at a minimum, one of Phillips' goals in buying rand was to replace the delta that would disappear when the Option triggered.

---

[21] Although the *Masri* court adopted a "but for" construction for deciphering intent and is the source of the district court's charge, a close reading of *Masri*'s analysis supports a sole intent standard. *See* 523 F. Supp. 2d at 373. There, the court relied on *Mulheren*, the unique context of open market manipulation, and principles of lenity to conclude that a "sole intent" standard was necessary to avoid criminalizing "otherwise legal activity." *Id.*

*See supra* at 11-19. Indeed, Phillips almost perfectly replaced his delta on Boxing Day, adding to his position to do so even *after* the Option had triggered. *See supra* at 14, 18-19. And instead of closing his spot position after the Option was triggered, he held on to it for [almost] two full days, during which he was exposed to over $700 million of market risk. In short, there can be little doubt that at least part of Phillips' intent was to manage risk—just like the purported victim Morgan Stanley.

There was also substantial evidence that Phillips traded at the times and in the amounts he did for legitimate reasons. The government claimed he traded on Boxing Day when certain markets were closed for the holiday to take advantage of low liquidity. A.1401. But the main piece of evidence upon which the government relied, the Boxing Day Chat, also showed that Phillips believed that the trader "w[ould] find liquidity." A.2782. *See supra* at 15. And he was right: Phillips had no problem finding liquidity at the barrier, most of which came from Morgan Stanley itself. A.804, A.1610-16. Evidence of the uncertainty surrounding the South African election, turning to certainty over the Christmas weekend, *see supra* at 12-14, showed that Phillips wanted the Nomura trader to move quickly for fear that the price would gap down, a prediction that, once again, turned out to be correct when the price fell below 12.5 the next day and *stayed there for over four months*, *see supra* at 19.

Further, the Boxing Day chat showed Phillips at various points trading in a manner plainly inconsistent with a sole intent to move the exchange rate to the barrier. After Phillips purchased $415 million in rand, he asked the Nomura salesman how much more rand he could buy to "break 50" (i.e., to reach a 12.5 exchange rate); the salesman responded, "at least another 200," and Phillips asked him to sell only $100 million. A.2788. And when the salesman told Phillips the 12.5 rate had traded, Phillips asked him to sell another $100 million—not $5 or $10 million simply to confirm the rate traded, but a full $100 million, the amount needed to almost fully replace his delta. A.2789. Even if a jury could reasonably find that some of his trading would have been different but for an intent to deceive, no reasonable jury could have found that Phillips had *no* legitimate intent, and thus he could not have been convicted under a sole intent instruction.

The instruction Phillips sought and the one the district court applied are incompatible. A sole intent instruction requires the absence of dual intent, while the instruction given not only expressly encompassed it, but implied to the jury that dual intent was present. *See supra* at 56-57. Given the nature of the evidence at trial, and that the entire case turned on the question of intent, the district court's error was not harmless. *Silver*, 864 F.3d at 119.

## IV.  THE DISTRICT COURT ERRED BY NOT REQUIRING PROOF OF ARTIFICIAL PRICE

The jury should have been instructed, as Phillips requested, on the traditional elements of price manipulation regarding artificial price. A.295. The absence of this instruction was error.

Manipulation is a "term of art" when used in connection with financial markets, and it requires the specific intent to create an artificial price. This Court has construed market manipulation under Section 6 of the CEA to include four elements: "(1) [the defendant] possessed an ability to influence market prices; (2) an artificial price existed; (3) [the defendant] caused the artificial prices; and (4) [the defendant] specifically intended to cause the artificial price." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013). And the CFTC has promulgated two relevant rules under Section 6: Rule 180.1, which prohibits, among other things, the use of "any manipulative device, scheme, or artifice to defraud," 17 C.F.R. § 180.1; and Rule 180.2, which expressly prohibits price manipulation, *id.* § 180.2.

The government charged Phillips with a scheme to defraud under Rule 180.1, and not price manipulation under Rule 180.2. A.43-44. This makes sense: the government could not charge price manipulation under Rule 180.2 because the foreign exchange market is unregulated. *See supra* at 40-41. But where, as here, the alleged scheme itself *is* open market manipulation, the government should have to

prove the traditional elements of price manipulation, including the creation of an artificial price. *Gorman II*, 2023 WL 2632111, at *4-6.

To hold otherwise would render both the *Amaranth* elements and Rule 180.2's prohibition against price manipulation meaningless, as the government could charge any market manipulation case as a scheme to defraud under § 180.1 and avoid having to prove the *Amaranth* elements. *See Gorman II*, 2023 WL 2632111, at *6 (holding "when the alleged manipulative act is in and of itself involving 'price manipulation' … the allegations must drill down one step further and satisfy the [*Amaranth* elements]").

Further, there is good reason to require an artificial price in open market manipulation cases. Traders routinely trade so as to disguise their intentions. This can include (as it did here) trading in small tranches to build a large position, rather than placing one large trade. *See supra* at 58-59. That is why "mere intent to affect prices" is not enough. *Commodity Futures Trading Comm'n v. Wilson*, No. 13 Civ. 7884, 2018 WL 6322024, at *14 (S.D.N.Y. Nov. 30, 2018). And requiring the government to prove artificial price ensures that routine trading activity, including that which affects prices (and, by definition, all trading affects prices), remains permissible while criminalization is reserved for trades that actually create prices unreflective of supply and demand.

The government argued at trial (and the district court agreed) that requiring artificial price would effectively require that the government prove the scheme succeeded, A.496, A.509, contrary to precedent, *see Markowski*, 274 F.3d at 529. But *Markowski* is not inconsistent with an artificial price requirement: Phillips could have artificially affected the price while still failing to trigger the Option.[22] (In that case, the scheme almost certainly would not have been material to an Option counterparty. But that simply underscores why unregulated markets are different: a false signal to market participants is permissible.) Further, unlike FX spot market participants, who at least theoretically could have been deceived (although not criminally) by Phillips' trades alone, Morgan Stanley, as Option counterparty, was only affected by the scheme after the rate touched the barrier. It follows that if the

---

[22] This is also consistent with Second Circuit precedent: in each case where the Court reaffirmed that success is not required to establish market manipulation, the complaint nevertheless alleged an actual effect on price resulting from a defendant's conduct. In *Set Capital*, the defendant allegedly engaged in hedging trades that "depressed the value of XIV Notes further than what would have been expected from market volatility alone." *Set Cap.*, 996 F.3d at 77. And although the Court in *ATSI* said that "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation," it affirmed dismissal of manipulation claims where the complaint pled "no particular connection between the negative reaction of the stock price and anything the defendants did." *ATSI*, 493 F.3d at 103–04.

exchange rate was *not* artificial at the time the barrier was triggered, then Morgan Stanley received no false price signal. [23]

While this Court has relied on *Markowski* in noting that "in some cases, … 'scienter is the only factor that distinguishes legitimate trading from improper manipulation,'" *Set Cap.*, 996 F.3d at 77, it has also, as noted above, expressed misgivings about (and never affirmatively endorsed) that theory in a criminal case involving the manipulation of a regulated market. *Mulheren*, 938 F.2d at 368. But even if the Court were to set aside those misgivings—and it should not—it does not follow that scienter can (or should) be the only factor that distinguishes legitimate trading from improper trading in an unregulated market.

Consider two individuals who make the exact same trades in the FX spot market. One individual intends to move the exchange rate; the other intends to manage risk. Without something more, neither has engaged in impermissible trading. Because sending a false signal to FX market participants—the essence of market manipulation—is not a crime. Thus, even if in "some cases," scienter is the only factor that distinguishes legitimate from impermissible trading, those cases should not include the open manipulation of unregulated markets.

---

[23] Borrowing from market manipulation cases in regulated markets, the district court instructed the jury to consider whether Phillips' trades were intended to "deceive or to send a false price signal into the market." A.1551. But what market?

## V. THERE WAS INSUFFICIENT PROOF OF MATERIALITY

A deception is material if it "has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it [is] addressed.'" *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)). In finding that there was sufficient evidence upon which the jury could have found that the charged scheme was material to a decision by an Option counterparty in the position of JPMorgan or Morgan Stanley, the district court relied on testimony from two bank representatives who were not involved in the facts of this case. Neither witness provided an evidentiary basis from which a reasonable jury could have found materiality.

Oweida testified that (i) Morgan Stanley "does not expect" that the exchange rate that triggers a barrier "will be the result of trading intentionally designed to trigger the barrier level," A.976-77; and (ii) it would be important to know if a counterparty traded in a manner intended to trigger a barrier because that intent is not priced into a one touch option *when it is sold*. A.976-77. Neither statement actually addressed materiality. First, the fact that someone does not "expect" something to happen does not mean that its occurrence is *material* to a later decision. It simply means that it was unexpected. Many things are unexpected—some are

70

important to decisions that follow; others are not.[24] Second, Oweida's testimony that Morgan Stanley does not price in manipulative intent when an option is sold had no bearing on the question of whether the subsequent scheme (which the government alleged began months later), was material to a decision that followed.

Santoro's testimony was no more relevant. She testified only that knowledge of a counterparty's trading designed to impact the exchange rate "could" affect the willingness to pay a settlement amount. A.1369. But she did not testify under what circumstances it could affect a willingness to pay; that it was likely to have such an effect, or that the actual trades in this case, of this amount, by this individual, whose fund had a longstanding relationship with JPMorgan and was party to an agreement that ensured JPMorgan held sufficient collateral to cover any dispute over payment (*see* A.2753-55) would have been material to a reasonable counterparty in JPMorgan's position. A.1553.[25]

---

[24] Even if something could be material simply by being unexpected (and it cannot), the relevant question here was whether Phillips' conduct, coupled with an intent to deceive, was material to a decision by Morgan Stanley; not whether a purported "result" of that trading was material.

[25] Indeed, Santoro neither worked in nor testified about JPMorgan's Prime Brokerage. Her testimony that certain trading could affect a counterparty's willingness to pay was in response to a question about JP Morgan's FX Options desk. A.1368. She was not asked about—and did not testify about—whether trading to affect the exchange rate would matter to JPMorgan in its role as a prime broker. On that issue, there was no evidence.

The district court reasoned that the jury could nonetheless infer that Phillips' scheme was material because "a counterparty to an option who trades in order to trigger a barrier is more likely to achieve that result than one who trades to hedge against risks or for other legitimate purposes." SPA.103. But insufficient evidence supported that conclusion. The district court relied on testimony from which a jury could infer Phillips' trading methods "resulted from his intent to trigger the barrier," SPA.104, but cited no evidence that his trading methods would be more likely to trigger the barrier than routine trades executed for legitimate purposes. And even if trades with the intent to trigger a barrier somehow were more likely to do so than the exact same trades executed for a different reason, there was insufficient evidence that any such marginal difference would be material to a counterparty in the position of Morgan Stanley.

The district court characterized Santoro and Oweida's testimony as "similar" to testimony in other cases that "a defendant's deception was important." SPA.104. But each of those cases involved testimony from personally involved counterparties about how the particular deception at issue was material to the specific transactions at issue. *United States v. Gramins*, 939 F.3d 429, 446-47 (2d Cir. 2019); *United States v. Litvak*, 808 F.3d 160, 175-76 (2d. Cir. 2015). No such testimony was introduced here. The witness's testimony essentially boiled down to confirming that

financial institutions generally presume their swap counterparties are not violating the law.

In short, the inference that this particular scheme would have been material to a counterparty in the position of JPMorgan or Morgan Stanley was "no more valid than others equally supported by reason and experience," *Mulheren*, 938 F.2d at 372, particularly in light of the extensive evidence that market participants anticipate increased trading around a barrier, and Morgan Stanley itself did precisely that. *See supra* at 10, 16. For these reasons, Phillips' conviction should be vacated. *Mulheren*, 938 F.2d at 372.

## VI. THE INDICTMENT AND CONVICTION VIOLATED PHILLIPS' RIGHT TO DUE PROCESS

Due process "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). This case involved multiple such applications, including the application of the commodities fraud statute to open-market manipulation of the unregulated FX spot market, a "but for" intent instruction pulled from the causation context, and the application of Section 2(i) to a one-off swap between sophisticated parties that could not conceivably impact the U.S. financial system, let alone cause systemic risk.

The lack of precedent from which fair notice could reasonably have been derived is evident from the arguments before the district court on how the jury should

have been charged on multiple case-dispositive elements. A.359 (observing that "a number of the [charge] issues are [neither] easy issues," nor "issues that have been resolved by charges in previous cases or by Second Circuit law"); *see also* SPA.60 (noting the "paucity of precedent interpreting Section 2(i)(1)"). Phillips could not have had fair notice of how the law applied to his conduct—including that he could be convicted in the United States for open market trades made with a legitimate intent in an unregulated market—when neither the parties nor the district court itself could settle on the appropriate legal standard until a few days before the jury was charged.

The lack of notice with regard to Section 2(i) was particularly acute. In its post-trial motions, the government cited no less than eight ostensible connections that it contended a reasonable jury could have found to constitute a "direct and significant" connection to activities in U.S. commerce. A.2068-77. The district court rejected all but one (the "false signal"). SPA.68-78. And even if this Court affirms the district court's conclusion that the connections to Morgan Stanley and JPMorgan satisfied Section 2(i)'s requirements beyond a reasonable doubt, it cannot follow that such an application of the statute was "fairly disclosed" to anyone—let alone to a U.K. citizen who entered into a single swap with an unknown U.K. counterparty through a U.K. broker.

The district court described this case as a "novel" and "first of its kind" prosecution, A.2336, that turned on "a vexing issue of federal law," SPA.79 (discussing open-market manipulation). This appeal may decide some of those vexing issues so that, in the future, both the public and the government will have notice of what sort of conduct can be prosecuted in the United States under the CEA. Neil Phillips, however, lacked such notice. And for that reason alone, due process requires that his conviction be overturned.

## CONCLUSION

For the reasons set forth above, the Court should vacate the sole count of conviction and direct the district court to enter a not guilty verdict or, in the alternative, order a new trial.

Date: October 25, 2024

Respectfully submitted,

*/s/ Sean Hecker*
Sean Hecker
Jenna M. Dabbs
David Gopstein
Trevor W. Morrison
Anne Yearwood
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
shecker@heckerfink.com
jdabbs@ heckerfink.com
dgopstein@heckerfink.com
tmorrison@heckerfink.com
ayearwood@heckerfink.com

*Counsel for Defendant-Appellant Neil Phillips*

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits requirements of Local Rule 32.1(a)(4) and this Court's order granting the parties' joint motion for leave to file oversized principal briefs, ECF 18.1, because this brief contains 17,871 words, excluding the parts of the document excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.


Dated:  October 25, 2024                    */s/ Sean Hecker*
                                            Sean Hecker

                                            *Counsel for Defendant-Appellant Neil Phillips*

## CERTIFICATE OF SERVICE

I, Sean Hecker, counsel for Defendant-Appellant and a member of the Bar of this Court, certify that, on October 25, 2024, copies of the foregoing brief were filed with the Clerk through the Court's electronic filing system, which will send notice of such filing to all counsel of record.

Dated:  October 25, 2024

*/s/ Sean Hecker*
Sean Hecker

*Counsel for Defendant-Appellant Neil Phillips*