# 24-1908

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL PHILLIPS, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX**
**VOLUME I OF X**
**(Pages A-1 to A-300)**

SEAN HECKER
JENNA M. DABBS
DAVID GOPSTEIN
TREVOR W. MORRISON
ANNE R. YEARWOOD
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

*Attorneys for Defendant-Appellant*

## TABLE OF CONTENTS

PAGE

Docket, *USA v. Phillips*, No. 22 Cr. 138 . . . . . . . . . . A-1

Sealed Indictment, dated March 3, 2022 . . . . . . . . . . A-23

Memorandum of Law in Support of Defendant Neil Phillips' Motion to Dismiss, dated April 28, 2023 . . . . . . . . . . A-49

Declaration of Sean Hecker in Support of Defendant Neil Phillips' Motion to Dismiss, dated April 28, 2023 . . . . . . . . . . A-87

Exhibit A—
Bank-2's "letter agreement" with Glen Point Master Fund dated October 30, 2017 . . . . . . . . . . A-89

Government's Memorandum of Law in Opposition to Defendant Neil Phillips' Motion to Dismiss, dated May 26, 2023 . . . . . . . . . . A-96

Reply in Support of Defendant Neil Phillips' Motion to Dismiss, dated June 9, 2023 . . . . . . . . . . A-146

Oral Argument Transcript, dated August 1, 2023 . . . . . . . . . . A-179

Letter to the Honorable Lewis J. Liman, dated September 25, 2023 . . . . A-228

The Government's Requests to Charge, dated October 9, 2023 . . . . . . . . . A-230

Proposed Requests to Charge on Behalf of Neil Phillips, dated October 9, 2023 . . . . . . . . . . A-280

Letter re Objections to Defense Proposed Jury Charge, dated October 12, 2023 . . . . . . . . . . A-311

Memorandum of Law in Support of Defendant Neil Phillips' Requests to Charge, dated October 12, 2023 . . . . . . . . . . A-331

PAGE

Final Pretrial Conference Transcript, dated October 11, 2023 .......... A-358

Oral Argument Transcript, dated October 10, 2023 (entered October 16, 2023) .......... A-381

Verdict Sheet, dated October 27, 2023 .......... A-481

Oral Argument Transcript, dated October 13, 2023 (entered October 31, 2023) .......... A-482

Trial Transcript, dated October 16, 2023 (entered November 13, 2023) .......... A-550

Trial Transcript, dated October 17, 2023 (entered November 13, 2023) .......... A-587

Trial Transcript, dated October 18, 2023 (entered November 13, 2023) .......... A-827

Trial Transcript, dated October 19, 2023 (entered November 13, 2023) .......... A-1099

Trial Transcript, dated October 24, 2023 (entered November 13, 2023) .......... A-1377

Trial Transcript, dated October 23, 2023 (entered November 13, 2023) .......... A-1588

Trial Transcript, dated October 20, 2023 (entered November 13, 2023) .......... A-1780

Trial Transcript (Verdict), dated October 25, 2023 (entered November 13, 2023) .......... A-1939

Memorandum of Law in Support of Neil Phillips' Motion for a Judgment of Acquittal or, in the Alternative, a New Trial, dated December 8, 2023 .......... A-1951

PAGE

Memorandum of Law in Opposition to Defendant's Motion for a Judgment of Acquittal or, in the Alternative, a New Trial, dated January 19, 2024 . . . A-2031

Reply Memorandum of Law in Further Support of Neil Phillips' Motion for a Judgment of Acquittal or, in the Alternative, a New Trial, dated February 2, 2024 . . . A-2111

Transcript of Oral Argument on Post Trial Motions, dated March 15, 2024 . . . A-2165

Judgment, dated June 25, 2024 . . . A-2294

Sentencing Transcript, dated June 25, 2024 . . . A-2301

Defendant's Notice of Appeal, dated July 12, 2024 . . . A-2348

Joint Letter Motion to Supplement Record, dated October 22, 2024 . . . A-2351

Exhibit A—
Draft Jury Charge, dated October 16, 2023 . . . A-2353

Exhibit B—
Revised Draft Jury Charge, dated October 21, 2023 . . . A-2393

Exhibit C—
Redlined Draft Jury Charge, dated October 21, 2023 . . . A-2436

Exhibit D—
Stipulation to Supplement Record, dated October 22, 2024 . . . A-2482

Order Granting Motion to Supplement Record, dated October 22, 2024 . . . A-2485

**Trial Exhibits Cited in Appendix**

DX-0102 . . . A-2487

DX-0107 . . . A-2491

PAGE

DX-0111 . . . . . . . . A-2495

DX-0506 . . . . . . . . A-2518

DX-0511 . . . . . . . . A-2521

DX-0600 . . . . . . . . A-2525

DX-0608 . . . . . . . . A-2539

DX-0621 . . . . . . . . A-2546

DX-0653 . . . . . . . . A-2550

DX-0807 . . . . . . . . A-2554

DX-0811 . . . . . . . . A-2559

DX-0812 . . . . . . . . A-2562

DX-2006 . . . . . . . . A-2567

DX-2007 . . . . . . . . A-2568

DX-2008 . . . . . . . . A-2569

DX-2009 . . . . . . . . A-2570

DX-2011 . . . . . . . . A-2571

DX-2018 . . . . . . . . A-2572

DX-2019 . . . . . . . . A-2573

DX-2022 . . . . . . . . A-2574

DX-2023 . . . . . . . . A-2575

DX-2024 . . . . . . . . A-2576

DX-2026 . . . . . . . . A-2577

DX-2053 . . . . . . . . A-2578

DX-2054 . . . . . . . . A-2579

DX-2055 . . . . . . . . A-2580

PAGE

DX-2056 . . . . . . A-2581

GX-101 . . . . . . A-2582

GX-403 . . . . . . A-2583

GX-404 . . . . . . A-2592

GX-407 . . . . . . A-2617

GX-409 . . . . . . A-2671

GX-410 . . . . . . A-2719

GX-421 . . . . . . A-2725

GX-427 . . . . . . A-2728

GX-430 . . . . . . A-2769

GX-431 . . . . . . A-2771

GX-446 . . . . . . A-2773

GX-500 . . . . . . A-2808

GX-502 . . . . . . A-2810

GX-503 . . . . . . A-2812

GX-555 . . . . . . A-2823

GX-556 . . . . . . A-2829

GX-570 . . . . . . A-2836

GX-573 . . . . . . A-2841

GX-602 . . . . . . A-2842

GX-603 . . . . . . A-2843

GX-607 . . . . . . A-2844

GX-623 . . . . . . A-2845

GX-641 . . . . . . A-2846

PAGE

GX-1121 .......... A-2847

GX-1123 .......... A-2848

GX-1124 .......... A-2849

GX-1126 .......... A-2850

DX-618 .......... A-2852

DX-2034 .......... A-2858

GX-408 .......... A-2859

GX-551 .......... A-2864

CLOSED,APPEAL,ECF

# U.S. District Court
# Southern District of New York (Foley Square)
# CRIMINAL DOCKET FOR CASE #: 1:22-cr-00138-LJL-1

Case title: USA v. PHILLIPS

Date Filed: 03/03/2022

Date Terminated: 06/28/2024

---

Assigned to: Judge Lewis J. Liman

**Defendant (1)**

**Neil Phillips**
*TERMINATED: 06/28/2024*
*also known as*
Sealed Defendant 1
*TERMINATED: 06/28/2024*

represented by

**Sean Hecker**
Kaplan Hecker and Fink LLP
350 Fifth Avenue Suite 7110
New York, NY 10118
212-763-0883
Fax: 212-564-0883
Email: shecker@heckerfink.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Conlon**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
212-763-0883
Email: aconlon@kaplanhecker.com
*TERMINATED: 08/22/2023*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Anne R. Yearwood**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212-763-0883
Email: ayearwood@heckerfink.com
*ATTORNEY TO BE NOTICED*

**David Norwich Gopstein**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118

212-763-0883
Email: dgopstein@kaplanhecker.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jenna Minicucci Dabbs**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
212-763-0883
Fax: 212-564-0883
Email: jdabbs@heckerfink.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 7:13C.F & 9 FALSE CLAIMS AND STATEMENTS (COMMODITIES FRAUD)<br>(2) | Imprisonment for a total term of Time Served. Supervised release for a term Two Years |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:371.F CONSPIRACY TO COMMIT COMMODITIES FRAUD<br>(1) | Dismissed |
| 18:1349.F ATTEMPT AND CONSPIRACY TO COMMIT WIRE FRAUD<br>(3) | Dismissed |
| 18:1343.F FRAUD BY WIRE, RADIO, OR TELEVISION<br>(4) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

**USA** represented by **Kiersten Ann Fletcher**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007

212-637-2238
Fax: 212-637-2527
Email: kfletcher@cahill.com
*TERMINATED: 06/04/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Noah David Solowiejczyk**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-2473
Fax: (212) 637-2527
Email: noah.solowiejczyk@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Thomas Somerset Burnett**
Department of Justice
United States Attorney's Office, Southern District of N
One St. Andrews Plaza
New York, NY 10007
212-637-1064
Email: thomas.burnett@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Mark Thomas**
U.S. Attorney's Office- SDNY
One Saint Andrew's Plaza
New York, NY 10007
212-637-2106
Fax: 212-637-2527
Email: andrew.thomas2@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/03/2022 | 2 | SEALED INDICTMENT as to Sealed Defendant 1 (1) count(s) 1, 2, 3, 4. (jm) (Entered: 09/01/2022) |
| 03/08/2022 | 1 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 03/08/2022) |
| 08/31/2022 | 3 | Order to Unseal Indictment as to Sealed Defendant 1. (Signed by Magistrate Judge Jennifer E Willis on 8/30/22)(jm) (Entered: 09/01/2022) |
| 08/31/2022 | | INDICTMENT UNSEALED as to Neil Phillips. (jm) (Entered: 09/01/2022) |
| 08/31/2022 | | Case Designated ECF as to Neil Phillips. (jm) (Entered: 09/01/2022) |
| 08/31/2022 | | Attorney update in case as to Neil Phillips. Attorney Noah David Solowiejczyk for USA added. (jm) (Entered: 09/01/2022) |
| 09/02/2022 | | Case as to Neil Phillips ASSIGNED to Judge Ronnie Abrams. (jm) (Entered: 09/02/2022) |

| | | |
|---|---|---|
| 12/15/2022 | 5 | NOTICE OF ATTORNEY APPEARANCE: Sean Hecker appearing for Neil Phillips. Appearance Type: Retained. (Hecker, Sean) (Entered: 12/15/2022) |
| 12/15/2022 | 6 | NOTICE OF ATTORNEY APPEARANCE: Jenna Minicucci Dabbs appearing for Neil Phillips. Appearance Type: Retained. (Dabbs, Jenna) (Entered: 12/15/2022) |
| 12/15/2022 | 7 | NOTICE OF ATTORNEY APPEARANCE: David Norwich Gopstein appearing for Neil Phillips. Appearance Type: Retained. (Gopstein, David) (Entered: 12/15/2022) |
| 12/15/2022 | 8 | NOTICE OF ATTORNEY APPEARANCE: Alexandra Conlon appearing for Neil Phillips. Appearance Type: Retained. (Conlon, Alexandra) (Entered: 12/15/2022) |
| 12/22/2022 | 9 | LETTER by Neil Phillips addressed to Magistrate Judge Gabriel W. Gorenstein from Jenna M. Dabbs dated December 22, 2022 re: proposed bail package (Dabbs, Jenna) (Entered: 12/22/2022) |
| 01/05/2023 | | Arrest of Neil Phillips. (jbo) (Entered: 01/06/2023) |
| 01/05/2023 | 11 | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Initial Appearance as to Neil Phillips held on 1/5/2023. Arraignment as to Neil Phillips (1) Count 1,2,3,4. Plea entered by Neil Phillips Not Guilty. Defendant present with retained counsel Jenna Dabbs and Sean Hecker. AUSAs Noah Solowiejczyk and Tom Burnett present for the Government. Defendant waives pretrial report. BAIL DISPOSITION: $15,000,000.00 Personal recognizance bond; To be cosigned by three financially responsible persons; Secured by (see below); Travel restricted to SDNY/EDNY/United Kingdom with all travel on notice to Pretrial Services; Surrender travel documents and no new applications; Pretrial supervision as directed by Pretrial Services; Deft to be released on own signature; Remaining conditions to be met by 1/9/23. *Mr. Phillips will be released pursuant to a personal recognizance bond in the amount of $15,000,000, co-signed by Alan Steven Jacobson, Anthony Robertson, and Beverly Lyn Jacobson, and secured by $750,000 in cash posted by Mr. Phillips, $250,000 from Alan Jacobson, and $250,000 from Anthony Robertson by 1/9/2023; *Mr. Phillips may retain his United Kingdom passport solely for the purposes of travel between the United States and the United Kingdom and must subsequently surrender his United Kingdom passport and any other travel documents (including any other passports he may possess) within 72 hours of arrival in the United Kingdom to the Pallas Partners law firm, and to the law firm Kaplan Hecker within 72 hours of arrival in the United Stales, and he may only gain access to his United Kingdom passport and any other travel documents with permission of the government; *Mr. Phillips's travel will be restricted to the United Kingdom, the Southern District of New York, and the Eastern District of New York, with all travel on notice to Pretrial Services; *Mr.Phillips shall, at the request of the government or Pretrial Services, make his current financial records available for review. [**Control date set for 1/19/23. Speedy trial time excluded until 1/19/23.] (jbo) (Entered: 01/06/2023) |
| 01/05/2023 | 12 | Appearance Bond Entered as to Neil Phillips: $15,000,000.00 Personal recognizance bond; To be cosigned by Alan Steven Jacobson, Anthony Robertson, and Beverly Lyn Jacobson, and secured by $750,000 in cash posted by Mr. Phillips, $250,000 from Alan Jacobson, and $250,000 from Anthony Robertson by 1/9/2023; Additional conditions..... (jbo) (Main Document 12 replaced on 1/11/2023) (jbo). (Entered: 01/06/2023) |
| 01/06/2023 | 10 | RULE 5(F) ORDER as to Neil Phillips (Signed by Magistrate Judge Sarah Netburn on 1/6/23)(jw) (Entered: 01/06/2023) |
| 01/25/2023 | 13 | LETTER by USA as to Neil Phillips addressed to Judge Ronnie Abrams from AUSA Noah Solowiejczyk dated January 25, 2023 re: Status Conference and Exclusion of Time Document filed by USA. (Attachments: # 1 Text of Proposed Order Proposed Speedy Trial Order)(Solowiejczyk, Noah) (Entered: 01/25/2023) |

| | | |
|---|---|---|
| 01/31/2023 | 14 | MEMO ENDORSEMENT as to Neil Phillips on re: 13 LETTER by USA as to Neil Phillips addressed to Judge Ronnie Abrams from AUSA Noah Solowiejczyk dated January 25, 2023 re: Status Conference and Exclusion of Time. ENDORSEMENT: An initial conference is scheduled for February 9, 2023 at 12:00 p.m. Time is excluded from January 25, 2023 until February 9, 2023 under the Speedy Trial Act, pursuant to 18 U.S.C. Section 3161(h)(7)(A). The lawyers shall appear for the conference in court in person to allow for public access given that authorization for judges in this District to conduct criminal proceedings remotely in accordance with the provisions of Section 15002 of the CARES Act has expired and broadcasting of criminal proceedings is not permissible under Rule 53 of the Federal Rules of Criminal Procedure. Because Mr. Phillips has consented to proceed remotely and this conference does not fall within the scope of the proceedings for which a defendant's presence is required under Rule 43, see generally United States v. Rubin, 37 F.3d 49, 54 (2d Cir. 1994), he may participate remotely. (Pretrial Conference set for 2/9/2023 at 12:00 PM before Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 1/31/2023) (ap) (Entered: 01/31/2023) |
| 02/03/2023 | 15 | LETTER by USA as to Neil Phillips addressed to Judge Ronnie Abrams from AUSAs Noah Solowiejczyk and Thomas Burnett dated February 3, 2023 re: Proposed Protective Order Document filed by USA. (Attachments: # 1 Text of Proposed Order Proposed Protective Order)(Solowiejczyk, Noah) (Entered: 02/03/2023) |
| 02/06/2023 | 16 | PROTECTIVE ORDER as to Neil Phillips...regarding procedures to be followed that shall govern the handling of confidential material. SO ORDERED: (Signed by Judge Ronnie Abrams on 2/6/2023)(bw) (Entered: 02/06/2023) |
| 02/09/2023 | | Minute Entry for proceedings held before Judge Ronnie Abrams: Pretrial Conference as to Neil Phillips held on 2/9/2023. AUSA Noah Solowiejczyk present. AUSA Thomas Burnett present. Defendant (1) Neil Phillips appearing telephonically. Defense counsel Jenna Dabbs and David Gopstein present. Court reporter Pam Utter present. Defendant Neil Phillips waives his physical appearance and consents to proceed telephonically. Motions shall be filed by April 28, 2023, responses by May 26, 2023 and replies by June 9, 2023. Pretrial submissions shall be due by September 27, 2023 and responses by October 4, 2023. A final pretrial conference is scheduled for October 11, 2023 at 2:00 p.m. Trial scheduled for October 16, 2023. Speedy trial time is excluded to October 16, 2023. (Motions due by 4/28/2023. Responses due by 5/26/2023. Replies due by 6/9/2023. Pretrial Conference set for 10/11/2023 at 02:00 PM before Judge Ronnie Abrams ) (Court Reporter Pamela Utter) (ap) (Entered: 02/09/2023) |
| 02/09/2023 | 17 | ORDER as to Neil Phillips. As agreed upon at today's conference, defendants shall file any motions by April 28, 2023, responses shall be due by May 26, 2023 and any replies by June 9, 2023. The parties shall be prepared to try this case on October 16, 2023. Any in limine motions, as well as proposed voir dire questions, jury instructions and verdict forms shall be filed no later than September 27, 2023, and responses thereto filed no later than October 4, 2023. A final pretrial conference shall be held on October 11, 2023 at 2:00 p.m. Time is excluded until October 16, 2023, under the Speedy Trial Act, pursuant to 18 U.S.C. Section 3161(h)(7)(A). SO ORDERED. (Signed by Judge Ronnie Abrams on 2/9/23)(jbo) (Entered: 02/09/2023) |
| 02/22/2023 | 18 | TRANSCRIPT of Proceedings as to Neil Phillips re: Conference held on 2/9/23 before Judge Ronnie Abrams. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/15/2023. Redacted Transcript Deadline set for 3/27/2023. Release of Transcript Restriction set for 5/23/2023. (Moya, Goretti) (Entered: 02/22/2023) |

| | | |
|---|---|---|
| 02/22/2023 | 19 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Conference proceeding held on 2/9/23 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 02/22/2023) |
| 03/01/2023 | 20 | NOTICE OF ATTORNEY APPEARANCE Thomas Somerset Burnett appearing for USA. (Burnett, Thomas) (Entered: 03/01/2023) |
| 04/28/2023 | 21 | MOTION to Dismiss . Document filed by Neil Phillips. (Hecker, Sean) (Entered: 04/28/2023) |
| 04/28/2023 | 22 | MEMORANDUM in Support by Neil Phillips re 21 MOTION to Dismiss .. (Hecker, Sean) (Entered: 04/28/2023) |
| 04/28/2023 | 23 | DECLARATION of Sean Hecker in Support as to Neil Phillips re: 21 MOTION to Dismiss .. (Attachments: # 1 Exhibit A - One Touch Option Letter Agreement)(Hecker, Sean) (Entered: 04/28/2023) |
| 05/26/2023 | 24 | RESPONSE in Opposition by USA as to Neil Phillips re: 21 MOTION to Dismiss .. (Burnett, Thomas) (Entered: 05/26/2023) |
| 06/05/2023 | 25 | NOTICE OF ATTORNEY APPEARANCE Kiersten Ann Fletcher appearing for USA. (Fletcher, Kiersten) (Entered: 06/05/2023) |
| 06/07/2023 | | NOTICE OF CASE REASSIGNMENT as to Neil Phillips, to Judge Lewis J. Liman. Judge Ronnie Abrams no longer assigned to the case. (laq) (Entered: 06/07/2023) |
| 06/08/2023 | | NOTICE OF HEARING as to Neil Phillips: The Final Pretrial Conference and Jury Trial will proceed as previously scheduled, but will now be held in Courtroom 15C at the 500 Pearl Street Courthouse. (Final Pretrial Conference set for 10/11/2023 at 02:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. Jury Trial set for 10/16/2023 at 09:00 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman.) (mf) (Entered: 06/08/2023) |
| 06/11/2023 | 26 | REPLY MEMORANDUM OF LAW in Support as to Neil Phillips re: 21 MOTION to Dismiss . . (Hecker, Sean) (Entered: 06/11/2023) |
| 07/14/2023 | | NOTICE OF HEARING as to Neil Phillips: The Court will hear oral argument from parties on the pending motion to dismiss on July 27, 2023 at 10:00 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 07/14/2023) |
| 07/14/2023 | | NOTICE OF (RESCHEDULED) HEARING as to Neil Phillips: The oral argument on the pending motion to dismiss previously set for July 27, 2023 is rescheduled to August 1, 2023 at 10:00 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 07/14/2023) |
| 07/28/2023 | 27 | LETTER MOTION addressed to Judge Lewis J. Liman from Jenna M. Dabbs dated July 28, 2023 re: request for permission for Defendant to appear remotely at oral argument . Document filed by Neil Phillips. (Dabbs, Jenna) (Entered: 07/28/2023) |
| 07/28/2023 | 28 | NOTICE OF ATTORNEY APPEARANCE: Anne R. Yearwood appearing for Neil Phillips. Appearance Type: Retained. (Yearwood, Anne) (Entered: 07/28/2023) |
| 07/28/2023 | 29 | MEMO ENDORSEMENT 27 LETTER MOTION addressed to Judge Lewis J. Liman from Jenna M. Dabbs dated July 28, 2023 re: request for permission for Defendant to |

| | | |
|---|---|---|
| | | appear remotely at oral argument as to Neil Phillips....ENDORSEMENT... REQUEST GRANTED. The Court permits Mr. Phillips to appear remotely at the upcoming oral argument on August 1, 2023 at 10:00 AM. Counsel will be provided zoom log-in information to which they will provide to Mr. Phillips to access the hearing (Signed by Judge Lewis J. Liman on 7/28/23) (jw) (Entered: 07/28/2023) |
| 08/01/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman:Oral Argument as to Neil Phillips held on 8/1/2023 re: 21 MOTION to Dismiss filed by Neil Phillips. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett and Kiersten Fletcher present. Court reporter present. Defendant, Neil Phillips, appeared remotely by Microsoft Teams Video Conference. No objection by any party with hearing proceeding with defendant appearing remotely. The Court heard oral argument from both parties in regard to defendant's motion to dismiss the indictment [Dkt. No. 21]. Argument taken under advisement, decision reserved by the Court. (jw) (Entered: 08/03/2023) |
| 08/11/2023 | 30 | MOTION for Alexandra Conlon to Withdraw as Attorney . Document filed by Neil Phillips. (Conlon, Alexandra) (Entered: 08/11/2023) |
| 08/11/2023 | 31 | DECLARATION of Alexandra Conlon in Support as to Neil Phillips re: 30 MOTION for Alexandra Conlon to Withdraw as Attorney .. (Conlon, Alexandra) (Entered: 08/11/2023) |
| 08/17/2023 | 32 | TRANSCRIPT of Proceedings as to Neil Phillips re: Oral Argument held on 8/1/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/7/2023. Redacted Transcript Deadline set for 9/18/2023. Release of Transcript Restriction set for 11/15/2023. (McGuirk, Kelly) (Entered: 08/17/2023) |
| 08/17/2023 | 33 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Oral Argument proceeding held on 8/1/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 08/17/2023) |
| 08/22/2023 | | ORDER granting 30 Motion to Withdraw as Attorney. Alexandra Conlon withdrawn from case as to Neil Phillips. (Signed by Judge Lewis J. Liman on 8/22/2023) (st) (Entered: 08/22/2023) |
| 08/25/2023 | 34 | JOINT LETTER MOTION addressed to Judge Lewis J. Liman from Kiersten A. Fletcher dated August 25, 2023 re: Pretrial Disclosure Schedule . Document filed by USA as to Neil Phillips. (Fletcher, Kiersten) (Entered: 08/25/2023) |
| 08/25/2023 | 35 | MEMO ENDORSEMENT granting 34 JOINT LETTER MOTION filed by USA addressed to Judge Lewis J. Liman from AUSA Kiersten A. Fletcher dated August 25, 2023 re: Pretrial Disclosure Schedule.... The Government respectfully submits this letter on behalf of the parties to inform the Court that, in advance of the October 16, 2023 trial date, the parties jointly propose the following pretrial disclosure deadlines, which they request that the Court adopt:... ENDORSEMENT: SO ORDERED. (Signed by Judge Lewis J. Liman on 8/25/2023) (bw) (Entered: 08/25/2023) |
| 09/01/2023 | 36 | OPINION AND ORDER as to Neil Phillips. The motion to dismiss the Indictment is denied without prejudice to Defendant making a Rule 29 motion for judgment of acquittal after the close of the Government's evidence and, if the Rule 29 motion is not granted then, after the close of all evidence. The Clerk of Court is respectfully directed to close |

| | | |
|---|---|---|
| | | Dkt. No. 21. (Signed by Judge Lewis J. Liman on 9/1/2023) (See ORDER set forth) (ap) (Entered: 09/01/2023) |
| 09/25/2023 | 37 | LETTER by USA as to Neil Phillips addressed to Judge Lewis J. Liman from Kiersten A. Fletcher dated September 25, 2023 re: Counts Three and Four Document filed by USA. (Fletcher, Kiersten) (Entered: 09/25/2023) |
| 09/26/2023 | 38 | CONSENT LETTER MOTION addressed to Judge Lewis J. Liman from Jenna M. Dabbs dated September 26, 2023 re: request for extension of deadline for motions in limine . Document filed by Neil Phillips. (Dabbs, Jenna) (Entered: 09/26/2023) |
| 09/27/2023 | 39 | MEMO ENDORSEMENT as to Neil Phillips (1) granting 38 CONSENT LETTER MOTION addressed to Judge Lewis J. Liman from Jenna M. Dabbs dated September 26, 2023 re: request for extension of deadline for motions in limine. ENDORSEMENT: REQUEST GRANTED. The Court approves the extension to deadlines as proposed. (Signed by Judge Lewis J. Liman on 9/27/2023) (ap) (Entered: 09/27/2023) |
| 09/27/2023 | | Set/Reset Deadlines as to Neil Phillips: Motions due by 9/29/2023. Responses due by 10/6/2023. (ap) (Entered: 09/27/2023) |
| 09/29/2023 | 40 | MOTION to Preclude *Testimony of Andrew Newman and Kenneth Froot*. Document filed by USA as to Neil Phillips. (Attachments: # 1 Exhibit Newman Disclosure, # 2 Exhibit Froot Disclosure)(Fletcher, Kiersten) (Entered: 09/29/2023) |
| 09/29/2023 | 41 | MOTION in Limine . Document filed by USA as to Neil Phillips. (Fletcher, Kiersten) (Entered: 09/29/2023) |
| 09/30/2023 | 42 | MOTION in Limine . Document filed by Neil Phillips. (Hecker, Sean) (Entered: 09/30/2023) |
| 09/30/2023 | 43 | DECLARATION of Sean Hecker in Support as to Neil Phillips re: 42 MOTION in Limine .. (Attachments: # 1 Exhibit A - Professor Richard Lyons' Supplemental Expert Disclosure, # 2 Exhibit B - Government's September 1, 2023 Letter and Expert Notice, # 3 Exhibit C - Government's September 8, 2023 3500 Material and 404(b) Letter, # 4 Exhibit D - Professor Carolyn Holmes' Expert Disclosure, # 5 Exhibit E - Professor Carolyn Holmes' Supplemental Expert Disclosure, # 6 Exhibit F - Professor Richard Lyons' Expert Disclosure)(Hecker, Sean) (Entered: 09/30/2023) |
| 10/02/2023 | 44 | ORDER as to Neil Phillips: The Court will hear oral argument from the parties on the pending motions in limine and Daubert motions on October 10, 2023 at 2:30 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. SO ORDERED. (Oral Argument set for 10/10/2023 at 02:30 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman) (Signed by Judge Lewis J. Liman on 10/2/2023) (lnl) (Entered: 10/02/2023) |
| 10/02/2023 | 45 | NOTICE OF ATTORNEY APPEARANCE Andrew Mark Thomas appearing for USA. (Thomas, Andrew) (Entered: 10/02/2023) |
| 10/02/2023 | | NOTICE OF HEARING (CHANGE IN START TIME) as to Neil Phillips: The Oral Argument on the pending motions in limine and Daubert motions scheduled for October 10, 2023 is MOVED to 10:00 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 10/02/2023) |
| 10/06/2023 | 46 | MEMORANDUM in Opposition by Neil Phillips re 40 MOTION to Preclude *Testimony of Andrew Newman and Kenneth Froot*., 41 MOTION in Limine .. (Hecker, Sean) (Entered: 10/06/2023) |
| 10/06/2023 | 47 | DECLARATION of Sean Hecker in Opposition as to Neil Phillips re: 40 MOTION to Preclude *Testimony of Andrew Newman and Kenneth Froot*., 41 MOTION in Limine .. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit A - Andrew Newman and Kenneth A. Froot's Supplemental Expert Disclosures)(Hecker, Sean) (Entered: 10/06/2023) |
| 10/07/2023 | 48 | RESPONSE in Opposition by USA as to Neil Phillips re: 42 MOTION in Limine .. (Fletcher, Kiersten) (Entered: 10/07/2023) |
| 10/09/2023 | 49 | PROPOSED EXAMINATION OF JURORS by USA as to Neil Phillips. (Fletcher, Kiersten) (Entered: 10/09/2023) |
| 10/09/2023 | 50 | Request To Charge by USA as to Neil Phillips. (Fletcher, Kiersten) (Entered: 10/09/2023) |
| 10/09/2023 | 51 | LETTER by USA as to Neil Phillips addressed to Judge Lewis J. Liman from Kiersten A. Fletcher dated October 9, 2023 re: Proposed Verdict Sheet Document filed by USA. (Fletcher, Kiersten) (Entered: 10/09/2023) |
| 10/09/2023 | 52 | Proposed Voir Dire Questions by Neil Phillips. (Hecker, Sean) (Entered: 10/09/2023) |
| 10/09/2023 | 53 | NOTICE of Proposed Verdict Form as to Neil Phillips (Hecker, Sean) (Entered: 10/09/2023) |
| 10/10/2023 | 54 | Request To Charge by Neil Phillips. (Hecker, Sean) (Entered: 10/10/2023) |
| 10/10/2023 | 55 | OPINION & ORDER as to Neil Phillips. Defendant's motions in limine, Dkt. No. 42, and the Government's motions in limine, Dkt. No. 41, and to exclude the expert testimony of Mr. Newman and Professor Froot, Dkt. No. 40, are granted in part and denied in part. The Clerk of Court is respectfully directed to close Dkt. Nos. 40, 41, and 42. (Signed by Judge Lewis J. Liman on 10/10/2023) (See ORDER set forth) (ap) (Entered: 10/11/2023) |
| 10/11/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Court reporter present. The Court heard oral argument from both parties in regard to the pending motions in limine and daubert motions. By 5:00PM on Saturday, October 14, 2023, parties are to submit any objections to the proposed voir dire. Jury Trial to proceed with Jury Selection beginning October 16, 2023 at 9:00AM in Courtroom 15C at the 500 Pearl Street Courthouse before Judge Lewis J. Liman (Jury Selection set for 10/16/2023 at 09:00 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman.) (jw) (Entered: 10/11/2023) |
| 10/11/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Pretrial Conference as to Neil Phillips held on 10/11/2023. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Court reporter present. Parties to provide the Court with disputed issues on request to charge by midnight tomorrow. Oral Argument scheduled for October 13, 2023 at 2:00PM in Courtroom 15C at the 500 Pearl Street Courthouse before Judge Lewis J. Liman. (Oral Argument set for 10/13/2023 at 02:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman) (ap) (Entered: 10/11/2023) |
| 10/12/2023 | 56 | LETTER by USA as to Neil Phillips addressed to Judge Lewis J. Liman from AUSAs Burnett, Fletcher, and Thomas dated October 12, 2023 re: Objections to Defense Proposed Jury Charge Document filed by USA. (Thomas, Andrew) (Entered: 10/12/2023) |
| 10/13/2023 | 57 | MEMORANDUM OF LAW in Support by Neil Phillips re: 54 Request to Charge filed by Neil Phillips . (Hecker, Sean) (Entered: 10/13/2023) |
| 10/13/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Oral Argument as to Neil Phillips held on 10/13/2023. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, |

| | | |
|---|---|---|
| | | Kiersten Fletcher, and Andrew Thomas present. Court reporter present. The Court heard oral argument from both parties. The Court reserves decision. (jbo) (Entered: 10/17/2023) |
| 10/15/2023 | 58 | LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated October 15, 2023 re: Request for Ruling on Rule 6(e) Motion and to Preclude Newly-Disclosed Government Witnesses . Document filed by Neil Phillips. (Hecker, Sean) (Entered: 10/15/2023) |
| 10/16/2023 | 59 | MEMORANDUM AND ORDER as to Neil Phillips. Defendant Neil Phillips ("Defendant") moves, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E), for the Court to either disclose or conduct an in camera review of the instructions given to the grand jury. Dkt. No. 57 at 23; Dkt. No. 58 at 12. Defendant contends that the Government's proposed petit jury charge on the elements of commodities fraud is "incorrect as a matter of law" and "[i]t stands to reason that the government presented the grand jury with the same instructions it seeks for trial." Dkt. No. 57 at 25. Defendant also avers that the Government may not have instructed the grand jury on extraterritoriality and that a failure to do so would constitute error. Id. at 24. The Court heard oral argument on Defendant's motion on October 16, 2023. At oral argument, the Government retorted that a dispute over petit jury instructions is insufficient to show a particularized need for secret grand jury materials. For the following reasons, Defendant's motion is denied.... [*** See this Memorandum And Order ***]... CONCLUSION: Defendant's motion to either disclose or conduct an in camera review of the instructions given to the grand jury, Dkt. No. 57; Dkt No. 58, is DENIED. The Clerk is respectfully directed to close Dkt. No. 58. SO ORDERED. (Signed by Judge Lewis J. Liman on 10/16/2023)(bw) (Entered: 10/16/2023) |
| 10/16/2023 | 60 | TRANSCRIPT of Proceedings as to Neil Phillips re: Conference held on 10/11/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Paula Horovitz, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/6/2023. Redacted Transcript Deadline set for 11/16/2023. Release of Transcript Restriction set for 1/14/2024. (McGuirk, Kelly) (Entered: 10/16/2023) |
| 10/16/2023 | 61 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Conference proceeding held on 10/11/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/16/2023) |
| 10/16/2023 | 62 | TRANSCRIPT of Proceedings as to Neil Phillips re: Oral Argument held on 10/10/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Noah Collin, (212) 805-0320, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/6/2023. Redacted Transcript Deadline set for 11/16/2023. Release of Transcript Restriction set for 1/14/2024. (McGuirk, Kelly) (Entered: 10/16/2023) |
| 10/16/2023 | 63 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Oral Argument proceeding held on 10/10/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely |

| | | |
|---|---|---|
| | | electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/16/2023) |
| 10/16/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Voir Dire held on 10/16/2023 as to Neil Phillips. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Anne Yearwood, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Voir Dire held and Jury selection was completed. 16 jurors were empaneled and sworn. The Court read preliminary instructions to the jurors. Juror #1 was excused. Trial to continue with opening statements on Tuesday, October 17, 2023 at 9:00AM. See Transcript. (Jury Trial set for 10/17/2023 at 09:00 AM before Judge Lewis J. Liman) (Court Reporter Sadie Herbert and Sam Mauro) (ap) (Entered: 10/17/2023) |
| 10/17/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Jury Trial as to Neil Phillips held on 10/17/2023. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Anne Yearwood, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Opening statement heard from the Government. Opening statement heard from the Defendant. The government calls its first witness, Graeme Henderson, and the witness is sworn. First witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its second witness, Jeffrey Gourdji, and the witness is sworn. Second witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its third witness, Nicholas Croix, and the witness is sworn. Third witness's testimony begun through direct and cross examination. Cross examination continued. Evidence entered. Trial continued to Wednesday, October 18, 2023 at 9:00AM. See Transcript. (Jury Trial set for 10/18/2023 at 09:00 AM before Judge Lewis J. Liman) (Court Reporter Sadie Herbert and Sam Mauro) (ap) (Entered: 10/19/2023) |
| 10/18/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Jury Trial as to Neil Phillips held on 10/18/2023. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Anne Yearwood, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Court reporters Sadie Herbert and Eve Giniger present. Government's third witness's testimony continued and concluded. Third witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its fourth witness, Mahesh Narayanan, and the witness is sworn. Fourth witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its fifth witness, Srin Iyer, and the witness is sworn. Fifth witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its sixth witness, Samer Oweida, and the witness is sworn. Sixth witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its seventh witness, Nicholas Burrlock, and the witness is sworn. Seventh witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its eighth witness, Richard Gerbasi, and the witness is sworn. Eighth witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its ninth witness, Maria Silveira, and the witness is sworn. Ninth witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its tenth witness, David Coratti, and the witness is sworn. Tenth witness's testimony begun through direct and cross examination. Cross examination continued. Evidence entered. Trial continued to Thursday, October 19, 2023 at 9:00AM. See Transcript. (lnl) (Entered: 10/19/2023) |
| 10/19/2023 | 64 | LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated October 19, 2023 re: motion to preclude government's use of improper summary charts . |

| | | |
|---|---|---|
| | | Document filed by Neil Phillips. (Hecker, Sean) (Entered: 10/19/2023) |
| 10/19/2023 | 65 | LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated October 19, 2023 re: motion to exclude Government Exhibit 538 . Document filed by Neil Phillips. (Hecker, Sean) (Entered: 10/19/2023) |
| 10/19/2023 | 66 | LETTER by USA as to Neil Phillips addressed to Judge Lewis J. Liman from AUSAs Burnett, Fletcher, and Thomas dated October 19, 2023 re: Opposition to Defense Motion to Preclude Government Summary Charts Document filed by USA. (Attachments: # 1 Exhibit A - GX 650-652, # 2 Exhibit B - Ho Timelines, # 3 Exhibit C - Parnas Timeline, # 4 Exhibit D - Skelos Timeline, # 5 Exhibit E - Calk Chart)(Thomas, Andrew) (Entered: 10/19/2023) |
| 10/19/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Jury Trial as to Neil Phillips held on 10/19/2023. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Anne Yearwood, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Government's tenth witness's testimony continued and concluded. Tenth witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its eleventh witness (as an expert witness), Prof Richard Lyons, and the witness is sworn. Eleventh witness's testimony is heard and entered through examination by both parties and the witness was excused. The government calls its twelfth witness, Krista Santoro, and the witness is sworn. Twelfth witness's testimony is heard and entered through direct examination and the witness was excused. Evidence entered. Trial continued to Friday, October 20, 2023 at 9:00AM. See Transcript. (Jury Trial set for 10/20/2023 at 09:00 AM before Judge Lewis J. Liman) (Court Reporter Sadie Herbert and Pamela Utter) (ap) (Entered: 10/20/2023) |
| 10/20/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Jury Trial as to Neil Phillips held on 10/20/2023. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Anne Yearwood, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. The government calls its thirteenth witness, Jennifer Sunu, and the witness is sworn. Thirteenth witness's testimony is heard and entered through direct examination and the witness was excused. The government calls its fourteenth witness, Bruno Salemme, and the witness is sworn. Fourteenth witness's testimony is heard and entered through examination by both parties and the witness was excused. Government rests its case. Defendant makes its Rule 29 motions, the Court reserves on the motions. Defendant calls its first witness (as an expert witness), Andrew Newman, and the witness is sworn. First witness's testimony begun through direct examination. Direct examination continued. Evidence entered. Trial continued to Monday, October 23, 2023 at 9:00AM. See Transcript. (Jury Trial set for 10/23/2023 at 09:00 AM before Judge Lewis J. Liman) (Court Reporter Sadie Herbert and Pamela Utter) (ap) (Entered: 10/20/2023) |
| 10/21/2023 | 67 | LETTER MOTION addressed to Judge Lewis J. Liman from Kiersten A. Fletcher dated October 21, 2023 re: Evidentiary Issues . Document filed by USA as to Neil Phillips. (Fletcher, Kiersten) (Entered: 10/21/2023) |
| 10/22/2023 | 68 | LETTER RESPONSE to Motion by Neil Phillips addressed to Judge Lewis J. Liman from Sean Hecker dated October 22, 2023 re: 67 LETTER MOTION addressed to Judge Lewis J. Liman from Kiersten A. Fletcher dated October 21, 2023 re: Evidentiary Issues .. (Hecker, Sean) (Entered: 10/22/2023) |
| 10/23/2023 | 69 | LETTER by Neil Phillips addressed to Judge Lewis J. Liman from Sean Hecker dated October 23, 2023 re: legal authority supporting proposed instruction on willfulness (Hecker, Sean) (Entered: 10/23/2023) |

| | | |
|---|---|---|
| 10/23/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Jury Trial as to Neil Phillips held on 10/23/2023. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Anne Yearwood, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Court reporters Sadie Herbert and Sam Mauro present. Defendant's first witness's testimony continued and concluded. First witness's testimony is heard and entered through examination by both parties and the witness was excused. Defendant reads stipulation into evidence. Defendant rests its case. No rebuttal case by Government. Evidence entered. Juror #11 excused. Charge conference held with parties. Trial continued with closing statements and jury charge to Tuesday, October 24, 2023 at 9:00AM. See Transcript. (lnl) (Entered: 10/26/2023) |
| 10/24/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Jury Trial as to Neil Phillips held on 10/24/2023. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Anne Yearwood, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Government's closing statement heard. Defendant's closing statement heard. Government's rebuttal statement heard. The Court charged the Jury. CSO sworn. Jury retired to begin deliberations. Deliberations continued. Alternate Jurors #13 and #14 excused. Court Exhibits #1 and #2 - Juror Notes. Trial continued with jury deliberations to Wednesday, October 25, 2023 at 9:00AM. See Transcript. (Jury Trial set for 10/25/2023 at 09:00 AM before Judge Lewis J. Liman) (Court Reporter Sadie Herbert and Sam Mauro) (ap) (Entered: 10/26/2023) |
| 10/25/2023 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Jury Trial as to Neil Phillips held on 10/25/2023. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Anne Yearwood, Jenna Dabbs, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Jury Deliberations continued and completed. Verdict reached. The jury delivered a unanimous verdict and finds defendant, Neil Phillips, Guilty on Count 2 and Not Guilty on Count 1 of the Indictment. See verdict sheet filed on docket. Jury polled. Jury excused with thanks of the Court and the Nation. Defendant's post-trial motions due by December 8, 2023. Government's response due by January 12, 2024. Defendant's reply due by January 26, 2024. Defendant's bail continued as previously set, with additional condition that Mr. Phillips's travel is limited to the Southern and Eastern Districts of New York until October 28, 2023. Sentencing is set for March 14, 2024 at 2:00PM in Courtroom 15C before Judge Lewis J. Liman. Court Exhibit #3 - Juror Note. PSI ordered, defense counsel must be present for presentence interview. See Transcript. (Motions due by 12/8/2023. Responses due by 1/12/2024. Replies due by 1/26/2024. Sentencing set for 3/14/2024 at 02:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman) (Court Reporter Pamela Utter) (ap) (Entered: 10/27/2023) |
| 10/25/2023 | | JURY VERDICT as to Neil Phillips (1) Guilty on Count 2 Neil Phillips (1) Not Guilty on Count 1. (ap) (Entered: 10/27/2023) |
| 10/25/2023 | | Oral Order of Referral to Probation for Presentence Investigation and Report as to Neil Phillips. (Signed by Judge Lewis J. Liman on 10/25/2023) (ap) (Entered: 10/27/2023) |
| 10/27/2023 | 70 | Juror Notes Court Exhibits: as to USA v. Neil Phillips. (bw) (Entered: 10/27/2023) |
| 10/27/2023 | 71 | VERDICT SHEET: as to USA v. Neil Phillips. Dated: 10/25/2023. (bw) (Entered: 10/27/2023) |
| 10/31/2023 | 72 | TRANSCRIPT of Proceedings as to Neil Phillips re: Oral Argument held on 10/13/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Tracy Groth, (212) 805-0320, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that |

| | | |
|---|---|---|
| | | date it may be obtained through PACER. Redaction Request due 11/21/2023. Redacted Transcript Deadline set for 12/1/2023. Release of Transcript Restriction set for 1/29/2024. (McGuirk, Kelly) (Entered: 10/31/2023) |
| 10/31/2023 | 73 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Oral Argument proceeding held on 10/13/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/31/2023) |
| 11/02/2023 | 74 | LETTER MOTION addressed to Judge Lewis J. Liman from USA dated 11/2/2023 re: Bail Modification . Document filed by USA as to Neil Phillips. (Burnett, Thomas) (Entered: 11/02/2023) |
| 11/02/2023 | 75 | MEMO ENDORSEMENT as to Neil Phillips (1) granting 74 LETTER MOTION addressed to Judge Lewis J. Liman from USA dated 11/2/2023 re: Bail Modification. ENDORSEMENT: REQUEST GRANTED. The Court approves the modification to Mr. Phillips's bail as proposed. (Signed by Judge Lewis J. Liman on 11/2/2023) (ap) (Entered: 11/02/2023) |
| 11/08/2023 | 76 | LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated November 8, 2023 re: request for extension of time to file post-trial motions . Document filed by Neil Phillips. (Hecker, Sean) (Entered: 11/08/2023) |
| 11/08/2023 | 77 | ORDER granting 76 LETTER MOTION request for extension of time to file post-trial motions. SO ORDERED. (Signed by Judge Lewis J. Liman on 11/8/2023) (bts) (Entered: 11/08/2023) |
| 11/13/2023 | 78 | TRANSCRIPT of Proceedings as to Neil Phillips re: Trial held on 10/16/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/4/2023. Redacted Transcript Deadline set for 12/14/2023. Release of Transcript Restriction set for 2/12/2024. (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 79 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Trial proceeding held on 10/16/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 80 | TRANSCRIPT of Proceedings as to Neil Phillips re: Trial held on 10/17/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Sadie Herbert, (212) 805-0310, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/4/2023. Redacted Transcript Deadline set for 12/14/2023. Release of Transcript Restriction set for 2/12/2024. (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 81 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Trial proceeding held on 10/17/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this |

| | | |
|---|---|---|
| | | transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 82 | TRANSCRIPT of Proceedings as to Neil Phillips re: Trial held on 10/18/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Eve Giniger, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/4/2023. Redacted Transcript Deadline set for 12/14/2023. Release of Transcript Restriction set for 2/12/2024. (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 83 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Trial proceeding held on 10/18/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 84 | TRANSCRIPT of Proceedings as to Neil Phillips re: Trial held on 10/19/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Sadie Herbert, (212) 805-0310, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/4/2023. Redacted Transcript Deadline set for 12/14/2023. Release of Transcript Restriction set for 2/12/2024. (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 85 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Trial proceeding held on 10/19/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 86 | TRANSCRIPT of Proceedings as to Neil Phillips re: Trial held on 10/20/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Sadie Herbert, (212) 805-0310, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/4/2023. Redacted Transcript Deadline set for 12/14/2023. Release of Transcript Restriction set for 2/12/2024. (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 87 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Trial proceeding held on 10/20/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 88 | TRANSCRIPT of Proceedings as to Neil Phillips re: Trial held on 10/23/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Sadie Herbert, (212) 805-0310, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/4/2023. Redacted |

| | | |
|---|---|---|
| | | Transcript Deadline set for 12/14/2023. Release of Transcript Restriction set for 2/12/2024. (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 89 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Trial proceeding held on 10/23/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 90 | TRANSCRIPT of Proceedings as to Neil Phillips re: Trial held on 10/24/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/4/2023. Redacted Transcript Deadline set for 12/14/2023. Release of Transcript Restriction set for 2/12/2024. (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 91 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Trial proceeding held on 10/24/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 92 | TRANSCRIPT of Proceedings as to Neil Phillips re: Trial held on 10/25/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/4/2023. Redacted Transcript Deadline set for 12/14/2023. Release of Transcript Restriction set for 2/12/2024. (McGuirk, Kelly) (Entered: 11/13/2023) |
| 11/13/2023 | 93 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Trial proceeding held on 10/25/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/13/2023) |
| 12/08/2023 | 94 | MOTION for Acquittal *or, in the Alternative, for a New Trial*. Document filed by Neil Phillips. (Hecker, Sean) (Entered: 12/08/2023) |
| 12/18/2023 | 95 | LETTER MOTION addressed to Judge Lewis J. Liman from USA dated December 18, 2023 re: Post-Trial Motion Scheduling . Document filed by USA as to Neil Phillips. (Burnett, Thomas) (Entered: 12/18/2023) |
| 12/19/2023 | 96 | MEMO ENDORSEMENT as to Neil Phillips (1) granting 95 LETTER MOTION addressed to Judge Lewis J. Liman from USA dated December 18, 2023 re: Post-Trial Motion Scheduling. ENDORSEMENT: REQUEST GRANTED. (Signed by Judge Lewis J. Liman on 12/19/2023) (ap) (Entered: 12/19/2023) |
| 12/19/2023 | | Set/Reset Deadlines as to Neil Phillips: Responses due by 1/19/2024. Replies due by 2/2/2024. (ap) (Entered: 12/19/2023) |

| | | |
|---|---|---|
| 12/21/2023 | 98 | LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated December 21, 2023 re: request for leave to travel . Document filed by Neil Phillips. (Attachments: # 1 Exhibit A - [FILED UNDER SEAL], # 2 Exhibit B - [FILED UNDER SEAL], # 3 Exhibit C - Waiver of Extradition)(Hecker, Sean) (Entered: 12/21/2023) |
| 12/22/2023 | 99 | LETTER RESPONSE in Opposition by USA as to Neil Phillips addressed to Judge Lewis J. Liman from USA dated December 22, 2023 re: 98 LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated December 21, 2023 re: request for leave to travel .. (Burnett, Thomas) (Entered: 12/22/2023) |
| 12/23/2023 | 100 | ORDER denying 98 LETTER MOTION of Neil Phillips re: request for leave to travel. The motion for a modification of the conditions of release to permit Mr. Phillips to travel to South Africa is denied. Mr. Phillips has not made a sufficient showing that the modification would not create a risk of flight. (Signed by Judge Lewis J. Liman on 12/23/2023) (bts) (Entered: 12/23/2023) |
| 01/19/2024 | 102 | RESPONSE in Opposition by USA as to Neil Phillips re: 94 MOTION for Acquittal *or, in the Alternative, for a New Trial*.. (Burnett, Thomas) (Entered: 01/19/2024) |
| 02/02/2024 | 103 | **FILING ERROR - DEFICIENT DOCKET ENTRY - (SEE DOCUMENT#104)** REPLY MEMORANDUM OF LAW in Support as to Neil Phillips re: 94 MOTION for Acquittal *or, in the Alternative, for a New Trial*. . (Hecker, Sean) Modified on 2/5/2024 (lb). (Entered: 02/03/2024) |
| 02/05/2024 | 104 | REPLY MEMORANDUM OF LAW in Support as to Neil Phillips re: 94 MOTION for Acquittal *or, in the Alternative, for a New Trial*. *(Corrected)*. (Hecker, Sean) (Entered: 02/05/2024) |
| 02/23/2024 | 105 | SCHEDULING ORDER as to Neil Phillips. The Court will hold oral argument on the pending post-trial motions in this matter on March 11, 2024, at 10:00AM in Courtroom 15C at the 500 Pearl Street Courthouse. The sentencing hearing previously scheduled for March 14, 2024 is adjourned. The Court will set a new date for sentencing at the next hearing. SO ORDERED. ( Oral Argument set for 3/11/2024 at 10:00 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. ) (Signed by Judge Lewis J. Liman on 2/23/2024)(bw) (Entered: 02/23/2024) |
| 02/23/2024 | | Terminate Deadlines and Hearings as to Neil Phillips: Terminated Sentencing set for 3/14/2024 at 02:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (bw) (Entered: 02/23/2024) |
| 02/27/2024 | | NOTICE OF HEARING (RESCHEDULED DATE) as to Neil Phillips: The Oral Argument on the pending post-trial motions previously set for March 11, 2024 is rescheduled to March 15, 2024 at 10:00 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 02/27/2024) |
| 03/07/2024 | 106 | LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated March 7, 2024 re: request for permission for Defendant to appear remotely at oral argument . Document filed by Neil Phillips. (Hecker, Sean) (Entered: 03/07/2024) |

| | | |
|---|---|---|
| 03/08/2024 | 107 | MEMO ENDORSEMENT granting 106 LETTER MOTION filed by Neil Phillips (1), addressed to Judge Lewis J. Liman from Attorney Sean Hecker dated March 7, 2024 re: request for permission for Defendant to appear remotely at oral argument.... We write on behalf of our client, Neil Phillips, to respectfully request that the Court permit Mr. Phillips to appear remotely at the oral argument scheduled for March 15, 2024. ENDORSEMENT: REQUEST GRANTED. The Court permits Mr. Phillips to appear remotely at the oral argument. The Court will provide instructions to access the hearing to defendant prior to the date. SO ORDERED. (Signed by Judge Lewis J. Liman on 3/8/2024) (bw) (Entered: 03/08/2024) |
| 03/15/2024 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Oral Argument as to Neil Phillips held on 3/15/2024. Defendant, Neil Phillips (on bail) present (remotely by Microsoft Teams Video Conference) with retained attorneys Jenna Dabbs, Sean Hecker, Anne Yearwood, and David Gopstein. AUSAs Thomas Burnett, Kiersten Fletcher, and Andrew Thomas present. Court reporter present. The Court heard oral argument from both parties regarding the pending post-trial motions. The Court reserves decision. The Government is directed to order a copy of the transcript of the hearing. The Sentencing hearing is scheduled for May 23, 2024 at 2:00PM in Courtroom 15C at the 500 Pearl Street Courthouse before Judge Lewis J. Liman. Defendant's sentencing submissions are due 3 weeks before sentencing and Government's sentencing submissions are due 2 weeks before sentencing. (Sentencing set for 5/23/2024 at 02:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman) (ap) (Entered: 03/21/2024) |
| 03/27/2024 | 108 | OPINION AND ORDER as to Neil Phillips re: 94 MOTION for Acquittal or, in the Alternative, for a New Trial filed by Neil Phillips. For the foregoing reasons, Phillips's motion for a judgment of acquittal or, in the alternative, a new trial, Dkt. No. 94, is DENIED. The Clerk of Court is respectfully directed to close Dkt. No. 94. (Signed by Judge Lewis J. Liman on 3/27/24)(jw) (Entered: 03/27/2024) |
| 04/02/2024 | 109 | TRANSCRIPT of Proceedings as to Neil Phillips re: Conference held on 3/15/2023 before Judge Lewis J. Liman. Court Reporter/Transcriber: Lisa Picciano Franko, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/23/2024. Redacted Transcript Deadline set for 5/3/2024. Release of Transcript Restriction set for 7/1/2024. (McGuirk, Kelly) (Entered: 04/02/2024) |
| 04/02/2024 | 110 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Conference proceeding held on 3/15/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/02/2024) |
| 04/25/2024 | 111 | CONSENT LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated April 25, 2024 re: request for adjournment of sentencing . Document filed by Neil Phillips. (Hecker, Sean) (Entered: 04/25/2024) |
| 04/30/2024 | 112 | MEMO ENDORSEMENT as to Neil Phillips on re: 111 CONSENT LETTER MOTION filed by Neil Phillips addressed to Judge Lewis J. Liman from Attorney Sean Hecker dated April 25, 2024 re: request for adjournment of sentencing. ENDORSEMENT: REQUEST GRANTED. The Sentencing hearing previously set for May 23, 2024 is rescheduled to June 3, 2024 at 10:30AM in Courtroom 15C at the 500 Pearl Street Courthouse. Defendant's sentencing submission is due on May 13, 2024. Government's |

| | | |
|---|---|---|
| | | sentencing submission is due on May 20, 2024. SO ORDERED. ( Defendant's sentencing submission due by 5/13/2024. Government's sentencing submission due by 5/20/2024. Sentencing set for 6/3/2024 at 10:30 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. )(Signed by Judge Lewis J. Liman on 4/30/2024) (bw) (Entered: 04/30/2024) |
| 05/13/2024 | 113 | SENTENCING SUBMISSION by Neil Phillips. (Attachments: # 1 Exhibit A - S)(Hecker, Sean) (Entered: 05/13/2024) |
| 05/20/2024 | 114 | SENTENCING SUBMISSION by USA as to Neil Phillips. (Burnett, Thomas) (Entered: 05/20/2024) |
| 05/29/2024 | 115 | LETTER by Neil Phillips addressed to Judge Lewis J. Liman from Sean Hecker dated May 29, 2024 re: response to the government's sentencing submission (Hecker, Sean) (Entered: 05/29/2024) |
| 05/30/2024 | 116 | ORDER as to Neil Phillips. A sentencing hearing is scheduled in this case for June 3, 2024. The parties dispute the Guidelines applicable to this case. The Court will entertain at the hearing any objections to the factual recitations in the Presentence Report and argument from the parties as to the applicable Guidelines. Sentencing in this case will be deferred to a future date, which the Court will set at the hearing on June 3, 2024. SO ORDERED. (Signed by Judge Lewis J. Liman on 5/30/2024) (bw) (Entered: 05/30/2024) |
| 06/03/2024 | 117 | MOTION for Kiersten Ann Fletcher to Withdraw as Attorney . Document filed by USA as to Neil Phillips. (Fletcher, Kiersten) (Entered: 06/03/2024) |
| 06/03/2024 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Oral Argument as to Neil Phillips held on 6/3/2024. Defendant, Neil Phillips (on bail) present (remotely by Microsoft Teams Video Conference) with retained attorneys Jenna Dabbs, Sean Hecker, and David Gopstein. AUSA Thomas Burnett present. Court reporter present. Defendant waives right to be physically present. The Court heard oral argument from both parties regarding the sentencing guidelines. The Court reserves decision. Defendant's supplemental submissions are due by June 13, 2024. Government response due by June 20, 2024. The Sentencing hearing is rescheduled to June 25, 2024 at 10:30AM in Courtroom 15C at the 500 Pearl Street Courthouse before Judge Lewis J. Liman. (Responses due by 6/20/2024. Sentencing set for 6/25/2024 at 10:30 AM before Judge Lewis J. Liman.) (jbo) (Entered: 06/12/2024) |
| 06/04/2024 | 118 | MEMO ENDORSEMENT as to Neil Phillips granting 117 MOTION for Kiersten Ann Fletcher to Withdraw as Attorney. ENDORSEMENT: The motion to withdraw is hereby GRANTED. (Attorney Kiersten Ann Fletcher terminated in case as to Neil Phillips) (Signed by Judge Lewis J. Liman on 6/4/2024) (lnl) (Entered: 06/04/2024) |
| 06/13/2024 | 119 | Sentencing Letter by Neil Phillips addressed to Judge Lewis J. Liman from Sean Hecker dated June 13, 2024 re: Supplemental Sentencing Submission. (Hecker, Sean) (Entered: 06/13/2024) |
| 06/17/2024 | 120 | TRANSCRIPT of Proceedings as to Neil Phillips re: Conference held on 6/3/2024 before Judge Lewis J. Liman. Court Reporter/Transcriber: Amy Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/8/2024. Redacted Transcript Deadline set for 7/18/2024. Release of Transcript Restriction set for 9/16/2024. (McGuirk, Kelly) (Entered: 06/17/2024) |
| 06/17/2024 | 121 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Conference proceeding held on 6/3/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have |

| | | |
|---|---|---|
| | | seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/17/2024) |
| 06/18/2024 | 122 | SENTENCING SUBMISSION by USA as to Neil Phillips. (Burnett, Thomas) (Entered: 06/18/2024) |
| 06/20/2024 | 123 | ORDER as to Neil Phillips: Sentencing in this case is scheduled for Tuesday, June 25, 2024. The Court hereby gives notice that (as foreshadowed in the prior conference and in the submissions of both parties) the Court is considering granting a downward variance from the Guidelines in this case. The Court is further considering imposing a fine in this case. The parties should be prepared to address both issues. Finally, with respect to the terms of supervised release which the Court currently intends to impose, the Court intends to impose a special condition thatnotwithstanding the standard condition that the defendant be supervised by the district of residenceMr. Phillips be permitted to reside abroad, including in his current residence. The parties are directed to meet and confer in advance of sentencing to discuss the residences in which Mr. Phillips should be permitted to reside during his period of supervised release. SO ORDERED. (Signed by Judge Lewis J. Liman on 6/20/2024) (lnl) (Entered: 06/20/2024) |
| 06/20/2024 | | *****DELETED DOCUMENTS. Deleted document numbers 124 and 125 ORDERS, as to Neil Phillips. The document was incorrectly filed in this case. (lnl)** (Entered: 06/20/2024) |
| 06/25/2024 | | Minute Entry for proceedings held before Judge Lewis J. Liman:Sentencing held on 6/25/2024 for Neil Phillips (1) Count 2. Defendant, Neil Phillips (on bail) present with retained attorneys Sean Hecker, Jenna Dabbs, David Gopstein, and Anne Yearwood. AUSA Thomas Burnett present. FBI Special Agent Patrick Zielinski present. Court reporter present. Defendant sentenced to time served, with a term of Supervised Release to be served. The Court notified defendant of right to appeal. See Judgment. (jw) (Entered: 06/28/2024) |
| 06/28/2024 | | DISMISSAL OF COUNTS on Government Motion as to Neil Phillips (1) Count 1,3,4. (jw) (Entered: 06/28/2024) |
| 06/28/2024 | 124 | FILED JUDGMENT IN A CRIMINAL CASE as to Neil Phillips (1), Count(s) 1, 3, 4, Dismissed; Found guilty on Count(s) 2, Imprisonment for a total term of Time Served. Supervised release for a term Two Years. The defendant will be permitted to reside in the locations of his current residences in the city of London, and in South Africa without further application to the Court. If the defendant intends to live elsewhere, he will have to apply to the Court for modification of the terms of his supervised release. As a modification to Standard Condition #1 - The defendant shall report via phone call to the probation office in the Southern District of New York within 72 hours of his arrival in the location where he intends to reside. Special Assessment of $100 which is due immediately. Fine of $1,000,000.00 will be payable by June 25, 2025. (Signed by Judge Lewis J. Liman on 6/25/24)(jw) (Entered: 06/28/2024) |
| 07/01/2024 | 125 | TRANSCRIPT of Proceedings as to Neil Phillips re: Sentence held on 6/25/2024 before Judge Lewis J. Liman. Court Reporter/Transcriber: Martha Martin, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/22/2024. Redacted Transcript Deadline set for 8/1/2024. Release of Transcript Restriction set for 9/30/2024. (McGuirk, Kelly) (Entered: 07/01/2024) |

| | | |
|---|---|---|
| 07/01/2024 | 126 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Phillips. Notice is hereby given that an official transcript of a Sentence proceeding held on 6/25/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 07/01/2024) |
| 07/12/2024 | 127 | NOTICE OF APPEAL by Neil Phillips from 124 Judgment. (nd) (Entered: 07/15/2024) |
| 07/12/2024 | | USCA Appeal Fees received $ 605.00, receipt number 30959 as to Neil Phillips on 7/12/2024 re: 127 Notice of Appeal filed by Neil Phillips. (nd) (Entered: 07/15/2024) |
| 07/15/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Neil Phillips to US Court of Appeals re: 127 Notice of Appeal. (nd) (Entered: 07/15/2024) |
| 07/15/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Neil Phillips re: 127 Notice of Appeal were transmitted to the U.S. Court of Appeals. (nd) (Entered: 07/15/2024) |
| 07/31/2024 | 128 | MOTION to Release Bond Obligation . Document filed by Neil Phillips. (Attachments: # 1 Proposed Order Exoneration of Bond)(Hecker, Sean) (Entered: 07/31/2024) |
| 08/01/2024 | 129 | ORDER as to Neil Phillips. WHEREAS, on January 5, 2023, the Defendant Neil Phillips' bond was imposed in the amount of $15,000,000.00, of which $1,250,000.00 was deposited in cash, and of that cash deposit, Mr. Phillips tendered $750,000.00, Alan Steven Jacobson tendered $250,000.00, and Anthony Robertson tendered $250,000.00, all to the Clerk of the United States District Court for the Southern District of New York (the "Clerk") (see ECF 12); WHEREAS, on November 2, 2023, the Defendant Neil Phillips' bond was increased from $15,000,000.00 to $20,000,000.00 (see ECF 75); WHEREAS, on June 25, 2024, the Defendant Neil Phillips was sentenced to time served, a term of two years of supervised release, a $1 million fine, and a $100 special assessment (ECF 124); and WHEREAS, the Defendant Neil Phillips has paid the $100 special assessment imposed by the Court at his sentencing hearing of June 25, 2024; IT IS HEREBY ORDERED, that the bond imposed in this matter is exonerated; IT IS FURTHER ORDERED, that the Clerk shall apply the $750,000 deposited by Mr. Phillips in connection with his bond toward payment of the $1 million fine imposed at sentencing; and IT IS FURTHER ORDERED, that the Clerk shall return the $250,000.00 from Alan Steven Jacobson, in a method of disbursement to be determined by the Clerk and Hecker Fink LLP, to Hecker Fink LLP (for subsequent disbursement to Mr. Jacobson), and the $250,000.00 from Anthony Robertson to Hecker Fink LLP (for subsequent disbursement to Mr. Robertson). SO ORDERED. (Signed by Judge Lewis J. Liman on 8/1/2024) (bw) (Entered: 08/01/2024) |
| 10/22/2024 | 130 | LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated October 22, 2024 re: joint request to supplement the record on appeal . Document filed by Neil Phillips. (Attachments: # 1 Exhibit A - Draft Jury Charge (10/16/23), # 2 Exhibit B - Revised Draft Jury Charge (10/21/23), # 3 Exhibit C - Revised Draft Jury Charge (Redline) (10/21/23), # 4 Exhibit D - Stipulation Regarding the Record on Appeal) (Hecker, Sean) (Entered: 10/22/2024) |
| 10/22/2024 | 131 | MEMO ENDORSEMENT as to Neil Phillips (1) granting 130 LETTER MOTION addressed to Judge Lewis J. Liman from Sean Hecker dated October 22, 2024 re: joint request to supplement the record on appeal. ENDORSEMENT: The motion is granted. SO ORDERED. (Signed by Judge Lewis J. Liman on 10/22/2022) (lnl) (Entered: 10/22/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/24/2024 12:55:04 | | | |
| **PACER Login:** | teamrpacc | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cr-00138-LJL |
| **Billable Pages:** | 20 | **Cost:** | 2.00 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

NEIL PHILLIPS,

Defendant.

**SEALED INDICTMENT**

22 Cr.

22 CRIM 138

**COUNT ONE**
**(Conspiracy to Commit Commodities Fraud)**

The Grand Jury charges:

Overview of the Scheme

1. In or about December 2017, NEIL PHILLIPS, the defendant, and others engaged in a scheme to artificially manipulate the United States dollar ("USD")/South African rand ("ZAR") exchange rate. PHILLIPS manipulated and sought to manipulate the USD/ZAR exchange rate in order to fraudulently trigger a payment under a barrier options contract into which his hedge fund had entered. Under this barrier options contract, PHILLIPS' hedge fund and a client of PHILLIPS' hedge fund were, collectively, entitled to a $20 million payment if the USD/ZAR exchange rate fell below a particular level at any time on or before a particular date.

2. On December 26, 2017 ("Boxing Day 2017"), NEIL PHILLIPS, the defendant, engaged in foreign currency exchange spot transactions in which PHILLIPS' hedge fund exchanged

hundreds of millions of USD in return for ZAR. PHILLIPS engaged in these USD/ZAR spot transactions for the purpose of intentionally and artificially driving the USD/ZAR exchange rate below the threshold level set by the barrier options contract in order to trigger the $20 million payment and defraud the counterparties to the options contract.

Relevant Individuals and Entities

3. At all times relevant to this Indictment, NEIL PHILLIPS, the defendant, was the co-founder and co-Chief Investment Officer of a hedge fund based in the United Kingdom ("Hedge Fund-1").

4. Hedge Fund-1 was a global "macro" hedge fund that focused on macroeconomic trends and emerging markets, and on the foreign exchange markets and currency and commodity products. NEIL PHILLIPS, the defendant, co-founded Hedge Fund-1 in or about 2015. At all times relevant to this Indictment, Hedge Fund-1 was registered as a commodity pool operator with the Commodity Futures Trading Commission (the "CFTC") and PHILLIPS was registered with the CFTC as associated with Hedge Fund-1.

Relevant Background and Terminology

5. The foreign currency exchange ("FX") market is a global market in which participants trade currencies in pairs. In a currency pair, each currency is valued relative to the

other. The ratio that expresses the value of one currency in relation to the other is commonly referred to as the "exchange rate" or the "rate."

6. The USD/ZAR is one such currency pair. An exchange rate of 12.50 USD/ZAR would thus reflect that a party could sell one USD in return for 12.50 ZAR.

7. There is no single, official marketplace for FX transactions. Customers trade directly with FX dealer banks. Several of these banks are global banks that are able to exchange many of the world's currencies, in large amounts, upon a customer's request.

8. FX "spot" trades involve one party agreeing to receive a particular currency in exchange for delivering a different currency, at an agreed-upon price and quantity. The actual exchange of the currencies (i.e. the trade "settlement") in connection with these FX spot transactions typically take place two business days after the parties agree on the terms of the transaction.

9. A substantial portion of FX spot transactions involving the USD, including the USD/ZAR currency pair, are settled through a third-party settlement bank that is headquartered in Manhattan, New York (the "Settlement Bank"). The Settlement Bank maintains a matching and settlement system

for member institutions engaged in FX transactions. At all times relevant to this Indictment, the Settlement Bank settled FX transactions in approximately 18 currencies, including the USD and the ZAR. The Settlement Bank conducted multilateral netting of all of its member institutions' transactions in all 18 currencies on a daily basis. With respect to the USD, the multilateral netting process occurred multiple times per day. Following this multilateral netting process, the Settlement Bank calculated whether its member institutions either owed USD or were entitled to receive USD. The USD portion of all FX transactions settled by the Settlement Bank flowed in and out of bank accounts held at the Federal Reserve Bank of New York.

The $20 Million One Touch Option

10. On or about October 30, 2017, Hedge Fund-1 purchased a "one touch" digital barrier option for the USD/ZAR currency pair with a notional value of $20 million, a barrier rate of 12.50, and an expiration date of January 2, 2018 (the "$20 Million One Touch Option"). Under the terms of the $20 Million One Touch Option, in the event that the USD/ZAR exchange rate went below 12.50 at any point prior to on or about January 2, 2018, Hedge Fund-1 would be entitled to a $20 million payment.

11. Hedge Fund-1 purchased the $20 Million One Touch Option through a financial services firm ("Intermediary Firm-1")

that facilitates trades on behalf of underlying clients. Intermediary Firm-1 permits its underlying clients to maintain anonymity in such transactions. The party that was ultimately obligated to pay $20 million in the event the $20 Million One Touch Option was triggered was a subsidiary of a bank headquartered in Manhattan, New York ("Bank-1"). Hedge Fund-1 and Bank-1 were not aware of the identity of their respective counterparties to the $20 Million One Touch Option contract.

12. Hedge Fund-1 subsequently allocated the notional value of the $20 Million One Touch Option such that Hedge Fund-1 would receive $15,660,000 and a fund that was a client of Hedge Fund-1 ("Client Fund-1") would receive the remaining $4,340,000 in the event that the $20 Million One Touch Option was triggered.

13. A bank that is headquartered in Manhattan, New York ("Bank-2"), acted as Hedge Fund-1's prime broker in connection with the $20 Million One Touch Option. After Hedge Fund-1 entered into the $20 Million One Touch Option, Bank-2 provided Hedge Fund-1 with a letter agreement that set forth the terms and conditions of the transaction. This letter agreement stated, among other things, that Hedge Fund-1 would be "acting in good faith and in a commercially reasonable manner" as the "Calculation Agent" in connection with the $20 Million One Touch Option and that Hedge Fund-1's "determinations and calculations"

would be "binding in the absence of manifest error." The letter agreement incorporated by reference the "2005 Barrier Option Supplement" published by the International Swaps and Derivatives Association, Inc. The 2005 Barrier Option Supplement stated, among other things, that the "Barrier Determination Agent" is "the party who determines whether or not a Barrier Event has occurred and provides notice if it determines that a Barrier Event has occurred" and that the "Barrier Determination Agent shall be the Calculation Agent" unless otherwise specified. The 2005 Barrier Option Supplement further stated that the "occurrence of a Barrier Event shall be determined in good faith and in a commercially reasonable manner by the Barrier Determination Agent."

<u>The Events Leading Up To Boxing Day 2017</u>

14. On or about October 30, 2017, the date that Hedge Fund-1 purchased the $20 Million One Touch Option, the USD/ZAR exchange rate was over 14.00. Between early November 2017 through on or about December 15, 2017, the USD/ZAR exchange rate fluctuated between approximately 14.50 and approximately 13.15.

15. December 16 and December 17, 2017, fell on a weekend. On or about Monday, December 18, 2017, following the announcement that a particular candidate ("Candidate-1") had been elected as president of the African National Congress

political party in South Africa, the USD/ZAR exchange rate lowered substantially, dropping to as low as approximately 12.52. But the USD/ZAR exchange rate did not fall lower than 12.50 on or about December 18, 2017, and thus Hedge Fund-1's $20 Million One Touch Option was not triggered.

16. Between on or about December 19, 2017, and on or about December 24, 2017, the USD/ZAR exchange rate did not fall below 12.50, and, accordingly, Hedge Fund-1's $20 Million One Touch Option was not triggered.

PHILLIPS Intentionally Manipulates the USD/ZAR Rate on Boxing Day 2017

17. With the $20 Million One Touch Option set to expire in a matter of days, on Boxing Day 2017, NEIL PHILLIPS, the defendant, engaged in a scheme to intentionally and artificially manipulate the USD/ZAR exchange rate to drive the rate below 12.50 and trigger payment under the $20 Million One Touch Option. PHILLIPS caused and sought to cause the USD/ZAR exchange rate to fall below 12.50 by engaging in FX spot trades in which he caused hundreds of millions of USD to be exchanged for ZAR. PHILLIPS engaged in this USD/ZAR FX spot trading for the express purpose of artificially driving the USD/ZAR rate below 12.50. In particular, by selling a large volume of USD in return for ZAR in a short period of time, PHILLIPS created an

artificial demand for the ZAR, which had the impact of strengthening the ZAR against the USD (i.e. as demand for ZAR increased the ZAR became more expensive). This strengthening of the ZAR against the USD meant that the exchange rate lowered (i.e. a seller of USD would receive less ZAR in return because the ZAR had now become more expensive).

18. Between shortly before midnight London time on December 25, 2017 (Christmas day) and approximately 12:45 a.m. London time on December 26, 2017 (Boxing Day), NEIL PHILLIPS, the defendant, directed a Singapore-based employee ("CC-1") of a bank ("Bank-3") to sell, on behalf of Hedge Fund-1, a total of approximately $725 million USD in exchange for ZAR.[1] PHILLIPS explicitly stated to CC-1 that his goal in conducting these USD/ZAR FX spot trades was to drive down the USD/ZAR exchange rate below 12.50. During the course of that approximately one-hour period, PHILLIPS, through his trading, caused the USD/ZAR rate to fall substantially in this short period of time until the rate went just below 12.50. As soon as PHILLIPS had achieved his objective and the USD/ZAR exchange rate fell below

[1] Bank-3 was acting as a dealer bank in connection with these FX spot transactions and was acting at the direction of PHILLIPS and Hedge Fund-1, who were the customer. PHILLIPS provided Bank-3 with orders and then Bank-3 sought out counterparties in the market in order to exchange USD for ZAR.

12.50 due to PHILLIPS' manipulative spot trading activity, PHILLIPS immediately directed that CC-1 cease trading.

19. NEIL PHILLIPS, the defendant, instructed CC-1 to conduct this USD/ZAR FX spot trading through Bloomberg chat messages. At the time PHILLIPS sent these chat messages, PHILLIPS was located in South Africa and CC-1 was located in Singapore. Other employees of Hedge Fund-1 and Bank-3 were also participants in the Bloomberg chat room in which PHILLIPS instructed CC-1 to conduct the USD/ZAR FX spot trading. These other participants in the Bloomberg chat room included, among others, a Hedge Fund-1 employee based in London ("CC-2"), a Hedge Fund-1 employee that worked in Manhattan, New York, and employees of Bank-3 based in Manhattan.

20. In the Bloomberg chat messages between NEIL PHILLIPS, the defendant, and CC-1, PHILLIPS explicitly directed CC-1 to continue selling until the USD/ZAR rate fell below 12.50 and expressly stated that PHILLIPS' purpose in directing these USD/ZAR spot trades was to drive the USD/ZAR rate below 12.50. For example:

a. At approximately 12:09 a.m. London time on December 26, 2017, PHILLIPS stated, in substance and in part, "my aim is to trade thru 50." CC-1 responded, "Ok sure."

b. At approximately 12:16 a.m. London time on December 26, 2017, PHILLIPS stated, in substance and in part, "Need to get it thru 50."

c. At approximately 12:19 a.m. London time on December 26, 2017, PHILLIPS asked CC-1, in substance and in part, "How much liquidity do u think between now and 50." CC-1 responded, in substance and in part, "we are the only sellers in the market, we've sold about 100 [million USD] and it's moved about 5 big figures . . . . but I imagine there is much more depth on the bid the closer we get to 12.50."[2]

d. At approximately 12:25 a.m. London time on December 26, 2017, PHILLIPS again stated, in substance and in part, "Need it to trade thru 50. 4990 is fine."

e. At approximately 12:27 a.m. London time on December 26, 2017, PHILLIPS, after instructing CC-1 to sell another 100 million USD for ZAR, stated, in substance and in part, "Get it thru."

f. At approximately 12:31 a.m. London time on December 26, 2017, CC-1 informed PHILLIPS, in substance and in part, that Bank-3 had sold 415 million USD in exchange for ZAR

[2] A "figure" is the second decimal point, i.e. .01. Accordingly, if, for example, a foreign exchange rate moved from 12.56 to 12.51, it would have moved by .05, or "5 big figures."

at PHILLIPS' direction thus far and that the lowest exchange rate the USD/ZAR had hit for the day was 12.5050. PHILLIPS responded by asking, in substance and in part, "[h]ow much more u think to break 50." CC-1 responded, in substance and in part, "if it's 100 bux [100 million USD] every 25 pips then at least another 200."[3]

g. At approximately 12:42 a.m. London time on December 26, 2017, PHILLIPS instructed CC-1, in substance and in part, to sell an additional 100 million USD in exchange for ZAR and stated, in substance and in part, "try to get it thru now," referring to driving the USD/ZAR exchange rate below 12.50. CC-1 stated in response, in substance and in part, "i will let you know as soon as we sell any below the figure."

h. At approximately 12:44 a.m. London time on December 26, 2017, CC-1 told PHILLIPS, in substance and in part, "we just sold at 4990." Approximately one minute later CC-1 stated, in substance and in part, "We are finishing now, will be 725 mio [million USD] all day." PHILLIPS responded, in substance and in part at approximately 12:45 a.m. London time, "Pls. [please] get me prof [proof] of the print. And stip [sic]

---

[3] A "pip" is the last (fourth) decimal point, i.e. 0.0001.

stop," referring to the fact that CC-1 should cease trading immediately.

i. At approximately 12:47 a.m. London time on December 26, 2017, PHILLIPS asked CC-1, "where is it now." CC-1 responded, in substance and in part that a particular pricing service was "showing 12.4975 as the low" and asked "[t]hat's sufficient yeah?" PHILLIPS responded, in substance and in part, "Perfect."

j. PHILLIPS thereafter instructed CC-1 to confirm the details of the trade with PHILLIPS' Hedge Fund-1 employee, CC-2. CC-2 and CC-1 thereafter briefly corresponded in the Bloomberg chat room regarding the details surrounding the USD/ZAR trade.

21. Following completion of the above-described spot trade, CC-1 sent NEIL PHILLIPS, the defendant, and others a trade summary reflecting that Hedge Fund-1 had sold in total approximately 725 million USD in exchange for approximately 9,070,902,750 ZAR.

22. On or about December 26, 2017, in the hours that followed the completion of the above-described USD/ZAR FX spot trading directed by NEIL PHILLIPS, the defendant, the USD/ZAR exchange rate once again increased and returned to levels above

the 12.50 barrier rate and did not go below the rate of 12.50 for the remainder of the day.

PHILLIPS Causes the Fraudulent Triggering of the $20 Million One Touch Option

23. Only five minutes after NEIL PHILLIPS, the defendant, caused the USD/ZAR FX spot rate to fall below 12.50, at approximately 12:52 a.m. London time on December 26, 2017, PHILLIPS instructed CC-2 in a Bloomberg chat message, in substance and in part, to notify Intermediary Firm-1 that the $20 Million One Touch Option had been triggered. Consistent with PHILLIPS' directive, CC-2 thereafter contacted an employee of Intermediary Firm-1 to confirm that the $20 Million One Touch Option had been triggered. CC-2's email to the employee of Intermediary Firm-1 omitted the fact that the triggering event – the USD/ZAR exchange rate falling below 12.50 – had occurred as a result of the manipulation of the USD/ZAR exchange rate by PHILLIPS. The employee of Intermediary Firm-1 thereafter confirmed to CC-2 that the $20 Million One Touch Option had been triggered.

24. Bank-2, which was serving as Hedge Fund-1's prime broker in connection with the $20 Million One Touch Option and with whom Hedge Fund-1 had executed the relevant letter agreement governing the transaction, required confirmation from

both the executing broker and from Hedge Fund-1 that the $20 Million One Touch Option had, in fact, been triggered. In this regard, on or about December 27, 2017, an employee of Hedge Fund-1 notified Bank-2, in substance and in part, that "[t]he below option level of 12.50 was hit yesterday" and sought to process payment in connection with the triggering of the $20 Million One Touch Option. This representation by Hedge Fund-1 to Bank-2 that the $20 Million One Touch Option had been triggered omitted the fact that the triggering event - the USD/ZAR exchange rate falling below 12.50 - had occurred as a result of the manipulation of the USD/ZAR exchange rate by NEIL PHILLIPS, the defendant.

25. The manipulation of the USD/ZAR rate on or about December 26, 2017, caused by NEIL PHILLIPS, the defendant, accordingly, resulted in the $20 Million One Touch Option being triggered, thereby defrauding the parties to the $20 Million One Touch Option and causing Hedge Fund-1 and Client Fund-1 to receive a payment pursuant to the terms of the $20 Million One Touch Option. In particular, on or about December 27, 2017, Bank-1, in connection with the $20 Million One Touch Option, sent a wire transfer of $20 million to a bank account controlled by a financial institution that was acting as Intermediary Firm-1's broker in connection with the transaction, which wire passed

through Manhattan, New York, as a result of the triggering of the $20 Million One Touch Option. On or about December 28, 2017, Bank-2, which was acting as Hedge Fund-1's prime broker, sent a wire transfer of $15,660,000 to a bank account held by Hedge Fund-1, which wire passed through Manhattan, New York. On or about December 28, 2017, Bank-2 also sent a wire transfer of $4,340,000 to a bank account held by Client Fund-1, which wire passed through Manhattan, New York.

The Settlement of the Boxing Day USD/ZAR FX Spot Trades

26. The USD/ZAR spot trades directed by NEIL PHILLIPS, the defendant, through Bank-3 on December 26, 2017, Boxing Day 2017, were settled through the Settlement Bank on or about December 28, 2017. In particular, on or about December 26, 2017, Bank-3 and Bank-2, which was acting as Hedge Fund-1's prime broker in connection with the trade, communicated settlement instructions relating to this USD/ZAR spot trade to the Settlement Bank, which were received by the Settlement Bank in, among other locations, the United States. On or about December 28, 2017, after the Settlement Bank netted out all FX transactions conducted by Bank-3 and Bank-2 across all 18 currencies settled by the Settlement Bank, Bank-3 transferred funds in USD into bank accounts held at the Federal Reserve Bank of New York, and

the Settlement Bank transferred funds from bank accounts held at the Federal Reserve Bank of New York in USD to Bank-2.

PHILLIPS's Statements to Hedge Fund-1 Investors

27. In or about January 2018, Hedge Fund-1 sent a communication to Hedge Fund-1 investors, which was signed by NEIL PHILLIPS, the defendant, and his co-founder. This communication to investors stated, in substance and in part, the following:

> The stand-out performance within EM [emerging markets] during December was, however, unrelated to broader market trends and, instead, reflected idiosyncratic political news in South Africa.
>
> *    *    *
>
> We had anticipated the potential for large swings in South African assets around the ANC [the African National Congress] electoral conference and, in particular, believed that the market had priced in too little risk of a [Candidate-1] victory. This judgment proved to be correct with the market subsequently coming to terms with the scope for a more positive policy dynamic than seen in South Africa for a long time.

28. Hedge Fund-1's communication to investors in or about January 2018 further reflected a positive 6 percent return for the month of December 2017.

29. Hedge Fund-1's January 2018 communication to investors, while touting Hedge Fund-1's predictions with respect

to South African political events and touting its returns for the month of December 2017, did not disclose to investors that NEIL PHILLIPS, the defendant, had intentionally and artificially manipulated the USD/ZAR exchange rate, nor did it disclose that PHILLIPS' rate manipulation had caused Hedge Fund-1 to receive a payment under the $20 Million One Touch Option.

**Statutory Allegations**

30. In or about December 2017, in the Southern District of New York and elsewhere, NEIL PHILLIPS, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1.

31. It was a part and an object of the conspiracy that NEIL PHILLIPS, the defendant, willfully and knowingly, would and did, directly and indirectly, use and employ, in connection with a swap, a contract of sale of a commodity in interstate and foreign commerce, or for future delivery on or subject to the rules of any registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing,

and attempting to use and employ, any manipulative device, scheme, and artifices to defraud; (2) making, and attempting to make, any untrue or misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue or misleading; and (3) engaging, or attempting to engage in any act, practice, and course of business which operates and would operate as a fraud and deceit upon any person, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5).

Overt Acts

32. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about December 25, 2017, and December 26, 2017, NEIL PHILLIPS, the defendant, while located outside of the United States, sent Bloomberg chat messages to CC-1, CC-2, and others, which messages passed through the Southern District of New York and were received and accessed by individuals located in the Southern District of New York, directing USD/ZAR FX spot trades in furtherance of a conspiracy to defraud involving the manipulation of the USD/ZAR exchange rate.

b. On or about December 25, 2017, and December 26, 2017, CC-1, acting at the direction of PHILLIPS, caused FX spot trades that resulted in 725 million USD being sold in exchange for ZAR.

c. On or about December 26, 2017, PHILLIPS sent Bloomberg chat messages to CC-2, which messages passed through the Southern District of New York, instructing CC-2, in substance and in part, to inform Intermediary Firm-1 that the $20 Million One Touch Option had been triggered.

d. On or about December 26, 2017, as directed by PHILLIPS, CC-2 sent an email to an employee of Intermediary Firm-1 in which CC-2 informed the employee of Intermediary Firm-1 that the $20 Million One Touch Option had been triggered, while not disclosing that the triggering event - the USD/ZAR exchange rate falling below 12.50 - had occurred as a result of the manipulation of the USD/ZAR exchange rate by PHILLIPS.

e. In connection with the triggering of the $20 Million One Touch Option, PHILLIPS and others caused Bank-1, on or about December 27, 2017, to send a wire transfer of $20 million, which wire passed through Manhattan, New York.

f. In connection with the triggering of the $20 Million One Touch Option, PHILLIPS and others caused Bank-2, on or about December 28, 2017, to send a wire transfer of

$15,660,000 to a bank account held by Hedge Fund-1, which wire passed through Manhattan, New York.

g. In connection with the triggering of the $20 Million One Touch Option, PHILLIPS and others caused Bank-2, on or about December 28, 2017, to send a wire transfer of $4,340,000 to a bank account held by Client Fund-1, which wire passed through Manhattan, New York.

h. In connection with the USD/ZAR spot trading that occurred at PHILLIPS' direction on or about December 25 and 26, 2017, PHILLIPS and others caused Bank-2 and Bank-3, on or about December 26, 2017, to transmit settlement instructions to the Settlement Bank relating to settlement of these USD/ZAR spot trades.

i. In connection with the USD/ZAR spot trading that occurred at PHILLIPS' direction on or about December 25 and 26, 2017, PHILLIPS and others caused the Settlement Bank, on or about December 28, 2017, to settle these USD/ZAR spot trades, and the USD portion of these FX transactions flowed in and out of bank accounts held at the Federal Reserve Bank of New York.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Commodities Fraud)**

The Grand Jury further charges:

33. The allegations contained in paragraphs 1 through 29, and 32 are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

34. In or about December 2017, in the Southern District of New York and elsewhere, NEIL PHILLIPS, the defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate and foreign commerce, or for future delivery on or subject to the rules of any registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, any manipulative device, scheme, and artifices to defraud; (2) making, and attempting to make, any untrue or misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue or misleading; and (3) engaging, or attempting to engage in any act, practice, and course of business which operates and would operate as a fraud and deceit upon any person, to wit, PHILLIPS and others, in connection with

the $20 Million One Touch Option, engaged in a scheme involving the intentional and artificial manipulation of the USD/ZAR exchange rate and other manipulative and deceptive devices and contrivances.

(Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

**COUNT THREE**
**(Conspiracy to Commit Wire Fraud)**

The Grand Jury further charges:

35. The allegations contained in paragraphs 1 through 29, and 32 are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

36. In or about December 2017, in the Southern District of New York and elsewhere, NEIL PHILLIPS, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

37. It was a part and object of the conspiracy that NEIL PHILLIPS, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and

promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, PHILLIPS and others, through interstate and foreign messages, telephone calls, and financial transfers, among other means, conspired to fraudulently cause a payment under the $20 Million One Touch Option.

(Title 18, United States Code, Section 1349.)

**COUNT FOUR**
**(Wire Fraud)**

The Grand Jury further charges:

38. The allegations contained in paragraphs 1 through 29 and 32 are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

39. In or about December 2017, in the Southern District of New York and elsewhere, NEIL PHILLIPS, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce,

writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, PHILLIPS and others, through interstate and foreign messages, telephone calls, and financial transfers, among other means, including wires passing through the Southern District of New York, engaged in a scheme to fraudulently cause a payment under the $20 Million One Touch Option.

(Title 18, United States Code, Sections 1343 and 2.)

**FORFEITURE ALLEGATION**

40. As a result of committing one or more of the offenses alleged in Counts Three and Four of this Indictment, NEIL PHILLIPS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to, a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

Substitute Asset Provision

41. If any of the above-described forfeitable property, as a result of any act or omission of NEIL PHILLIPS, the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c) to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

NEIL PHILLIPS,

Defendant.

**SEALED INDICTMENT**

22 Cr. ___

(7 U.S.C. §§ 9(1) and 13(a)(5); 17 C.F.R. § 180.1; 18 U.S.C. §§ 371, 1343, 1349, and 2; )

DAMIAN WILLIAMS
United States Attorney.

A TRUE BILL

Foreperson.
[signature]

03/03/22
(CA)

SEALED INDICTMENT filed w/ Arrest Warrant

KH PARKER
USMJ

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

NEIL PHILLIPS,

*Defendant*.

No. 1:22-cr-00138-RA

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NEIL PHILLIPS' MOTION TO DISMISS**

Sean Hecker
Jenna M. Dabbs
David Gopstein
Alexandra Conlon
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
aconlon@kaplanhecker.com

April 28, 2023

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 3

A. The FX Spot Market ..... 3

B. The One-Touch Option Transaction ..... 3

C. The December 26, 2017 Spot Trades ..... 5

D. The Barrier Event Notifications ..... 6

E. The Charges ..... 6

ARGUMENT ..... 6

I. THE CEA CHARGES ARE JURISDICTIONALLY DEFECTIVE ..... 7

A. The Indictment Does Not Allege Fraudulent Conduct Involving a Transaction Covered by the CEA.. ..... 7

i The CEA does not apply to FX spot trades. ..... 7

ii. The CEA does not apply to the Option because it lacks a "direct and significant connection with activities in, or effect on, commerce of the United States." ..... 8

iii. The Indictment fails to allege fraud "in connection with" a commodity transaction under Section 9(1) of the CEA. ..... 9

B. The Indictment Does Not Allege Conduct in the United States Necessary for Jurisdiction Under the CEA. ..... 12

II. THE INDICTMENT FAILS TO ALLEGE A SCHEME TO DEFRAUD BASED ON MANIPULATIVE TRADING. ..... 15

A. Fraud Based on Market Manipulation Requires the Government to Prove that Phillips Intended To and Did Cause an "Artificial Price." ..... 15

i. The trading described in the Indictment could not have caused an artificial price ..... 16

ii. Phillips' alleged subjective intent to affect the market does not change the analysis. ..... 18

III. THE INDICTMENT FAILS TO ALLEGE AN ACTIONABLE OMISSION. ..... 20

A. Phillips Owed no Duty of Disclosure to Any Party to the One Touch Option........... 21

B. The Indictment Fails to Allege a Material and Misleading Misrepresentation or Omission. ........................................................................................................................ 23

i. The alleged omission was not misleading. ........................................................ 23

ii. The alleged omission was not material. ............................................................ 24

IV. THE INDICTMENT SHOULD BE DISMISSED BECAUSE APPLICATION OF THE CEA AND WIRE FRAUD STATUTES TO PHILLIPS' CONDUCT VIOLATES THE DUE PROCESS CLAUSE........................................................................................................ 26

A. Novel Construction.......................................................................................... 27

B. Vagueness........................................................................................................ 28

CONCLUSION ............................................................................................................... 29

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ..... 16, 17

*BP Am., Inc. v. Fed. Energy Regul. Comm'n*,
52 F.4th 204 (5th Cir. 2022) ..... 10

*Chadbourne & Parke LLP v. Troice*,
571 U.S. 377 (2014) ..... 11

*Chiarella v. United States*,
445 U.S. 222 (1980) ..... 21

*Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*,
554 F. Supp. 2d 523 (S.D.N.Y. 2008) ..... 18

*Commodity Futures Trading Comm'n v. Gorman*,
587 F. Supp. 3d 24 (S.D.N.Y. 2022) ..... 15, 18, 20

*Commodity Futures Trading Comm'n v. Gorman*,
2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) ..... 8, 10, 14, 15

*Commodity Futures Trading Comm'n v. McDonnell*,
332 F. Supp. 3d 641 (E.D.N.Y. 2018) ..... 11

*Commodity Futures Trading Comm'n v. Parnon Energy Inc.*,
875 F. Supp. 2d 233 (S.D.N.Y. 2012) ..... 16

*Commodity Futures Trading Comm'n v. Wilson*,
2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ..... 16, 18, 19

*Dunn v. Commodity Futures Trading Comm'n*,
519 U.S. 465 (1997) ..... 7

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ..... 16, 17

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ..... 1

*Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*,
414 F.3d 325 (2d Cir. 2005) ..... 4

*Hunter v. Fed. Energy Regul. Comm'n*,
711 F.3d 155 (D.C. Cir. 2013)........................................................................................ 10

*In re Amaranth Nat. Gas Commodities Litig.*,
587 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................................ 16, 18, 19

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ................................................................ 7

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
917 F.3d 85 (2d Cir. 2019) .......................................................................................... 12

*In re Vivendi, S.A. Securities Litig.*,
838 F.3d 223 (2d Cir. 2016) .................................................................................. 23, 24

*Jing v. Sun*,
2022 WL 1505950 (E.D.N.Y. Jan. 4, 2022)................................................................. 11

*Laydon v. Coöperatieve Rabobank U.A.*,
55 F.4th 86 (2d Cir. 2022) ............................................................................ 12, 13, 14, 15

*McBoyle v. United States*,
283 U.S. 25 (1931) ...................................................................................................... 26

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) .................................................................................................... 13

*Ong v. Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018) ........................................................................ 25

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*,
572 F. App'x 60 (2d Cir. 2014)................................................................................... 14

*Press v. Chem. Inv. Servs. Corp.*,
166 F.3d 529 (2d Cir. 1999) ........................................................................................ 11

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
937 F.3d 94 (2d Cir. 2019) ..................................................................................... 12, 13

*(RC) 2 Pharma Connect, LLC v. Mission Pharmacal Co.*,
2022 WL 2441046 (S.D.N.Y. July 5, 2022).................................................................. 22

*RJR Nabisco, Inc. v. Eur. Cmty.*,
579 U.S. 325 (2016) ............................................................................................... 12, 13

*Santa Fe Indus. v. Green*,
430 U.S. 462 (1977) .................................................................................................... 17

*Sec. Exch. Comm'n v. Frohling*,
851 F.3d 132 (2d Cir. 2016) ..... 20

*Sec. Exch. Comm'n v. Masri*,
523 F. Supp. 2d 361 (S.D.N.Y. 2007) ..... 18

*Sec. Exch. Comm'n v. Zandford*,
535 U.S. 813 (2002) ..... 11

*Sullivan & Long, Inc. v. Scattered Corp.*,
47 F.3d 857 (7th Cir. 1995) ..... 17

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) ..... 7

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) ..... 20

*United States v. Bank of New York Mellon*,
941 F. Supp. 2d 438 (S.D.N.Y. 2013) ..... 21

*United States v. Benjamin*,
2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ..... 9, 26

*United States v. Binday*,
804 F.3d 558 (2d Cir. 2015) ..... 20, 24

*United States v. Bogucki*,
2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) ..... 28

*United States v. Bryant*,
556 F. Supp. 2d 378 (D.N.J. 2008) ..... 28, 29

*United States v. Connolly*,
24 F.4th 821 (2d Cir. 2022) ..... 23

*United States v. Dransfield*,
913 F. Supp. 702 (E.D.N.Y. 1996) ..... 9

*United States v. Gen. Dynamics Corp.*,
644 F. Supp. 1497 (C.D. Cal. 1986) ..... 21, 28

*United States v. George*,
223 F. Supp. 3d 159 (S.D.N.Y. 2016) ..... 21

*United States v. Gilbert*,
668 F.2d 94 (2d Cir. 1981) ..... 20

*United States v. Goodrich*,
12 F.4th 219 (2d Cir. 2021) .......... 17

*United States v. Hawit*,
2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) .......... 14

*United States v. Hayes*,
118 F. Supp. 3d 620 (S.D.N.Y. 2015) .......... 9

*United States v. Johnson*,
945 F.3d 606 (2d Cir. 2019) .......... 20

*United States v. Lanier*,
520 U.S. 259 (1997) .......... 26, 27

*United States v. Liberto*,
2020 WL 5994959 (D. Md. Oct. 9, 2020) .......... 21

*United States v. Minuse*,
114 F.2d 36 (2d Cir. 1940) .......... 20

*United States v. Mulheren*,
938 F.2d 364 (2d Cir. 1991) .......... 17, 20, 27

*United States v. Race*,
632 F.2d 1114 (4th Cir. 1980) .......... 21, 28, 29

*United States v. Radley*,
632 F.3d 177 (5th Cir. 2011) .......... 9, 15

*United States v. Royer*,
549 F.3d 886 (2d Cir. 2008) .......... 19

*United States v. Russo*,
74 F.3d 1383 (2d Cir. 1996) .......... 17

*United States v. Rybicki*,
354 F.3d 124 (2d Cir. 2003) .......... 24, 25

*United States v. Sampson*,
371 U.S. 75 (1962) .......... 7

*United States v. Scop*,
846 F.2d 135 (2d Cir. 1988) .......... 20

*United States v. Smith*,
555 F. Supp. 3d 563 (N.D. Ill. 2021) .......... 20

*United States v. Szur*,
289 F.3d 200 (2d Cir. 2002) ........ 21

*United States v. Weaver*,
860 F.3d 90 (2d Cir. 2017) ........ 24

*United States v. Williams*,
553 U.S. 285 (2008) ........ 1

*Universal Health Servs., Inc. v. United States*,
579 U.S. 176 (2016) ........ 24

*W.W.W. Associates, Inc. v. Giancontieri*,
77 N.Y.2d 157 (N.Y. 1990) ........ 22

*WesternGeco LLC v. ION Geophysical Corp.*,
138 S.Ct. 2129 (2018) ........ 12

*Wu v. Bitfloor, Inc.*,
460 F. Supp. 3d 418 (S.D.N.Y. 2020) ........ 13

**Statutes**

7 U.S.C. § 2(c)(1)(A) ........ 7

7 U.S.C. § 2(i)(1) ........ 8

7 U.S.C. § 9(1) ........ passim

7 U.S.C. § 9(2) ........ 10

15 U.S.C. § 78i ........ 17

15 U.S.C. § 78j ........ 10

18 U.S.C. § 1343 ........ 6

**Rules**

Fed. R. Civ. P. 52(a) ........ 18

Fed. R. Crim. P. 12(b) ........ 9

Fed. R. Crim. P. 12(b)(3)(B)(v) ........ 7

**Regulations**

Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations,
78 Fed. Reg. 45292 (Jul. 26, 2013) .......... 8

17 C.F.R. § 180.1 .......... 11

**Other Authorities**

CFTC, *Anti-Manipulation and Anti-Fraud Final Rules,* https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/amaf_factsheet_final.pdf .......... 11

## PRELIMINARY STATEMENT

The right to fair notice, guaranteed by the Due Process Clause of the Fifth Amendment, is deeply rooted in American law. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."); *United States v. Williams*, 553 U.S. 285, 304 (2008) (due process requires "fair notice of what is prohibited"). But if the indictment in this case is allowed to stand, Neil Phillips will face a criminal trial for making trades that violated no agreement, rule, regulation, or law, and for failing to disclose those trades when he had no obligation to do so. The trading activity alone cannot support a market manipulation claim. And the alleged omission alone does not support a fraud claim. The government's allegations fare no better when they are combined and cast as a "scheme to defraud."

All of the charges in this case depend on trades that Phillips made in the foreign exchange ("FX") spot market on December 26, 2017. The government alleges that Phillips made those trades in order to lower the United States Dollar to South African Rand ("USD/ZAR") exchange rate and thereby trigger a payment on an option that was tied to that exchange rate. The government alleges that Phillips then defrauded the counterparties to that option by not telling them about his spot market trades.

The trades on which the alleged scheme to defraud rests were lawful. The indictment alleges only legitimate transactions made on the open market—real trades with real counterparties and real risk. The indictment does not allege that Phillips' trades amounted to misrepresentations. Nor does it allege that Phillips' trades defrauded investors in the FX spot market by misleading them about the true USD/ZAR exchange rate. Instead, the indictment claims that Phillips' open-market trades were made with an intent to move the USD/ZAR exchange rate, and therefore that the subsequent movement in the USD/ZAR exchange rate was "artificial." The alleged victims of

the exchange rate movement were not the FX spot market participants, but rather the parties to the previously-entered option.

The government's manipulation theory is alarming for its novelty. Recognizing that the alleged open-market manipulation could not support a standalone commodities manipulation charge (because, among other reasons, the trading did not occur in a commodities market), the government charged this conduct as violative of the Commodity Exchange Act's ("CEA") prohibition on manipulation "in connection with" the option – *which was entered into two months before the allegedly manipulative trading*. In doing so, the government asks this court to extend the CEA to an FX market that Congress decided it should not reach, for trading activity no court has ever held to be a crime. And the government does so in a case where the alleged conduct happened entirely abroad, beyond the reach of the CEA, a statute with only limited application to foreign conduct under specific circumstances that are not present here.

The indictment fails not only because it depends on a flawed manipulation theory, but because Phillips had no obligation to disclose his trading activity. Recognizing that Phillips had no duty of disclosure to any party to the option, the indictment relies on boilerplate language in an agreement between Phillips' hedge fund and its broker, and suggests that that boilerplate language somehow created a duty to disclose his trades. But that agreement imposed no duty on Phillips to disclose his trades to anyone—let alone the counterparty to the option, a market participant whose identity Phillips did not even know—and the claim that it did is contradicted by provisions contained within the very same agreement. Indeed, the only omission charged in the indictment stems from a notification by Phillips' hedge fund that the option had been triggered. This notification—which was made neither *by* Phillips nor *to* the counterparty who sold the option—was not false, misleading, or material.

The conduct alleged in the indictment is neither commodities fraud nor wire fraud. And applying those statutes to this conduct would violate Phillips' fundamental due process right to fair warning of what conduct the criminal law prohibits. For these reasons, and as set forth below, the indictment should be dismissed in its entirety.

## STATEMENT OF FACTS

### A. The FX Spot Market[1]

The FX spot market is a global market in which participants—the vast majority of whom are global financial institutions and other sophisticated institutional investors—trade currencies in pairs, with each currency valued as a ratio relative to the other. *See* Indictment ("Ind.") ¶ 5 (Dkt. 2). The ratio is then expressed as the "exchange rate." *Id*. There is no formal marketplace for FX transactions; rather, participants trade directly with FX dealer banks, many of whom are global banks able to exchange many of the world's currencies in large amounts upon customer request. *Id*. ¶ 7.

### B. The One Touch Option Transaction

In 2015, Neil Phillips co-founded Glen Point Capital ("Glen Point" or "Hedge Fund-1"), a London-based hedge fund focused on macroeconomic trends and emerging markets. Ind. ¶ 4. One of the products that Glen Point used as part of its investment strategy was the "one touch" digital barrier option. *Id.* ¶ 10. In exchange for a paid premium, the counterparty to a one touch option agrees to pay a notional value if a particular currency pair reaches—or touches—a specified exchange rate, referred to as the "barrier," by a certain date. *Id.* ¶ 10–11.

On October 30, 2017, Glen Point purchased a one touch digital barrier option for the USD/ZAR currency pair with a notional value of $20 million, a barrier rate of 12.50, and an

[1] Phillips accepts the factual allegations from the Indictment as true solely for purposes of this motion.

expiration date of January 2, 2018 (the "One Touch Option" or the "Option"). *Id.* ¶ 10. The counterparty who sold the Option ("Bank-1"), was obligated to pay Glen Point the notional value if the USD/ZAR exchange rate reached the barrier rate (the "Barrier Event") before the Option expired. *Id.* ¶¶ 10–11. At the time Glen Point entered into the Option, the USD/ZAR exchange rate was over 14.00. *Id.* ¶ 14.

Glen Point entered into the Option through a financial services firm ("Intermediary Firm-1") that facilitated trades on behalf of clients who are not known to each other. *Id.* ¶ 11. Thus, neither Glen Point nor Bank-1 knew their counterparty's identity. Another financial institution ("Bank-2") acted as Glen Point's prime broker in connection with the transaction. *Id.* ¶ 13. After Glen Point entered into the One Touch Option, Bank-2 provided Glen Point with a letter agreement setting forth the terms and conditions of the transaction (the "Confirmation Agreement" or "Agreement," attached as Exhibit A). *Id.*

The Agreement provided that Glen Point would act as the "Calculation Agent"—that is, Glen Point would determine when the barrier rate had been reached—and would do so "in good faith and in a commercially reasonable manner." *Id.* The Agreement incorporated by reference the "2005 Barrier Option Supplement" published by the International Swaps and Derivatives Association, Inc. (the "ISDA Supplement"), a trade organization that publishes form documents that are the "industry standard" for swap transactions. *Id.*; *see Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 327–28 (2d Cir. 2005). The ISDA Supplement stated that the "Barrier Determination Agent" "determines whether or not [the] Barrier Event has occurred and provides notice if it determines that [the] Barrier Event has occurred." Ind. ¶ 13. Like the Agreement, the ISDA Supplement stated that the "occurrence of [the] Barrier Event shall be determined in good faith and in a commercially reasonable manner by the Barrier

Determination Agent." *Id.* Under the Supplement, the Barrier Determination Agent and Calculation Agent could be different parties but would be the same party "unless otherwise specified." *Id.* Bank-1—the counterparty who sold the One Touch Option—was not a party to the Agreement.

Subsequently, Glen Point allocated the notional value of the One Touch Option such that, if triggered, Hedge Fund-1 would receive $15,660,000, and one of its client funds ("Client Fund-1"), a third party for which Glen Point managed certain investments, would receive $4,340,000. *Id.* ¶ 12.

**C. The December 26, 2017 Spot Trades**

Between October 30 and December 15, 2017, the USD/ZAR rate "fluctuated between approximately 14.50 and approximately 13.15." *Id.* ¶ 14. Then, on December 18, 2017, it was announced that Cyril Ramaphosa was elected president of the African National Congress political party in South Africa. *Id.* ¶ 15. The USD/ZAR exchange rate then lowered to approximately 12.52 (just two cents from the 12.50 barrier at issue), meaning the Rand strengthened relative to the Dollar. *Id.*

On December 26, 2017, Phillips—sitting in South Africa—sold USD in exchange for ZAR in a series of spot trades executed by a Singapore-based employee of a foreign bank ("Bank-3"), effectively betting on a strengthening Rand. *Id.* ¶¶ 18–19. Phillips communicated with an employee of Bank-3 through the Bloomberg platform chat function, instructing him to make various trades and asking him for market color about the USD/ZAR exchange rate. *Id.* ¶¶ 18–21. According to the Indictment, Phillips stopped trading on December 26, 2017 after the USD/ZAR exchange rate fell below 12.50. *Id.* ¶ 18. Phillips later explained to Glen Point's investors that his goal was to purchase Rand before the market "[came] to terms with" the prospect of a "more positive policy dynamic than seen in South Africa for a long time." *Id.* ¶ 27.

### D. The Barrier Event Notifications

As noted above, Glen Point was the designated "Calculation Agent" under its agreement with its broker (Bank-2). Accordingly, on December 26, 2017, Phillips instructed a Glen Point employee to notify Intermediary Firm-1 that the Barrier Event—*i.e.*, the USD/ZAR falling below 12.50—had occurred. *Id.* ¶ 23. The following day, on December 27, 2017, a different Glen Point employee made the same notification to Bank-2. *Id.* ¶ 24. The Indictment alleges that the notification by Glen Point omitted that the Barrier Event had allegedly been triggered by Phillips' spot trades. *Id.* ¶ 23. The Indictment does not allege any communication by Phillips, Glen Point or anyone else to Bank-1 notifying it that the Option had been triggered. Later that day, Bank-1 wired the notional value of the Option to Intermediary Firm-1's broker. *Id.* ¶ 25. Those funds were subsequently transferred to Glen Point and to Client Fund-1. *Id.*

### E. The Charges

On March 3, 2022, the government obtained an Indictment charging Phillips with commodities fraud, in violation of 7 U.S.C. § 9(1); wire fraud, in violation 18 U.S.C. § 1343; and conspiracies to commit the same. All four counts are based on the same alleged scheme to defraud the counterparties to the Option in December 2017.

## ARGUMENT

The Indictment alleges that Phillips engaged in a scheme to defraud, in violation of the CEA and wire fraud statute, premised on (1) allegedly manipulating the exchange rate between the South African Rand and the U.S. Dollar by trading in the relevant spot market (the "Manipulation Theory") and (2) failing to disclose the alleged manipulation to the counterparty to the One Touch Option (the "Omission Theory"). Because the allegations in the Indictment, taken as true, cannot establish that Phillips committed or conspired to commit commodities fraud or wire fraud, the

Indictment must be dismissed. *See* Fed. R. Crim. P. 12(b)(3)(B)(v); *United States v. Sampson*, 371 U.S. 75, 78–79 (1962); *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012).

## I. THE CEA CHARGES ARE JURISDICTIONALLY DEFECTIVE.

The Government alleges violations of the CEA based on a "scheme involving the intentional and artificial manipulation of the USD/ZAR exchange rate and other manipulative and deceptive devices and contrivances." Ind. ¶ 34. The conduct alleged in the Indictment is not covered by the CEA and thus, as a matter of law, cannot violate it.

### A. The Indictment Does Not Allege Fraudulent Conduct Involving a Transaction Covered by the CEA.

The government alleges fraudulent conduct in connection with two types of transactions: foreign currency spot trades and the One Touch Option. Neither is covered by the CEA.

#### *i. The CEA does not apply to FX spot trades.*

As an initial matter, the CEA has never applied to any "agreement[s], contract[s], or transaction[s] in . . . foreign currency." 7 U.S.C. § 2(c)(1)(A). This includes spot foreign currency transactions, which the Supreme Court has stated are "free from supervision" under United States commodities laws. *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 473 (1997). Congress extended the CEA's jurisdiction when it passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank"), but only to reach retail customers in off-exchange foreign currency transactions. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *17 (S.D.N.Y. Sept. 20, 2016) (quoting *Dunn*, 519 U.S. at 473) (noting the "general exemption from CFTC regulation for sophisticated off-exchange foreign currency trading"). In

short, FX spot transactions are not covered by the CEA and do not, on their own, provide a basis for claims under the statute.[2]

### *ii. The CEA does not apply to the Option because it lacks a "direct and significant connection with activities in, or effect on, commerce of the United States."*

The One Touch Option also does not provide a basis for a CEA claim because it lacks a "direct and significant connection" to the United States. Section 2(i) of the CEA states that provisions of the CEA relating to swaps shall not apply to activities outside of the United States *unless those activities "have a direct and significant connection with activities in, or effect on, commerce of the United States*." 7 U.S.C. § 2(i)(1) (emphasis added). The CFTC's interpretive guidance explains that Section 2(i)'s "direct and significant" threshold targets activities that create "systemic risks" to the United States financial system. *See* Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 45292, 45299–300 (Jul. 26, 2013). As the guidance makes clear, §2(i) is meant to address "risks like those that occurred during the 2008 Financial Crisis, where foreign affiliates of U.S. institutions engaged in risky swap trades that 'result[ed] in or contribute[d] to substantial losses to U.S. persons and *threaten[ed] the financial stability of the entire financial U.S. system*.'" *Commodity Futures Trading Comm'n v. Gorman*, No. 21-Civ.-870 (VM), 2023 WL 2632111, at *9 n.9 (S.D.N.Y. Mar. 24, 2023) (*Gorman II*) (emphasis added) (quoting 78 Fed. Reg. at 45295). Accordingly, "cross-border application" of the CEA swaps provision "was thus geared towards protecting against the 'failures and near failures [that] revealed the vulnerability of the U.S. financial system and economy to *systemic risk*." *Id.* (emphasis in original) (quoting 78 Fed. Reg. at 45295).

[2] Presumably recognizing this jurisdictional limitation, the Commodities Fraud count in the Indictment does not allege fraud in connection with the FX trades, which are the trades the government contends artificially impacted the USD/ZAR exchange rate, but rather "in connection with the $20 Million One Touch Option." Ind. ¶ 34.

The Court "may properly decide [a] jurisdiction question on [a] pre-trial motion to dismiss pursuant to Rule 12(b)" where, as here, the question "goes to whether [the statute] applies to the Defendant['s] alleged criminal conduct, not to the issue of the Defendant['s] guilt or innocence." *United States v. Dransfield*, 913 F. Supp. 702, 707 (E.D.N.Y. 1996); *see also United States v. Hayes*, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015) (analyzing on a motion to dismiss whether the Government sufficiently alleged domestic conduct). This is particularly true where "the indictment includes detailed factual allegations that "draw[] a clear picture of the Government's theory" and the Court therefore "need not look beyond the face of the indictment or take any inferential steps to conclude that the facts alleged in the indictment do not allege a violation of the given statutes." *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *13–15 (S.D.N.Y. Dec. 5, 2022) (dismissing indictment for failing to "explicitly allege" an "implicit element of [the] statute").

Here, the CEA claims rest entirely on the One Touch Option—a foreign swap that lacks a direct and significant connection with activities in, and effect on, U.S. commerce. The Indictment must be dismissed because it does not (and could not) allege that the Option meaningfully affected any aspect of the U.S. financial system or posed "systemic risks" that could justify the exceptional extraterritorial application of the CEA to a foreign swap.

***iii. The Indictment fails to allege fraud "in connection with" a commodity transaction under Section 9(1) of the CEA.***

The Indictment also fails to allege a claim under the CEA for an additional reason: it does not allege fraud "in connection with" the One Touch Option as required to state a § 9(1) violation. As explained above, the alleged non-retail spot transactions in South African Rand are outside the scope of the CEA and therefore cannot be the basis for a CEA charge. *See also United States v. Radley*, 632 F.3d 177 (5th Cir. 2011) (prosecution for CEA manipulation and related wire fraud

based on propane futures transactions dismissed because the alleged transactions were exempt from the CEA); *cf. BP Am., Inc. v. Fed. Energy Regul. Comm'n*, 52 F.4th 204, 210, 215 (5th Cir. 2022) (alleged fraudulent transactions outside the jurisdiction of a federal agency cannot be prosecuted by the agency on grounds that they were in connection with a jurisdictional transaction); *Hunter v. Fed. Energy Regul. Comm'n*, 711 F.3d 155 (D.C. Cir. 2013). Accordingly, there is no alleged violative conduct "in connection with" the One Touch Option.

In addition, § 9(1) of the CEA, by its terms, covers only fraud-based manipulations, *i.e.*, those effectuated using deceptive and fraudulent devices. *See Gorman II*, 2023 WL 2632111, at *4–5 (construing § 9(1) as reaching fraud-based manipulations with respect to commodities and §9(2) as reaching "non-fraud-based manipulation" of the price of a commodity, like the "aggregation and abuse of market power sufficient to move the market against the prevailing financial markets' tides"). The Indictment does not allege any misrepresentations, half-truths, fraudulent omissions, or deceptive conduct (*e.g.*, wash sales, fictitious trading) in the alleged spot market trading. Accordingly, for the reasons set forth in greater detail in Section III below, the Indictment fails to allege any fraud in connection with the One Touch Option.

Further, courts interpreting the "in connection with" requirement of the Securities Exchange Act of 1934 (the "1934 Act"), a provision nearly identical to the one at issue here, have limited its application to fraud claims where the manipulative device or contrivance induced the purchase or sale of a security. The 1934 Act prohibits the use or employment of "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security." 15 U.S.C. § 78j; *compare with* 7 U.S.C. § 9(1) (prohibiting the use and employment of any "manipulative or deceptive device or contrivance" "in connection with any swap"). In interpreting the "in connection with" requirement of the CEA, courts generally look to interpretations of the

same phrase in Section 10(b) of the [1934 Act]." *Jing v. Sun*, No. 21-cv-2350 (GRB) (AYS), 2022 WL 1505950, at *17 (E.D.N.Y. Jan. 4, 2022).[3] In the securities context, a "manipulative or deceptive device or contrivance" is only used "in connection with" the purchase or sale of a security where the device "somehow induced the purchaser to purchase the security at issue." *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999); *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security'"). Even where courts have broadly construed the "in connection with" requirement under the CEA, they have done so only when the alleged manipulative or fraudulent device "coincide[d]" sufficiently with or was "contemporaneous with" the transactions at issue. *See Commodity Futures Trading Comm'n v. McDonnell*, 332 F. Supp. 3d 641, 722–23 (E.D.N.Y. 2018) (finding misrepresentations and omissions made throughout scheme to defraud to induce investors to invest, remain invested, and delay withdrawing funds were made "in connection with, and contemporaneous with" transactions covered by the CEA) (citing *Sec. Exch. Comm'n v. Zandford*, 535 U.S. 813, 820 (2002) (holding fraudulent device used "in connection" with securities sale where defendant's breaches of fiduciary duty "coincide[d]" with securities transactions)). Here, the Indictment alleges that Phillips engaged in a scheme to defraud in December 2017—two months after Glen Point purchased the One Touch Option from Bank-1. Ind. ¶¶ 1, 10. The Indictment alleges no statements to Bank-1 of any kind—let alone statements that were material to Bank-1's decision to enter into

[3] *See also* CFTC, *Anti-Manipulation and Anti-Fraud Final Rules*, 1, https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/amaf_factsheet_final.pdf (noting Regulation 180.1, which addresses the prohibition on manipulative devices, "is modeled on Securities and Exchange Commission Rule 10b-5" and stating the Commission "intends to be guided by" precedent interpreting the words "in connection with" in the securities context).

the Option or to pay its notional value when triggered. To be sure, the One Touch Option and the open-market trades in the FX spot market both involved the USD/ZAR exchange rate. But the trades, which are outside the scope of the CEA, and which were made in a different market, with different parties, months later, were not "in connection with" the One Touch Option even in the broadest sense of that requirement as it has been construed under the applicable law, and therefore they cannot form the basis of a CEA claim.

**B. The Indictment Does Not Allege Conduct in the United States Necessary for Jurisdiction Under the CEA.**

Counts One and Two should be dismissed for the additional reason that they do not allege a domestic application of the CEA.

The CEA is interpreted "in light of the presumption against extraterritoriality, a canon of statutory interpretation that is a 'basic premise of our legal system.'" *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 95 (2d Cir. 2022) (quoting *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 102 (2d Cir. 2019)). The presumption exists to help "'avoid the international discord that can result when U.S. law is applied to conduct in foreign countries' and 'reflects the commonsense notion that Congress generally legislates with domestic concerns in mind.'" *Id.* at 95–96 (quoting *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 95 (2d Cir. 2019)).

The Second Circuit uses a two-step framework to determine whether a statute covers foreign conduct. *Prime*, 937 F.3d at 102 (citing *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016)). First, a court must look to the language of the statute to determine whether it contains "a clear indication of an extraterritorial application" to rebut the presumption against extraterritorial application. *Laydon,* 55 F.4th at 96 (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129, 2136 (2018)). Absent such a "clear indication," the court must determine

whether "'the case involves a domestic application of the statute.'" *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337). Applying this two-step framework, the Second Circuit has already held that Section 9(1) "lacks . . . a clear statement of extraterritorial effect." *Prime*, 937 F.3d at 103 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010)). The CEA claims in the Indictment fare no better under the Second Circuit's "domestic application" test.

In order to determine whether the Indictment charges a "satisfactory domestic application," the Court must "discern the 'focus of congressional concern' in enacting" the CEA, in particular the "conduct" the statute aims to regulate and "the parties and interests it seeks to protect." *Id*. The CEA "serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Id.* at 101 (citation omitted); *see also Wu v. Bitfloor, Inc.*, 460 F. Supp. 3d 418, 424 (S.D.N.Y. 2020) (same). The focus of Section 9(1) is, as the section's title suggests, to prohibit manipulative and deceptive conduct.

Under *Prime,* if "the conduct relevant to [(9)(1)'s] focus occurred abroad"—*i.e*., if a defendant is alleged to have "engag[ed] in fraud" abroad—the CEA's anti-fraud provisions are inapplicable. 937 F.3d. at 107–08 (finding the CEA's anti-fraud provisions inapplicable when defendants allegedly reported artificial transactions to a London-based rate reporting agency and thereby altered a futures index that settled oil trades on both London-and U.S. based exchanges). Here, the Indictment fails to allege a domestic application of the CEA for each component of the alleged fraud scheme—both the alleged omissions and the alleged manipulative trading.

First, the alleged omission was made by Glen Point employees located in London to a Swiss Entity (Intermediary Fund-1) and the London-based subsidiary of a bank headquartered in the U.S. (Bank-2)—all while Phillips was in South Africa. Ind. ¶¶ 19, 23–24. Looking at the

"alleged misleading statements alone," there is no "compelling impact they produced on the U.S. financial system," which the CEA aims to protect. *Gorman II*, 2023 WL 2632111, at *10 (dismissing CFTC's misrepresentation fraud theory where the defendant made the alleged misstatements while in Japan to Japanese counterparties in a transaction governed by Japanese law).

Second, the conduct underlying the alleged manipulative trading is equally removed from the United States. The Indictment alleges that Phillips made manipulative trades from South Africa via the Singapore trading desk of a foreign bank in a global market. Ind. ¶¶ 18–19. The Indictment points to wires that went through the U.S. to establish some U.S. link to the alleged fraudulent conduct abroad, but the wires alone do not establish a domestic application of the CEA. *See Laydon*, 55 F.4th at 96–98 (affirming dismissal of CEA fraud claims as impermissibly extraterritorial where touchpoints with U.S. included purchases on a U.S.-based exchange and communications made in furtherance of a conspiracy with a U.S.-based trader on U.S.-based servers); *Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (summary order) (affirming dismissal of RICO claims based on wire fraud where financing was obtained in U.S. and invoices were sent to and paid by a bank in the U.S. because "[t]he activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices—took place outside of the United States"); *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *5 (E.D.N.Y. Feb. 17, 2017) ("[I]n a given case, a court must conduct a more holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of U.S. wires").

Here, the alleged manipulative trading occurred in the USD/ZAR spot market, a market that is expressly exempt from CEA oversight, on "foreign trading desks" as part of "conduct

abroad." *See Laydon*, 55 F.4th at 97–98. Because the Indictment fails to allege that either the trading at issue or the alleged omissions were domestic, the CEA claims must be dismissed.

## II. THE INDICTMENT FAILS TO ALLEGE A SCHEME TO DEFRAUD BASED ON MANIPULATIVE TRADING.

The government accuses Phillips of market manipulation by making open-market trades with a subjective intent to move the exchange rate. But the Indictment does not allege that Phillips' trades themselves constituted market manipulation of a commodity. Nor could it: as noted above, the CEA doesn't apply to the FX spot market.

Instead, the Indictment alleges that the trades were manipulative conduct "in connection with" the One Touch Option. Ind. ¶ 34. The government's theory represents a stark expansion of criminal market manipulation charges to open-market transactions in unregulated markets. This is especially so because even if the Indictment did allege criminal market manipulation of a commodity or security (and it does not), it would still fail as a matter of law for the reasons that follow.

### A. Fraud Based on Market Manipulation Requires the Government to Prove that Phillips Intended to and Did Cause an "Artificial Price."

CEA §9(1) covers only fraud-based market manipulations—those caused by a "manipulative or deceptive device or contrivance." Where, as here, the government alleges a fraudulent omission that is based on a failure to disclose a *non-fraud-based manipulation*, it first must prove the four necessary elements of a non-fraud-based manipulation, two of which are that the defendant specifically intended to and did cause an artificial price to exist. *See Commodity Futures Trading Comm'n v. Gorman*, 587 F. Supp. 3d 24, 41 (S.D.N.Y. 2022) (*Gorman I*); *Gorman II*, 2023 WL 2632111, at *6.[4]

[4] If the Court finds that the Indictment fails to allege a scheme to defraud based on manipulative trading, the Court should dismiss not only the CEA charges (Counts I and II), but also the wire fraud charges because the wire fraud

Prices are "artificial" when they have been set by some mechanism that has the effect of "distort[ing] those prices" and "prevent[ing] the determination of those prices by free competition alone." *Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012). The mere intent to affect prices is not enough. *Commodity Futures Trading Comm'n v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024, at *14 (S.D.N.Y. Nov. 30, 2018) (criticizing CFTC manipulation theory as "tautological" for "conflat[ing] artificial prices with the mere intent to affect prices"). Instead, a defendant must intend to cause "prices that [he] understood to be unreflective of the forces of supply and demand." *Id.* at *15. In other words, an artificial price does not exist (and market manipulation does not occur) where a defendant's rational market participation "does not send a false signal." *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) (*Amaranth II*), aff'd, 730 F.3d 170 (2d Cir. 2013); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 100 (2d Cir. 2007) (fraud allegation based on market manipulation must allege manipulator "engaged in market activity aimed at deceiving investors as to how other market participants have valued a security"). The Indictment uses the right word—artificial—but in a manner wholly divorced from its significance and meaning in market manipulation cases.

***i. The trading described in the Indictment could not have caused an artificial price.***

Certain trading practices involve deceptive conduct that has no purpose other than creating an artificial price. *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205 (1976) (describing "specific practices that were considered so inimical to the public interest as to require express

---

charges depend on the same "antecedent scheme to defraud." *See Radley*, 632 F.3d at 180 (dismissing CEA charges and related wire fraud charges where wire fraud charges were based on the same "antecedent scheme to defraud," holding "when the government's allegations charge market manipulation and cornering as the 'scheme to defraud,' and our preceding discussion explains why [under the CEA] this is not criminal conduct . . . the same scheme cannot alone be re-characterized and rendered illegal as wire fraud.").

prohibition"); 15 U.S.C. § 78i (prohibiting certain per se manipulative transactions). "Manipulation" in the context of a market manipulation fraud claim is "virtually a term of art when used in connection with securities markets [and] refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *ATSI Commc'ns, Inc*, 493 F.3d at 99–100 (discussing market manipulation claims under Section 10(b) of the SEA) (quoting *Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977)). Unsurprisingly, market manipulation claims premised on these inherently deceptive trading practices have been repeatedly upheld. *See, e.g., Hochfelder*, 425 U.S. at 205 (wash sales and matched orders); *United States v. Goodrich*, 12 F.4th 219, 224 (2d Cir. 2021) (same); *United States v. Russo*, 74 F.3d 1383, 1387 (2d Cir. 1996) ("parking" and unauthorized placement of shares). But the Indictment describes legitimate transactions, conducted transparently in the open market, with willing market participants on the opposite side of each trade. These transactions cannot, without some other deceptive conduct, support a manipulation claim. *See ATSI Commc'ns, Inc.*, 493 F.3d at 101 ("Furthermore, short selling—even in high volumes—is not, by itself, manipulative . . . To be actionable as a manipulative act, short selling must be willfully combined with *something more* to create a false impression of how market participants value a security.") (emphasis added). Without more, Phillips' alleged trading, which involved actual trades with willing market counterparties, is not manipulative. *See also United States v. Mulheren*, 938 F.2d 364, 371 (2d Cir. 1991) (significant trading over short period of time "alone . . . does not make the investor a manipulator"); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995) ("They say that [the defendant] prevented the price from rising . . . by selling short more and more stock. This is just to say that [the defendant], like a bluffer in a poker game, kept redoubling its bet until the other players lost heart. But so what?").

***ii. Phillips' alleged subjective intent to affect the market does not change the analysis.***

A legitimately structured trade "supported by a legitimate economic rationale. . .cannot be the basis for liability under the CEA because it does not send a false signal." *Amaranth II*, 587 F. Supp. 2d at 534. No false signal results just because that same trade is made with a mixed motive—both for a legitimate economic reason and with a manipulative intent. *See Wilson*, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) (finding no artificial price established where defendant traded with alleged manipulative intent and with a "rationale and a formula that support[ed] the" trading activity). Thus, in order to proceed on an open-market manipulation claim, the government must allege that "but for the manipulative intent, the defendant would not have conducted the transaction." *Sec. & Exch. Comm'n v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007); *see also Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 554 F. Supp. 2d 523, 534 (S.D.N.Y. 2008) (applying the *Masri* test distinguishing between open-market transactions made for a "legitimate economic reason" and transactions made solely with the "intent of artificially affecting the price").

Indeed, courts in this district have refused to find that even a defendant who traded with a subjective intent to affect the price of a product necessarily created an artificial price. *See Wilson*, 2018 WL 6322024, at *15, 21 (ordering judgment for defendants under Fed. R. Civ. P. 52(a)).[5] To allege market manipulation, the government must allege something more than the trader's intent. It must allege the defendant engaged in deceptive conduct that has "the effect of distorting [the]

---

[5] In *Gorman I*, the court articulated its view that in an open-market manipulation case, manipulation could conceivably be established where legitimate transactions were made with an intent to manipulate, contradicting the court's rationale in *Wilson*. *Gorman I*, 587 F. Supp. 3d at 43. The court noted that *Wilson* was decided in a different posture, after trial, as opposed to on a motion to dismiss. *Id.* at 45. Setting aside the departure from *Wilson*, the court ultimately denied dismissal of the complaint because the CFTC "plausibly allege[d] Gorman intentionally planned and timed his trades with the purpose and effect of creating an artificial price for Ten-Year Swap Spreads." *Id.* at 44. Here, even if the Court applies the logic of *Gorman I*, the Indictment fails to allege that Phillips manipulated a relevant market and, as argued *supra* at 18-20, fails to allege Phillips created an artificial price.

price[]" and "preventing the determination of [the] price[] by free competition alone," by, for example, making bids the defendant "thought might be unprofitable" or "could not be accepted by a counterparty." *Id.* at *11, 13. This additional requirement exists for good reason. Without it, regulatory and criminal actions would "encroach on legitimate economic decisions," "discourag[ing] the very activity that underlies the integrity of the markets they seek to protect." *Amaranth II*, 587 F. Supp. 2d at 535.

The Indictment itself supports the notion that Phillips' trades had a legitimate economic rationale. Specifically, the Indictment makes clear that Phillips traded USD/ZAR on December 26, 2017 for the same reason he bought the Option in the first place: because he believed the Rand would strengthen relative to Dollar. He became even more confident in this prediction after seeing the market's reaction to the December 18, 2017 election. *See* Ind. ¶ 15 (explaining that the USD/ZAR rate "lowered substantially" in the wake of the election). His letter to investors spells out his lawful rationale. *See* Ind. ¶ 27 ("We had anticipated the potential for large swings in South African assets around the ANC . . . electoral conference and, in particular, believed that the market had priced in too little risk of a [Candidate-1] victory."). These allegations would not survive a motion to dismiss in a civil case because they spell out a legitimate economic rationale; they cannot possibly support a criminal prosecution.

In this Circuit, defendants have only been convicted of manipulation stemming from open-market trades where, in addition to trading with a manipulative intent, the defendant engaged in other deceptive conduct aimed at creating a price that was "dictated not by market forces." *See United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008) (upholding conviction for defendants who shorted stocks based on misappropriated confidential information concerning FBI and SEC investigations). Indeed, the Second Circuit has expressed "misgivings" about the possibility of a

prosecution based on the precise theory the government advances here—namely, legitimate trades made with "the purpose and intent of driving the price" of a stock to a particular level. *Mulheren*, 938 F.2d at 365.[6] Those misgivings should be particularly acute here, where the alleged open-market manipulation involved absolutely no deceptive conduct and occurred in a market governed by neither the securities nor the commodities laws.

## III. THE INDICTMENT FAILS TO ALLEGE AN ACTIONABLE OMISSION.

Wire fraud requires (1) a scheme to defraud, (2) with money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme. *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). A material falsehood, made either as an affirmative misrepresentation or "omission[] of material information that the defendant has a duty to disclose," is an essential component of a scheme to defraud. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).[7] There is no such affirmative falsehood or qualifying omission here.

The Indictment does not allege any misrepresentation or omission made by Phillips himself. Rather, the only omission alleged in the Indictment was in connection with the notification by a Glen Point employee that the Barrier Event had occurred. *See* Ind. ¶ 24. And that notification (which was true) was made by Glen Point in its capacity as "Calculation Agent" and "Barrier Determination Agent"—roles that, by the terms of the Agreement cited in the Indictment, could have been filled by third parties. In other words, the only alleged omission in this case was the

[6] Whether a criminal prosecution can proceed under Rule 10b-5 (the corollary to the CEA section charged here) on the theory that a defendant made a legitimate open-market transaction "solely to affect the price of a security" remains an open question. *Id.* at 368. We are aware of no criminal conviction for fraud based on market manipulation that did not involve the use of any deceptive device. *Cf., e.g.*, *United States v. Smith*, 555 F. Supp. 3d 563, 575 (N.D. Ill. 2021) (spoofing); *United States v. Johnson*, 945 F.3d 606, 613–15 (2d Cir. 2019) (affirmative misrepresentations to contractual counterparty); *United States v. Scop*, 846 F.2d 135, 137–38 (2d Cir.) (matched orders through fictitious nominees), *modified on reh'g on other grounds*, 856 F.2d 5 (2d Cir. 1988); *United States v. Gilbert*, 668 F.2d 94, 95 (2d Cir. 1981) (matched orders and wash sales); *United States v. Minuse*, 114 F.2d 36, 38 (2d Cir. 1940) (fictitious accounts, matched orders, wash sales, and dissemination of false literature).

[7] Commodities fraud claims based on omissions similarly require the existence of a duty. *See Sec. & Exch. Comm'n v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016); *Gorman I*, 587 F. Supp. 3d at 45.

failure to disclose information to Glen Point's broker that any other third party acting as Calculation Agent would not even have known.[8]

The alleged omission cannot form the basis for a wire fraud claim for three reasons: first, because Phillips (and Glen Point) had no duty of disclosure to any party to the Option; second, because the alleged omission to Glen Point's broker was not misleading; and third, because it was not material.

**A. Phillips Owed No Duty of Disclosure to Any Party to the One Touch Option.**

Fraud premised on an omission, whether charged under the CEA or the wire fraud statute, requires proof that the defendant had a duty to disclose the omitted information. *See United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 482 & n.259 (S.D.N.Y. 2013). A duty to disclose "arises [only] when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States,* 445 U.S. 222, 228 (1980) (internal quotation marks and alteration omitted); *see also United States v. Szur*, 289 F.3d 200, 210 (2d Cir. 2002) (same).

In the absence of any actual duty to any party to the Option, the Indictment relies on Glen Point's role as Calculation Agent to determine the occurrence and provide notice of the Barrier Event to Bank-2 in a "good faith" and "commercially reasonable manner." *See* Ind. ¶ 13. As a matter of law, this provision in the Confirmation Agreement between Glen Point and Bank-2 cannot form the basis for a duty to disclose trading activity.[9]

---

[8] Notably, the Indictment does not allege that the notification was made to Bank-1, the counterparty to the Option. This is not surprising: as the discovery in this case has confirmed, Bank-1 had a separate contract with its own broker regarding the terms of the Option. Under that contract, Bank-1 was the Barrier Determination Agent and Calculation Agent. And in that capacity, Bank-1 independently determined that a Barrier Event had occurred. In other words, Bank-1 paid the notional value on the option not because of any notification by Glen Point personnel but because Bank-1 *itself* determined that it had in fact been triggered.

[9] Although the Court must take the allegations in the indictment as true in deciding a motion to dismiss, courts can and do consider the terms of a contract that is "the very subject of the indictment." *United States v. Gen. Dynamics Corp.*, 644 F. Supp. 1497, 1500 (C.D. Cal. 1986), *rev'd on other grounds*, 828 F.2d 1356 (9th Cir. 1987); *see also*

First, the Agreement imposes no fiduciary or other duty on Glen Point in its capacity as the buyer of the One Touch Option. *See* Ex. A. Indeed, it expressly states that each party represents that it "is not acting as a fiduciary or financial, investment or commodity trading advisor" to the other. *Id.* at 4. Further, if these sophisticated parties intended to impose a duty on Glen Point, particularly in light of the explicit disclaimer, they would have said so in the Agreement. *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (NY 1990) (noting court must assume contract contains all aspects of the parties' agreement).

Second, the Agreement stated that Bank-2 may buy and sell "the asset underlying the option in the spot" market and that it might trade that asset "before the [B]arrier [E]vent occurs," which may "affect the likelihood of" the Barrier Event occurring. Ex. A at 3. In other words, the Agreement explicitly contemplated trading by one of the parties to the Confirmation Agreement. Again, if the parties intended to prohibit trading that would "affect the likelihood of" a Barrier Event occurring, or impose a duty to disclose such trading, they could have done so. Instead, they did the opposite.

The Indictment invents a duty that did not exist based on the very written agreement that disclaimed it. On these facts, Bank-2 could not even maintain a claim for breach of contract against Phillips because it could not point to any provision of the Confirmation Agreement that Phillips violated. *See (RC) 2 Pharma Connect, LLC v. Mission Pharmacal Co.*, No. 21-cv-11096 (LJL), 2022 WL 2441046, at *7 (S.D.N.Y. July 5, 2022) (explaining that it is an "essential requirement for a breach of contract claim that [p]laintiff identify the specific provisions of a contract that it

---

*United States v. Liberto*, No. CR RDB-19-0600, 2020 WL 5994959, at *7 (D. Md. Oct. 9, 2020) (same). The meaning of a contract is "purely a matter of law for the court" that "should" be decided on a motion to dismiss. *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980); *see also United States v. George*, 223 F. Supp. 3d 159, 163 (S.D.N.Y. 2016) ("A court can resolve a dispute without trial of the general issue when a motion to dismiss an indictment is made solely upon an issue of law, and not fact.").

alleges the defendant has violated") (internal quotation marks omitted). Yet the government incredibly maintains Phillips should be held *criminally* liable under the same circumstances.

### B. The Indictment Fails to Allege a Material and Misleading Misrepresentation or Omission.

The Indictment should be dismissed because it fails to allege that the information Phillips allegedly omitted—that his trading moved the USD/ZAR exchange rate to 12.50—was material. Whether this failure to disclose is framed as an omission (as in the Indictment), affirmative misrepresentation, or half-truth, the result is the same.[10] While an omission made as a half-truth may be actionable even in the absence of an independent duty, a half-truth can only support a fraud claim when the omitted information is material and its omission is misleading. *See In re Vivendi, S.A. Securities Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) (defining half-truths as statements that become "misleading by omission").

#### *i. The alleged omission was not misleading.*

As a preliminary matter, Glen Point's notification was accurate: a Barrier Event occurred and Glen Point accurately reported it. Glen Point had no duty to report *how* the Barrier Event occurred, but rather *whether* it occurred. *See* Ind. ¶ 13 (Calculation Agent "determines whether or not a Barrier Event has occurred and provides notice if it determines that a Barrier Event has occurred"). In other words, as Calculation Agent, Glen Point was supposed to make a calculation. It did so, and its notification was not misleading. Indeed, where a party to an agreement provides the precise information the agreement calls upon them to provide, and nothing more, the omission of additional information cannot form the basis for a half-truth fraud claim. *See United States v.*

---

[10] In a January 27, 2023 letter to the government, the undersigned counsel requested clarification from the government concerning several claims and legal theories in the Indictment, including the source of any duty that could support a fraud charge based on an omission. On April 11, 2023, the government responded that "in the interest of avoiding unnecessary motion practice . . . the Government intends to argue that the defendant's [omission] . . . was a half-truth and a misleading affirmative representation."

*Connolly*, 24 F.4th 821, 842–43 (2d Cir. 2022) (reversing convictions for defendants prosecuted for making fraudulent omissions or half-truths by making LIBOR submissions as required in the BBA LIBOR Instruction to LIBOR submitters, but failing to disclose the LIBOR submissions were trader-influenced, which was not prohibited by the BBA LIBOR Instruction in place at the time).

***ii. The alleged omission was not material.***

A statement is material only if it "would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct." *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc). Even a false statement made to a counterparty cannot support a fraud conviction unless it would "affect a reasonable person's evaluation of a proposal." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (internal quotation marks omitted); see *also Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) ("materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation'"). To determine whether omitted information charged as a half-truth is material and misleading, "the proper question" is not "what might have happened had a company remained silent, *but what would have happened if it had spoken truthfully*." *Vivendi*, 838 F.3d at 258 (emphasis added).

Although materiality is often treated as a mixed question of fact and law, it is clear on the face of the Indictment that the omitted information alleged here cannot support a wire fraud charge. Wire fraud requires the government to allege that the defendant engaged in a scheme to defraud in order to obtain money or property. *See Binday*, 804 F.3d at 569. At best, the Indictment alleges an omission made to two entities (Bank-2 and Intermediary Fund-1) to whom no duty was owed and from whom no money could have been (or was) obtained. Because the Indictment itself makes clear the alleged omission was not material, this Court should dismiss Counts III and IV.

First, the Agreement between Bank-2 and Glen Point makes clear that the parties to the Option might trade in ways that could affect the USD/ZAR exchange rate, and if they did, they had no obligation to disclose it. Ex. A at 3. Indeed, the facts alleged in the Indictment, taken together, make clear that as Calculation Agent, Glen Point would have to trade in the USD/ZAR spot market after purchasing the Option to be able to determine when the exchange rate reached a particular level. *See e.g.*, Ind. ¶ 7 ("[t]here is no single, official marketplace for FX," "[c]ustomers trade directly with FX dealer banks"), ¶ 13 (Calculation Agent is "the party who determines whether or not a Barrier Event has occurred"—here whether or not the USD/ZAR rate reached 12.50).

Second, information concerning Glen Point's USD/ZAR spot trading activity was clearly not something any party to the One Touch Option needed or expected to know. The only reason that there was any communication from Glen Point to Bank 2 after the Barrier Event occurred was because it happened to serve as Calculation Agent, a role that could have been filled by someone else. *See* Ind. ¶ 13. And if a third party had served as Calculation Agent, a possibility expressly contemplated in the ISDA Supplement, that third party could not possibly have disclosed information concerning Glen Point's trading because it would not have had it. *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018) (finding no duty to disclose information omitted in alleged half-truth where "no reasonable investor would have considered significant" the undisclosed information "*in deciding whether to invest*," making the "alleged misstatement . . . therefore immaterial") (emphasis added).

Finally, the alleged omission was not material because it would not "naturally tend to lead or [be] capable of leading a reasonable [person] to change [his] conduct." *Rybicki*, 354 F.3d at 145. The government's theory appears to be that, if Glen Point had informed *Bank-2* about its trading

(which it had no obligation to do), *Bank-1* reasonably would have changed its conduct. But how? Bank-1 was obligated to pay the option if a Barrier Event occurred; it determined that a Barrier Event occurred; and it made the required payment. Bank-1 was not deciding whether to enter the Option—it had already done that months before. For all of these reasons, as a matter of law, the alleged omission cannot satisfy the materiality requirement.

## IV. THE INDICTMENT SHOULD BE DISMISSED BECAUSE APPLICATION OF THE CEA AND WIRE FRAUD STATUTES TO PHILLIPS' CONDUCT VIOLATES THE DUE PROCESS CLAUSE.

Due Process requires that a defendant have "fair warning" of precisely what conduct a criminal law prohibits. *McBoyle v. United States*, 283 U.S. 25, 27 (1931). The Indictment implicates two manifestations of the fair warning requirement: the vagueness doctrine and the principle that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *13 (S.D.N.Y. Dec. 5, 2022) (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267.

First, the government's novel open-market Manipulation Theory does not provide fair warning that the alleged conduct, which has never before formed the basis of a criminal conviction, violated the law. Second, the government's theory that Phillips fraudulently omitted disclosure of his trading in USD/ZAR in violation of a duty created by the Confirmation Agreement is void for vagueness because the Agreement expressly allowed the parties to trade in a manner that could affect the exchange rate. Phillips cannot be charged with a crime for allegedly breaching a contractual duty when the alleged conduct falls well within a reasonable interpretation of the contract.

**A. Novel Construction**

Here, the government's Manipulation Theory is a novel construction of both the CEA and the wire fraud statute. There is no precedent for criminalizing sophisticated traders for predicting that a market—regulated by neither the securities nor commodities laws—will shift in a particular direction and then trading in support of that prediction, even with the hope that their trading might further that outcome.

As discussed above, *see supra* Section II, market manipulation requires something more than legitimately structured trades on the open-market that do not create an artificial price. In every criminal market manipulation case based on actual trading activity that moved the price of a security or commodity, there was some additional element of fraud or manipulation. But here, in addition to there being no security or commodity, there are also "[n]one of the traditional badges of manipulation." *United States v. Mulheren*, 938 F.2d 364, 370 (2d Cir. 1991). Criminal charges based on market manipulation must involve some sort of deceptive act or tool. *See supra* at 20 (collecting cases). Indeed, in one of the few cases involving a remotely similar fact pattern, the Second Circuit reversed a criminal conviction for insufficient evidence of scienter while expressing "misgivings" about the government's view that nothing more than intent is needed to support a market manipulation criminal charge. *Mulheren*, 938 F.2d at 368.

In light of this precedent, the charges in this case require a "novel construction" not contemplated by the language of the statutes themselves or any case interpreting them. *Lanier*, 520 U.S. at 266. Indeed, the Indictment raises the question of when and to what extent Phillips could have traded in USD/ZAR before the Option expired, and how much he could trade before his lawful trading activity would become criminal. The Indictment therefore violates Phillips' right to fair warning that his conduct runs afoul of the law under the Due Process Clause. *Cf. Mulheren*, 938 F.2d at 370; *see also United States v. Bogucki*, No. 18-CR-00021-CRB-1, 2019 WL 1024959,

at *7 (N.D. Cal. Mar. 4, 2019) (granting judgement of acquittal where the trading activity "violated no clear rule or regulation, was not prohibited by the agreements between the parties, and indeed was consistent with the parties' understanding of the arms-length relationship in which they operated").

**B. Vagueness**

The charges against Phillips are unconstitutionally vague as applied to his conduct. Specifically, the lynchpin of the Government's theory for all counts is that Phillips fraudulently omitted the fact that he traded in a manner that caused the price of USD/ZAR to reach 12.50. Because, as charged, the offenses turn on the permissibility of his conduct under the terms of the Agreement, "the 'fair warning' principle of the Due Process Clause must be applied to the terms of the [Agreement]." *United States v. Bryant*, 556 F. Supp. 2d 378, 442 (D.N.J. 2008). Where fraud charges are based on a "'scheme or artifice to defraud' predicated on a violation of" a contract, that contract itself must have made it "reasonably clear" that a defendant's conduct was prohibited. *Id.* Put another way, "the application of the vagueness doctrine to the [contract] requires not just that a jury might reasonably find that [the defendant] violated the [contract], but that the [contract] gave 'fair warning'—a warning that is '*reasonably clear*'—that [his] conduct was prohibited." *Id.*

Here, as described above, the Confirmation Agreement imposed no duty on Glen Point, no limitation on its trading activity, and contained no requirement that it provide the information that Phillips is accused of omitting.[11] Because Phillips' conduct was "authorized under a reasonable

[11] In determining whether the Indictment comports with the fair warning principle, this Court can consider the terms of the One Touch Option and related governing documents. Where a contract is "the very subject of the indictment," "[i]f those terms make it clear that the indictment should not proceed, it would be a travesty if the [d]efendant[] w[as] forced to engage in a lengthy trial with the inevitable result that the Court would then dismiss the indictment once the Contract came into evidence." *Gen. Dynamics Corp.*, 644 F. Supp. at 1500. "For example, if a contract explicitly and clearly said that a [defendant] could do 'X', and if an indictment were returned that said the [defendant] had conspired to commit a fraud under the contract by doing 'X', it would be absurd to require a trial." *Id.* Thus, "whenever a defendant's statement or action under a contract accords with a reasonable construction of the enabling language of

interpretation of the contract," *Race*, 632 F.2d at 1120 (4th Cir. 1980), application of the CEA or wire fraud statutes to impose criminal liability for precisely that conduct would violate Phillips' right to fair warning under the Due Process Clause. *See Bryant*, 556 F. Supp. 2d at 448 ("If such a reasonable construction supports [the defendant]'s actions, even if another reasonable interpretation prohibits those actions, the contract would be ambiguous, and [his] prosecution for mail and wire fraud for such conduct would be barred by the Due Process Clause of the Fifth Amendment.").

## CONCLUSION

For the foregoing reasons, the Indictment should be dismissed in its entirety.

Dated: April 28, 2023
New York, New York

By: ______________________

Sean Hecker
Jenna M. Dabbs
David Gopstein
Alexandra Conlon
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
aconlon@kaplanhecker.com
*Counsel for Defendant Neil Phillips*

the contract," fraud charges "cannot stand under those circumstances." *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980).

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>NEIL PHILLIPS,<br><br>Defendant. | Case No. 22-CR-138 (RA)<br><br>**Oral Argument Requested** |

**DECLARATION OF SEAN HECKER IN SUPPORT OF DEFENDANT NEIL PHILLIPS' MOTION TO DISMISS**

I, SEAN HECKER, declare as follows:

1. I am a Partner in the law firm of Kaplan Hecker & Fink LLP and counsel for Neil Phillips in the above-captioned action.

2. I respectfully submit this declaration in connection with the Memorandum of Law in Support of Defendant Neil Phillips' Motion to Dismiss (the "Motion").

3. Attached hereto as **Exhibit A** is a true and correct copy of Bank-2's "letter agreement" with Glen Point Master Fund dated October 30, 2017.[1]

In accordance with 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

---

[1] Exhibit A is referenced in the Indictment at ¶¶ 13, 24.

Executed at: New York, New York
April 28, 2023

Sean Hecker
Jenna M. Dabbs
David Gopstein
Alexandra Conlon
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
aconlon@kaplanhecker.com
*Counsel for Defendant Neil Phillips*

# EXHIBIT A

[redacted]

[redacted]

```
Date:    November 01, 07:25:51 PM GMT
Subj:    61593939
Pages:   6
```

---

This message is confidential and subject to terms at: [redacted] including on confidentiality, legal privilege, viruses and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Confidentiality Notice: This transmission is intended for the use of the individual or entity to which it is addressed, and it may contain information that is confidential or privileged under law. If the reader of this message is not the intended recipient, you are hereby notified that retention, dissemination, distribution or copying of this fax is strictly prohibited. If you received this fax in error, please notify the sender immediately by telephone and destroy the original. Thank you.

[redacted]

[redacted]

[redacted]

[redacted]
Bournemouth
BH7 7DA
UNITED KINGDOM

Attention: Prime Brokerage EMEA

Direct Line: 44 (0) [redacted]
Facsimile: 44 (0)
Switchboard: 44 (0)

Glen Point Master Fund Limited

30 October 2017

Reference Number: 80HAU61593939

3487746

One Touch Binary Currency Option Transaction

The purpose of this letter agreement is to confirm the terms and conditions of the Transaction entered into between [redacted] and Glen Point Master Fund Limited, (the "Counterparty") on the Trade Date specified below.

The definitions and provisions contained in the 1998 FX and Currency Option Definitions, as amended by the 2005 Barrier Option Supplement (as published by the International Swaps and Derivatives Association, Inc.; EMTA, Inc.; and the Foreign Exchange Committee) are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

1. This Confirmation supplements, forms part of, and is subject, to the ISDA Master Agreement dated as of 10 December 2015, as amended and supplemented from time to time (the "Agreement"), between [redacted] and the Counterparty. All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

---

USI: 1030229152 GFXFXO000000000000000000HCZFFA904; UTI: 1030229152 GFXFXO000000000000000000HCZFFA904
Trade data of this transaction has been reported pursuant to applicable U.S. law to the following swap data repository: DTCC Data Repository (U.S.) LLC. Trade data of this transaction may also have been reported to the same or other trade repositories pursuant to other applicable laws.



[redacted] plc. Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] National Association. Organised under the laws of USA with limited liability. Main Office: [redacted] USA. Registered [redacted] branch in England & Wales branch [redacted] Registered [redacted] London, [redacted] Limited. Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] Europe Limited. Registered in England & Wales [redacted] London, [redacted] All authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority.

[redacted]

[redacted] [redacted]

2. The terms of the particular Transaction to which this Confirmation relates are as follows:

(a) General Terms:

| | |
|---|---|
| Internal Reference: | 61593939 |
| Trade Date: | 30 October 2017 |
| Buyer: | Counterparty |
| Seller: | [redacted] |
| Currency Option Type: | Binary |
| Expiration Date: | 2 January 2018 |
| Expiration Time: | 10:00 New York Time |
| Settlement: | Non-Deliverable |
| Settlement Amount: | USD 15,660,000.00 |
| Settlement Date: | Two Business Days following the occurrence of a Barrier Event. |
| Premium: | USD 1,624,725.00 |
| Premium Payment Date: | 1 November 2017 |

(b) Other terms and conditions:

| | |
|---|---|
| Barrier Event: | Applicable |
| Event Type: | One-Touch Binary |
| Spot Exchange Rate Direction: | Less than or equal to the Barrier Level |
| Barrier Level: | 12.5 ZAR/USD |

USI: 1030229152 GFXFXO00000000000000000HCZFFA904; UTI: 1030229152 GFXFXO00000000000000000HCZFFA904
Trade data of this transaction has been reported pursuant to applicable U.S. law to the following swap data repository: DTCC Data Repository (U.S.) LLC. Trade data of this transaction may also have been reported to the same or other trade repositories pursuant to other applicable laws.
Reference Number: 80HAU61593939



[redacted] Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] Organised under the laws of USA with limited liability. Main Office: [redacted] USA. Registered as a branch in England & Wales branch [redacted] Registered [redacted] London, [redacted] Registered in England & Wales [redacted] London, [redacted] Europe Limited. Registered in England & Wales [redacted] London, [redacted] All authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority.

[redacted]

[redacted] [redacted]

| | |
|---|---|
| Event Period Start Date and Time: | Trade Date at the time of execution thereof |
| Event Period End Date and Time: | Expiration Date at the Expiration Time |

**Option Disclosure:**

[redacted] has priced, executed and will manage the risks associated with this transaction in a principal capacity and at arm's length. [redacted] is not acting as your fiduciary, agent or advisor in relation to the execution of this transaction and management of the associated risks. [redacted] has made no representation or warranty to you concerning the performance of this transaction or [redacted] other activities and/or competing interests that could conflict with this transaction at any point during the term of the transaction.

By their nature, binary and barrier (or digital) option structures have the potential to generate large hedging requirements for [redacted] throughout the life of the trade. These requirements are highly fluid, require significant trading judgment, and have the potential to result in large and directionally unfavorable movements for our counterparties, particularly around the reference period, fixing period/window, or expiries of the option ("Event").

Specifically, our hedging requirements may include:

(i) buying and selling, on a dynamic basis, exposure to the asset underlying the option in the spot, cash or derivatives markets;

(ii) dynamically adjusting our hedges as market prices approach an Event; and

(iii) anticipating an Event and unwinding our hedges before the barrier event occurs, and/or unwinding our hedges after an Event occurs.

Unwinding or adjusting the hedge typically consists of buying or selling a quantity of the asset underlying the option, or terminating or entering into derivatives positions with market counterparties. This activity may affect the likelihood of an Event occurring or not occurring. In addition, derivative transactions that we execute in other capacities may affect the probability that an Event will occur.

[redacted] is a marketing name for investment banking businesses of [redacted] and its subsidiaries and affiliates worldwide.

3. Calculation Agent: Counterparty, acting in good faith and in a commercially reasonable manner, and whose determinations and calculations will be binding in the absence of manifest error.

4. Offices:
The Office of [redacted] for this Transaction is London.
The Office of the Counterparty for this Transaction is Grand Cayman.

---

USI: 1030229152 GFXFXO0000000000000000HCZFFA904; UTI: 1030229152 GFXFXO0000000000000000HCZFFA904
Trade data of this transaction has been reported pursuant to applicable U.S. law to the following swap data repository: DTCC Data Repository (U.S.) LLC. Trade data of this transaction may also have been reported to the same or other trade repositories pursuant to other applicable laws.
Reference Number: 80HAU61593939



[redacted] Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted]. Organised under the laws of USA with limited liability. Main Office: [redacted] USA. Registered as a branch in England & Wales [redacted] Registered Branch Office [redacted] London, [redacted] Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] Europe Limited, Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] All authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority.

[redacted]

[redacted] [redacted]

[redacted]

5. Office and Address for notices in connection with this Transaction

[redacted] [redacted]

Bournemouth
BH7 7DA
UNITED KINGDOM
Direct Line: 44 (0) [redacted]
Facsimile: 44 (0) [redacted]
Attention: Prime Brokerage EMEA

6. Documents to be delivered. Each party shall deliver to the other, at the time of its execution of this Confirmation, evidence of the specimen signature and incumbency of each person who is executing the Confirmation on the party's behalf, unless such evidence has previously been supplied in connection with this Agreement and remains true and in effect.

7. Representations and Warranties: Absent a written agreement to the contrary, each party represents and warrants to the other party that (i) it is not relying on any advice (whether written or oral) of the other party regarding this Transaction; (ii) it has the capacity to evaluate (internally or through independent professional advice) this Transaction and has made its own decision to enter into this Transaction; (iii) it understands the terms, conditions and risks of this Transaction and is willing to accept those terms and conditions and to assume (financially and otherwise) those risks; and (iv) the other party (1) is not acting as a fiduciary or financial, investment or commodity trading advisor for it, (2) has not given to it (directly or indirectly through any other person) any assurance, guaranty or representation whatsoever as to the merits (either legal, regulatory, tax, financial, accounting or otherwise) of this Transaction or any documentation related thereto, and (3) has not committed to unwind this Transaction.

---

USI: 1030229152 GFXFXO0000000000000000HCZFFA904; UTI: 1030229152 GFXFXO0000000000000000HCZFFA904
Trade data of this transaction has been reported pursuant to applicable U.S. law to the following swap data repository: DTCC Data Repository (U.S.) LLC. Trade data of this transaction may also have been reported to the same or other trade repositories pursuant to other applicable laws.
Reference Number: 80HAU61593939



[redacted] plc. Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] National Association. Organised under the laws of USA with limited liability. Main Office: [redacted] USA. Registered as a branch in England & Wales branch [redacted] Registered Branch Office [redacted] London, [redacted] Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] Europe Limited. Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] All authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority.

[redacted] [redacted]

[redacted]

This Confirmation supersedes and replaces any other confirmation (including any other written confirmation, SWIFT MT305 or phone/oral confirmation) issued by [redacted] in connection with this Transaction on or prior to the date hereof.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to the above address.

Yours faithfully,

[redacted]

Name: [redacted]

Title: Managing Director

Accepted and confirmed as of the date first written

Glen Point Master Fund Limited

Name:

Title:

Your Reference Number:

USI: 1030229152 GFXFXO000000000000000000HCZFFA904; UTI: 1030229152 GFXFXO000000000000000000HCZFFA904
Trade data of this transaction has been reported pursuant to applicable U.S. law to the following swap data repository: DTCC Data Repository (U.S.) LLC. Trade data of this transaction may also have been reported to the same or other trade repositories pursuant to other applicable laws.
Reference Number: 80HAU61593939



[redacted] plc. Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] National Association. Organised under the laws of USA with limited liability. Main Office: [redacted] USA. Registered as a branch in England & Wales [redacted] Registered Branch Office [redacted] London, [redacted] Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted]imited. Registered in England & Wales [redacted] Registered Office [redacted] London, [redacted] All authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority.

[redacted]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

- v. -

NEIL PHILLIPS,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

No. 22 Cr. 138 (RA)

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Thomas Burnett
Kiersten Fletcher
Noah Solowiejczyk
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

A. The FX Market ..... 3

B. Glen Point and the One Touch Option ..... 3

C. Phillips's Criminal Scheme ..... 5

D. The Indictment ..... 8

ARGUMENT ..... 8

I. The Motion to Dismiss the CEA Counts Should be Denied ..... 8

A. Applicable Law ..... 8

B. The Indictment Alleges a Manipulative and Deceptive Scheme in Connection with a Swap ..... 9

C. The CEA Counts Do Not Allege an Impermissibly Extraterritorial Application of the CEA ..... 15

*1. Section 6(c)(1) and Rule 180.1 Have Both Domestic and Extraterritorial Reach as Applied to Swaps* ..... 16

*2. The CEA Counts Are a Domestic Application of the Statute* ..... 18

*3. In the Alternative, the CEA Counts Are a Permissible Extraterritorial Application of the Statute* ..... 21

D. The CEA Counts Allege Violations of Section 6(c)(1) and Rule 180.1 ..... 25

*1. The CEA Counts Allege a Violation of Section 6(c)(1) and Rule 180.1* ..... 25

*2. Phillips Wrongly Relies on Elements From a Different Statute* ..... 28

*3. The CEA Counts Do Not Require Deceptive Conduct Beyond Open Market Transactions with Manipulative Intent* ..... 31

*4. The CEA Counts Allege Manipulative Intent and Deceptive Conduct* ..... 34

II. The Motion to Dismiss the Wire Fraud Counts Should be Denied ..... 35

III. The Constitutional Challenge to the Indictment Should be Denied ..... 40

A. Applicable Law ..... 40

B. The Charges in the Indictment Do Not Violate the Due Process Clause ..... 41

CONCLUSION ..... 45

## TABLE OF AUTHORITIES

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ............... 26, 27, 32, 33, 34, 37, 42
*BP Am. Inc. v. FERC*, 52 F.4th 204 (5th Cir. 2022) ............... 12
*CFTC v. Amaranth*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008) ............... 32
*CFTC v. Gorman*, 587 F. Supp. 3d 24 (S.D.N.Y. 2022) ............... 31-32
*CFTC v. Kraft Food Grp.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) ............... 28, 30, 31, 42
*CFTC v. McDonnell*, 332 F. Supp. 3d 641 (E.D.N.Y. 2018) ............... 13, 14
*CFTC v. Monex Credit Co.*, 311 F. Supp. 3d 1173 (C.D. Cal. 2018) ............... 10
*CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233 (S.D.N.Y. 2012) ............... 11
*CFTC v. Wilson,* 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ............... 33
*Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014) ............... 13
*Costello v. United States*, 350 U.S. 359 (1956) ............... 9
*FAA v. Cooper*, 566 U.S. 284 (2011) ............... 29
*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) ............... 27
*Hunter v. FERC*, 711 F.3d 155 (D.C. Cir. 2013) ............... 12
*In re Amaranth Nat. Gas Comm. Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008) ............... 28
*In re Foreign Exch. Benchmark Rates Antitrust Litig.,* 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ... 11
*In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242 (2d Cir. 2023) ............... 17, 18, 21
*Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2014) ............... 30
*Lotes Co. v. Hon Hai Precision Indus.*, 753 F.3d 395 (2d Cir. 2014) ............... 21, 22
*Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001) ............... 42
*Maynard v. Cartwright*, 486 U.S. 356 (1988) ............... 41
*Morisette v. United States*, 342 U.S. 246 (1952) ............... 27
*Morrison v. National Australia Bank*, 561 U.S. 247 (2010) ............... 15
*Laydon v. Coöperatieve Rabobank U.A.* 55 F.4th 86 (2d Cir. 2022) ............... 20
*Perez v. United States*, 402 U.S. 146 (1971) ............... 22-23
*Ploss v. Kraft Food Grp.*, 197 F. Supp. 3d 1037 (N.D. Ill. 2016) ............... 28, 42
*Prime Int'l Trading v. BP PLC*, 937 F.3d 94 (2d Cir. 2019) ............... 13, 16, 17, 18, 19, 21
*RJR Nabisco, Inc. v. European Cmty.*, 136 S.Ct. 2090 (2016) ............... 16
*S.E.C. v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) ............... 26, 32, 42
*SEC v. LEK Secs. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017) ............... 26, 32
*SEC v. Vali Mgmt.*, 2022 WL 2155094 (2d Cir. 2022) ............... 26, 30, 32
*Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64 (2d Cir. 2021) ............... 26, 32, 33, 34
*Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015) ............... 42

*SIFMA v. CFTC*, 67 F. Supp. 3d 373 (D.D.C. 2014) .......... 17, 21, 23
*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022) .......... 25
*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) .......... 35, 37, 43
*United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008) .......... 44
*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022) .......... 38
*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016) .......... 8
*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) .......... 35, 9
*United States v. Epksamp*, 832 F.3d 154 (2d Cir. (2016).......... 16
*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) .......... 40
*United States v. Frank*, 156 F.3d 332 (2d Cir. 1998) .......... 37
*United States v. Gen. Dyn. Corp.*, 644 F. Supp. 1497 (C.D. Cal. 1986) .......... 44
*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) .......... 35
*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016) .......... 40
*United States v. Harris*, 821 F.2d 589 (5th Cir. 2016) .......... 36
*United States v. Houtar*, 980 F.3d 268 (2d Cir. 2020) .......... 40, 42, 44
*United States v. Juwa,* 508 F.3d 694 (2d Cir. 2007) .......... 9
*United States v. Leslie*, 103 F.3d 1093 (2d Cir. 1997) .......... 23
*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) .......... 39
*United States v. Milani*, 739 F. Supp. 216 (S.D.N.Y. 1990) .......... 41
*United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991) .......... 33
*United States v. Naiman*, 211 F.3d 40 (2d Cir. 2000) .......... 36-37
*United States v. Napout*, 963 F.3d 163 (2d Cir. 2020) .......... 15-16
*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) .......... 15, 34, 9
*United States v. Prado*, 933 F.3d 121 (2d Cir. 2019) .......... 15
*United States v. Race*, 632 F.2d 1114 (4th Cir. 1980) .......... 44
*United States v. Radley*, 637 F.3d 177 (5th Cir. 2011) .......... 11, 12
*United States v. Regan*, 937 F.2d 823 (2d Cir. 1991) .......... 27, 32, 35, 37
*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) .......... 25
*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008) .......... 27, 32, 34, 35
*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) .......... 41
*United States v. Shellef*, 732 F. Supp. 2d 42 (E.D.N.Y. 2010) .......... 44
*United States v. Torres,* 2021 WL 1947503 (S.D.N.Y. May 13, 2021) .......... 8
*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999) .......... 9
*United States v. Vilar*, 7298 F.3d 62 (2d Cir. 2013) .......... 16
*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018) .......... 9

*United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021) ........................................................................ 10, 35, 8
*Univ. Health Servs. v. United States*, 579 U.S. 176 (2016) ........................................................................ 36

## PRELIMINARY STATEMENT

Neil Phillips manipulated a global exchange rate and deceived American financial institutions, all to guarantee his hedge fund a $20 million payday. The scheme took place in the dead of night, right after Christmas. Using his access to vast amounts of capital, Phillips sold $725 million in exchange for South African rand. His goal—which he stated clearly to a co-conspirator—was to push down the value of the dollar relative to the rand, so the exchange rate would momentarily fall below 12.50 rand per dollar.

Phillips's motivation was simple: he wanted to cheat. Phillips managed funds that, pursuant to an options contract, were entitled to a $20 million payment from an American bank if the exchange rate fell below that threshold. So he took matters into his own hands. He secretly drove the exchange rate just low enough to trigger the option, then deceived other parties involved in the option—including another American bank—telling them that the magic number had been reached, without disclosing that the exchange rate had fallen not due to normal market forces, but because of his own manipulative trading.

In his motion to dismiss, Phillips tries to garb himself in the Constitution, claiming that prosecuting him for this deceptive scheme offends fundamental principles of fair notice. But the clothes don't fit. Phillips violated settled rules that prohibit deceptive schemes in options markets and obtaining money by making misleading statements; rules that Phillips undoubtedly understood as a sophisticated investor who was registered with, and ran a fund that was registered with, the Commodity Futures Trading Commission.

Since shortly after the 2008 financial crisis, the Commodity Exchange Act has made it a crime to engage in deceptive schemes in connection with any swap, including options based on foreign-currency exchange rates. Courts in this Circuit have long recognized that deceptive

schemes include those that involve engaging in open-market trading strategies with the intent to manipulate prices. The logic of these decisions is straightforward: market participants expect that prices are set by natural forces of supply and demand, not the whims of manipulators, so a secret plan to intentionally manipulate prices is a form of deception.

Phillips broke that settled rule. By using his massive buying power on the night of a major holiday, he was able to give a false impression that normal market forces had caused the dollar/rand exchange rate to fall below 12.50, then further deceived other relevant parties to the option by telling them the magic number had been reached, without disclosing that his own manipulative trading was the cause. Phillips's claim that it is novel to charge this plainly deceptive scheme as a deceptive scheme in violation of the Commodity Exchange Act is at odds with the text of the relevant statutes and long-settled law.

Phillips's attempt to characterize the wire-fraud charges is novel are equally off base. The wire-fraud statute has long barred people from defrauding others through misleading statements, including misleading half truths. Phillips violated that prohibition. Under the terms of the options contract, Phillips's hedge fund was responsible for determining when the option had been triggered and doing so in "good faith" and a "commercially reasonable manner." But after manipulating the exchange rate, Phillips directed his employees to confirm to other parties that the option had been triggered, without disclosing that he made that determination based the results of his own manipulative trading. Those confirmations were doubly misleading: They implied that Glen Point was acting in "good faith" and a "commercially reasonable manner," when in reality Phillips had cheated. And they implied that the option had been triggered as a result of natural market forces, rather than Phillips's manipulation. It should come as no surprise that misleading another person into parting with millions of dollars is a crime. Phillips's motion to dismiss should be denied.

## BACKGROUND

### A. The FX Market

The foreign currency exchange ("FX") market is a global market, in which people and companies trade currencies in pairs. Indictment ¶ 5. The relative value of the currencies in each pair is expressed as a ratio, commonly referred to as an "exchange rate." *Id.* A common type of FX trade is a "spot" trade, where a party agrees to sell one currency for another, at an agreed-upon exchange rate and quantity. *Id.* ¶ 8. The exchange of the currencies, known as the "settlement" of the trade, typically takes place two business days after the agreement. *Id.* When a spot trade involves the United States dollar ("USD"), settlement often occurs through a particular bank in Manhattan (the "Settlement Bank"), with the USD portion of each trade flowing through bank accounts at the Federal Reserve Bank of New York. *Id.* ¶ 9.

In addition to making "spot" trades, parties in FX markets also trade a wide assortment of options. One type of FX option is a "one touch" digital barrier option. *Id.* ¶ 10. In a one touch digital barrier option, one party pays a premium and, in return, the counterparty promises that it will pay a specified amount (known as the "notional value") if the exchange rate of a particular currency pair reaches (or "touches") a specified rate (the "barrier") by a certain date. *Id.* ¶¶ 10-11. If the exchange rate does not touch the barrier by that specified date, the counterparty keeps the premium and is not required to pay the notional value. *Id.*

### B. Glen Point and the One Touch Option

Neil Phillips was the co-founder and co-Chief Investment Officer of a hedge fund that focused on FX trading. *Id.* ¶ 4. The hedge fund, known as Glen Point Capital ("Glen Point"), was headquartered in the United Kingdom, but consisted of two entities—Glen Point Capital LLC, in London, and Glen Point Capital Advisors LP, in New York—that jointly managed investments for multiple commodity pools, which are pools of funds from investors for investing in commodity

and foreign-exchange markets. *See id.* ¶¶ 3-4, 12, 19. Glen Point was registered with the Commodity Futures Trading Commission ("CFTC") as a "commodity pool operator." *Id.* ¶ 4. And Phillips was personally registered with the CFTC as an associate of Glen Point. *Id.* ¶ 4.

One of the currency pairs in which Glen Point traded was the pairing of the United States dollar and the South African rand ("ZAR"). *Id.* ¶¶ 6, 27. As of late October 2017, the USD/ZAR exchange rate was hovering over 14.00, which meant that one dollar was worth slightly more than 14.00 ZAR. *Id.* ¶ 14. Glen Point staked out a position on the premise that, by early 2018, the value of the dollar would fall relative to the rand. Specifically, on October 30, 2017, Glen Point purchased a one touch digital barrier option (the "OT Option") for the USD/ZAR currency pair, with a notional value of $20 million, a barrier rate of 12.50, and an expiration date of January 2, 2018. *Id.* ¶ 10. So if the USD/ZAR exchange rate fell to or below 12.50 at any point before January 2, 2018, the pools Glen Point managed would receive a $20 million payment. *Id.*

Glen Point was involved with two American financial institutions in connection with the OT Option. The fund began by using a financial services firm (the "Intermediary Firm") to find a willing counterparty for the option. *Id.* ¶ 11. The Intermediary Firm found an American bank ("American Bank-1") for that role and arranged for American Bank-1 to take the opposite side the OT Option. *Id.* As a result, American Bank-1 would be required to pay Glen Point's funds $20 million if, at some point before January 2, 2018, the USD/ZAR exchange rate fell below 12.50. *Id.* Because the Intermediary Firm allowed its clients to maintain anonymity, neither Glen Point nor American Bank-1 knew the identity of their respective counterparty to the transaction. *Id.*

After the Intermediary Firm found a willing counterparty in American Bank-1, Glen Point used a second bank headquartered in the United States ("American Bank-2"), to act as its prime broker for the OT Option. *Id.* ¶ 13. This meant American Bank-2 sent Glen Point a contract

embodying the terms of the OT Option, with American Bank-2 listed as the "seller" of the OT Option—not the Intermediary Firm or American Bank-1. *See id.* The contract stated that Glen Point would serve as the "Calculation Agent," which meant that it would be charged with determining whether the 12.50 USD/ZAR had been met. *Id.* The contract required Glen Point, as Calculation Agent, to "act[] in good faith and in a commercially reasonable manner." *Id.* The agreement also incorporated by reference the "2005 Barrier Option Supplement" published by the International Swaps and Derivatives Association, Inc., which reiterates that the "occurrence of a [b]arrier [e]vent shall be determined in good faith and in a commercially reasonable manner." *Id.*

Practically speaking, this arrangement meant that, if the OT Option's barrier was triggered, American Bank-2 would make the $20 million payment to Glen Point's funds, then be reimbursed by transfers from American Bank-2. *See id.* ¶ 25. Glen Point specified in its agreements with American Bank-2 that, if the OT Option proved to be a success, $15,660,000 should go to one set of Glen Point's funds, with the remaining $4,340,000 going to a fund operated by a Glen Point client ("Client Fund-1"). *See id.* ¶ 12.

**C. Phillips's Criminal Scheme**

The investment theory behind the OT Option was related to anticipated political events in South Africa. The African National Congress ("ANC") is a major political party in South Africa that it has governed the country since South Africa's first post-apartheid election. When Glen Point created the OT Option, the ANC was scheduled to hold party leadership elections in mid-December 2017. *See id.* ¶ 27. The idea behind OT Option, which was set to expire two weeks after the election, was that a particular candidate ("Candidate-1") was likely to become president of the ANC, and that the rand would strengthen relative to the dollar as a result of that victory, lowering the exchange rate below 12.50 USD/ZAR. *Id.*

Political events unfolded as Glen Point had hoped, but they did not shift the exchange rate

enough to hit the barrier in the OT Option. In the weeks before the ANC leadership election, the USD/ZAR exchange rate fluctuated between 14.50 and approximately 13.15—far above the 12.50 barrier. *Id.* ¶ 14. That changed on December 18, 2017, when the ANC announced that Candidate-1 had been elected the ANC's president. *Id.* ¶ 15. The market reacted quickly, with the USD/ZAR exchange rate falling as low 12.52 that day. *Id.* But the exchange rate did not fall below 12.50, and it remained over that threshold between December 19 and Christmas day. *Id.* ¶ 16.

With the OT Option set to expire in a matter of days, Phillips took matters into his own hands. He intentionally and artificially manipulating the USD/ZAR exchange rate, so it would fall trigger the OT Option. *Id.* ¶ 17. Phillips carried out that plan by selling massive quantities of dollars for rand in the dead of night right after Christmas, with the stated objective of selling just enough dollars to drive the exchange rate below 12.50, then to stop selling, so he would not have to buy any more rand than was necessary to trigger the $20 million payout. *See id.* ¶¶ 17-18.

The scheme began shortly before midnight London time on December 25, 2017, Christmas day. *Id.* ¶ 18. Phillips, who was in South Africa at the time, reached out over Bloomberg chat to a banker in Singapore ("CC-1") who regularly did business with Glen Point. *Id.* Phillips directed CC-1 to begin selling dollars for rand, with the express goal of driving the USD/ZAR exchange rate below 12.50. *Id.* ¶¶ 18, 20. Phillips had CC-1 sell dollars in batches, constantly checking in to see how much more would be needed to drive the exchange rate below 12.50. For example:

- At approximately 12:09 a.m. on December 26,2017, Phillips wrote, "my aim is to trade thru 50," and CC-1 responded, "Ok sure." *Id.* ¶ 20(a).

- At approximately 12:19 a.m., Phillips asked CC-1 "[h]ow much liquidity" CC-1 thought there was "between now and 50." CC-1 responded, in substance and in part, that "we are the only sellers in the market." *Id.* ¶ 20(c).

- At approximately 12:25 a.m., Phillips wrote, "[n]eed it to trade thru 50. 4990 is fine." *Id.* ¶ 20(d).

- At approximately 12:31 a.m., CC-1 told Phillips that he had sold $450 million for rand and that the lowest the exchange rate had gone was 12.5050. Phillips responded by asking, "[h]ow much more u think to break 50?" *Id.* ¶ 20(f).

- At approximately 12:42 a.m., Phillips instructed CC-1 to sell another $100 million for rand, urging him to "try to get it thru now." CC-1 responded that he would let Phillips "know as soon as we sell any below the figure." *Id.* ¶ 20(g).

Finally, at approximately 12:44 a.m., CC-1 let Phillips know "we just sold at 4990." *Id.* ¶ 20(h). Phillips immediately responded, "Pls. [please] get me prof [proof] of the print. And stip [sic] stop." *Id.* In all, Phillips sold over $725 million for rand in under an hour, to drive the exchange rate momentarily below 12.50. *Id.* ¶ 21. Soon after Phillips's manipulative trading ended, the USD/ZAR exchange rate returned to levels above 12.50. *Id.* ¶ 22.

Phillips moved quickly to secure his payout. Minutes after manipulating the exchange rate, he told a Glen Point employee in London to notify the Intermediary Firm that the OT Option had been triggered. *Id.* ¶ 23. The employee contacted an employee at the Intermediary Firm to confirm that the barrier had been reached, but did not reveal that the triggering event occurred because Phillips had manipulated the exchange rate. *Id.* Later that morning, another Glen Point employee notified American Bank-2 that the "option level of 12.50 was hit yesterday," also failing to tell American Bank-2 that Phillips had manipulated the exchange rate to hit that barrier. *Id.*

As a result of Phillips's scheme, American Bank-1 made the $20 million payment under the OT Option, and Glen Points funds, including Client Fund-1, received their ill-gotten rewards. *Id.* ¶ 25. American Bank-1 and American Bank-2 made wire transfers through New York to facilitate the payments. *Id.*

**D. The Indictment**

On March 3, 2022, a grand jury sitting in this District returned an indictment (the "Indictment") charging Phillips in four counts. Counts One and Two (the "Commodities Exchange Act Counts" or "CEA Counts") charge Phillips with conspiring to commit commodities fraud, in violation of Title 18, United States Code, Section 371, and commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1. Counts Three and Four (the "Wire Fraud Counts") charge Phillips with conspiring to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2.

## ARGUMENT

## I. The Motion to Dismiss the CEA Counts Should be Denied

### A. Applicable Law

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must, for each count, "give the official or customary citation of the law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1); *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *3 (S.D.N.Y. May 13, 2021). An indictment is sufficient under Rule 7 and the Fifth Amendment "as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021).

To satisfy these requirements, "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *Id.* That is, it need only describe the "core of criminality to be proven at trial," not "the particulars of how a defendant effected the crime." *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016).

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 365 (1956). It is not proper to weigh the sufficiency of the evidence underlying the indictment, unless the Government has already made "a full proffer of the evidence it intends to present at trial." *United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009).* This rule exists because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). "That is something [courts] do after trial." *Id.* Dismissal is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018).

**B. The Indictment Alleges a Manipulative and Deceptive Scheme in Connection with a Swap**

"In the wake of the financial crisis of 2008, Congress . . . provided the [CFTC] with additional and broad authority to prohibit fraud and manipulation." 76 Fed. Reg. 41,398 (2011). This new statutory authority—in Section 6(c)(1) of the Commodities Exchange Act ("Section 6(c)(1)")—made it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap . . . any manipulative or deceptive device or contrivance," in violation of rules promulgated by the CFTC. 7 U.S.C. § 9(1). The CFTC gave force to that law through 17 C.F.R. § 180.1 ("Rule 180.1"), which prohibits, "in connection with any swap," using "any manipulative device, scheme or artifice to defraud," making any "untrue or

misleading statement" of fact or omission, or engaging in "any act, practice or course of business, which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 180.1(a).

The Indictment properly alleges that Phillips violated the CEA and conspired to do the same. The Indictment alleges that Phillips engaged in a criminal scheme to trigger the OT Option by using "manipulative device, scheme or artifice to defraud," making "untrue or misleading" statements of fact or omissions, and engaging in actions that "operate[d] as a fraud or deceit" on others. Indictment ¶¶ 30-35. The Indictment also alleges that this misconduct occurred "in connection with the [OT Option]," which is a type of swap. *Id.* These allegations are sufficient at the motion to dismiss stage because they "track the language of the statute" and give the defendant fair notice of the charge against him, so he can defend his case and plead double jeopardy at any future proceeding. *Wedd*, 993 F.3d at 120. Indeed, the Indictment goes well beyond the requirements of Rule 7 and the Fifth Amendment by including factual allegations that describe the nature of Phillips's illegal scheme.

Phillips's claim that the Indictment does not allege conduct "involving a transaction covered by the CEA" misapprehends both the Indictment and the law. Start with the argument that "FX spot transactions are not covered by the CEA" and so "do not, *on their own*, provide a basis for claims under the statute." Mot. at 8 (emphasis added). This is a red herring: the CEA Counts allege a deceptive scheme in connection with triggering the OT Option, not that Phillips's spot trades, on their own, were criminal. Indictment ¶¶ 30-35.[1]

---

[1] The premise that FX spot transactions are not subject to Section 6(c)(1) and Rule 180.1 is also not necessarily correct. Those laws are not limited to commodities regulated by the CFTC, but rather apply "broadly to any swap, or a contract of sale of any commodity in interstate commerce." *See CFTC v. Monex Credit Co.*, 311 F. Supp. 3d 1173, 1184-85 (C.D. Cal. 2018). The Court, however, need not reach the issue because the allegations in the Indictment charge Phillips with manipulation in connection with a swap.

One touch digital options are "swap[s]" under the CEA. The statute defines "swap" to include "any agreement . . . that is [an] option of any kind" based on the value of, among other things "[one] or more . . . currencies," 7 U.S.C. § 1a(47)(i), and specifies that the statute applies to "option[s]" in "foreign currency," *id.* § 2(c)(2)(A)-(B); *see* 77 Fed. Reg. 48208-01, 48254 (2012) ("[T]he statutory swap definition includes options, and it expressly enumerates foreign currency options."). Regulations also specify that "[t]he term swap" includes "foreign currency option[s], foreign exchange option[s] and foreign exchange rate option[s]." 17 C.F.R. § 240.3a69-2. Thus, Phillips's illegal scheme to trigger the OT Option was an illegal scheme to trigger a swap.

That Phillips's deceptive scheme relied, in part, on using spot transactions does not alter the analysis. FX spot transactions were simply one of the means to accomplish the illegal end of carrying out a deceptive scheme in connection with triggering the OT Option. Courts have long recognized that, under the CEA, it is unlawful to take actions with one type of product (even if that product is not regulated) to manipulate another product covered by the statute. *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Cv. 7789 (LGS), 2016 WL 5108131, at *18 (S.D.N.Y. Sept. 20, 2016) (noting "[c]ourts have allowed . . . CEA manipulation claims . . . where the allegedly manipulated market was influenced by actions taken in another market"); *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 243 (S.D.N.Y. 2012) (finding that use of exempt product to manipulate non-exempt product was actionable). That makes sense: nothing in the CEA gives a free pass to deceptive conduct in connection with foreign-currency options—which are expressly covered as "swaps" under the statute—simply because that manipulation also involved spot transactions. *See* 76 Fed. Reg. 41,381, at 41,406 (final rulemaking guidance explaining that Rule 180.1 applies to "cross-market manipulation").

The lone CEA case Phillips cites, *United States v. Radley*, 637 F.3d 177 (5th Cir. 2011), is

not to the contrary. Mot. at 9-10. That decision dismissed CEA counts that charged defendants with manipulating transactions that were exempt from regulation under the statute. *See id.* at 181-83. This would be akin to a charge that Phillips *solely* manipulated FX spot transactions. The charges here, however, are fundamentally different: they are based on Phillips's participation in a scheme to commit fraud in connection with a swap, and FX spot transactions were only one means by which he carried out that unlawful scheme..[2]

Phillips's next argument—that his illegal scheme was not "in connection with a swap" because it did not coincide with the creation of a swap, Mot. at 10-12—is at odds with the language of the CEA. Section 6(c)(1) and Rule 180.1 prohibit fraud "in connection with any swap." There is no textual requirement that the fraudulent acts occur in connection with the purchase, sale, or creation of the swap. Consistent with the text, Section 6(c)(1) and Rule 180.1 "reach all manipulative or deceptive conduct in connection with the purchase, sale, solicitation, execution, *pendency, or termination* of any swap." 76 Fed. Reg. 41,398, 41,406 (emphasis added).

It would make little sense to limit swap-based manipulation claims to the purchase or sale of a swap. Unlike in the context of a stocks, the critical economic moments for swaps occur not only when they are purchased and sold, but also when they are triggered or not triggered. A key economic question for the OT Option, for instance, was whether it would be triggered. There is no reason to read the CEA as allowing fraudulent conduct with respect to that critical issue.

---

[2] Phillips is also wrong to rely on *BP Am. Inc. v. FERC*, 52 F.4th 204 (5th Cir. 2022), and *Hunter v. FERC*, 711 F.3d 155 (D.C. Cir. 2013). Those cases addressed the scope of the Federal Energy Regulatory Commission's authority and had nothing to do with the CEA. They also do not support Phillips's position. Both held that FERC lacked authority to impose fines for transactions outside its jurisdiction, simply because those transactions were in connection with jurisdictional transactions. *See, e.g.*, *BP Am.*, 52 F.4th at 217, 221-22. Neither addressed the situation at issue in Phillips's case, where transactions outside of the agency's authority were used to manipulate transactions that fall under the agency's jurisdiction.

The Indictment lines up squarely with the text of the CEA. The Indictment alleges that Phillips's scheme was in connection with a swap because it was calculated to trigger the OT Option before that option expired. This falls within Rule 180.1's reach because it relates to the "pendency" and "termination" of the swap. 76 Fed. Reg. 41,398, at 41,406 ("The Commission interprets the words 'in connection with' broadly, not technically or restrictively."); *see also id.* at 41,401 (explaining that Rule 180.1 applies to any "fraud or manipulation that has the potential to affect . . . swaps markets or participants in these markets").

Phillips's argument to the contrary is based on the wrong statute. Phillips points to the Securities Exchange Act and Rule 10b-5, which prohibit fraud "in connection with the *purchase or sale* of any security." 15 U.S.C. § 78j (emphasis added). That is the wrong place to look. While those provisions are similar to Section 6(c)(1) and Rule 180.1 in many respects—including the use of the phrase "in connection with"—they notably differ in the use of the "purchase or sale" language. There is no equivalent "purchase or sale" language in the portion of Section 6(c)(1) addressing swaps. 7 U.S.C. § 9(1); *see Prime Int'l Trading v. BP PLC*, 937 F.3d 94, 107 (2d Cir. 2019) ("There is nothing in Section [9(1)'s] text suggesting it focused on 'purchases and sales of securities in the United States . . . .'").

The textual difference is critical. Case law from the securities context may be useful for interpreting the phrase "in connection with," but the relevant question here is: In connection with what? Under the CEA, the issue is whether the fraud is in connection with any swap, not in connection with the purchase or sale of a swap. So long as the scheme is "material to" the parties to the swap—whether it be their decision to purchase, sell, exercise, or terminate—the scheme is in connection with the swap. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014).

Phillips is wrong to claim that *CFTC v. McDonnell*, 332 F. Supp. 3d 641 (E.D.N.Y. 2018),

counsels a different result. Mot. at 11. That decision involved a CEA claim related to fraud "in connection with contracts of sale of a commodity," so the court focused on whether the fraud was in connection with the contract of sale. *McDonnell*, 332 F. Supp. 3d at 722-23. The CEA's focus is different with respect to swaps because, as explained above, those are fundamentally different financial products. This Court should follow the plain text of the statute.

Finally, Phillips is wrong to claim that the CEA does not apply to his crime because the OT Option is, in his telling, a "foreign swap." Mot. at 8-9. Factually, calling the OT Option a "foreign swap" is incorrect: Glen Point was registered with the CFTC, its counterparty (and victim of Phillips's fraud) was American Bank-1, and the prime broker it used to create the OT Option was American Bank-2. Indictment ¶ 13. Evidence at trial will also show, among other things, that Glen Point itself was based, in part, in the United States; that part of the OT Option was assigned to Client Fund-1, which is run from the United States; that one of the Glen Point funds that benefited from the OT Option was based in the United States; and that the swap was recorded with an American swap reporting service. Phillips's claim that the OT Option is a "foreign swap" is just a spin on the facts, which is not a basis for a motion to dismiss.

Legally, Phillips's claim that the OT Option is a "foreign swap" is based on a clear misinterpretation of the CEA. The statute does not divide the world into foreign swaps and domestic swaps; it just defines "swaps" based on the nature of the financial product. *See supra* at 11. There is no question that the OT Option is a "swap" under that definition, so Phillips cannot seek dismissal by inventing a new category of "foreign swaps." The legal authority Phillips cites is not about foreign and domestic swaps, but about the extent to which certain provisions of the CEA "apply to *activities* outside the United States." 7 U.S.C. § 2(i)(1) (emphasis added). That is, the extent to which certain conduct-regulating provisions of the CEA, including Section 6(c)(1)

and Rule 180.1, apply extraterritorially. As explained in the next section, the Indictment charges a domestic application of Section 9(1) and Rule 180.1, or at a minimum a permissibly extraterritorial application of those provisions. There is not a separate requirement that the swap be domestic. That is simply not a part of the CEA's statutory scheme.

### C. The CEA Counts Do Not Allege an Impermissibly Extraterritorial Application of the CEA

Despite the fact that Phillips manipulated a dollar-denominated exchange rate, to deceive an American counterparty into paying $20 million, Phillips argues that the CEA Counts charge an impermissibly extraterritorial application of the statute. Mot. at 8-9, 12-15. This argument is wrong on the merits and is not a proper basis for a motion to dismiss.

Procedurally, Phillips's extraterritoriality argument must wait for full factual development at trial. Phillips's brief proceeds from the premise that whether the CEA Counts are impermissibly extraterritorial is a "jurisdiction[al] question." Mot. at 9. But the Supreme Court in *Morrison v. National Australia Bank*, held that extraterritoriality is a "merits question," not a question of "subject-matter jurisdiction" that implicates a court's "power to hear a case." 561 U.S. 247, 254 (2010). The Second Circuit has applied that logic in the criminal context, holding that whether an Indictment alleges an impermissibly extraterritorial application of a statute "is a merits question." *United States v. Prado*, 933 F.3d 121, 138 (2d Cir. 2019).

Because extraterritoriality is a merits question, it is not a basis for dismissing an Indictment, particularly where, as here, the extraterritoriality issue requires a full presentation of evidence. *See Perez*, 575 F.3d at 166 (holding that weighing evidence underlying indictment not allowed unless the Government has made "a full proffer of the evidence it intends to present at trial"). The Second Circuit and courts in this district routinely evaluate extraterritoriality arguments based on the full record developed at trial. *See, e.g.*, *United States v. Napout*, 963 F.3d 163, 180 (2d Cir. 2020)

(finding Government "presented ample evidence" at trial to show charge was not extraterritorial); *United States v. Vilar*, 7298 F.3d 62, 77 (2d Cir. 2013) (finding trial record contained sufficient evidence that charge was not extraterritorial); *United States v. Epksamp*, 832 F.3d 154, 169 (2d Cir. (2016) (same). This is akin to the rule that proof of jurisdictional elements—like proof of an effect on interstate commerce—is evaluated only upon a full presentation of the evidence. *See United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998).

Phillips has not identified a single case in this District where a court has dismissed an indictment at the motion to dismiss stage on extraterritoriality grounds. And dismissal at this stage would be inconsistent with the legal rules governing indictments. The point of an indictment is to "inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in future prosecution." *Id.* at 776. A full exposition on extraterritoriality is not necessary to accomplish either of those purposes. Accordingly, given the fact-intensive nature of the extraterritoriality issue, resolving the matter at this stage would be inappropriate.

In any event, even if this Court reached the merits, the CEA Counts would easily pass muster. When it comes to swaps, the CEA applies both domestically and extraterritorially. The CEA Counts are a domestic application of the statute, but even if they were not, their extraterritorial reach would be permissible under the statute.

### 1. *Section 6(c)(1) and Rule 180.1 Have Both Domestic and Extraterritorial Reach as Applied to Swaps*

With respect to swap-related activity, the CEA reaches not only domestic conduct, but also extraterritorial conduct. The CEA, like other statutes, is interpreted "in light of the presumption against extraterritoriality." *Prime Int'l Trad. v. BP PLC*, 937 F.3d 94, 102 (2d Cir. 2019). This requires applying a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc. v. European Cmty.*, 136 S.Ct. 2090, 2101 (2016). First, "courts look to the text of the statute

to discern whether there is a clear indication of extraterritoriality." *Prime*, 937 F.3d at 102. If the statute lacks such a clear statement, it "does not apply abroad." *Id.* "[A]t the second step," then, courts must determine whether the case involves a proper "domestic application of the statute" by "evaluat[ing] whether the domestic activity pleaded is the focus of congressional concern." *Id.*

Generally speaking, Section 6(c)(1) and Rule 180.1 do not apply extraterritorially because they "lack[] . . . a clear statement of extraterritorial effect." *Id.* at 103. The question, then, is whether a particular charge under those provisions is not "so predominantly foreign as to render the claims impermissibly extraterritorial." *Id.* at 107; *accord In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 267 (2d Cir. 2023). In answering that question, courts look to whether the case involves domestic activity related to the "focus" of Section 6(c)(1) and Rule 180.1, which is "rooting out manipulation and ensuring market integrity." *Prime*, 937 F.3d at 107.

But while Section 6(c)(1) and Rule 180.1 *generally* do not apply extraterritorially, there is a statutory exception for conduct related to swap, including the conduct alleged in the CEA Counts. Under 7 U.S.C. § 2(i), the provisions of the CEA "relating to swaps" apply "to activities outside of the United States" if those activities "have a direct and significant connection with activities in, or effect on, commerce of the United States." This provision, which was enacted in light of "the interconnected nature of domestic and international swaps trading," provides "for the extraterritorial application" of CEA provisions related to swaps, including Section 6(c)(1). *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 388 (D.D.C. 2014). The Second Circuit has held that this provision "contains, on its face, a clear statement of extraterritorial application," *Prime*, 937 F.3d at 103, so applications of Section 6(c)(1) and Rule 180.1 related to swaps can reach extraterritorial activities, so long as those activities are of a class that have a "direct and significant connection with activities in, or effect on, commerce of the United States," 7 U.S.C. § 2(i).

It follows, then, that the CEA Counts are not impermissibly extraterritorial if they are either a domestic application of the law or within the statute's extraterritorial reach under Section 2(i).

### *2. The CEA Counts Are a Domestic Application of the Statute*

The CEA Counts charge a domestic application of the statute. The focus of Section 9(1) and Rule 180.1 is to "root[] out manipulation and ensur[e] market integrity." *Prime*, 937 F.3d at 103. As alleged in the Indictment, Phillips's scheme was inextricably tied to the United States from beginning to end, so it is not "so predominantly foreign as to render" the CEA claims an extraterritorial application of the statute. *Platinum*, 61 F.4th at 267.

From its creation, the OT Option was a domestic concern. As alleged in the Indictment, Glen Point, which was registered with the CFTC, held one side of the option, standing to benefit if the USD/ZAR exchange rate fell below 12.50. Indictment ¶ 10. American Bank-1, a financial institution in the United States, held on the other side, on the hook to make the payment if Glen Point's bet paid off. *Id.* ¶ 11. Glen Point also used another American financial institution, American Bank-2, as its prime broker for the transaction, which meant that Glen Point's contract for the OT Option had American Bank-2 as the counterparty. *Id.* ¶ 13. As a result, two financial institutions in the United States had direct interests in the OT Option.[3]

Phillips's illegal scheme to trigger the OT Option also involved conduct in, and directed at, the United States. For one, a critical component of Phillips's scheme was selling huge quantities of dollars to shift the USD/ZAR exchange rate. *Id.* ¶ 18. While Phillips was in South Africa at

[3] Phillips notes that Glen Point interacted with the London branch of American Bank-2. Mot. at 13. That is of no moment. American Bank-2 is based in the United States, and CFTC regulations explicitly treat foreign branches of American financial institutions as "U.S. Persons" for purposes of the agency's regulations. *See* 78 Fed. Reg. at 45,315 ("[A] foreign branch of a U.S. person is itself a U.S. person."). The proof at trial will also establish that the financial risk associated with brokering the OTC Option was ultimately borne by the U.S. bank holding company, the shares of which are listed on the New York Stock Exchange.

the time and used a banker in Singapore to execute the sales, the conduct nonetheless directly affected a core American interest—the value of the dollar—and involved conduct in the United States because the trades Phillips ordered were settled in the United States, drawing on bank accounts held at the Federal Reserve Bank of New York. *Id.* ¶ 26.

Moreover, the point of the mass selling was to send a misleading price signal to the other parties involved in the OT Option, including American Bank-1 and American Bank-2. *See id.* ¶¶ 23-24. Those parties were watching to see if the USD/ZAR exchange rate would fall below 12.50, triggering the OT Option, and Phillips's trading sent the misleading signal that the rate had crossed that threshold due to the natural interplay of market forces. *Id.* To make sure the deception worked, Phillips had his employees confirm with, among others, American Bank-2 that the OT Option had been triggered, never disclosing the true reason the exchange rate fell below 12.50. *Id.* ¶ 24. And finally, Glen Point's funds and Client Fund-1 received their payout, which involved both American Bank-1 and American Bank-2 wiring money through the United States. *Id.* ¶ 25.

These allegations show that the CEA Counts stem from domestic activity that relates to the focus of the CEA, "rooting out manipulation and ensuring market integrity." *Prime*, 937 F.3d at 103. Phillips's scheme went to the heart of domestic market integrity because it involved undermining the reliability of a dollar-denominated exchange rate and manipulating a swap with an American counterparty and an American prime broker. The manipulation itself was also directed at, and involved activity in, the United States, including the settlement of Phillips's dollar sales, the misleading price signal his trading sent, the misleading statement he had an employee make to confirm the OT Option was triggered, and the receipt of his ill-gotten gains.

And that is just what is alleged in the Indictment. At trial, the evidence will show, among other things, that Client Fund-1, an American entity, was a party to the OT Option; that another

Glen Point fund that was a party to the swap had American investors; and that information about the OT Option, including its creation and triggering, was recorded with an American swap data repository, which exist to keep records on swaps regulated under the CEA. *See* CFTC, Data Repositories, *available at* https://www.cftc.gov/IndustryOversight/DataRepositories/index.htm.

Arguing against the domestic nature of this case, Phillips relies heavily on *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86 (2d Cir. 2022). Mot. at 12-14. But that decision undermines Phillips's point. There, a private plaintiff sued under the CEA, arguing that the defendant's "conduct abroad" to manipulate "an index tied to a foreign market" had affected a position the plaintiff purchased on a "domestic market." *Id.* at 97. The Second Circuit rejected the claim *not* on the grounds that it was an impermissible extraterritorial application of Section 6(c)(1) and Rule 180.1, but instead because it was an impermissible extension of a separate provision that grants plaintiffs a private right of action under the CEA. *Id.* at 96-98. The Circuit allayed concerns that the decision would "undermine the ability of U.S. law and regulators to protect domestic markets and investors," by explaining that the decision "concerns private rights of action" and "has nothing to do with government enforcement." *Id.* at 98 n.11.

The case against Phillips, by contrast, goes to the core of the ability of American law and regulators to protect American markets and investors. The case involves not only a victim in the United States, but also manipulation of the dollar, misleading price signals and statements to American banks, and settlement and payment through the American financial institutions. The CEA was designed to allow the Government to protect these core American concerns.

These deep ties to the United States also distinguish this case from *Prime International*. There, the Second Circuit affirmed dismissal of a private CEA suit on the grounds that "[n]early every link in [the] chain of wrongdoing [was] entirely foreign": the defendants were foreign

entities, manipulating a foreign benchmark, through foreign transactions. 937 F.3d at 98, 100, 107; *see Platinum*, 61 F.4th at 267-68 (describing *Prime International*). Phillips's scheme was altogether different. Rather than being "entirely foreign," *Platinum*, 61 F.4th at 268, it was designed at each step to affect American interests and parties. The scheme was inextricably tied to the United States, so the CEA Counts are a domestic application of the statute.

#### ***3. In the Alternative, the CEA Counts Are a Permissible Extraterritorial Application of the Statute***

In the alternative, the CEA Counts are a permissible extraterritorial application of the statute. Phillips's scheme had a "direct and significant connection with activities in, or effect on, commerce in the United States," 7 U.S.C. § 2(i), so it falls within the CEA's extraterritorial reach.

Section 2(i) extends the CEA abroad to swap-related activities that have (1) a direct and significant connection with activities in commerce in the United States, or (2) a direct and significant effect on commerce in the United States. 7 U.S.C. § 2(i). The CEA Counts charge a permissible extraterritorial application of Section 6(c)(1) and Rule 180.1 under both theories.

There is no question that Phillips's scheme had a "direct" connection with activities in, and effect on, commerce in the United States. The CFTC has consistently explained that the term "direct" in Section 2(i) simply requires a "reasonably proximate causal nexus" between the swap activities and commerce in the United States. 78 Fed. Reg 45,292, 45,300 (2013); 85 Fed. Reg. 56,924, 56,929 (2020); *accord SIFMA*, 67 F. Supp. 3d at 392. This is in line with Second Circuit case law interpreting the word "direct" in the context of a similar statute extending antitrust rules abroad. *See Lotes Co. v. Hon Hai Precision Indus.*, 753 F.3d 395, 410 (2d Cir. 2014) (defining "direct" as requiring a "reasonably proximate causal nexus").

Each step of Phillips's scheme had a direct connection with, and effect on, commerce within the country. Most glaringly, the crime had an American victim; the point of the scheme

was to trigger the OT Option, forcing American Bank-1 to pay $20 million. Indictment ¶ 11. A key part of accomplishing that scheme involved a massive sale of dollars for rand. That, too, was connected with activities in, and had an effect on, commerce in the United States: the sales were settled through a bank in the United States and affected the integrity of a dollar-denominated exchange rate. *Id.* ¶¶ 18, 26. Another component of Phillips's scheme was sending a misleading price signal and misleading confirmation to, among others, American Bank-2, which was Glen Point's prime broker and the counterparty to the OT Option. *Id.* ¶¶ 13, 24. Because Bank-2 is headquartered in New York, and the risks associated with brokering the OT Option were ultimately borne by the US parent, a NYSE listed firm, this conduct also had direct connection with, and effect on, commerce in the United States. Finally, Phillips's scheme triggered payments from American Bank-1 and American Bank-2, which came from American financial institutions and passed through New York. *Id.* ¶ 25.[4]

The scheme's connection with, and effect on, commerce in the United States was also "significant" under any plausible interpretation of the term. The CEA reaches "activities" abroad that have a "significant" connection with or effect on commerce in the country. 7 U.S.C. § 2(i). CFTC guidance has consistently interpreted this language as extending the CEA extraterritorially to categories of swap activities that have a significant affect "as a class or in the aggregate," rather than extending the statue extraterritorially using a "transaction-by-transaction" based approach. 78 Fed. Reg. at 45,300; *accord* 85 Fed Reg. at 56,930. This interpretation is in line with the many federal statutes that regulate activities that, as a class, affect interstate commerce. 78 Fed. Reg. at 45,300; *see, e.g.*, *Perez v. United States*, 402 U.S. 146, 154 (1971) ("Where the class of activities

[4] As explained above, the Government expects the evidence at trial will show additional connections between Phillips's scheme and the United States. *See supra* at 19-20.

is regulated and that class is within the reach of federal power, the course have no power to excise, as trivial, individual instances of the class."); *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir. 1997) (explaining that, because the Hobbs Act and money laundering statutes "regulate activities which, in the aggregate, have a substantial effect on interstate commerce" then "the *de minimis* character of individual instances arising under [the] statute is of no consequence").

Under this interpretation of Section 2(i), the CFTC has held that swap activities involving "U.S. persons" satisfy Section 2(i)'s "direct and "significant" test. 78 Fed. Reg. at 45,308-09; 85 Fed. Reg. at 56,940; *SIFMA*, 67 F. Supp. 3d at 391. "U.S. persons" include companies that are located or incorporated in the United States or that have their principal place of business in the United States. 78 Fed. Reg. at 45,309. A foreign branch of a U.S. person—such as the foreign branch of a bank based in the United States—is also a U.S. person. *Id.* at 45,315. When an entity engages in "swap activities involving" a "U.S. person," those activities "satisfy the 'direct and significant test under [S]ection 2(i)." *Id.* at 45,309; *see* 85 Fed. Reg. at 56,940.

Applied here, Phillips's manipulative and deceptive scheme was of a class of activities that have a significant connection with, and effect on, commerce in the United States. For one, the scheme involved numerous U.S. persons and therefore satisfied the "direct and significant" test. The victim of the scheme, American Bank-1, was a U.S. person. So was American Bank-2, Glen Point's prime broker for the OT Option. And the Government expects evidence at trial will show that multiple beneficiaries of the OT Option, including Client Fund-1, were U.S. persons. Under the CFTC's guidance, then, the charged scheme falls comfortably within Section 2(i).

Moreover, Phillips's illegal scheme is clearly part of a class of activities that, in the aggregate, have a significant connection with, and effect on, commerce in the United States. The CFTC has emphasized that the CEA's "anti-manipulation provisions" protect "market integrity,"

and that it is "essential that they apply" even when the swap involves a party that is not a U.S. person. 78 Fed. Reg. at 45,337. Indeed, the CFTC has regulated against the presumption that "persons engaging in any aspect of swap transactions within the U.S." are "subject to the CEA and commission regulations prohibiting the employment, or attempted employment, of manipulative, fraudulent, or deceptive devices." 85 Fed. Reg. at 56,961, 56968. Finding that Phillips's scheme was not subject to Section 2(i) would erode the CEA's ability to protect American investors and American markets from fraud and manipulation.

Finally, even if this Court adopted a transaction-based approach to interpreting the term "significant," Phillips's scheme easily qualifies as having both a sufficient connection with, and effect on, commerce in the United States. Phillips moved a dollar-denominated exchange rate and misled multiple American financial institutions, to obtain $20 million from an American victim. Both the scheme and the payout were significant by any reasonable understanding of the term. *See* Merriam Webster *available at* https://www.merriam-webster.com/dictionary/significant (defining "significant' as "a noticeably or measurably large amount").

Phillips's only argument to the contrary is based on an obvious misreading of CFTC guidance. Phillips cites a passage of that guidance stating that one of the primary reasons for the enactment of the Dodd Frank reforms in the CEA was to guard against "systemic risk" to the United States financial system. Mot. at 8-9. That is true, but it does not follow that Section 2(i) applies only when the specific swap at issue in a case "posed 'systemic risks.'" *Id.* at 9. It is hard to imagine any single transaction that would meet that standard. Nor would it make sense for Congress to have regulated only single transactions that pose systemic risks, while leaving unregulated entire classes of activity that, as a whole could pose a substantial threat to the economy. *See* 78 Fed. Reg. at 45,294 (explaining how poor risk management over time

contributed to the 2008 financial crisis). That is why, in the guidance document Phillips cites, the CFTC rejects the "transaction-by-transaction" approach to interpreting Section 2(i) that Phillips now proposes. *Id.* at 45,300. This Court, too, should reject his cramped reading of the statute.

### D. The CEA Counts Allege Violations of Section 6(c)(1) and Rule 180.1

In his final challenge to the CEA Counts, Phillips argues that the Indictment does not to allege "a scheme to defraud based on manipulative trading." Mot. at 15. This argument falters from the get go because Phillips does not contend the Indictment fails to include "the elements of the offense charged," "fairly inform[] [him] of the charges," or "enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007). That is all that is required at this stage of the case.

Instead, Phillips makes what amounts to a motion for summary judgment, asserting that the Government will need to prove certain elements at trial, such as the creation of an "artificial price"; claiming that the "trading described in the Indictment could not have caused an artificial price" because, as Phillips sees it, there was no "deceptive conduct"; and arguing that Phillips lacked the necessary intent to manipulate the market. Mot. at 15-19. None of these arguments are appropriately resolved on a motion to dismiss. *See United States v. Aiyer*, 33 F.4th 97, 116 (2d Cir. 2022) ("[A]lthough a judge may dismiss a civil complaint pretrial for insufficient evidence on a motion for summary judgment, a judge generally cannot do the same for a federal criminal indictment."). In any event, Phillips is far off the mark on the merits, relying on case law applying the wrong statute, ignoring years of Second Circuit decisions regarding open-market manipulation, and misconstruing the allegations in the Indictment.

#### *1. The CEA Counts Allege a Violation of Section 6(c)(1) and Rule 180.1*

Phillips engaged in a deceptive scheme to trigger the OT Option by driving the USD/ZAR exchange rate below 12.50, then failing to disclose to the relevant counterparties that the OT

Option had been triggered by his own, manipulative trading activity. *See* Indictment ¶¶ 30-34. This deceptive conduct amounts to a clear violation of Section 6(c)(1) and Rule 180.1.

Section 6(c)(1) prohibits using "any manipulative or deceptive device" in connection with a swap. 7 U.S.C. § 9(1). That "manipulative or deceptive" language "is virtually identical to the terms used in [S]ection 10(b) of the Securities Exchange Act of 1934." 76 Fed. Reg. 41,398, 41,399 (2011). Given the similarity, the CFTC "model[ed] . . . Rule 180.1 on SEC Rule 10b-5." *Id.* In so doing, the CFTC stated that it would "be guided," although "not controlled, by the substantial body of judicial precedent applying the comparable language of . . . Rule 10b-5." *Id.*

For decades, courts in this Circuit have recognized, in the context of securities cases, that the ban on "manipulative or deceptive" devices "prohibits not only material misstatements but also manipulative acts," including market manipulation. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Market manipulation is a form of deception that involves "intentional or willful conduct designed to deceive or defraud [other market participants] by controlling or artificially affecting" prices. *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007); *accord Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64, 76 (2d Cir. 2021).

While market manipulation "encompasse[s] practices such as wash sales, matched orders, or rigged prices, [it] is not limited to these practices." *SEC v. LEK Secs. Corp.*, 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017). Rather, manipulation "broadly includes those practices that are intended to mislead investors by artificially affecting market activity." *Id.*; *see SEC v. Vali Mgmt.*, No. 21-453, 2022 WL 2155094, at *1 (2d Cir. 2022) (summary order) ("In using the term 'manipulation,' there is no doubt that Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices."). Ultimately, "[t]he gravamen of manipulation is deception of investors into believing" that prices "are determined by the natural interplay of supply and

demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).

Thus, to sustain a charge of market manipulation under SEC Rule 10b-5 and Section 10(b) of the Exchange Act, under which Rule 10b-5 was promulgated, "case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." *ATSI Commc'ns*, 493 F.3d at 100. "The deception arises from the fact that investors are misled to believe that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.*; *see also Set Capital*, 996 F.3d at 76 ("For market activity to artificially affect a security's price, we generally ask whether the transaction or series of transactions sends a false pricing signal to the market."); *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008) (approving criminal jury instruction that "[t]he essential element of manipulation is the deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand"); *United States v. Regan*, 937 F.2d 823, 829 (2d Cir. 1991) (holding, in criminal case, that "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact").

The principle that deception encompasses misleading others to believe that prices are determined by the natural forces of supply and demand, not rigged by manipulators, applies with equal force to the CEA. Section 6(c)(1) of the CEA contains the same "manipulative or deceptive device" phrase from which this principle arises. *See Morisette v. United States*, 342 U.S. 246, 263 (1952) (explaining that when Congress uses specific terms of art or legal phrasing, there is a presumption that it "knows and adopts the cluster of ideas that were attached to each borrowed word"). And courts applying Section 6(c)(1) and Rule 180.1 in cases involving manipulation have

drawn from this Circuit's securities case law. *See, e.g.*, *CFTC v. Kraft Food Grp.*, 153 F. Supp. 3d 996, 1011 (N.D. Ill. 2015) (holding that Section 9(1) claim "should be interpreted in line with Section 10(b)); *Ploss v. Kraft Food Grp.*, 197 F. Supp. 3d 1037, 1054 (N.D. Ill. 2016) (same).

Applied here, the Section 10(b) case law provides a clear guide. Phillips is accused deception in connection with the OT Option. His deception arises, in part, from the fact that he misled other relevant parties to the security to believe the exchange rate fell below that threshold due to the natural interplay of supply and demand, rather than his own effort to trigger the option. To be sure, this is, in some respects, different than many Section 10(b) cases: Phillips's scheme was to deceive the parties to the OT Option, not investors generally. But the basic principle is the same: it is misleading to trick others into believing that a particular price—here, the exchange rate—arose through the natural interplay of supply and demand, when it in fact came about through the efforts of the manipulator.

### *2. Phillips Wrongly Relies on Elements From a Different Statute*

Phillips's argument starts with the false premise that the Government "must prove the four necessary elements" of what Phillips calls "non-fraud-based manipulation." Mot. at 15. The elements that Phillips is referring to are from a *different statute*—commonly referred to as Section 9(a)(2) of the CEA ("Section 9(a)(2))—which predates Section 6(c)(1) and prohibits "manipulat[ing] . . . the price of any . . . swap." 7 U.S.C. § 13(a)(2). Establishing liability under Section 9(a)(2) requires proof that: "(1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Amaranth Nat. Gas Comm. Litig.*, 587 F. Supp. 2d 513, 530 (S.D.N.Y. 2008). Legally and logically, these elements do not apply to claims under Section 6(c)(1) and Rule 180.1.

Legally, the statutory language and regulatory guidance show that the elements of

Section 9(a)(2) do not apply in anti-manipulation actions under Section 6(c)(1). As explained above, the operative language of Section 6(c)(1) prohibits "manipulative or deceptive" devices, and neither the text of the statute nor of Rule 180.1 suggest that proof of such a scheme requires establishing any elements from Section 9(a)(2). On top of that, the language in Section 6(c)(1) is almost a verbatim recitation of language in Section 10(b) of the Securities Exchange Act. This is powerful evidence that Congress intended the elements of Section 10(b) of the Exchange Act, and the case law interpreting it, to serve as a guide for applying Section 6(c)(1). *See FAA v. Cooper*, 566 U.S. 284, 292 (2011) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."). And as explained above, and discussed further below, nothing in the case law applying Section 10(b) of the Exchange Act requires proof akin to the elements of Section 9(a)(2) of the Commodities Exchange Act. Rather, the case law applying Section 10(b) of the Exchange Act holds that a deceptive scheme can be established through proof of open-market transactions conducted with an intent to manipulate the forces of supply and demand. *See supra* at 25-28; *see also infra* at 31-33.

By contrast, Congress used language from Section 9(a)(2) in a *different* part of Section 6(c)—specifically, Section 6(c)(3), which contains much of the same language as Section 9(a)(2). This shows that, if Congress wanted to import the law from Section 9(a)(2) into Section 6(c)(1), it knew how to do so. Congress did not put Section 9(a)(2)'s language into Section 6(c)(1), so there is no basis to judicially graft the two statutes together. Indeed, consistent with the statutory language, CFTC's rulemaking that created Rule 180.1 specified that the Section 6(1) was intended to "*augment* the Commission's existing authority to prohibit fraud and manipulation," not to replicate what was already covered by Section 9(a)(2). 76 Fed. Reg. at 41,401 (emphasis added);

*see Kraft*, 153 F. Supp. 3d at 1010 (rejecting argument that case law from Section 9(a)(2) applies to claims under Section 6(c)(1)).

Logically, it makes little sense to import elements from section 9(a)(2) to Section 6(c)(1). The statutes serve different functions. Section 9(a)(2) is about manipulating prices, whereas Section 6(c)(1) broadly prohibits deception in connection with swaps and other products. *See Kraft*, 153 F. Supp. 3d at 1018 (explaining the different functions of Section 9(a)(2) and Section 6(c)(1)).[5] This is why the elements of Section 9(a)(2) claims do not readily map onto Section 6(c)(1) claims. The first three elements of Section 9(a)(2) claims, for instance, require that the defendant had the ability to influence prices, that an artificial price existed, and that the defendant caused the artificial price. These elements all go to the *success* of a manipulative scheme. But they have no home in Section 6(c)(1), which like Section 10(b), imposes a form of scheme liability: prohibiting all manipulative or deceptive devices, without regard to the success of those schemes. *See, e.g.*, *Vali Mgmt.*, 2022 WL 2155094, at *2 (holding that, under Section 10(b), there is no "require[ment] of showing artificial market impact . . . before concluding certain acts are manipulative"); *Koch v. SEC*, 793 F.3d 147, 153-54 (D.C. Cir. 2014) (rejecting argument that proof of price impact is necessary because "intent—not success—is all that must accompany manipulative conduct to prove a violation of [Section 10(b)]").

Similarly, Section 9(a)(2)'s requirement of an intent to create an artificial price does not translate to Section 6(c)(1). As noted above, the former prohibits "manipulat[ing] . . . price," whereas the latter is not so restricted. *See* 76 Fed. Reg. at 41,398 (Rule 180.1 applies "regardless

[5] As noted in *Kraft*, Section 9(a)(2) is, in some respects, broader than Section 6(c)(1) in that it unambiguously applies to manipulation even when the manipulator has fully disclosed the manipulation to the intended victim (such as a hypothetical situation where Phillips told other parties to the OT Option in advance that he was going to move the exchange rate to trigger the barrier option). *See Kraft*, 153 F. Supp. 3d at 1018.

of whether the conduct in question was intended to create or did create an artificial price"). Accordingly, the abstract concept of "artificial price" makes little sense in most Section 6(c)(1) cases; rather, the appropriate inquiry is whether the defendant is acting with the intent to deceive, including the intent to deceive by interfering with the natural forces of supply and demand.

The case at hand is a perfect example: Phillips is charged not with manipulating prices generally, but rather with manipulating the USD/ZAR exchange rate to momentarily pass the 12.50 threshold required to trigger the OT Option. What makes his conduct deceptive is the fact that it was designed to deceive counterparties to the OT Option into believing the exchange rate fell below 12.50 due to the natural interplay of supply and demand, rather than his own manipulative conduct. Abstract notions of an "artificial price" have no bearing on that analysis.[6]

#### *3. The CEA Counts Do Not Require Deceptive Conduct Beyond Open Market Transactions with Manipulative Intent*

In addition to relying on elements from the wrong statute, Phillips also disregards clear Circuit precedent, claiming that "open market" transactions cannot be manipulative without additional "deceptive conduct." Mot. at 16-17. This misconstrues the meaning of deception in the context of market manipulation and the Second Circuit has rejected the argument that deceptive conduct beyond the intent to alter natural interplay of supply and demand is required.

As explained above, market manipulation can be deceptive by misleading other market participants to believe prices are set "by the natural interplay of supply and demand," not the

---

[6] These facts distinguish this case from *CFTC v. Gorman*, 587 F. Supp. 3d 24 (S.D.N.Y. 2022), which did not involve a manipulative scheme to trigger an option. The Government respectfully submits that, for the reasons described in this section, *Gorman* was wrong to import elements from Section 13(a)(2) to a Section 9(1) claim. *See Kraft*, 153 F. Supp. 3d at 1010-11 (rejecting that approach). But this Court need not resolve the interaction between Section 13(a)(2) and Section 9(1) generally, because importing elements from one to the other is inappropriate in this case.

conduct of the manipulator. *ATSI Commc'ns*, 493 F.3d at 100. Deceptive market manipulation can involve deceptive conduct, like affirmative misstatements or wash trading, but that is not required. *See LEK Secs.*, 276 F. Supp. 3d at 59.

The Second Circuit and courts in this District have repeatedly held that "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Set Capital*, 996 F.3d at 77; *see, e.g.*, *Masri*, 523 F. Supp. 2d at 361 ("[I]f an investor conducts an open-market transaction with the intent of artificially affecting the price of the security . . . it can constitute market manipulation."); *LEK Secs.*, 276 F. Supp. 3d at 59 ("Market manipulation can be accomplished through otherwise legal means."); *see also Gorman*, 587 F. Supp. 3d at 42-43 (holding, in Section 9(1) context, that "open-market transactions that are not, in and of themselves, manipulative or illegal, may constitute manipulative activity . . . when coupled with manipulative intent"); *CFTC v. Amaranth*, 554 F. Supp. 2d 523, 534 (S.D.N.Y. 2008) (holding, Section 13(a)(2) context, that "manipulative intent alone can support liability for otherwise legal, open-market transactions"). In fact, just last year, the Second Circuit affirmed a jury instruction explaining that, "[i]n some cases, a defendant's 'scienter,' that is, a defendant's intent to manipulate the securities market, is all that distinguishes legitimate trading from manipulative trading." *Vali Mgmt.*, 2022 WL 2155094, at *1.[7]

None of the decisions Phillips cites establish that open-market trading, coupled with manipulative intent, is insufficient to prove manipulation. Phillips, for instance, cites a passage

[7] Phillips is wrong to claim that defendants in this Circuit have not been convicted of market manipulation based on open-market trades without "other deceptive conduct." *See, e.g.*, *Regan*, 937 F.2d at 829 (upholding conviction based on short selling to depress price); *Royer*, 549 F.3d at 900 (rejecting argument that instruction was erroneous because it allowed conviction based solely on open-market trading). Courts in this District have also recently denied motions to dismiss based on the premise that deceptive conduct is required to prove market manipulation. *See United States v. Hwang*, No. 22 Cr. 240 (ALK), Dkt. No. 66 at 3 (S.D.N.Y. Mar. 23, 2023)

from *ATSI* stating that "short selling . . . is not, by itself, manipulative," and that it must be combined "with something more" to constitute manipulation. 493 F.3d at 101. But *ATSI* recognized that the "something more" could be the defendant's intent, noting that, "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." *Id.* at 102; *see Set Capital*, 996 F.3d at 77 (adopting this interpretation of *ATSI*).

Phillips is also wrong to rely on *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991), to claim that the Circuit has "misgivings" about open-market manipulation claims. Mot at 17-19. Unlike in this case, the Government's theory in *Mulhern* was not that market manipulation is a way to deceive investors into believing that the price is set by natural market forces, and the Circuit "express[ed] no view" on that "alternative" approach. 938 F.2d at 368 & n.2. Moreover, whatever "misgivings" the Second Circuit might have had when *Mulheren* was decided in 1991, decades of case law since have come down firmly on the side of concluding that open-market transactions can be illegal, when paired with manipulative intent. *See supra* at 25-28, 31-32.

Finally, Phillips's attempt to read *CFTC v. Wilson*, No. 13 Cv.7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018), for the proposition that manipulative intent does not render open-market trading illegal, Mot. at 19, is misguided. For one, that case involved Section 9(a)(2), not Section 6(c)(1), and so involved a different set of legal questions than in this case. And even setting that aside, the Court in *Wilson* simply found, after trial, that the defendant lacked manipulative intent—in other words, that he did not have the intent to create prices that were "unreflective of the forces of supply and demand." 2018 WL 6322024, at *15.

In short, the case law is clear: the fact that part of Phillips's crime involved selling dollars for rand on an open market does not mean it was not a manipulative and deceptive scheme punishable under Section 6(c)(1) and Rule 180.1.

#### ***4. The CEA Counts Allege Manipulative Intent and Deceptive Conduct***

Finally, Phillips claims that his mass sales of dollars for rand had a "legitimate economic rationale." Mot. at 18-19. That assertion is at odds with the Indictment, which alleges that Philips "intentionally and artificially dr[ove] the USD/ZAR exchange rate below the threshold level set by the [OT Option] in order to trigger [a] $20 million payment and defraud the counterparties to the options contract." Indictment ¶ 2; *see also id.* ¶ 20 (alleging that Phillips "expressly stated that [his] purpose in directing these USD/ZAR spot trades was to drive the USD/ZAR rate below 12.50"). At this stage, the Court must accept "the facts alleged by the government . . . as true," *Velastegui*, 199 F.3d and 592 n.2, and it is not proper to weigh the sufficiency of the evidence, *Perez*, 575 F.3d at 166, so the Court should reject Phillips's efforts to litigate his intent.

Moreover, even if it were proper to evaluate the factual allegations in the Indictment, and even if Phillips were correct that, to prove the CEA Counts, the Government needed to prove an artificial price and deceptive conduct, the motion to dismiss would still fail. The Indictment repeatedly alleges that Phillips's scheme was "to intentionally and artificially manipulate the USD/ZAR exchange rate to drive the rate below 12.50 and trigger payment under the [OT Option]." Indictment ¶ 17. The Indictment also alleges facts that Phillips's trading and triggering of the OT Option occurred in a deceptive manner. Phillips made massive sales of dollars for rand over a short period of time. *Id.*; *see Set Capital*, 996 F.3d at 77 (finding "flood[ing] the market" is deceptive); *ATSI*, 493 F.3d at 101 (finding "trading engineered to stimulate demand" can be deceptive). He made those sales late at night on a holiday, at a time when he was the "only seller[] in the market." *Id.* ¶¶ 19-20; *see Set Capital*, 996 F.3d at 77 (finding taking advantage of "illiquidity in the . . . market" was deceptive); *Royer*, 549 F.3d at 900 (finding timing trading to maximize impact on price was deceptive). And he did not disclose to the other relevant parties to the OT Option that his own trading activity, carried out with intent to drive the exchange rate below

12.50, is what triggered the option. *Id.* ¶¶ 23-24; *see Regan*, 937 F.2d at 829 (finding "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit . . . .").

In short, even if there were a requirement, which there is not, that the Indictment contain factual allegations demonstrating an artificial a price and deceptive conduct, the obligation would be more than satisfied by what is contained in the Indictment.

## II. The Motion to Dismiss the Wire Fraud Counts Should be Denied

Phillips's challenge to the Wire Fraud Counts stumbles out of the gate because it relies on arguments that are not properly resolved on a motion to dismiss. Phillips does not contend that the Indictment fails to state the "elements of the offense[s]" or put him on notice of charges, nor does he claim that the Indictment is insufficient to allow him to "plead an acquittal or conviction in bar of future prosecution." *Wedd*, 993 F.3d at 120. Instead, he claims that "[t]he alleged omission was not misleading" or "material." Mot. at 23-24. These are arguments about the "adequacy of the facts," so his motion should be denied out of hand. *Dawkins*, 999 F.3d at 780.

Even looking past that fatal flaw, Phillips's arguments fail on the merits. The wire fraud statute "penalize[s] using . . . a wire communication to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). A scheme to defraud does not require an affirmative falsehood or an omission in the context of a fiduciary duty. "[I]t is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000). In this sense, "[a] duty to disclose can . . . arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure to avoid being misleading." *Id.*; *see* Rest. (Second) of Torts § 529 (1977) (a "representation stating the truth so far as it goes" may be misleading because of the "failure to state additional or

qualifying matter[s]”).

Here, Phillips's fraudulent scheme involved having Glen Point employees tell other parties to the OT Option that the 12.50 barrier had been reached, without disclosing that Phillips's manipulative trading drove the exchange rate below that threshold. As explained in the Indictment, Glen Point was the "Calculation Agent" in connection with the OT Option. Indictment ¶ 13. This meant that it was in charge of determining whether the 12.50 barrier had been reached. *Id.* The relevant contracts specified that, in making that determination, Glen Point would do so "in good faith and in a commercially reasonable manner." *Id.*

Right after driving the exchange rate below 12.50, Philips had Glen Point employees carry out this Calculation Agent role by telling other parties to the OT Option—including American Bank-2—that the barrier had been reached. *Id.* ¶ 23. While these statements may have been literally true, they were misleading because they omitted that Phillips had triggered the barrier through a manipulative trading strategy.

The deception arose in two respects. For one, because Glen Point was acting as Calculation Agent, the statement that the OT Option barrier had been triggered carried the implicit representation that Glen Point had made that determination in "good faith" and in a "commercially reasonable manner," such that Glen Point was entitled to payment. *Id.* ¶ 13. This was misleading because, in reality, Glen Point had not acted reasonably, but instead determined the triggering event based on its own manipulative trading. *See, e.g.*, *Univ. Health Servs. v. United States*, 579 U.S. 176, 188-90 (2016) (finding implied certification of entitlement to payment is fraud when coupled with omission of compliance with "contractual requirements"); *United States v. Harris*, 821 F.2d 589, 599 (5th Cir. 2016) (fining fraudulent statement based on "implied representation"); *United States v. Naiman*, 211 F.3d 40, 44 (2d Cir. 2000) (finding mail fraud where defendant billed

under contract without disclosing breach); *United States v. Frank*, 156 F.3d 332, 334-36 (2d Cir. 1998) (same). Separately, the representation that the OT Option had been triggered impliedly conveyed that the 12.50 barrier had been reached due to the natural interplay of supply and demand, rather than Glen Point's manipulative trading. *See Regan*, 937 F.2d at 829 ("Failure to disclose that market prices are being artificially depressed operates as a deceit . . . and is an omission of a material fact."); *ATSI*, 493 F.3d at 100 (finding "deception arises" when market participants are "misled to believe" prices "are determined by the natural interplay of supply and demand, not rigged by manipulators"). Thus, in order to make the statements not misleading, Phillips was required to disclose that the OT Option had been triggered due to his trading strategy.

None of Phillips's arguments undermine this theory, much less provide a basis to dismiss the Indictment. His lead argument—that Glen Point lacked a "fiduciary or other duty," Mot. at 21-22—is irrelevant. That is not the theory of fraud here and such a duty is not required. *Autuori*, 212 F.3d at 119 ("[A] fiduciary duty is not the *sine qua non* of fraudulent omissions").

The claims that the OT Option contracts "contemplated trading," and that Phillips did not even breach those contracts, Mot. at 22, are also distractions. It is true that Glen Point's OT Option contract with American Bank-2 discloses that American Bank-2 might engage in legitimate trading activities, such as hedging, that could affect the probability of the OT Option being triggered. But that is a point against Phillips, not in his favor. It shows that the mere possibility a party's legitimate trading could inadvertently affect the relevant exchange rate was important enough to disclose ahead of time. This is a clear indication that Phillips's illegitimate trading activity designed to move the exchange rate is something parties to the OT Option would have found important. By the same token, the claim that Phillips's manipulation "could not even [give rise to] a claim for breach of contract," Mot. at 22-23, is plainly wrong. Glen Point had an obligation

act in "good faith" and a "commercially reasonable manner," which it did not do when it manipulatively triggered the OT Option. This is, of course, a fraud case, not one for a breach of contract, so breach is not relevant. But the idea that Phillips complied with Glen Point's contractual obligation ignores at the clear language of the agreement.

Phillips next claims that that "[t]he alleged omission was not misleading," asserting that all Glen Point was supposed to do was report that the OT Option had been triggered. Mot. at 23-24. But this ignores that Glen Point was not only supposed to determine a barrier event, but to do so in good faith and a commercially reasonable manner. Indictment ¶ 13. As explained above, by reporting the event, without disclosing the manipulative trading that brough it about, Glen Point gave the false impression that it was acting appropriately under the contract, and that the barrier had been reached through natural market forces.

This situation is fundamentally different from the one in *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), on which Phillips relies. There, defendants were accused of submitting false information about the rate at which their bank could borrow money because, among other things, modifying submission to benefit certain trading positions. *Id.* at 825-29. The Second Circuit vacated the defendants' convictions, finding that the relevant submissions were false because the government failed to show they "were not rates at which [the bank] could" borrow money. *Id.* at 841-42. It also found the statements were not misleading because the statements did not imply anything about how the defendants determined the rates at which their banks could borrow money, beyond representing that the banks would not collude. *Id.* at 842-43. Here, by contrast, the OT Option contracts explicitly represent that Glen Point would determine the barrier event in good faith and in a commercially reasonable manner and statements about price (unlike statements about the rate at which banks can borrow money) carry an implicit representation that price is determined

by the natural forces of supply and demand, rather than by manipulators.

Finally, Phillips's materiality arguments do not even approach providing a basis for dismissal. Materiality is particularly "well suited for jury determination," *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015), and here, a reasonable jury could certainly conclude that Phillips concealing his market manipulation—which was both illegal and inconsistent with Glen Point's contractual obligations—was material.

Phillips's arguments to the contrary do not carry water. First, the OT Option contracts did not, as Phillips claims, say that parties might trade in ways that could affect the exchange rate, without having an obligation to disclose. Mot. at 25. Rather, it had an explicit, advance disclosure that American Bank-2 might need to engage in certain legitimate trading strategies that could inadvertently affect the exchange rate. If anything, this language suggests the importance of manipulative trading to the parties, since the contract included a disclosure specifically calling out legitimate trading that had an inadvertent rather than intentional impact on the exchange right.

Second, Phillips's claim that third parties could have served as the Calculation Agent is beside the point. Glen Point was the Calculation Agent, and it had an obligation to carry out that role in good faith and in a commercially reasonable manner. The fact the parties could have come up with a different arrangement did not give Glen Point a license to deceive his counterparty about his manipulative trading.

Finally, Phillips's argument that Glen Point did not make representations to American Bank-1 misunderstands the nature of the OT Option arrangements. Economically speaking, American Bank-1 held the opposite side of the OT Option. But contractually, Glen Point faced American Bank-2, its prime broker. The Indictment specifically alleges that American Bank-2 "required confirmation" from Glen Point that the OT Option had been triggered, and American

Bank-2 made the $20 million payment. Indictment ¶¶ 24-25. Thus, the misleading representation that the OT Option had been triggered was essential to Phillips's fraudulent scheme.

## III. The Constitutional Challenge to the Indictment Should be Denied

In his final argument, Phillips claims that all of the Counts are unconstitutionally novel and vague, in violation of the Fifth Amendment. This challenge is baseless. Phillips is charged with violating well-established legal rules prohibiting fraud and deception; rules that he clearly understood as a sophisticated trader registered with the CFTC. His effort to skirt responsibility is wrong on the merits and, at a minimum, not a basis for a motion to dismiss.

### A. Applicable Law

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016). "The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Id.* Under the fair notice prong, the question is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.*

"When a vagueness challenge alleges a lack of notice, the relevant inquiry is whether the statute presents an ordinary person with sufficient notice of . . . what conduct is prohibited." *United States v. Houtar*, 980 F.3d 268, 274 (2d Cir. 2020). "This requirement assures that statutes do not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." *Id.* "Statutes need not, however, achieve meticulous specificity, which would come at the expense of flexibility and reasonable breadth." *Id.*; *accord United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011).

Because vagueness challenges are "as applied," courts "must await conclusion of the trial" to determine whether a statute is unconstitutionally vague in a particular case. *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990). As the Supreme Court has explained, "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *see also United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity.").

**B. The Charges in the Indictment Do Not Violate the Due Process Clause**

There is no merit to the argument that the charges in the Indictment are so novel or vague that they violate the Due Process Clause of the Constitution. This case involves a straightforward application of rules that have been in place for decades.

Phillips's first argument—that the Indictment charges a novel theory of manipulation—is just a repackaging of his challenge to the CEA Counts. This argument is no more correct when advanced under the guise of the Due Process Clause. The text of Section 6(c)(1) provides clear notice that it prohibits the full panoply of manipulative and deceptive schemes, broadly barring all "manipulative or deceptive device[s] or contrivance[s]." Rule 180.1 is similarly clear, and it was accompanied by CFTC guidance that it was intended to "reach all manipulative or deceptive conduct in connection with" the enumerated categories of transactions. 76 Fed. Reg. at 41,405. To be sure, neither the statute nor the regulation list all possible types of manipulative and deceptive devices, but that is not constitutionally required. *See Houtar*, 970 F.3d at 274 ("Statutes need not . . . achieve meticulous specificity . . . at the expense of flexibility and reasonable

breadth."). That is particularly important where, as here, the statute is intended to be flexible, so it can reach all types of manipulative and deceptive schemes. *See* 76 Fed. Reg. at 41,401 ("The [CFTC] intends to interpret and apply [Section 9(1) and Rule 180.1] not technically and restrictively, but flexibly to effectuate its remedial purpose.").

Moreover, going back years before Phillips's illegal scheme, courts had ruled that it open-market transactions with the intent to manipulate prices could be unlawfully deceptive. By the time of Phillips's crime in late 2017, Section 10(b) of the Securities Exchange Act—which uses the same "manipulative or deceptive" language as Section 9(1)—had been read to prohibit open-market manipulation for at least a decade. *See, e.g.*, *Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001) ("'[M]anipulation] can be illegal solely because of the actor's purpose."); *Masri*, 523 F. Supp. 2d at 371-72 ("[O]pen-market transaction with the intent of artificially affecting the price . . . can constitute market manipulation"); *ATSI*, 493 F.3d at 102 ("[I]n some cases scienter is the only factor that distinguishes legitimate trading form improper market manipulation"); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 82 (S.D.N.Y. 2015) (holding that "open-market transaction" may be manipulative "when coupled with manipulative intent"). Courts had also applied this rule to Section 6(c)(1) in the years before Phillips's illegal scheme. *See, e.g.*, *Kraft*, 153 F. Supp. 3d at 1010-11 (applying rule against open-market manipulation to Section 6(c)(1) in 2015); *Ploss*, 197 F.3d at 1054-56 (same in 2016). Given the text of the statute and years of case law, there is no basis to claim that people "had no reason to even suspect" that open-market manipulation "might be within [the statute's] scope." *Houtar*, 980 F.3d at 274.

That many of these decisions arise in the context of civil actions is of no moment. In this context, civil and criminal enforcement actions rely on the same statutes and regulations, so cases in the civil context show what those conduct statutes prohibit. And in any event, the Second Circuit

has, on multiple occasions, held that defendants can be criminally convicted of manipulation based on open-market transactions with an intent to manipulate. *See supra* at 32 n.7. At bottom, this is not a case involving novel legal principles or thorny questions about how much Phillips was allowed to trade and when. Mot. at 27-28. Rather, it is a straightforward application of the established principle that trading with intent to manipulate can be unlawfully deceptive.

Phillips is also wrong to challenge the constitutionality of prosecuting him based on fraudulent representations in connection with triggering the OT Option. Mot. at 28-29. As explained above, the Government does not, as Phillips claims, contend that Glen Point had a fiduciary duty to make certain disclosures under the OT Option contracts. Instead, by causing employees to send out confirmations that the OT Options had been triggered, without disclosing his manipulative trading activity, Phillips misled others because those statements falsely implied that Glen Point was acting in good faith and a commercially reasonable manner, and that the OT Option had been triggered as a result of natural market forces.

The gravamen of this claim is that the *confirmations*—not the statements in OT Option contracts—were misleading, which is a well-established basis for a wire-fraud claim. *See Autuori*, 212 F.3d at 118 (allowing wire-fraud claims based on "misleading" statements); Rest. (Second) Torts § 529 ("A duty to disclose can . . . arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure to avoid being misleading."); *see also supra* at 36-37 (collecting fraud cases based on misleading claims of entitlement to payment under contracts). There is no plausible fair-notice problem with this theory. It is fair to assume that reasonable people know that intentionally making misleading statements to obtain millions of dollars can be criminal. And as to whether Phillips knew the statements were misleading, that is a fact question for the jury: the Government will prove that Phillips had specific intent to defraud,

which is a powerful check on any possibility that he lacked notice he was doing anything wrong.

None of the decisions Phillips cites warrant dismissing the Indictment on vagueness grounds, much less doing so at the motion to dismiss stage. For one, the premise that a Due Process challenge can arise based on the language of a contract—rather than the statute—makes little sense. The question in a Due Process challenge is whether "the *statute* presents an ordinary person with sufficient notice of . . . what conduct is prohibited." *Houtar*, 980 F.3d at 273 (emphasis added). Here, that means the question is whether the wire-fraud statute is sufficiently clear to put a reasonable person on notice that a misleading statement could be unlawful. Any ambiguities in the statements or contracts at issue go to strength of the evidence, not to any question of a constitutional dimension. *See United States v. Shellef*, 732 F. Supp. 2d 42,68 (E.D.N.Y. 2010) ("Any ambiguities or inconsistencies in the contract . . . go to the weight of the evidence . . . ."). Phillips cites no case within this Circuit that has evaluated a vagueness challenge based on the ambiguity of the alleged misstatement and doing so makes little sense with the doctrine.

Instead, Phillips cites three out-of-district cases, none of which support his position. The one Circuit decision he cites was not even a constitutional vagueness challenge: it simply found, in the context of a false-statements claim, that the Government had not proved falsity. *United States v. Race*, 632 F.2d 1114, 1119-20 (4th Cir. 1980). The two other district-court decisions Phillips cites provide no legal basis for evaluating a vagueness claim based on the nature of the alleged misstatements, rather than the statutes. And in any event, those decisions rejected the vagueness challenges at issue because they could not conclude, as a matter of law, that the alleged misstatements were not misleading. *See United States v. Gen. Dyn. Corp.*, 644 F. Supp. 1497, 1501-02 (C.D. Cal. 1986) (denying motion to dismiss); *United States v. Bryant*, 556 F. Supp. 2d 378, 448 (D.N.J. 2008) (same).

This case, in short, is one for the jury. The defendant violated well-established legal principles prohibiting fraud and manipulation. His arguments to the contrary are fundamentally fact disputes for trial, not for a motion to dismiss.

## CONCLUSION

Accordingly, the Government respectfully requests that the Court deny the defendant's motions to dismiss the Indictment.

Dated: New York, New York
May 26, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s
Thomas Burnett
Kiersten Fletcher
Noah Solowiejczyk
Assistant United States Attorneys

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

NEIL PHILLIPS,

*Defendant*.

No. 1:22-cr-00138-LJL

**ORAL ARGUMENT REQUESTED**

# REPLY IN SUPPORT OF DEFENDANT NEIL PHILLIPS' MOTION TO DISMISS

Sean Hecker
Jenna M. Dabbs
David Gopstein
Alexandra Conlon
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
aconlon@kaplanhecker.com

June 9, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

I. THE CEA DOES NOT APPLY TO THE ALLEGED TRADES AND OMISSION. ..... 3

A. The FX Spot Trades Were Not Made "In Connection With" the Option. ..... 3

B. Applying the CEA to the Alleged Conduct Would Be an Impermissible Extraterritorial Application. ..... 5

i. Pursuant to Section 2(i), the CEA does not apply to the spot trades and alleged omission because they are "activities outside the United States." ..... 6

ii. The Indictment fails to allege a permissible extraterritorial or domestic application of Section 6(c)(1). ..... 8

II. THE CEA COUNTS DO NOT ALLEGE VIOLATIONS OF SECTION 6(C)(1) AND RULE 180.1 ..... 10

A. The Government Must Prove an Artificial Price ..... 10

i. Market manipulation charges require a showing of artificial price, regardless of the provision charged ..... 11

ii. The Government mischaracterizes caselaw to argue scienter is the only element it must prove ..... 14

III. THE WIRE FRAUD COUNTS MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO ALLEGE AN ACTIONABLE MISREPRESENTATION. ..... 17

A. The Alleged Omission Was Not Misleading. ..... 17

B. The Alleged Omission Was Not Material. ..... 21

IV. THE GOVERNMENT'S THEORY OF CRIMINALITY VIOLATES CONSTITUTIONAL PRINCIPLES ..... 23

CONCLUSION ..... 27

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .......... 12, 14, 15, 24

*Bai v. Tegs Mgmt., LLC*,
No. 20-CV-4942 (DLC), 2022 WL 602711 (S.D.N.Y. Mar. 1, 2022) .......... 4

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
866 F. Supp. 2d 257 (S.D.N.Y. 2012) .......... 22

*Commodity Futures Trading Comm'n v. Gorman*,
587 F. Supp. 3d 24 (S.D.N.Y. 2022) .......... 15

*Commodity Futures Trading Comm'n v. Gorman*,
No. 21-CV-870 (VM), 2023 WL 2632111 n.9 (S.D.N.Y. Mar. 24, 2023) .......... passim

*Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*,
153 F. Supp. 3d 996 (N.D. Ill. 2015) .......... 12, 13, 14, 24

*Commodity Futures Trading Comm'n v. McDonnell*,
332 F. Supp. 3d 641 (E.D.N.Y. 2018) .......... 4

*Commodity Futures Trading Comm'n v. Parnon Energy Inc.*,
875 F. Supp. 2d 233 (S.D.N.Y. 2012) .......... 13

*Commodity Futures Trading Comm'n v. Wilson*,
No. 13-CV-7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) .......... 10, 11, 16

*Chadbourne & Parke LLP v. Troice*,
571 U.S. 377 (2014) .......... 4

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) .......... 14

*FAA v. Cooper*,
566 U.S. 284 (2011) .......... 12

*In re Vivendi, S.A. Securities Litig.*,
838 F.3d 223 (2d Cir. 2016) .......... 22

*Markowski v. Sec. Exch. Comm'n*,
274 F.3d 525 (D.C. Cir. 2001) .......... 25

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) .......... 10

*Ong v. Chipotle Mexican Grill, Inc.*,
294 F.Supp. 3d 199 (S.D.N.Y. 2018)........................................................................... 21

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*,
572 Fed. App'x 60 (2d Cir. 2014)................................................................................ 9

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
937 F.3d 94 (2d Cir. 2019)...................................................................................... 8, 9

*Press v. Chem. Inv. Servs. Corp.*,
166 F.3d 529 (2d Cir. 1999)........................................................................................ 3

*Sec. Exch. Comm'n v. LEK Secs. Corp.*,
276 F. Supp. 3d 49 (S.D.N.Y. 2017)........................................................................... 15

*Sec. Exch. Comm'n v. Masri*,
523 F. Supp. 2d 361 (S.D.N.Y. 2007)..................................................................... 15, 24

*Sec. Exch. Comm'n v. Tourre*,
No. 10-CV-3229 (KBF), 2012 WL 5838794 (S.D.N.Y. Nov. 19, 2012) .................................. 5

*Sec. Exch. Comm'n v. Vali Mgmt.*,
2022 WL 2155094 (2d Cir. 2022)................................................................................ 15

*Sec. Exch. Comm'n. v. Zandford*,
535 U.S. 813 (2002)...................................................................................................... 4

*Sec. Indus. & Fin. Markets Ass'n v. Commodity Futures Trading Comm'n.*,
67 F. Supp. 3d 373 (D.D.C. 2014)............................................................................ 6, 8

*Set Cap. LLC v. Credit Suisse Grp.*,
996 F.3d 64 (2d Cir. 2021)............................................................................... 12, 13, 14

*Sharette v. Credit Suisse Int'l*,
127 F. Supp. 3d 60 (S.D.N.Y. 2015)........................................................................... 24

*United States v. Barrow*
400 F.3d 109, 117–18 (2d Cir. 2005).......................................................................... 23

*United States v. Benjamin*,
No. 21-CR-706 (JPO), 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) .................................. 26

*United States v. Bryant*,
556 F. Supp. 2d 378 (D.N.J. 2008) ............................................................................ 26

*United States v. Connolly*,
24 F.4th 821 (2d Cir. 2022) ................................................................................. 20, 21

*United States v. Frank*,
156 F.3d 332 (2d Cir. 1998) ........ 19

*United States v. Gen. Dyn. Corp.*,
644 F. Supp. 1497 (C.D. Cal. 1986) ........ 26

*United States v. Harris*,
821 F.3d 589 (5th Cir. 2016) ........ 19

*United States v. Lanier*,
520 U.S. 259 (1997) ........ 26

*United States v. McLellan*,
959 F.3d 442 (1st Cir. 2020) ........ 3

*United States v. Naiman*,
211 F.3d 40 (2d Cir. 2000) ........ 19

*United States v. Race*,
632 F.2d 1114 (4th Cir. 1980) ........ 27

*United States v. Royer*,
549 F.3d 886 (2d Cir. 2008) ........ 13

*United States v. Rybicki*,
354 F.3d 124 (2d Cir. 2003) ........ 23

*United States v. Wolfson*,
642 F.3d 293 (2d Cir. 2011) ........ 22

*Universal Health Servs., Inc. v. United States*,
579 U.S. 176 (2016) ........ 19

*WesternGeco LLC v. ION Geophysical Corp.*,
138 S. Ct. 2129 (2018) ........ 9

*Wu v. Bitfloor, Inc.*,
460 F. Supp. 3d 418 (S.D.N.Y. 2020) ........ 9

**Statutes**

7 U.S.C. § 2(i) ........ 3, 5

7 U.S.C. § 2(c)(1) ........ 3

7 U.S.C. § 2(c)(2) ........ 3

7 U.S.C. § 5(b) ........ 9

7 U.S.C. § 6(c)(1) ........ passim

7 U.S.C. § 9(1) ........ 9

7 U.S.C. § 9(a)(2) ........ passim

15 U.S.C. § 78j(b). ........ 5

**Regulations**

76 Fed. Reg. (July 14, 2011) ........ 3

**Rules**

17 C.F.R. § 180.1 ........ 11, 13, 15

**Other Authorities**

Concurring Statement of Commissioner Scott D. O'Malia, Commodity Futures Trading Comm'n, (Dec. 21, 2012), https://www.cftc.gov/PressRoom/SpeechesTestimony/omailastatement122112 ........ 7

Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report (January 2011), https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf ........ 6

Int'l Swaps & Derivatives Ass'n, 2005 Barrier Option Supplement https://www.isda.org/a/j7MDE/Tech_Rev_05BarrierSupp.pdf ........ 18

Sen. Christopher Dodd, Cong. Rec., Vol. 156, Issue 105, S5878-79 (July 15, 2010) ........ 7

Sen. Rep. No. 111-76 ........ 5

Statement of Support by Chairman Gary Gensler on Final Exemptive Order Regarding Compliance with Certain Swap Regulations and Further Proposed Guidance (Final Order), Commodity Futures Trading Comm'n, (Dec. 21, 2012) https://www.cftc.gov/PressRoom/SpeechesTestimony/genslerstatement122112 ........ 7

## PRELIMINARY STATEMENT

The government's opposition brief is replete with concessions, altered legal theories, and internal inconsistencies that underscore why this case should be dismissed.

*First*, the government concedes that the FX trading activity upon which this entire indictment is based *is not criminal*, and that its case rests on Glen Point's purported failure to disclose its trades in its capacity as Calculation Agent.

*Second,* the government concedes that there is nothing that Bank-1—the alleged victim—would have done differently had Glen Point disclosed those trades. Presented with this specific question in Mr. Phillips' moving brief, the government offers no response.

*Third,* notwithstanding the indictment's allegations that Mr. Phillips' trading artificially manipulated the exchange rate, the government now contends that artificial price is an "abstract" concept with no bearing on this case. Opp. at 31. Under the government's theory, Mr. Phillips could be convicted for not disclosing a non-fraudulent, open-market trade that had no impact on price. The government does not, and cannot, cite any authority for this expansive theory of fraud. Because there is none.

*Fourth*, the government for the first time adds a claim that Glen Point's notification that the one touch option had been triggered was an untrue "implicit representation" that the exchange rate moved due to the natural forces of supply and demand, *i.e.*, that it was not artificial. This theory—which appears neither in the indictment nor in the government's April 11, 2023 letter, which stated that it intended to argue that Glen Point's notification was actually a "half-truth"—is untethered to the contractual language upon which it is purportedly based and fundamentally inconsistent with the government's own brief. On the one hand, the government now intends to argue that the notification was false because it implied that the price was not artificial. On the

other hand, the government disavows any obligation to prove artificiality. In other words, the government claims it need not prove the falsity of what was allegedly implied.

At bottom, the government's opposition contends that (i) a defendant may be criminally liable for not disclosing open-market trades based *solely* on his alleged intent to affect price[1] in an unregulated market—even without having actually impacted price or engaged in any additional allegedly fraudulent conduct; and (ii) a defendant can be criminally liable for an alleged omission to a third-party when even the government cannot articulate how the alleged victim would have behaved differently absent the alleged omission. These theories reflect a stark departure from the government's own indictment, do not meet the elements of the charged statutes, and violate Mr. Phillips' constitutional right to due process. Indeed, the opposition raises a panoply of unanswered questions regarding when trading crosses the line from permissible to criminal and what exactly a trader would need to disclose—and to whom—in order to stay on the right side of the line. The arbitrariness of the government's theory is underscored by its concession that there would be no actionable misstatement or omission in this case if Mr. Phillips engaged in the *exact same trading activity* and Glen Point had not been the Calculation Agent.

Mr. Phillips need not "garb himself," as the government contends, in his right to due process. It is a fundamental right afforded to all criminal defendants and one that, if this case proceeds to trial, the government's shifting, unprecedented and expansive theories of criminal liability will violate.

[1] To be clear, Mr. Phillips rejects wholeheartedly the allegation that he traded solely to affect the exchange rate, but maintains that doing so under these circumstances, as alleged in the Indictment, is not a crime.

## I. THE CEA DOES NOT APPLY TO THE ALLEGED TRADES AND OMISSION.

The government claims that Mr. Phillips violated the CEA by engaging in an illegal scheme that relied on lawful FX spot trades to trigger the Option, a "swap" under the CEA. But as the government all but concedes, the CEA does not apply to the FX spot trades, *see* Opp. at 10, n.1.,[2] and it admits that the FX spot trades, even if they could fall under the ambit of the CEA, "on their own" were not "criminal." *Id.* at 10. The government seeks to surmount these concessions by arguing that the FX trades nonetheless can be pulled into the CEA because they are the engine of and therefore "in connection with" the alleged scheme to defraud the Option grantor. *Id.* at 11–12. The government's circular argument ignores instructive securities cases that make clear that conduct must be material to an action taken or decision made with respect to a swap to clear the "in connection with" hurdle.

### A. The FX Spot Trades Were Not Made "In Connection With" the Option.

Courts in the securities context have limited the alleged deceptive conduct reached by the "in connection with" requirement to conduct that is "material to a decision" to buy or sell a covered security. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014); *see also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999) (limiting 1934 Act manipulative device claim to circumstances where the device "somehow induced the purchaser to purchase the security at issue"); *United States v. McLellan*, 959 F.3d 442, 458–59 (1st Cir. 2020) ("[T]he alleged fraud

[2] The non-retail FX spot transactions involved here are doubly excluded from the CEA. The CEA expressly and entirely excludes them from its scope, 7 U.S.C. § 2(c)(1): "Except as provided in paragraph (2), nothing in this Act (other than section 5b, or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in—(A) foreign currency[.]" The exceptions in CEA Section 2(c)(2) are limited to transactions on an organized exchange and transactions in "retail" foreign currency. The government does not contend and cannot contend that the FX spot transactions here were executed on an organized exchange or are retail transactions as defined in the CEA (i.e., transactions entered into with a person who is not an "eligible contract participant," as defined in CEA Section 1a(17)). In addition, the narrow exception to the prohibition against extraterritorial application of the CEA found in CEA Section 2(i) is limited to swap transactions; it does not apply to FX spot.

must reach a certain threshold of materiality to be deemed made 'in connection with' a transaction in securities."); *Bai v. Tegs Mgmt., LLC*, No. 20-CV-4942 (DLC), 2022 WL 602711, at *6 (S.D.N.Y. Mar. 1, 2022).

The government argues this Court should ignore the securities law precedents because he reach of the "in connection with" element in Section 10(b) of the 1934 Act is ostensibly narrower than the same phrase in Section 6(c)(1) of the CEA; specifically, because the "in connection with" language in the 1934 Act is followed by "the *purchase or sale* of any security." *See* Opp. at 13.

And the government states "the relevant question here is: In connection with what?" But the very securities cases the government dismisses provide the answer. Even assuming that the CEA's "in connection with" applies more broadly than the purchase or sale of a swap—and the government does not cite a single case in which it has — it still can only reach manipulative or deceptive conduct *material to a decision* involving a swap. *See Commodity Futures Trading Comm'n v. McDonnell*, 332 F. Supp. 3d 641, 723 (E.D.N.Y. 2018) (defining fraudulent conduct as occurring "in connection with, and contemporaneous with" contracts of sale of a commodity); *see also* 76 Fed. Reg. 41406 (July 14, 2011) (CFTC guidance citing the Supreme Court's interpretation of "in connection with" language in SEC Rule 10b-5 and stating that the Commission "intends to be guided by this and other precedent . . . in the securities context").[3]

The government acknowledges this—that conduct must be material to a party's "decision" in order to satisfy the "in connection with" requirement, Opp. at 13 ("So long as the scheme is

[3] The government's attempt to distinguish *McDonnell* as irrelevant because it involved a contract of sale of a commodity and "[t]he CEA's focus is different with respect to swaps" is unpersuasive. Opp. at 13–14. *McDonnell* did not define "in connection with" based on the financial product involved. Rather, *McDonnell* looked to securities fraud precedent to determine the scope of "in connection with" in the CEA and found that the CEA's "in connection with" requirement is "construed broadly" and is "satisfied where the contract of sale of a commodity is in interstate commerce and the fraud are not independent events." 332 F. Supp. 3d at 722 (citing *Sec. Exch. Comm'n v. Zandford*, 535 U.S. 813, 820 (2002)).

'material to' the parties to the swap —whether it be their decision to purchase, sell, exercise, or terminate— the scheme is in connection with the swap."), but it fails to identify any such decision by Bank-1. The reason for that is clear: Bank-1 entered into the swap before the spot trading and barrier notification took place and, by that point, Bank-1 had no decision to make with respect to the exercise of the Option, which was automatic upon the occurrence of a Barrier Event. Moreover, even if one could point to some potential decision by the Option grantor (which the government does not), it is difficult to conceive of how—by the government's own theory of the case—lawful spot trading that does not result in an artificial price could possibly be material to any decision by the Option grantor.

The government's interpretation of the "in connection with" requirement, untethered to the materiality and contemporaneity requirements in securities precedent, would take the "in connection with" requirement "too far from where it has heretofore been." *Sec. Exch. Comm'n. v. Tourre*, No. 10-CV-3229 (KBF), 2012 WL 5838794, at *5 (S.D.N.Y. Nov. 19, 2012). Because the spot trades were not "in connection with" the Option, the CEA claims fail.

**B. Applying the CEA to the Alleged Conduct Would Be an Impermissible Extraterritorial Application.**

The government advances two theories to defend its claim that the CEA can reach trading activity and omissions made outside the United States. The government claims: (i) that Section 2(i) of the CEA makes Section 6(c)(1) of the CEA applicable to the alleged conduct; and (ii) that applying the CEA to the alleged conduct here would be a proper "domestic application of the statute," or, in the alternative, that Section 2(i) of the CEA makes Section 6(c)(1) of the CEA applicable to the alleged conduct. Opp. at 16. The government is wrong on both counts.

**i. Pursuant to Section 2(i), the CEA does not apply to the spot trades and alleged omission because they are "activities outside the United States."**

The plain terms of Section 2(i) prohibit the extraterritorial application of the CEA to swap "activities outside the United States" unless those activities "have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i).

The Option clearly involves "activities outside the United States"—a contract pegged to an exchange rate on a decentralized market, entered overseas between a London hedge fund and a London financial intermediary. Those activities did not have a "direct and significant connection" to or "effect on" U.S. commerce. And the government does not allege that, in entering into the Option or providing notice of its exercise, Mr. Phillips or Glen Point had any communications with any party in the United States.

The "direct and significant" provision sets a high bar. Prior to the 2008 financial crisis, swaps were generally unregulated. But Congress viewed swaps as the underlying cause of that crisis and brought them within the CEA's coverage. *See Sec. Indus. & Fin. Markets Ass'n v. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 385–88 (D.D.C. 2014) ("*SIFMA*") (explaining the statutory history of swaps coverage under the CEA); Sen. Rep. No. 111-76, at 29–32 (2010). Congress also observed that although certain of those swap-related activities occurred overseas, they nonetheless caused economic turmoil in the United States. *See SIFMA*, 67 F. Supp. 3d at 387; *see also* Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report at xviv, 49–51, 349–52 (January 2011), https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf. So Congress enacted Section 2(i) to address risks like "those that occurred during the 2008 Financial Crisis, where foreign affiliates of U.S. institutions engaged in risky swap trades that 'result[ed] in or contribute[d] to substantial losses to U.S. persons and *threaten[ed] the financial stability of the entire U.S. system*.'" *C.F.T.C. v. Gorman*, No. 21-CV-870 (VM), 2023

WL 2632111, at *26 n.9 (S.D.N.Y. Mar. 24, 2023) ("*Gorman II*") (quoting 78 Fed. Reg. 45295) (emphasis added). As then-Chair Gensler recognized, Congress enacted Section 2(i) to cover swap activities "executed offshore by U.S. financial institutions" that "sent risk straight back to our shores" and resulted in "eight million Americans los[ing] their jobs, millions of families los[ing] their homes, and small businesses across the country fold[ing]." Statement of Support by Chairman Gary Gensler on Final Exemptive Order Regarding Compliance with Certain Swap Regulations and Further Proposed Guidance (Final Order), CFTC (Dec. 21, 2012), https://www.cftc.gov/PressRoom/SpeechesTestimony/genslerstatement122112 (discussing how "the nature of modern finance" results in "risk that builds up offshore [and] inevitably comes crashing back onto U.S. shores" and citing AIG, Lehman Brothers, and Citigroup as examples); Sen. Christopher Dodd, Cong. Rec., Vol. 156, Issue 105, S5878-79 (July 15, 2010) (noting that international regulation is necessary to curtail regulatory arbitrage and establish "a more orderly system in our globe because, as we have all painfully learned, matters that occur thousands of miles away can *affect the economy* in our own country") (emphasis added).

The government ignores this statutory history, reaching for a sledgehammer where Congress provided a scalpel. It asks the Court to extend the CEA's reach to activities outside the United States that do not implicate the concerns that led to Section 2(i)'s enactment. To support this expansive theory, the government relies primarily on Interpretive Guidance by the CFTC. *See* Opp. at 22–25. No court has embraced this expansive view of Section 2(i), *cf. Gorman II*, 2023 WL 2632111, at *9 n.9, and the Commission's particular guidance on the reach of Section 2(i), cited extensively in the Opposition, was criticized for asserting a "grossly overbroad conception of extraterritorial reach," *see* Concurring Statement of Commissioner Scott D. O'Malia, CFTC (Dec. 21, 2012), https://www.cftc.gov/PressRoom/SpeechesTestimony/omailastatement122112.

Even the CFTC has described it as only "a non-binding general statement of policy intended to communicate its views and intentions." *SIFMA*, 67 F. Supp. 3d at 425 (concluding that the CFTC Interpretive Guidance on Section 2(i) "is an interpretive, and not a legislative, rule," and is thus not binding). In short, Section 2(i)'s "direct and significant" standard was designed to protect "commerce in the United States," not a single U.S. counterparty on a lone swap.

The Option-related activities, as described in the Indictment and discussed in the Opposition, do not implicate the concerns Section 2(i) was enacted to address, and they cannot justify the exceptional extraterritorial application of the CEA to the activities at issue here.

**ii. The Indictment Fails to Allege a Permissible Extraterritorial or Domestic Application of Section 6(c)(1).**

The Second Circuit set forth a two-step framework in *Prime* to determine whether a statute can properly be applied to conduct outside of the United States. *Prime Int'l Trading, Ltd. v. BP P.L.C.,* 937 F.3d 94, 102 (2d Cir. 2019). The first step directs the court to the language of the statute at issue to determine whether it contains "a clear indication of extraterritoriality" to rebut the presumption against extraterritorial application. *Id.* In the second step, courts look to the facts of the particular case to determine whether applying the statute to those facts constitutes a "domestic application." *Id.* at 104. The allegations in the Indictment fail at each step. First, the lack of an "enumerated extraterritorial command" in Section 6(c)(1) "bars" its extraterritorial application. *Id*. at 103.[4] Second, the alleged fraudulent conduct—the spot trades and the failure to disclose them—occurred entirely abroad and cannot support a "domestic application" of the CEA.

---

[4] The government relies in part on *Prime* for the proposition that Section 2(i) creates an extraterritorial exception to Section 6(c)(1)'s exclusion of extraterritorial conduct. Opp. at 17. But *Prime* cuts against that position. There, plaintiffs made a "last-ditch effort" to argue that "'swap-related' Brent transactions" had a "direct and significant" effect on U.S. commerce and, as a result, established extraterritorial jurisdiction over their Section 6(c)(1) fraud clams. *Prime*, 937 F.3d at 103–04. The Second Circuit did not address this argument because plaintiffs failed to make it below. *See id.* Before declining to consider plaintiffs' arguments, however, the court analyzed Section 2(i) and its effect, if any, on Section 6(c)(1). *See id.* at 103. Here, the court was clear: Section 2(i) is a "separate provision," whose clear statement of extraterritorial effect removed "any lingering doubts about whether Section[] 6(c)(1) . . . independently

To determine whether a claim that rests on foreign conduct might still be a proper "domestic application" of a particular statute, the Second Circuit directs courts to "discern the 'focus of congressional concern' in enacting" the statute, in particular the "conduct" the statute aims to regulate and "the parties and interests it seeks to protect." *Id.* at 104 (internal quotation marks omitted) (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010); *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018)). The CEA aims generally to protect the markets it regulates from "price manipulation," "disruptions to market integrity," and "systemic risk," 7 U.S.C. § 5(b), and to "protect[] the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Prime*, 937 F.3d at 101 (citation omitted); *see also Wu v. Bitfloor, Inc.*, 460 F. Supp. 3d 418, 424 (S.D.N.Y. 2020) (same). Section 6(c)(1) is specifically focused on the CEA's general goal of preventing price manipulation. *See* 7 U.S.C. § 9(1) (titled "Prohibition regarding manipulation and false information").

Here, the conduct took place abroad. The Opposition hangs its hat on several touchpoints in the United States, such as the participation of global banks with locations in the United States and wires sent through banks in the United States, *see* Opp. at 18–21, none of which relate to the core alleged misconduct—omissions and spot trades—that happened overseas. Even the evidence the government now promises to present at trial (the location of Client Fund-1 and the ministerial recording of the swap in an American swap data repository) does not relate to the alleged "chain of wrongdoing," which here, as in *Prime*, was "entirely foreign." *See* Opp. at 19–20; *Prime*, 937

appl[ies] extraterritorially" and "reinforce[d] [the court's] conclusion" that the text of Section 6(c)(1) "bars [] extraterritorial application here." *Id.* The upshot of this reasoning is clear: Section 2(i) and Section 6(c)(1) are distinct statutes with different focuses, and Section 2(i)'s extraterritorial reach cannot overcome Section 6(c)(1)'s independent and well-accepted exclusion of extraterritorial conduct.

F.3d at 107; *see also Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 Fed. App'x 60, 61 (2d Cir. 2014) (summary order) (affirming dismissal of RICO claims based on wire fraud where financing was obtained in U.S. and invoices were sent to and paid by a bank in the U.S. because "[t]he activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices—took place outside of the United States").

## II. THE CEA COUNTS DO NOT ALLEGE VIOLATIONS OF SECTION 6(C)(1) AND RULE 180.1.

The government contends that it need not prove (i) artificiality; or (ii) anything more than an intent to manipulate a market. The government is wrong on both counts.

### A. The Government Must Prove an Artificial Price.

Notwithstanding the government's claim that all it is required to show is "open market transactions with manipulative intent," the government also states that the essence of manipulation is that it "mislead[s] other market participants to believe prices are set 'by the natural interplay of supply and demand,' not the conduct of the manipulator"—in this case, leading Bank-1 to believe that the Barrier Rate was reached due to the interplay of supply and demand. Opp. at 31–32. Thus, a market manipulation scheme based on open-market trading where the *only deceit alleged* is the failure to disclose the price impact of the defendant's trading requires that the market *has been successfully manipulated* in order to establish that another market participant was actually deceived. *See Gorman II*, 2023 WL 2632111, at *4, 6 ("[I]nsofar as the Commission alleges price manipulation as the underlying manipulative act, the Commission will need to also allege a specific intent to create an artificial price."); *Commodity Futures Trading Comm'n v. Wilson*, No. 13-CV-7884 (RJS), 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) ("There are multiple elements for market manipulation, and . . . a central one . . . is artificiality. Artificiality is not proven or disproven by intent."). Taken to its logical

conclusion, the government's view of Section 6(c)(1) would criminalize legitimate trading any time it was coupled with a desire that the trading affect the price of the commodity at issue, an interpretation that is foreclosed by the caselaw, *Wilson*, 2018 WL 6322024, at *14 (criticizing CFTC manipulation theory as "tautological" for "conflat[ing] artificial prices with the mere intent to affect prices"), and also contrary to common sense and the inherent dynamics of trading markets, since every order seeks to effect a trade at a price and every executed order has an incremental effect on market price.

The government's effort to characterize the charges against Mr. Phillips as not about "manipulating prices generally" but rather about "manipulating the USD/ZAR exchange rate to momentarily pass the 12.50 threshold required to trigger the OT Option" is a distinction without a difference. There is no allegation that the counterparties to the spot trades, who were anonymous to Mr. Phillips but in this marketplace can be presumed to be sophisticated institutions, were coerced or deceived into entering into the trades at the agreed upon prices. And in the absence of such an allegation, the participation of such counterparties can only be characterized as part of the natural interplay of supply and demand.

At bottom, the alleged "manipulative act" is the failure to disclose the manipulation of the USD/ZAR exchange rate. Thus, according to the government's own theory, the charge cannot stand unless the rate was in fact artificial. *Gorman II*, 2023 WL 2632111, at *6.

**i. Market manipulation charges require a showing of artificial price, regardless of the provision charged.**

The government argues that it need not demonstrate any artificial impact on the USD/ZAR exchange rate because Section 6(c)(1) does not incorporate the elements that are required under Section 9(a)(2)—one of which is creation of an artificial price. *See id*. at 25–35. The government argues, correctly, that Section 6(c)(1) and Rule 180.1 should be analyzed consistent with the

caselaw interpreting Section 10(b) of the Securities Exchange Act and Rule 10b-5. *Id*. at 26, 29. But the government is incorrect that the only element it is required to prove to establish a 10b-5 violation—and, by extension, a violation of Section 6(c)(1)—is an intent that the trading affect the exchange rate. *Id*. at 31–35.

Setting aside the fact that other courts in this circuit have applied the elements of Section 9(a)(2) to market manipulation claims, *see, e.g.*, *Gorman II*, 2023 WL 2632111, at *6, the cases applying Section 6(c)(1) and 10b-5 *cited in the Opposition* also require an artificial impact on price to establish market manipulation. *See* Opp. at 42 (citing *Set Cap.*, 996 F.3d at 76 ("manipulative" under the securities laws is "virtually a term of art" which requires market activity that "artificially affect[s] a security's price"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007) ("The critical question [for a market manipulation claim under 10b-5] then becomes what activity 'artificially' affects a security's price in a deceptive manner."); *Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1015 (N.D. Ill. 2015) ("Plaintiff has adequately pled scienter because the Complaint sets out factual allegations showing that Kraft intended to 'deceive or defraud investors by controlling or artificially affecting the price of' commodities and/or futures.")). As the government notes, "[i]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." Opp. at 29 (quoting *FAA v. Cooper*, 566 U.S. 284, 292 (2011)).

Here, the "cluster of ideas" that was attached to the concept of market manipulation when Congress enacted Section 6(c)(1) included the element of an artificial price. It is unsurprising that the elements of Section (9)(a)(2) mirror those of market manipulation-based claims under Section 6(c)(1) and 10b-5 because they reflect the way courts consider "manipulation" or a "manipulative"

device in the context of financial fraud generally. As the government itself agrees, manipulation, whether involving a security or a commodity, means that the price of the security or commodity has been "artificially affect[ed]" in a manner that "sends a false pricing signal to the market." *Id.* at 27 (quoting *Set Cap.*, 996 F.3d at 76). Central to any claim for market manipulation is that an investor was deceived "into believing that prices at which they purchase[d] and s[old] securities [were] determined by the natural interplay of supply and demand." *Id.* (quoting *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008)). This is another way of saying that to incur criminal liability, a defendant must have created an artificial price via manipulative means that another market participant relied on, mirroring the elements of market manipulation under 10b-5 and 6(c)(1). *See Kraft Foods,* 153 F. Supp. 3d at 1021–22 ("A price is 'artificial' . . . when it 'does not reflect the market or economic forces of supply and demand.'"); *Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 247 (S.D.N.Y. 2012) ("[A] price may be artificial if it is higher than it would have been absent Defendants' conduct.").

The government claims that Section 9(a)(2) and Section 6(c)(1) cannot include the same elements because they "serve different functions"—specifically, according to the government, "Section 9(a)(2) is about manipulating prices, whereas Section 6(c)(1) broadly prohibits deception in connection with swaps and other products." Opp. at 30. But it is this very logic that courts have applied to determine that although "intent to create an artificial price is not an element of a general claim for fraud" under Rule 180.1, which covers a broad array of manipulative devices and schemes, where "the alleged manipulative act is in and of itself . . . 'price manipulation,'" the allegations "must drill down one step further and satisfy the traditional four prongs of a price manipulation claim." *Gorman II*, 2023 WL 2632111, at *6.

The government's reliance on *Kraft Foods*, *see* Opp. at 29–30, is misplaced. Although the court there distinguished between Sections 9(a)(2) and 6(c)(1) in explaining that while Section 9(a)(2) does not include explicit language requiring fraud, Section 6(c)(1) does require fraud, it denied dismissal of the Section 6(c)(1) counts only because it found that the complaint did allege that the defendants' trading included deceptive conduct. *Kraft Foods,* 153 F. Supp. 3d at 1010 – 15.

The court went on to hold that the pleading requirements under Section 10(b), and by extension Section 6(c)(1), "vary depending on the type of claim alleged," and where the claim involves market manipulation, the pleading standard, based on "the Supreme Court's view that manipulation is 'intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price," requires allegations of "what effect the scheme had on the market for the commodities at issue." *Kraft Foods*, 153 F. Supp. 3d at 1011–12 (quoting *Ernst & Ernst v. Hochfelde*r, 425 U.S. 185, 199 (1976)).[5]

**ii. The government mischaracterizes caselaw to argue scienter is the only element it must prove.**

The government repeatedly asserts that "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." Opp. at 33 (quoting *ATSI*, 493 F.3d at 102). But the government mistakenly defines the mental state constituting "scienter" in the context of non-deceptive open market trading as simply an intent to impact price.

It is clear from a closer read of the caselaw that the language the government cites about scienter is meant to distinguish between, on the one hand, open market trading that "impacts the market price" but is not necessarily manipulative because it does not *artificially* impact the market,

[5] In *Gorman II*, the court noted that, in this context, "controlling" and "artificially affecting" mean the same thing. *Gorman II*, 2023 WL 2632111, at *6 (cleaned up).

and, on the other hand, the same trading if it was intended to impact price in a manner that does not reflect supply and demand. *Set Cap.*, 996 F.3d at 77. None of the cases cited by the government held that open market trading can be made criminal solely because the trader hoped or even intended that it would impact the price in a favorable direction. Rather, each case involved a manipulative scheme that *did* impact the underlying market and thereby defrauded investors. *See, e.g.*, *id.* (allegations of manipulative scheme sufficient where the allegations "demonstrated the impact of Credit Suisse's hedging trades" on the market *and* sufficiently alleged scienter); *ATSI*, 493 F.3d at 102 (holding "a manipulation complaint must plead with particularity the nature, purpose, *and effect* of the fraudulent conduct and dismissing claims where the allegations "fail to state even roughly . . . why [the defendants'] sales *caused* the precipitous drop in stock price" (emphasis added)); *Commodity Futures Trading Comm'n v. Gorman*, 587 F. Supp. 3d 24, 41 (S.D.N.Y. 2022) ("*Gorman I*") (holding the CFTC must prove artificial price to establish market manipulation under Rule 180.1); *Sec. Exch. Comm'n v. Masri*, 523 F. Supp. 2d 361, 364 (S.D.N.Y. 2007) (detailing the price impact of the defendant's trading which enabled him to avoid a related obligation pursuant to a put option).

The government relies on *Sec. Exch. Comm'n v. LEK Secs. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017) and the Second Circuit summary order affirming it, *Sec. Exch. Comm'n v. Vali Mgmt.*, 2022 WL 2155094, at *1 (2d Cir. 2022) (summary order), for the proposition that there is no "require[ment] of showing artificial market impact . . . before concluding certain acts are manipulative." Opp. at 26, 30 (alteration in Opp.). But the government avoids mentioning the "certain acts" at issue there: "layering," which involves the practice of placing multiple non-bona fide orders with the intent of canceling them for the very purpose of injecting false information about supply and demand into the market. *See LEK Secs.*, 276 F. Supp. 3d at 55–57. It is no

surprise that the lower court and Second Circuit in that case found that price impact was not required to make the placement of false orders a manipulative act because placing non-bona fide orders is inherently manipulative and serves no purpose other than to inject false information into the market—indeed, the defendants in *LEK Securities* had received multiple warnings from regulators that it considered the practice illegal. Here, by contrast, Mr. Phillips made exclusively bona fide transactions.

The government's theory here is the identical theory that was expressly rejected in *Wilson*: that the mere knowledge and intent that a transaction will affect the price is enough to make otherwise legitimate transactions illegal. 2018 WL 6322024, at *14−15. In *Wilson*, which involved a market manipulation charge brought under both Section 6(c) and 9(a)(2), *id.* at 12, Judge Sullivan chastised the CFTC for "attempt[ing] to read out the artificial price element of the *Amaranth* test [for market manipulation] by collapsing it into the subjective intent requirement." *Id.* at 15. ("[B]ecause the Court lacks the authority to reduce *Amaranth*'s four elements down to two, the Court declines to adopt the CFTC's intent-based approach to assessing artificial price."). The government's theory here would likewise collapse the elements of manipulation into the subjective intent to manipulate.

In short, the government has pointed to no case in which legitimate trades made with an intent to affect price, but nothing more, constitutes a crime. Every case in which the manipulative act at issue is market manipulation, whether brought under 10b-5, 6(c)(1), or 9(a)(2), requires a showing of artificial effect on price. It is that effect that makes the scheme deceptive or manipulative: the artificiality of the price, and failure to disclose it, together form the basis of the charge. Any argument that the government need not show artificial market effect would be entirely unprecedented, and would raise grave due process concerns. *See infra* 23–27.

## III. THE WIRE FRAUD COUNTS MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO ALLEGE AN ACTIONABLE MISREPRESENTATION.

In the Motion, Mr. Phillips argued that the sole omission alleged in the Indictment—that Glen Point, in its capacity as Calculation Agent, did not notify its broker that the triggering event had occurred because of the alleged manipulation—is not actionable because Mr. Phillips owed no duty of disclosure to any party to the Option. Mot. at 21. The government concedes, as it must, that Mr. Phillips owed no duty. Opp. at 37. Now, however, the government attempts to repackage the alleged omission as misleading "half truths" and "implicit representation[s]." *Id.* at 2, 36. Both of these efforts to recast or relabel the alleged problematic conduct fail.

### A. The Alleged Omission was Not Misleading.

The government's implied misrepresentation claim rests on the notion that Mr. Phillips misled counterparties by notifying them that the Barrier Event had occurred without disclosing his trading activity because, in the absence of a disclosure, the parties would have presumed the Barrier Event occurred as a result of organic supply and demand rather than his "manipulative trading." *Id.* at 37, 38. According to the government, the counterparties would not have presumed Mr. Phillips' trading affected the occurrence of the Barrier Event because of the "good faith" and "commercially reasonable" language in the Option contract. *Id.* at 36. The government's theory requires a finding that, first, the "good faith" and "commercially reasonable manner" provisions applied to Mr. Phillips' *trading activity* as opposed to Glen Point's role as Calculation Agent; and second, that the failure to disclose that trading activity violated those provisions. Neither is supportable.

The "good faith" and "commercially reasonable manner" language comes from a single provision in the Option contract that on its face applies only to the Calculation Agent's performance of its role. The contract defines the Calculation Agent as the "Counterparty, acting in

good faith and in a commercially reasonable manner; and whose determinations and calculations will be binding in the absence of manifest error." Ex. A at 4. The contract incorporates by reference the 2005 Barrier Option Supplement published by the ISDA, which, as indicated in the Indictment, further defines Calculation Agent as "the party who determines whether or not a Barrier Event has occurred and provides notice if it determines that a Barrier Event has occurred." Ind. ¶ 13; Int'l Swaps & Derivatives Ass'n [ISDA], 2005 Barrier Option Supplement ("2005 Supplement") at 1, https://www.isda.org/a/j7MDE/Tech_Rev_05BarrierSupp.pdf. The 2005 Supplement additionally outlines the minimal requirements for the notification, stating that the Calculation Agent "shall promptly notify the other party to the [t]ransaction . . . of the occurrence of a Barrier Event . . . with a notice provided by telex, telephone . . . or other electronic notification." 2005 Supplement at 5.

Taken together, the Option contract and 2005 Supplement make clear that the requirement to act in "good faith" and in a "commercially reasonable manner" has literally nothing to do with the counterparty's trading activities. Instead, those phrases pertain to the Calculation Agent's performance of its job — to determine whether the Barrier Event has occurred and to provide notice of it "promptly" by specified means. When Mr. Phillips, through others at Glen Point, made the notifications, he accurately (and acting in a good faith and commercially reasonable manner) reported the occurrence of the Barrier Event in the manner required by the Option Contract and the 2005 Supplement. There is no basis in the language of the Option contract or the 2005 Supplement for the government's claim that Glen Point's notification of the Barrier Event came with an implied assurance about how or why the Barrier Event occurred and Glen Point's role, if any, in the occurrence. If these sophisticated parties wanted to include a provision governing Glen Point's trading activity, they could have done so. But they did not.

The cases the government cites concerning "implied certification[s]" and "implied representation[s]," Opp. at 36–37, provide no support for its implied misrepresentation claim. In each of those cases, a government contractor made an implied and express misrepresentation to the government in highly regulated transactions that required compliance with federal and state laws as a condition of receiving federal and state funds. *See Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 177, 181, 190 (2016) (false claims act case holding "implied certification theory can be a basis for liability" under certain circumstances, including where party requests payment from government and also "makes specific representations about the goods or services provided" or "fails to disclose noncompliance with material statutory, regulatory, or contractual requirements" making its representations "misleading half-truths"); *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016) (upholding defendant's conviction for scheme to defraud where defendant induced "government agencies to award [defendant's companies] contracts for which it was not eligible"); *United States v. Naiman*, 211 F.3d 40, 43 (2d Cir. 2000) (upholding in part and reversing in part convictions of defendants who engaged in scheme to defraud the government in part by falsely certifying compliance with contract requirements in signed documents); *United States v. Frank*, 156 F.3d 332, 334–35 (2d Cir. 1998) (upholding convictions for defendants who engaged in scheme to defraud municipalities by agreeing in contracts to dispose of waste in compliance with federal regulations, and charging municipality a higher fee to do so, while secretly engaging in "short-dumping" and falsifying billing records). The "Calculation Agent" provision in the Option contract between two sophisticated private parties cannot reasonably be compared to the clear and uniform requirement in government contracts that contractors will follow state and federal law, a condition precedent to receiving government funds.

The government's claim that the alleged omission about Mr. Phillips' trading was misleading and inconsistent with contractual language rests on a proposition for which it cites no authority. *See e.g.*, Opp. at 37. Without drawing on any case discussing "good faith" in this context, or invoking any industry standard or guidance to explain why market participants would not (in the government's telling) view this behavior as "commercially reasonable," the government claims that a Calculation Agent's failure to disclose trading meant to affect a product relevant to the transaction in which he serves as agent is by definition not in "good faith" nor "commercially reasonable."[6] This Court should not entertain the government's argument given the Second Circuit's holding in *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022).

In *Connolly*, the government argued the defendants made "implied certification[s]" by making LIBOR submissions in response to the British Bankers' Association's ("BBA") question concerning the rate at which Deutsche Bank could borrow money. *Id.* at 832, 842 (citation omitted). The government argued that by responding to the BBA's question, the defendants implicitly certified that they had determined the rates "according to the BBA's rules." *Id.* at 831. According to the government, the "implied statements were false because the numbers that the conspirators caused to be submitted were not calculated according to the prescribed considerations [from the BBA] but were instead numbers that would help Deutsche Bank make money at its counterparties' expense." *Id.* (citation omitted). The Second Circuit reversed the defendants' convictions. In doing so, the Court looked to, among other things, "the language of the BBA LIBOR Instruction" and "any accompanying elaboration or explanations of the BBA LIBOR

---

[6] Additional recent guidance published by ISDA regarding the responsibilities of the Calculation Agent clearly relates the phrases "good faith" and "commercially reasonable" to the standard by which the Calculation Agent makes it determination. *See* ISDA, "Calculation Agent Standard," Key Changes in the 2021 ISDA Interest Rate Derivatives Definitions (June 2021) https://www.isda.org/a/BNEgE/Key-Changes-in-the-2021-ISDA-Interest-Rate-Derivatives-Definitions-June-2021.pdf.

Instruction" because "where, as here a[n alleged] scheme to defraud *is premised on an instruction--in this case from the BBA to the submitting bank*--the government has the burden to *negate any reasonable interpretation of the instruction* that would make Deutsche Bank's submission responsive" *Id.* at 834 (internal quotation marks omitted). Importantly, the Court stated:

> Finally, we see no merit in the government's argument that a trader-influenced LIBOR submission constituted a "half-truth[ ]" on the theory that it carried an "implied certification" that there had in fact been no trader influence on the submission . . . As discussed earlier, the BBA LIBOR Instruction as it existed during the earlier period at issue in this prosecution, while explicitly barring collaboration between panel banks, said nothing to bar a panel bank's LIBOR submitters from receiving or considering input from that bank's employees who were derivatives traders. There being no guidance from the BBA as to int**ra**bank input—especially given an explicit prohibition of int**er**bank input--a bank's submission of a LIBOR rate did not implicitly represent that there had been no consideration of the panel bank's existing trades.

*Id.* at 842.

As in *Connolly*, the Option contract did not restrict the Calculation Agent's trading activity or require its disclosure. The government tries to distinguish *Connolly* by arguing that a notification about "price (unlike statements about the rate at which banks can borrow money)" "carr[ies] an implicit representation that price is determined by the natural forces of supply and demand, rather than by manipulators." Opp. at 38–39. The government provides no citation or authority for this claim. In short, Glen Point accurately reported a Barrier Event and had no obligation to disclose its trading activity. The notification upon which this entire Indictment relies was thus neither false nor misleading.

**B. The Alleged Omission was Not Material.**

The government's wire fraud claims should be dismissed for the independent reason that the alleged omission was not, as a matter of law, material. The Indictment and Opposition fail to establish that Glen Point's USD/ZAR spot trading activity was something any party to the Option

needed or expected to know. *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F.Supp. 3d 199, 234 (S.D.N.Y. 2018) (finding alleged half-truth immaterial where "no reasonable investor would have considered significant" the undisclosed information "in deciding whether to invest").

The Opposition makes no effort to explain "what might have happened," what decision Bank-1—the government's only alleged victim—could have made if Mr. Phillips had disclosed Glen Point's USD/ZAR spot trading activity. *See In re Vivendi*, *S.A. Securities Litig.,* 838 F.3d 223, 258 (2d Cir. 2016). The government does not address the fact that the Indictment itself makes clear that the parties to the Option understood (1) that Glen Point, as Calculation Agent, would trade in the USD/ZAR spot market while the Option was pending, and (2) that the parties would not be apprised of Glen Point's trades. Instead, the government again resorts to tautologies—it argues, for example, that it would have been material to the parties to know that Glen Point had engaged in manipulative trading, and the trading was manipulative because Glen Point did not tell the parties about it. Opp. at 39.

The Opposition makes only two points about materiality, neither of which help the government. First, the Opposition claims that Bank-2 (Glen Point's broker) must have viewed information concerning Glen Point's trading activity as material because it was important enough to Bank-2 to disclose its own potential trading activity in the Agreement. Opp. at 39. As a preliminary matter, Bank-2 served as Glen Point's broker, and "[a] relationship of trust and confidence" exists between a broker and a customer "with respect to those matters that have been entrusted to the broker." *United States v. Wolfson*, 642 F.3d 293, 295 (2d Cir. 2011). It is unsurprising, then, that Bank-2 included numerous disclaimers in the Agreement about its own trading activity. Ex. A at 3. Such disclaimers are routine and are enforced by courts. *See e.g.*, *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 268 (S.D.N.Y. 2012) ("[T]he

agreed upon waiver serves to disclaim the Note Dealers' duty of care under FINRA guidelines."). Moreover, the government's interpretation of the Agreement attempts to impose both a trading restriction and disclosure requirement that does not exist. *See United States v. Barrow*, 400 F.3d 109, 117–18 (2d Cir. 2005) (explaining that "[w]here the language of a contract is unambiguous, the parties' intent is discerned from the four corners of their agreement").

Second, the Opposition claims that it is irrelevant that Mr. Phillips' alleged misrepresentation was not made to nor relied upon by Bank-1, the sole alleged victim. *See* Opp. at 14, 39–40. Notably, the government does not dispute that Bank-1 independently determined that the Barrier Event had occurred, see Mot. at 26; Opp. at 39, and, as a result, made the $20 million payment. Nor does the government answer the question of what Bank-1 could or would have done differently had Glen Point disclosed its trading to its broker. Instead, the government argues that because Glen Point notified Bank-2 of the Barrier Event and ultimately received the payment from Bank-2, the notification was "essential." Opp. at 40. It is of course true that, in its role as Calculation Agent, Glen Point was required to notify Bank-2 of a Barrier Event. But a statement is material only if it "would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct." *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc). The government offers no explanation for how the disclosure of Mr. Phillips' trading activity would have changed the outcome.

## IV. THE GOVERNMENT'S THEORY OF CRIMINALITY VIOLATES CONSTITUTIONAL PRINCIPLES.

The government claims that this prosecution comports with Due Process because Mr. Phillips "is charged with violating well-established legal rules prohibiting fraud and deception." Opp. at 40. While the statutes and rules he is charged with may be well established, the government's theory for applying them here most certainly is not.

As discussed above, *see supra* 10–16, the government argues that an individual can be criminally liable for open market trades that are not themselves manipulative but that were allegedly intended to impact the USD/ZAR exchange rate, without any demonstration of the creation of an artificial price that is unreflective of the natural forces of supply and demand. No court has ever upheld such a conviction, and the cases on which the government relies, in addition to consisting solely of civil cases that do not raise the same Due Process implications, all involved either a showing of artificial price impact or another form of deception inherent in the trading or conduct itself. *See Markowski v. Sec. Exch. Comm'n.*, 274 F.3d 525, 527 (D.C. Cir. 2001) (upholding disciplinary action based on publication of non-bona fide bid quotations); *ATSI*, 493 F.3d at 102 (requiring demonstration that defendant caused artificial price movement to sustain 10b-5 claim); *Masri*, 523 F. Supp., at 366 (artificial price impact of the defendant's trading enabled him to avoid a related obligation pursuant to a put option); *Kraft Foods*, 153 F.Supp. 3d at 1011–12 (requiring allegations of "what effect the scheme had on the market for the commodities at issue" under Section 6(c)(1) (internal citation omitted)); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 82 (S.D.N.Y. 2015) (manipulative use of high-volume short sales and related misrepresentations). Aside from those cases, the government cites cases for general due process principles in support of its argument that its theory of criminality in this case does not violate Phillips' right to fair notice that his conduct was illegal, but points to no precedent permitting this broad and far-reaching proposed theory of criminality.

Here, if the government were permitted to prosecute Mr. Phillips for bona fide trades without having to show that he in fact created an artificial price, it would be prosecuting Mr. Phillips for conduct that did not actually "mislead other market participants to believe prices [were] set 'by the natural interplay of supply and demand,' not the conduct of the manipulator." Opp. at

31–32. Because this theory would create a new category of criminalized conduct, Phillips would not have had fair notice that he could be prosecuted for it.

The government argues that this is "not a case involving novel legal principles or thorny questions about how much Mr. Phillips was allowed to trade and when." Opp. at 43. But if it does not involve the questions of how much Mr. Phillips was allowed to trade and when, then it is necessarily a novel theory: the implication of the government's argument is that Mr. Phillips could have traded *any* amount in the open market, failed to move the price or create a price unreflective of the forces of supply and demand, and yet nonetheless be guilty of a crime even though, on those facts, the Option would have been triggered by the true exchange rate—a rate reflective of market forces—and no market participant would have been deceived. There is no precedent for such a prosecution. Moreover, this indictment raises endless questions about how much trading is permissible and what, according to the government, needs to be disclosed. If Mr. Phillips had sold $1,000 of USD in exchange for ZAR with the hope that it would move the exchange rate from 12.501 to 12.5, would that be manipulation? Would he have had to disclose the trade—and his hope that it would move the exchange rate—to his broker? If he engaged in the exact same conduct but had a third-party as his Calculation Agent, would the answer be the same? If he sold $100 million of USD in exchange for ZAR because he believed it was a good trade but also hoped that it would trigger the Option payment, would the answers be any different? The government's inability to answer these basic questions speaks volumes about the due process problem.

The government insists that the "gravamen of this claim is that the *confirmations* [that the barrier rate was triggered]—not the statements in OT Option contracts—were misleading." Opp. at 43. But without the creation of an artificial price, those confirmations could not have been misleading, and prosecution based on the confirmations would thus be a novel theory of criminality

in which open-market trading, in the absence of any fiduciary duty or other obligation not to trade, that deceives no one and causes no impact on the interplay between supply and demand, constitutes a crime. *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *13 (S.D.N.Y. Dec. 5, 2022) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.") (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)).

The government also argues that there can be no constitutional vagueness challenge based on the language of the Agreement even though the government's theory of criminality relies entirely on its interpretation of the Agreement's language and its view that it prohibited Mr. Phillips' conduct. But it cites no case refuting the principle, applied in *United States v. Gen. Dyn. Corp.*, 644 F. Supp. 1497, 1500–02 (C.D. Cal. 1986) and *United States v. Bryant*, 556 F. Supp. 2d 378, 448 (D.N.J. 2008), that where a scheme is predicated purely on a violation of a contract, the contractual obligation prohibiting the conduct must have been reasonably clear. *Bryant*, 556 F. Supp. 2d at 442.

Here, the government asserts that the *only* thing that made Mr. Phillips' conduct unlawful was his contractual obligation to act in "good faith" and a "commercially reasonable manner" in determining whether the barrier rate was triggered, thereby making his failure to disclose his own trading activity a fraudulent omission. It is true that in *General Dynamics* and *Bryant* the respective courts ultimately could not conclude that the particular contracts at issue were so ambiguous as a matter of law that they could not support the Indictment. But here, there is simply nothing at all in the Agreement that could possibly be construed as having imposed a duty on Glen Point to limit its trading activity in connection with the contract. In fact, as discussed above, the Agreement expressly contemplated continued trading that may "affect the likelihood of" the barrier rate being

triggered. *See* Ex. A. at 3. Where a defendant's conduct is clearly authorized under a reasonable interpretation of the contract that serves as the only source of a legal obligation, courts can and should dismiss. *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980) ("The meaning of a clause, couched as this one was in language of common use and understanding, was purely a matter of law for the court, which should have granted the defendants' motion to dismiss any charge based on the defendants' billing for per diem under the contract.").

## CONCLUSION

For the foregoing reasons and the reasons in the Motion, the Indictment should be dismissed in its entirety.

Dated: June 9, 2023
New York, New York

By: ______________________

Sean Hecker
Jenna M. Dabbs
David Gopstein
Alexandra Conlon
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
aconlon@kaplanhecker.com
*Counsel for Defendant Neil Phillips*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA, New York, N.Y.

v. 22 Cr. 138 (LJL)

NEIL PHILLIPS,

Defendant.

------------------------------x

August 1, 2023
10:35 a.m.

Before:

HON. LEWIS J. LIMAN,

U.S. District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: THOMAS S. BURNETT
KIERSTEN A. FLETCHER
Assistant United States Attorneys

KAPLAN HECKER & FINK LLP
Attorneys for Defendant
BY: JENNA MINICUCCI DABBS
DAVID N. GOPSTEIN
SEAN HECKER

(Case called)

THE DEPUTY CLERK: Starting with counsel for the government, please state your appearance for the record.

MR. BURNETT: Good morning, your Honor. I am Tom Burnett for the government. I am joined here by AUSA Kiersten Fletcher.

THE COURT: Good morning.

MS. FLETCHER: Good morning, your Honor.

MR. GOPSTEIN: Good morning, your Honor. David Gopstein for Mr. Phillips who is appearing via Teams. I am joined by my colleagues, Jenna Dabbs and Sean Hecker.

THE COURT: Good morning.

I see Mr. Phillips on the video. Welcome, Mr. Phillips.

THE DEFENDANT: Thank you very much, your Honor.

THE COURT: And Mr. Phillips, can you hear the proceedings in front of us?

THE DEFENDANT: I can hear perfectly, I have got visual, and I hope you can hear me.

THE COURT: All right. We can hear you and, Mr. Gopstein, I take it that your client is appearing via teams pursuant to my order permitting him to do so and pursuant to your request; is that right?

MR. GOPSTEIN: That's correct, your Honor.

THE COURT: Any objection to proceeding in this

fashion from the defense?

MR. GOPSTEIN: No objection, your Honor.

THE COURT: Any objection from the government proceeding this way?

MR. BURNETT: No, your Honor.

THE COURT: I have got the motion to dismiss the indictment in front of me. I am prepared to hear argument. I will hear first from counsel for the defendant, and then I will hear from the government, and then if there are any last words counsel from the defendant wants to provide, I will hear from counsel for the defendant. I should start by apologizing that we are getting a little bit of a late start this morning. I had an attorney admission ceremony. Some of you may have seen. It is one of the pleasures of the job and unfortunately it created a bit of a delay.

Let me hear from counsel for the defendant.

MR. GOPSTEIN: Thanks very much, your Honor. May I speak from the podium?

THE COURT: Yes.

MR. GOPSTEIN: Your Honor, the entirety of this indictment depends on a single statement -- the statement was not made by Mr. Phillips, it was not made to the alleged victim, and it was true. The statement, upon which this whole case depends, was made by Mr. Phillips' hedge fund in its capacity as the so-called calculation agent under an agreement

between the fund and its prime broker. The indictment rises and falls on the notification by the calculation agent for an obvious reason. The underlying trading activity upon which this case is purportedly based, open market trades with real counterparties and real risk in the unregulated FX spot market was not criminal. And that is not in dispute. Despite all of the discussion about market manipulation, the government has not actually charged Mr. Phillips with market manipulation in this case because it cannot. Instead, the indictment strains to bring lawful trades into the contours of the criminal law by building an entire case out of what the indictment described as the calculation agent's omission that the government now calls a half truth or an implied misrepresentation. However phrased, the result in this case is the same, your Honor, the indictment alleges no false statements, it alleges no unlawful trades, and it alleges no crimes. What it does do is assert an interpretation of a contract that fails as a matter of law. It attempts to criminalize trading activity in the FX spot market that had not before been subject to prosecution and it raises all sorts of questions for market participants about whether and under what circumstances, and to what extent, previously lawful trading could now be subject to criminal prosecution. And remarkably, it disavows an obligation to actually prove to the jury what it claims to be the only false statement in this case, that is, that it was Mr. Phillips' open marked trades in

the FX spot market that artificially caused the option to be triggered. And we recognize, your Honor, that it is the rare case where an indictment violates a defendant's due process rights but this is that case. There was no fair notice that form language in a stock agreement about a potentially third-party's administerial role carried with it an obligation to disclose a party's underlying trading activity or the intent behind those trades and that the failure to do so could result in criminal prosecution.

THE COURT: Doesn't that argument with respect to due process reach too far? I mean, I would imagine that in this marketplace virtually every swap contract is bespoke. You might have a good argument with respect to this particular contract and the duties of a calculation agent, you might not, but that doesn't necessarily mean, even if you are right, that it is a due process violation. In other words, if I find that there is a due process violation here, aren't I opening up the door to similar challenges at this early stage in connection with every case where there might be a swap contract or some other form of bespoke contract in whatever marketplace you might be talking about?

MR. GOPSTEIN: I don't believe so, your Honor, and sticking with the four corners of the indictment itself, what the indictment says is that this contract incorporated a form language from the 2005 barrier supplement that applies to every

single case. Every single case has the same language, every single swap -- this is form language that says the barrier determination agent determines whether or not the option was triggered. The calculation agent calculates whether or not the option was triggered. And those obligations apply solely to the calculation agent in its role as calculation agent. And so, if I look at the indictment, again, the fact that the indictment, your Honor, relies so heavily on a 2005 barrier supplement that is available online that applies to all contracts underscores the problem here, underscores how much the government is straining to bring these trades into the criminal context. That supplement existed for a very long time. The language there, your Honor, is clear, and it is appropriate when the government relies so heavily, as it is doing here, on a purported obligation in a contract to look at that contract at a motion to dismiss.

Now there may be some contracts, your Honor, where there is ambiguous language. There may be some contracts, your Honor, where it is appropriate to wait and see. This isn't that case because the whole case, your Honor -- the whole case -- relies on the premise that Glen Point, the hedge fund, because it was the calculation agent, had an obligation to notify its prime broker that it had engaged in trading that the government alleges caused the option to be triggered. There is no reasonable reading of that contract that has that

obligation. If these sophisticated parties, engaging in one-touch binary options, had wanted to impose such an obligation on the parties it could have done so but they didn't. And that is clear from the face of the document.

Sticking with the due process point, your Honor, under the government's theory of this case, the exact same trading activity that is alleged here, open market trades on the FX spot market, the exact same option, exact same payment, all of that would not be criminal if someone else had been the calculation agent or the barrier determination agent. That is the person whose job it was to look up and see if the option had been triggered. And as the 2005 supplement referenced in the indictment contemplates, that didn't have to be either of the parties. It didn't have to be Glen Point. It didn't have to be the counterparty. It could have been anyone. And that raises the question, and it is a due process question, in terms of notice and a fair application. If changing the identity of the calculation agent or the barrier determination agent changes all of this trading conduct from criminal to not, how is the underlying conduct criminal? And if that is the indication, and your Honor, I submit, that is the only logical reading of this indictment, then the irony is that every market participant going forward can avoid the possibility of sitting in this courtroom, can avoid the possibility of criminal prosecution, simply by having somebody else play that role.

This indictment raises all sorts of due process questions that the government should be able to answer. If the exact -- if Mr. Phillips made the exact same trades but two weeks earlier -- same volume, same intent, but two weeks earlier when the exchange rate wasn't close to 12.5 but was a lot higher, and then two weeks later the option was triggered, is that a crime? Did he have the obligation to notify?

THE COURT: Your hypothetical is two weeks earlier there are the trades in that those trades still had an effect on the market? I am not sure exactly how your hypothetical works.

MR. GOPSTEIN: Obligation in that he has the exact same alleged intent: I'm going to make these trades, I'm going to buy $750 million worth of brand, but I'm going to go a little bit earlier and not going to trigger the option immediately but later the option is triggered. Does he have the obligation to notify the calculation agent that potentially one of the factors that contributed to this triggering was my trades two weeks earlier. If it was at 12.51 and he bought a million dollars, or if he was just a really, really bad trader but he had the intent, which is all the government says it needs to prove here, that he had the intent to manipulate the exchange rate and move it a little bit, is that a crime? Did he still, under the government's theory, have an obligation to notify the calculation agent?

What if the counterparty to the underlying option, the alleged victim in this case, was also on the other end of the allegedly manipulated open market trades in the FX spot market? Now, the government will correct me if I am wrong but this one isn't a hypothetical because the discovery in this case has shown that the alleged victim -- a sophisticated financial institution -- was on the other side of many of the allegedly fraudulent trades in the FX spot market. So is it fraud to not tell the counterparty you don't know -- because the way this option was structured was the counterparties didn't know each other -- is it fraud to not tell a counterparty you don't know about trades they actually participated in? These are some of the questions that are raised by this indictment. But, of course, due process requires fair notice before a defendant is charged. And your Honor, this is the rare case -- even if the government can answer these questions now, can come up with theories of where the line is, due process requires more than that and the indictment should be dismissed on those grounds.

In addition to raising serious due process concerns, the indictment should be dismissed because it does not state a crime. It does not allege wire fraud and it does not allege commodities fraud and it doesn't allege conspiracies to commit either of those crimes and I would like to start, your Honor, with wire fraud and really, more broadly, the alleged false statement in this case because if you find, your Honor, that

that statement is not actionable, what remains in this case are just lawful open market trades in an unregulated market, in other words, the indictment must be dismissed.

THE COURT: But the indictment alleges the elements of the violation and aren't you asking me to assess the evidence -- something that I would do at the close of the government's case before the jury returns a verdict. But usually we are instructed not to evaluate the evidence at this stage, for good reasons, because the government is not required to lay out its case. It is a criminal case, it is not a civil case. The government is not required to plead facts.

MR. GOPSTEIN: Absolutely, your Honor. It is rare that an indictment rises to this level of due process concern and it is rare that an indictment should be dismissed because, as your Honor said, typically, simply just tracking the statute may be enough but there are cases where an indictment is dismissed and we are not asking you to evaluate the evidence, we are asking you to evaluate whether the theory, as pled here in the indictment, as alleged, could constitute violations of the two statutes charged. And there are circumstances where courts, looking just at the indictment, have dismissed cases on those grounds and this should be one of those cases, your Honor, because in order to plead an actionable false statement, which is an element of wire fraud, it is required, a statement must be misleading and it must be material. And here there is

only one statement. The whole case is about that one statement and it is about the notification, the notification by the entity, Glen Point -- not by Mr. Phillips -- that the option had been triggered.

THE COURT: If the indictment just didn't make reference to the role as calculation agent and didn't reference the agreement at all, just said that there were communications that were made in the course of the scheme that were misleading, wouldn't that be sufficient to satisfy the requirements for an indictment? And if the indictment was bare bones like that, wouldn't that undermine your argument?

MR. GOPSTEIN: If the indictment simply just essentially parroted the elements of the statute and nothing more?

THE COURT: Correct.

MR. GOPSTEIN: Well, then, one, we would have a motion for bill of particulars, we would have a motion that says this is --

THE COURT: You would have a motion for bill of particulars and that would help you at trial but that wouldn't provide a basis for dismissal of the indictment.

MR. GOPSTEIN: No, but it can't be, your Honor, that simply -- if it were the case that simply alleging the elements and nothing more always were sufficient to survive motion to dismiss then motions to dismiss would never be granted in cases

like this where the theory is spelled out in the indictment. Like the motion to dismiss granted in *Benjamin* recently in this court.

THE COURT: But if your argument is right then the government would rarely do what it did in this case, which is give you all kinds of information about what its theory is to help you prepare for trial. You would no longer have speaking indictments. So I'm not sure from a systemic perspective your approach is more attractive or, put another way, more consistent with the law.

MR. GOPSTEIN: If that were the case then the ability for a defendant to move to dismiss an indictment would not have meaning because every case would simply just be here is the elements of the statute and then we are going to go forward. The reason that defendants are able to make a motion to dismiss an indictment -- and it happens rarely and is granted rarely -- is in unique cases like this where we know what the elements are, we know what is being charged.

THE COURT: It is also sometimes where the government chooses to make a full proffer -- that is going to be a question that I have for the government, to give them a heads up -- and there are advantages to the government making a full proffer, because if the government makes that full proffer and I find that even with that full proffer it is not enough, they've got an appeal. If they try the case and the evidence

doesn't satisfy Rule 29 and I agree with you at that stage, they don't have an appeal, they're done.

MR. GOPSTEIN: The government has asserted a theory here, your Honor, they've spelled it out and said that this entire case hinges on a statement that, as a matter of law, as a matter of the indictment, as a matter of the allegations that it was true. And they said it is a contract, looking at a contract can be a matter of law. There are contracts that are ambiguous. This one isn't. And if the entire case -- the entire case depends on this false notification and the government -- again, the government started by describing it as an omission and they concede there was no duty here so now they are describing it as a half truth and also an implied misrepresentation, but in order for a half truth, your Honor, to be misleading, the information that was allegedly omitted must make the truthful part of that statement misleading and there was nothing here that could conceivably meet that standard. And again, your Honor, this is the rare case where it is apparent from the allegations in the indictment that the elements are not met. The government's entire argument turns on the provision between the hedge fund and the broker requiring the calculation agent to determine whether the barrier event occurred acting in good faith or in a commercially reasonable manner.

THE COURT: I take it part of your point is that that

language, the meaning of that language can't turn upon the identity of the calculation agent. Am I understanding part of your argument correctly?

MR. GOPSTEIN: Part of my argument is that the criminal case, that is premised on allegedly fraudulent trading, can't turn on the identity of the calculation agent but, as a matter of contract interpretation, and just the allegations here, that provision cannot be read to impose a duty on the parties to the option to disclose their trading activity. The government argued in its opposition brief that Glen Point had obligation to act in good faith in a commercially reasonable manner which it did not do when it manipulatively triggered the OT option. What the government is doing is taking the good faith and commercially reasonable obligation that applies clearly and exclusively to the calculation agent, in its limited role of calculating whether the option was triggered, and saying that Glen Point violated it when it engaged in trading activity. There is no plausible reading of that contract that imposes that duty on Glen Point. And that's critical, your Honor, because the entire case depends on it. The reason the indictment refers back to this 2005 supplement is because without this false statement, again, there is no criminal case. What you have are open market trades in an unregulated marked that the government concedes are not criminal on their own. And so once you find, your

Honor, that there was no misstatement, the rest of the case collapses.

You know, it is true, materiality is often a question of law and fact and that is the government's response in the motion. But there are rare cases where the absence of materiality is evident from the indictment itself and this is that case because the government, in its opposition brief, it doesn't respond to the question what decision by the alleged victim in this case was impacted by the alleged half truth or the implied misrepresentation or the omission, however it is phrased. What decision was impacted? How could the alleged victim have acted any differently? The government is silent on these issues but it says, the government says that the notification was "essential" to the execution of the scheme. A lot of things, your Honor, are essential to the execution of the alleged scheme. That doesn't make them material as a matter of law. Wires are essential, transfers are essential. Materiality has meaning. It has to be an important fact, an important misstatement to the recipient that affects their decision. The government does not address this in their brief, nor can they. That is a reason, your Honor, another reason, to dismiss this indictment.

THE COURT: Are you saying that if Glen Point had disclosed that the barrier was breached as a result of manipulative trading that Bank no. 2 would not have made a

different decision?

MR. GOPSTEIN: A few things, your Honor. One the only alleged victim in this case is Bank no. 1. Bank no. 1 is the party that paid the $20 million. Bank no. 1 did not know who Glen Point was and Glen Point did not know who Bank no. 1 was. Glen Point's contract, upon which this entire case is based, is with its prime broker Bank no. 2. So to answer your question would they have done anything different, the answer is no, but the relevant question is would Bank 1, the alleged victim, had done anything different. And the answer to that is no. The government didn't respond to it and there is no conceivable answer. And in fact, again, we should not be at a trial in this case. But, if we are, what the discovery has shown is that Bank no. 1 had its own contract, it was the same as Glen Point's contract. Bank no. 1 was the calculation in that contract. Bank no. 1 determined, on its own, that the option was in fact triggered and it made the payment. So how could it be that a notification by Glen Point, to its broker, that was true and carried with it no implied misrepresentation about anything in the market -- and just on that point, again, about implied representations, this is implied in the government's brief that the notification carried with it an implied representation that the option was triggered due to the organic supply and demand of the FX spot market. There is no authority cited by the government for that point. And it doesn't really

make sense because if the calculation agent can be anybody, and if the calculation agent's job is to look and see if the option was triggered and to do it in a commercially reasonable manner, what it could be implying is two things; one, the number in fact was hit; and two, I looked it up and determined it in a commercially reasonable manner. To argue that it implies more about underlying trading activity that is not regulated and that the contract doesn't prohibit it, is just not a fair reading of that.

THE COURT: Your reading of the contract, what kind of conduct by Glen Point would be commercially unreasonable and not in good faith?

MR. GOPSTEIN: In its capacity as calculation agent.

THE COURT: Correct.

MR. GOPSTEIN: There are some examples in the literature about what calculation agents's were supposed to do and what it means to be commercially reasonable.

THE COURT: Don't tell me what it means to be commercially reasonable, tell me what it would mean to be commercially unreasonable.

MR. GOPSTEIN: It would be commercially unreasonable if Glen Point determined that the option had been triggered on June 3rd by looking at an unreputable database that looked at the wrong things. It would be commercially unreasonable if it waited a couple hours and said, you know what, it is actually

triggered but I'm looking -- that's the level of sort of ministerial function that we are talking about here as a calculation agent. But to impose upon a calculation agent's duties to look into the intent, not just the trading but the intent of the parties when they engaged in permissible trading under both the regulations and the contract itself, imposes a duty that simply does not exist. And your Honor, on top of all that, the government, in its opposition brief, said we should go to trial and they're going to prove that this notification was false, they're going to prove --

THE COURT: What part of your analysis goes to good faith? What would be not in good faith and why doesn't the indictment at least allege enough to show that there was bad faith here?

MR. GOPSTEIN: It doesn't allege enough because, again, the good faith is tied to, solely and exclusively, the calculation, and the notification if the good faith had been tied -- if the parties had wanted to impose a good faith or any other obligation on the two parties that governed their trading, this is what the government reads into it, they could have done so.

THE COURT: Let's say the calculation agent was not Glen Point here, it was a third-party, but the third-party was engaged in its own separate manipulative trading for some other reason, and it just reported -- or maybe it wasn't manipulative

trading but it just reported as breaching the barrier option, an idiosyncratic trade that it did, one that did not, in any way, reflect the market -- I don't know, I mean maybe it was a spoof trade that it did -- would that violate the duty of good faith if the calculation agent did a spoof trade?

MR. GOPSTEIN: If the calculation agent engaged in a spoof trade and the contract didn't say the calculation agent can't trade in a certain way, and as long as the calculation agent made the calculation in a commercially reasonable manner, then no. If they wanted to govern the underlying activity of the calculation agent --

THE COURT: So you are saying if the calculation agent did a spoof trade that resulted in the barrier being breached and then reported that spoof trade as reflecting that the barrier was breached, the calculation agent, in that instance, would have acted in good faith and would not have breached the violation of good faith.

MR. GOPSTEIN: If the calculation had caused it to be breached?

THE COURT: Yes.

MR. GOPSTEIN: Yes, then he calculated it in good faith.

THE COURT: OK.

MR. GOPSTEIN: And again, if it imposes more duties upon the calculation agent. I think there are more

hypotheticals that we can get into but the facts, as alleged here, turn solely -- all of the underlying trading, your Honor, of course, the government alleges is manipulative, had there been that third-party calculation agent we wouldn't be here today.

THE COURT: I want to be cognizant that I will give you a lot of time but I can't give you unlimited time so I want to make sure you hit all your other argument.

MR. GOPSTEIN: I think the last item that I would like to address is the government's position that it need not prove any artificial price in this case, that it need to only prove that Mr. Phillips had the intent -- the intent -- to artificially manipulate the exchange rate.

THE COURT: So doesn't *Set Capital* create an issue for you?

MR. GOPSTEIN: I don't think so in this case, your Honor, because *Set Capital*, like every other case that is cited in the briefing about market manipulation, addresses the situation where somebody is charged with manipulating a market where the alleged victims, if it is a criminal case, or the alleged victims in an SEC case, are the investors in that market. And the case law says, repeatedly, manipulation is a term of art, both parties cite it. And it is. And the purpose of enforcing market manipulation laws, whether civilly or criminally, is so that participants in the market, investors

when they're deciding whether or not to purchase or sell a security or commodity, that they have fair, full information. Right? That the market incorporates the theory that supply and demand is reflected. This is not a market manipulation case in that sense because the government is not alleging that anybody who trades in the FX spot market is the victim. What they're alleging is that Bank 1 is the victim and they're alleging Bank 1 is the victim because Glen Point did not tell it that the option was triggered because of -- because of -- the trades. The indictment says it and at various points the government says it, but now the government wants to go to trial on the theory that a jury can find Mr. Phillips guilty of wire fraud and commodities fraud based solely on a finding that the calculation agent did not tell Bank 1 that Mr. Phillips intended to move the market. Full stop. Nothing more. Under that theory, your Honor, Mr. Phillips could be guilty in every single hypothetical that I raise. He intended to move the market when he bought a million dollars. He intended to move the market -- without anything else -- when making the trade two weeks earlier. That cannot be a basis for a criminal prosecution. And for the government to walk away from any obligation to prove the falsity of the one false statement that they allege in this case, for that reason as well, your Honor, the indictment should be dismissed.

THE COURT: I take it you are still pressing the

extra-territoriality argument; is that correct?

MR. GOPSTEIN: Yes, your Honor, but unless you have questions, we will rely on our papers.

THE COURT: I do have a question, which is, under your reading of direct and significant, what kinds of swap trades that would not call for domestic application, would be covered by the Commodities Exchange Act?

MR. GOPSTEIN: Swap trades that are far more substantial than this one, we cite to the *Gorman* decision and Judge Marrero's reading of the direct and significant language there. One trade, $20 million, does not reach that threshold, and the arguments that the underlying FX spot trading affected the U.S. currency also do not reach that threshold for two reasons: One, the trading isn't covered; and two, if anything that affected U.S. currency -- and it is not plausible that this trade actually affected the value of the U.S. currency -- but if any trade touched upon U.S. currency, then CEA would have jurisdiction and I think that is not something that Congress intended when it said limitation on jurisdiction.

THE COURT: One other related question -- but this goes to the domestic application prong -- is that the language that I just referenced, the direct and significant, as well as 6(c) itself comes from the Dodd-Frank Act -- I think you referenced that, the government references that. The language that was picked up in Prime about the purpose of the CEA -- the

Commodities Exchange Act -- was from the predecessor, was from the act before it was amended by Dodd-Frank. Is there any understanding that you have got with respect to what the purpose is of the addition of 6(c) and the direct and significant? I mean, another way of putting it is, is it proper for me to look to the findings that Congress made in connection with a law that was different from the law that added these sections?

MR. GOPSTEIN: I think I follow your Honor.

THE COURT: I mean, they passed a bill. The bill said 6(c), it had 2(i) in it.

MR. GOPSTEIN: Absolutely.

THE COURT: That bill didn't have any findings, it didn't have the findings that were in the CEA before. What is the purpose of 6(c) and 2(i)?

MR. GOPSTEIN: Well, 2(i), specifically, to provide a limited extraterritorial application to certain swap-related conduct that was not there before and Dodd-Frank brought some swaps in and I think it is set forth in *Prime*, among other case law, which does focus on conduct. So I think 2(i) is specifically limited and narrow. There is very limited case law and *Prime* didn't address it because the parties below, so as your Honor said it is focused on the domestic application separate and apart from 2(i) but both of them, ultimately, come into play here and for those reasons we don't think there is

sufficient jurisdiction here.

THE COURT: Thank you. Let me hear from the government.

Mr. Burnett?

MR. BURNETT: Thank you, your Honor.

So there are two things that I want to start by picking up on from the defense presentation and these are, I think, two problems that are cross-cutting with their motion to dismiss. So, first, the defense is wrongly trying to make this case all about the communication of the barrier triggering event from Glen Point to Glen Point's prime broker. That's wrong. There is a wire fraud count -- two wire fraud counts that are based on that representation, and then there is a market manipulation charge -- two market manipulation charges that are separately based on the manipulative conduct. So when the defense was saying if it were not for the communication from Glen Point to JP Morgan about the barrier triggering event we wouldn't be here because there would be no crime, that is just wrong. Open market manipulation --

THE COURT: What would be the fraud in connection with an instrument regulated by the Commodities Exchange Act if there wasn't that communication?

MR. GOPSTEIN: What the fraud would be would be the manipulative trading in the spot market in order to trigger the barrier. So, whether that -- and that would apply regardless

of whether Glen Point was the calculation agent or whether someone else was the calculation agent. If Glen Point intentionally manipulated the dollar-rand exchange rate in order to push that exchange rate to trigger the option, then that is sufficient regardless of whatever statement Glen Point or anyone else may have made to the counterparties to the transaction. So, distinct from one another, I think the defense is wrong to collapse it that this case is all about one statement. It is just not true and has never been true from the indictment all the way through from our briefing.

The second main issue with the defense argument is they're effectively trying to litigate summary judgment through a motion to dismiss which is not appropriate in a criminal case. All that an indictment needs to do, as this Court has articulated, is give the defense notice of the charges against him with enough specificity so he can defend himself and plead double jeopardy. The indictment does that, there is no obligation on the part of an indictment to lay out all of the government's theories or evidence of the charges which is really what the defense brief and submission is getting at.

THE COURT: Let's talk though about the wire fraud counts. A moment ago you said that the wire fraud counts are based on an omission theory or a half truth theory arising from the communication between Glen Point and the prime broker in its capacity as calculation agent. There are two related

questions; one is if you have got an answer to the point made by the defense that the language that you cite can't be read to give rise to an obligation to disclose the factors that gave rise to the barrier being breached; and second would be if you don't have an answer to the question framed that way, is there -- are you saying that there is going to be more evidence? I don't know that I need to ask you for that evidence right now but I could give you the opportunity to lay it out for me and give you a decision as to whether it would be sufficient.

MR. BURNETT: Yes, your Honor.

So on the wire fraud charge, we think -- the indictment alleges and the brief spells out that that notification from Glen Point was false in two respects. So first, by saying that the barrier had been triggered, that implied that the natural interplay of supply and demand had caused the exchange rate to fall and trigger the option. Now the basis for that does not come from the good faith and commercially reasonable language in the contract. Instead, that comes from the background presumption that parties expect that prices are determined by the natural interplay of supply and demand. The case law support for that comes from cases like *ATSI* and other open market manipulation cases that are cited at length in the brief. That was a misimpression that Glen Point gave to its counterparties when it said that the

barrier option had been triggered but left out that the reason it was triggered was because of Glen Point's manipulative trading.

THE COURT: But what obligation did it have to tell the prime broker as to what the factors were that triggered the barrier being breached -- or being triggered, the swap being triggered.

MR. BURNETT: Obligation comes from two sources, so one is the statement of the barrier being triggered was itself misleading because it carried with it this national implication that supply and demand, the natural forces of supply and demand caused the triggering event, which was not true, and more information was needed in order to correct that misimpression. So that's the non-contract basis for the obligation. Then there is a separate contract basis for the obligation which is the good faith and commercially reasonable language that the defense was focused on during its presentation, and there the contract is clear that the calculation agent, which in this case was Glen Point, has an obligation to determine the barrier event in good faith in a commercially reasonable manner. The defense's idea that it is possible to hive off the determination of the barrier from trading conduct and that those are two distinct concepts, is wrong. And the reason it is wrong is because when you are making a barrier determination, you need to make a decision about what trades

should count for deciding whether a barrier event has occurred and I think this goes to the hypothetical that your Honor had proposed. There is no one centralized exchange where all trading of a spot dollar-rand occurs. There are some exchanges, some are bigger than others, there are bilateral exchanges parties make with banks. So a calculation agent, part of the job is figuring out which trades are actually sufficient to reflect the market such that a barrier event has happened. So, under the defense reading what Glen Point can hypothetically do, is engage in a series of related transactions with Glen Point and, say, another Glen Point entity over a dollar rand that are below 1250 or below the barrier and say, hey, a trade occurred below this barrier so now I, as the calculation agent, can say that a barrier event has occurred. That is not operating in good faith because it is selecting a trade that the barrier agent knows is not truly reflecting an actual non-manipulated market transaction. And in terms of support for this, the government will offer additional support for this idea of good faith and commercial reasonableness at trial, we are not going to make a full proffer at this stage, but is just one example that the Court should look at for understanding how there is a relationship between picking trades and making the barrier determination event. The New York Fed has a foreign exchange committee that, in 2000, put out some guidance on how a calculation agent

should go about determining barrier events because it is actually not all that straightforward in a market like an FX market, how to determine which trades are sufficient have triggered a barrier, and that guidance addresses certain things like how off-market transactions or transactions between two related parties, things like that, the types of trades are not things that are good faith barrier events. So there is not this clean distinction between trading activity and barrier determination that the defense makes it out to be. Instead, those are related to one another.

Now, just one last point on wire fraud, unless the Court has further questions, and particularly on the materiality point. Again, the government is not at this time making a full proffer of its evidence on materiality, and materiality is classically something that should be presented at trial to a jury and decided on at a Rule 29 motion or by the jurors themselves. I think here it is clear, easy to understand how the omission here could have been material.

There is a contract that governs this arrangement and also an understanding that a genuine barrier event needs to have occurred. If Glen Point had, say, informed its prime broker, hey, we calculated this barrier event and it was based on the fact that we manipulated the market to trigger the barrier, the prime broker, which actually was the one that had to make the direct payout to Glen Point and then get reimbursed

from the actual counterparty, very well might have paused and said, I'm not sure that I'm going to get reimbursed if I tell the other counterparty here that this whole barrier triggering only occurred because of this manipulation so I'm not going to make the payout, I'm going to litigate, I'm going to escalate this to legal, I'm going to see if there are other disciplinary avenues that I can pursue. Again, we are not making a factual proffer at this stage about how exactly this would have played out, that is something for the trial, but the idea that no one would have cared if a barrier was reached because of manipulation we don't think is correct and certainly not basis to dismiss the indictment at this stage.

MR. BURNETT: Now --

THE COURT: Words you used twice, I assume, were carefully chosen when you said that you were not making a full proffer. You understand the consequences of not making a full proffer, which is that if I determine at the close of your evidence that it is not enough to go to the jury, then, under the Supreme Court's case law, that decision might stand, so make a choice here.

MR. BURNETT: Yes, your Honor. And we are making that choice and understand the consequences of it.

Now I want to be sure to address the commodities fraud and market manipulation claim because this is distinct, it is not based on the fact that Glen Point was the one that said to

the other party the barrier event has been triggered. And here is why:

Mr. Phillips, the indictment alleges over Christmas night and into the early morning of Boxing Day, spent $725 million to buy Rand in a highly illiquid time and giving orders to the person who was carrying out those trades to trade in a way that would intentionally drive the exchange rate to trigger the barrier option. Now, as the defense has pointed out, Glen Point was not the only one that was looking at this exchange rate to make a barrier determination, there was also the counterparty to the option that was also looking at the barrier, as was the intermediary who was the one that set up the transaction. So what Glen Point did -- or what Mr. Phillips did by doing that trading was he sent a false signal about the supply and demand and he artificially moved the price to trigger the barrier. That, by itself, is fraudulent market manipulation and is actionable. If we had a hypothetical scenario where Glen Point was not the calculation agent but instead some third-party bank was the calculation agent and it saw that trading -- not saw the trading but saw the market move, saw the barrier get triggered and then did the alert with Glen Point having no role in giving that alert, that would still be fraudulent market manipulation. That is very clear under the --

THE COURT: Are you saying that Bank 1, which was in

the market, might have seen the trades but it didn't know who was making them and what the intent was?

MR. BURNETT: So both. Basically the way, getting into some of the facts now, the way these trades were actually carried out was that Glen Point had another bank -- it was identified as Bank 3 in the indictment -- go and actually do the trades, the $725 million worth of trading so all that would show up, to the extent you would see anything at all, would be Bank 3 on the trades, not Glen Point on any of the trades, not to mention the counterparty obviously can't get into the head of the entity that it is trading with so there was no way to assess intent like after the fact where we actually have the chats where Mr. Phillips directs the trader to try and push the price through the barrier -- or through 1250, which was the barrier.

So that, by itself, was manipulative conduct, totally setting aside the wire fraud theory about false statements. Now, in terms of what the government needs to prove there is this dispute about price artificiality which I think there is a little bit of talking past one another here.

So the government's view that we have laid out in the brief is that open market trades, like buying spot Rand, can be manipulative when there is an intent to artificially move the price, so there is an intent to interfere with the natural interplay of supply and demand. There is a long line of Second

Circuit and district court case law finding that open market trades -- things like shorting, going long, real trades with real counterparties -- can be manipulative when they're done with manipulative intent. And artificiality matters there in the sense that the defendant needs to have traded with the intent to artificially move the price so to interfere with the interplay of supply and demand. Where we differ from defense is whether it is an element of the crime that the government has to prove that an artificial price was in fact accomplished. And what this goes to and what the distinction here is, goes to the defense between scheme liability under 6(c) and Rule 180.1 which is what we charged, versus not scheme liability which is the older market manipulation statute 9(a)(2) that the defense is drawing elements from. Now, it is black letter law in scheme liability that the success of the scheme is not an element that the government needs to prove. The success of the scheme might be good evidence of the fact that there was in fact a scheme, and evidence about the success is admissible, but it is not an element the government needs to prove. And I think, actually, the best case to see this point is *Lek Securities* which was then affirmed firm by *Valley Management*. So if you look at Judge Cote's instructions in *Lek Securities*, she explicitly instructed the jury that the success of the scheme or the actual creation of an artificial price was not something that the government needed to establish. That was

challenged on appeal in *Valley Management* and the Second Circuit affirmed that instruction. Now, the defense has tried to distinguish *Lek* on the grounds that it was a layering case but that is actually just wrong. There were two schemes that were at issue in *Lek Securities*; one was a layering case that they are referring to, but the other scheme was a cross-market manipulation scheme which is exactly like the one we have here where there were real trades in one market performed by the defendants in *Lek Securities* that were used to benefit options that that defendant held, which is the same thing here, real trades used to manipulate another market. And what the court held what you need is intent to create an artificial price or an artificial price movement, not the proof of an actual artificial price.

The other scenario where this comes up so you can see legally how it plays out, one is wire fraud cases where the standard instruction is always that the scheme or artifice to defraud does not need to have actually been successful. And then the other thing is there are some cases that address attempted market manipulation under the old market manipulation statute since this is kind of the latter pages of the Wilson decision that the defense cites and it is also Judge Chin's decision in the *Amaranth* case, and in those decisions the elements of the attempted manipulation are that there is an intent to artificially move the price and an overt act in

furtherance of that. There is no actual requirement that an artificial price was created. We think attempt is the better analogy here to scheme liability so what matters is the action plus the intent, not the success.

Now, the defense had kind of thrown out a few hypos about crazy scenarios that this could give rise to. We don't think there is a whole lot to them. First of all, this is not a case of someone buying a thousand dollars of Rand in attempt to move the price. No one would do that and it is not particularly good way to make law based on a hypothetical that no one would do. The example would be like a question about whether throwing a ping-pong ball at someone with intent to kill them is attempted murder. Maybe, but no one does that and it is not a useful way to think about applying or developing the law in this area. What matters here is that there was an actual action, actual conduct, trading conduct, with intent to trigger the option by artificially moving the price. That's what matters, those are the two elements, and the extent of that trading, the timing of the trading, the volume of the trading, the way the trades were executed are all things go to intent so if, as the defense had hypothesized, he traded $725 million in Rand when it was two weeks out and the price was nowhere near the barrier. Well, that would be pretty good evidence of intent. There wasn't actually intent to artificially move the price to trigger the barrier but that is

just not the case we have so it is not a particularly good way to make law in this area.

Now, unless the Court has further questions on this manipulation point?

THE COURT: Yes, I would like to make sure you touch on extraterritorial.

MR. BURNETT: That is what I was going to go to next.

On the point about extraterritoriality, as we laid out, we think this is both a domestic application of the state and a permissibly extraterritorial application of the statute.

THE COURT: And what is your view of the focus of the statute? And then the Supreme Court has recently, as of the end of this past term, has focused on the conduct, right, that's what it said in *Arbitron*, the trademark case, was conduct is really critical. So there are two questions there that I am putting to you.

MR. BURNETT: This is in terms of, this is on the domestic application.

THE COURT: Correct.

MR. BURNETT: The question on the domestic application, the focus of the statute is rooting out manipulation and ensuring market integrity. We agree that *Prime* properly articulates the focus of 6(c) -- again, setting 2(i) the extender statute to the side for the moment -- and the reason that there is conduct, that the key focus here really is

that Mr. Phillips' scheme was directed at and relied on American financial institutions so the product that he was buying and selling was dollars are so it is a dollar-denominated exchange rate which is different from the product in other cases that the Second Circuit has found were not domestic applications of the statute like *Prime* and *Laydon*. That's one piece of it. Second, the trades, while they were executed or created on an exchange, the trades actually occurred here in New York City.

THE COURT: Meaning the settlement occurred here.

MR. BURNETT: Yes, the actual settlement.

THE COURT: But at that point the fraud was consummated. If the trades hadn't settled for some reason the fraud would have still been accomplished, correct?

MR. BURNETT: Even in terms of more narrowly focusing on the completion of the scheme, the misinformation that Mr. Phillips was putting into the market was being picked up by the American financial institution that was the counterparty to the trade. When they were looking at their screens and determining whether a barrier event occurred and seeing a price moving, he was sending that false information to an American institution here in New York and then the actual payments of the consummation of the scheme, where the money goes from Bank 1 back to Mr. Phillips goes through American financial institutions here in the country so actually getting the money

also required conduct here in the United States.

THE COURT: Is what you are trying to do by that first point is to analogize this to sending a misleading impression into the United States, somebody from outside the United States was sending some false information to you, a person?

MR. BURNETT: It is the false pricing, your Honor.

THE COURT: I understand the false information related to the price but is the analogy just somebody from abroad sending false information to somebody in the United States?

MR. BURNETT: Yes, your Honor.

THE COURT: But so how does that work if, as I understand the facts here will play out, that Glen Point didn't have any idea as to who the identity was of the party on the other end?

MR. BURNETT: That is a good question, and the answer is that jurisdictional elements are not about intent. You don't need intend with respect to a jurisdictional element. The same reason why in a gun case the defendant doesn't need to know the gun previously traveled in interstate commerce in order for that element to be established.

THE COURT: It sounds to me that if you are almost trying to create the old effects test with almost a more relaxed application of the effects test than it had prior to *Morrison*. Because if your proposition is right, the dissemination of false information that ends up in the United

States with an effect in the United States, would be enough to create domestic conduct. That strikes me as being too broad.

MR. BURNETT: I think the important difference is that there actually is a key textual difference between *Morrison* and why the effects test wasn't viable there versus the elements of the statute here in the manipulation context.

So 10b-5, unlike Rule 180.1, is actually about the purchase or sale of a security. That is the conduct element of the statute which is why the general effects test in *Morrison* was not properly focused at the actual focus of the statute and the conduct of the statute that was at issue in that case. But what the proper test is going to be a statute-specific inquiry. So when you have something like Rule 180.1 in Section 6(c) which does not have that purchase or sale element, it is not a purchase or sale statute and the focus is more broadly to preserve market integrity, then when you are thinking about the focus of the statute, preserving market integrity has to take into account the harming U.S. party by deceiving them here in the United States, that goes to the essence of American market integrity.

THE COURT: Although one might argue if the purpose of the extra-territoriality jurisprudence was also to preserve some form of comity and to recognize that other countries have the prerogative to regulate conduct within their territories without interference of U.S. legal principles, didn't most of

the conduct here take place either in South Africa or in the UK?

MR. BURNETT: So the actual trading orders occurred from south Africa and the trading happened in Singapore. I think what matters is international comity is a background principle that has to step aside when you are looking at what Congress actually intended. And I think here the domestic -- we can be sort of doubly sure that Congress wanted this type of conduct to be within the scope of American jurisdiction not only because of the domestic application of the statute, but also Section 2(i) and the extraterritorial extender and there it is very clear that the provisions of the Dodd-Frank Act, which would include Section 6(c) and its implementing regulations, are explicitly extended abroad to the extent that the activities at issue have a direct and significant connection with or effect on the United States and that's important, it is a direct and significant connection or a direct and significant effect. And I think the kind of statutory and regulatory background there is important to understand, too, which is that as the *SIFMA* case explains Congress recognized that this previously unregulated over-the-counter swap market had the vast global connections which did have a direct effect on American financial institutions because it basically allowed the unregulated buildup of risk in these institutions that later became a

problem in 2008. So what Congress did, explicitly, was extend swap regulations abroad, and I think that the test, direct and significant, the CFTC has explained what that means. So direct is just a reasonably proximate causal nexus and that's the CFTC, which is relying on case law interpreting the similar extender statute in the antitrust area. And here there is clearly a reasonable proximate causal nexus between conduct and American financial institutions since American financial institutions were the ones who made the payout, they were the prime broker, and they were also one of -- an American party was one of the entities on whose behalf Glen Point was trading. So that's one part of it. And then on the significance point, the CFTC has rightly decided that significance is not like a transaction-by-transaction thing. It is not, oh, this swap is only regulated if it is so big, just one swap, that it could take down an entire bank if something went wrong with it. It is not clear that such a swap exists, period, in the world, and it makes no sense in light of the background of the statute. If you read the regulatory preamble, the type of concerns at issue in Dodd-Frank was not that there was one transaction that was ready to wipe out AIG it, was that there was this gradual unregulated buildup of risk over time, that because it was gradual and not regulated, ultimately took down these financial institutions and the extender statute allowed the CFTC and the government to get into the business of regulating those

transactions and those activities that can accrete and have a significant effect on or connection with the United States.

So we think the better way to interpret the rule here is really that -- I apologize, I want to make sure I get it precisely -- is really that so manipulative activity, in connection with a swap that has U.S. counterparties, is within 2(i), the extender statute, and it comes from the direct and significant language.

THE COURT: And your point about significant is that it had a significance on the value of the dollar or what is the significance?

MR. BURNETT: What is significant, remember, significance is not on a transaction-by-transaction basis so what you are really looking at is the class of activities regulated so here manipulative conduct related to swaps, does that have a significant effect on U.S. financial institutions. And if the answer is yes -- which it is -- then particular instances of manipulative conduct with swaps that they're U.S. counterparties on, fall within the CFTC's ambit.

THE COURT: That strikes me, that categorical approach -- I understand your point that it is very difficult to say, it has to be done on a transaction-by-transaction basis, because your point is, as I understand it, that if it is done on a transaction-by-transaction basis, that there will be no activities outside of the United States that would satisfy

2(i). On your reading, it strikes me that every manipulation that could have an impact on a U.S. investor would satisfy 2(i) and that that reads out direct and significant.

MR. BURNETT: It is not every, it is only those -- it is manipulative conduct where there is a U.S. person as a counterparty. And this goes directly to the CEA and Congress' ability to -- and decision to -- protect U.S. investors. So all that we are doing is taking Congress' intent, which is to protect U.S. investors, and saying when the counterparty, the one that is harming the U.S. investors is overseas, we can still reach that because the goal is to protect U.S. investors.

THE COURT: Tell me again how you ascribe meaning to the word "significant."

MR. BURNETT: It is not assessed on a transaction-by-transaction basis.

THE COURT: I got that.

MR. BURNETT: Yes.

THE COURT: But then what is it?

MR. BURNETT: So it is manipulative conduct with respect to swaps.

THE COURT: But isn't that covered by 6(c)? Aren't you building in a redundancy?

MR. BURNETT: It is not building in a redundancy because 2(i) doesn't separately create any type of liability. What we are saying is that 2(i) extends 6(c) abroad to the

extent that 6(c) applies to swap manipulation.

THE COURT: You are going to need to help me a little bit more. Are there other provisions of the CEA to which 2(i) applies?

MR. BURNETT: It applies to any Dodd-Frank statute or regulation as it pertains to swaps.

THE COURT: I understand that, but on the assumption -- which you may tell me is wrong -- that by saying that any conduct that violates 6(c) that has a direct effect on a U.S. investor, is by definition significant, you are depriving the word "significant" of any independent meaning. You, in order to respond to my argument, you need to be able to point me to some other provision of the CEA to which 2(i) applies that is not manipulation.

MR. BURNETT: Yes, your Honor. So I think two things. So, first, I think the reason -- it is not that it doesn't give "significance" meaning, it is that the significance is related to the class of activities, namely manipulative activities generally, not any particular activity.

THE COURT: I understand, but 6(c) doesn't cover anything other than manipulative activities.

MR. BURNETT: Sure, and I think the place to look is that the regulatory guidance that we cited that interprets 2(i) and applies it applies 2(i) to a host of reporting requirements, recordation requirements, record-keeping

requirements, that it is impossible to think that any of those recordings, record-keeping, documentation requirements individually could have a significant effect on a U.S. person, rather what matters is that as a class those activities are significant, have a significant connection with or effect on U.S. persons which is why they fall into 2(i). And to try and splice it up --

THE COURT: Would your view be the same if it turns out that the only instance of manipulation in connection with swap trading was Mr. Phillips, the only one that took place, it would still have a significant effect on the United States?

MR. BURNETT: I think as in like the only one in history, the history of the world? I think what the CEA has done is make the judgment and that -- the CFTC has made the judgment that the class of manipulative and fraudulent activity as a whole can have a significant effect on in connection with the United States, so that part of the statute is extended abroad. And in a hypothetical world where there is only one instance of manipulation, maybe that judgment is wrong, but I don't think there is any evidence that we live in that world.

THE COURT: Correct me if I am wrong, but are you also arguing that the indictment satisfies principles of extra-territoriality even if I looked at it on a transaction-by-transaction basis?

MR. BURNETT: Yes, your Honor. We think it does

because if you just take the dictionary definition of the term "significant" it is noteworthy, notable, and it is not something that needs to threaten the entire stability of the financial system. And here, the manipulative activity is significant because of the massive amount of trading, the significant effect on the dollar rand exchange rate which is a dollar denominated exchange rate and the fact that it caused the $20 million payout by an American financial institution and $20 million is a significant amount of money.

THE COURT: I have got one more question for you and then I will let you finish up and then I will turn back to the defense.

You make the argument in your brief that no court has ever dismissed an indictment for extraterritoriality reasons and you also cite *Morrison* for the fact that extraterritoriality does go to the subject matter jurisdiction of the court. I am just curious, under your view, is the grand jury required to make a finding with respect to territoriality or extraterritoriality? It is not officially an element of a crime.

MR. BURNETT: I don't believe the grand jury does. I think if this case were to go to trial the Court could and would put the issue to the jury and an instruction and the example there would be the *Napout* case, which we cited, which is the *NCAA* case where there was instruction on

extraterritoriality that went to the jury.

THE COURT: I take it your view is that you need not plead domestic conduct or, put it another way, the grand jury need not, in its indictment, specify that there is domestic conduct. Is that right?

MR. BURNETT: I think that might be right in the abstract, but here there is domestic conduct alleged in the indictment that the grand jury voted on.

THE COURT: OK. Anything further Mr. Burnett before I turn back to your adversary?

MR. BURNETT: No, your Honor. Thank you.

THE COURT: Let me hear from the defense.

MR. GOPSTEIN: Thank you, your Honor.

I think, your Honor, a number of these arguments, when viewed independently or together, show the novelty of this prosecution and come back to the due process question. The government's claim that the commodities fraud count can proceed solely on the trades in the FX spot market, they don't cite a prosecution that has proceeded on those grounds. With conduct solely in an unregulated market and under the government's theory, the only thing that brings that unregulated lawful trading into the purview of the Commodities Act was the fact that an option existed and entered into two months earlier. And the government is not alleging, even today I think, that anybody who may have had an option that was tied to this

currency affair, was the victim of the crime. That is not what is charged here. What is charged is that Mr. Phillips manipulated the exchange rates, on its own, in order to fraudulently trigger a payment, specifically this payment. And so the idea, again, that there is not going to be -- there is not going to be any evidence of what happened, it really begs the question who draws the line here of what kind of trading is permissible or not. It is too simple to say, well, this trade, with nothing more, he intended to move it. And that's enough. And the failure to disclose that intent fraudulently triggered -- fraudulently triggered -- the payout. And it is unclear, and what was presented to the grand jury, the indictment said he caused it. The indictment says he fraudulently triggered it. But if he didn't, because that trade had no impact on the market, if it didn't actually move it, then it was not fraudulently triggered. He had a thought. Maybe. And to draw this entire case based on that is insufficient and there isn't precedent for it.

Similarly, just briefly on this idea that any trade, any swap false within or this manipulation falls within the purview of 2(i) is far too broad a reading. It can't be any dollar amount. The idea that it affected the currency I think is a non-starter, your Honor, because again, the spot market is not regulated and the idea that it touched on it, that is not what these statutes are getting at.

Ultimately, the idea that if we fast forward to the trial, the evidence right here, as presented and I understand it is not a proffer of full evidence, but the government is going to ask the jury to convict on the grounds that Mr. Phillips, according to the government, intended to move the exchange rate and the confirmation, calculation agent didn't disclose it. Full stop. And this indictment repeatedly says that he caused it and there has to be some proof of that cause, causation in order to match up with what is charged and there has to be some proof of that in order for the statement, the statement, the notification to be false.

Thank you.

THE COURT: Thank you.

Give me five minutes, and then I will be back in.

(Recess)

THE COURT: The arguments have been very helpful and I am going to take it under advisement. I will try to get you a decision as soon as I can. I began the morning with the bar admission talking about the excellence of practice before this Court, and this morning's performance has not disappointed in that regard so thank you, both, very much. I will try to get you a decision as soon as I can.

o0o

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 25, 2023

**BY ECF**

Hon. Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. Neil Phillips*, 22 Cr. 138 (LJL)**

Dear Judge Liman:

The Government respectfully submits this letter to inform the Court and the defense that it does not intend to proceed at trial on Counts Three and Four of the Indictment.

Counts Three and Four of the Indictment charge the defendant with conspiring to commit, and committing, wire fraud. As the Court is aware, the gravamen of those offenses is that the defendant directed Glen Point to notify its counterparties that the option at issue in this case (the "Option") had been triggered but withheld from those counterparties the fact that the defendant's manipulative trading had caused the Option to trigger. The defendant's half-truth was materially misleading because Glen Point, as a "calculation agent" under the Option, had an obligation to determine the occurrence of a barrier event "in good faith and in a commercially reasonable manner."

The Government stands behind the allegations of the Indictment and its characterizations of the anticipated trial proof during the motion to dismiss litigation. The Government believes that it could adduce evidence sufficient to support a guilty verdict on Counts Three and Four. But the Government acknowledges that the jury and the Court may well find otherwise. Accordingly, to streamline the trial and to avoid protracted Rule 29 litigation, the Government will ask that the jury be charged only on Counts One and Two of the Indictment.

As for Counts One and Two, which charge commodities fraud, the Government intends to present proof and argument that the defendant is guilty, because he manipulated the dollar/rand market to trigger the Option, as alleged in the Indictment. The Government does not intend to argue that, by virtue of its role as a calculation agent, Glen Point's failure to include information about its manipulative trading in its notifications about the barrier event was a misleading statement or fraudulent omission. The Government does, however, reserve the right to introduce evidence that the defendant did not tell others about his manipulative trading as evidence of, among other things, his wrongful and manipulative intent, his consciousness of guilt, and as proof that his

actions were not "fully disclosed" to the market. *Set Captal LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021).

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney

by: ______________________________
Thomas S. Burnett
Kiersten A. Fletcher
Andrew Thomas
Assistant United States Attorneys

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

NEIL PHILLIPS,

Defendant.

22 Cr. 138 (LJL)

**THE GOVERNMENT'S REQUESTS TO CHARGE**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Thomas S. Burnett
Kiersten A. Fletcher
Andrew Thomas
Assistant United States Attorneys
-Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

NEIL PHILLIPS,

Defendant.

22 Cr. 138 (LJL)

REQUESTS TO CHARGE

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the Government respectfully requests that the Court include the following in its charge to the jury.

TABLE OF CONTENTS

REQUEST NO. 1: General Requests ..... 1
REQUEST NO. 2: Summary of the Indictment ..... 2
REQUEST NO. 3: Multiple Counts ..... 3
REQUEST NO. 4: Conspiracy and Substantive Crimes Explained ..... 4
REQUEST NO. 5: Count Two – Commodities Fraud – General Instruction ..... 6
REQUEST NO. 6: Count Two – Commodities Fraud – Elements ..... 7
REQUEST NO. 7: Count Two – Commodities Fraud – First Element – Manipulative Scheme ..... 8
REQUEST NO. 8: Counts Two – Commodities Fraud – Second Element – In Connection With ..... 10
REQUEST NO. 9: Count Two – Commodities Fraud – Third Element – Intent ..... 12
REQUEST NO. 10: Count One – Conspiracy to Commit Commodities Fraud ..... 15
REQUEST NO. 11: Count One – Conspiracy to Commit Commodities Fraud – Elements ..... 16
REQUEST NO. 12: Count One – Conspiracy to Commit Commodities Fraud – Existence of Agreement ..... 17
REQUEST NO. 13: Count One – Conspiracy to Commit Commodities Fraud – Second Element – Membership. 20
REQUEST NO. 14: Count One – Conspiracy to Commit Commodities Fraud – Third Element – Overt Act ..... 23
REQUEST NO. 15: Coconspirator Statements ..... 25
REQUEST NO. 16: Presence of Counsel ..... 26
REQUEST NO. 17: Extraterritoriality ..... 27
REQUEST NO. 18: Venue ..... 29
REQUEST NO. 19: False Exculpatory Statements ..... 31
REQUEST NO. 20: Other Acts Evidence ..... 32
REQUEST NO. 21: Variance in Dates ..... 33
REQUEST NO. 22: Expert Witness ..... 34
REQUEST NO. 23: Law Enforcement Witnesses ..... 35
REQUEST NO. 24: Preparation of Witnesses ..... 36
REQUEST NO. 25: Uncalled Witnesses – Equally Available To Both Sides ..... 37
REQUEST NO. 26: Other Individuals Not on Trial ..... 38
REQUEST NO. 27: Defendant’s Testimony ..... 39
REQUEST NO. 28: Defendant’s Right Not to Testify ..... 40
REQUEST NO. 29: Particular Investigative Techniques Not Required ..... 41
REQUEST NO. 30: Use of Evidence Obtained Pursuant to Searches ..... 42
REQUEST NO. 31: Use of Charts and Summaries ..... 43
REQUEST NO. 32: Stipulations ..... 44
REQUEST NO. 33: Transcripts ..... 45
REQUEST NO. 34: Redactions ..... 46
REQUEST NO. 35: Concluding Remarks ..... 47

REQUEST NO. 1: General Requests

The Government respectfully requests that the Court give its usual instructions to the jury on the following matters:

a. Function of Court and Jury.

b. Indictment Not Evidence.

c. Statements of Court and Counsel Not Evidence.

d. Rulings on Evidence and Objections.

e. Burden of Proof and Presumption of Innocence.

f. Reasonable Doubt.

g. Government Treated Like Any Other Party.

h. Definitions, Explanations, and Example of Direct and Circumstantial Evidence.

i. Inferences.

j. Credibility of Witnesses.

k. Jury's Recollection Controls.

l. Right to See Exhibits and Have Testimony Read During Deliberations.

m. Sympathy: Oath of Jurors.

n. Punishment is Not to Be Considered by the Jury.

o. Verdict of Guilt or Innocence Must Be Unanimous.

REQUEST NO. 2: Summary of the Indictment

The defendant, NEIL PHILLIPS, has been charged in what is called an Indictment. An Indictment is simply an accusation. It is not evidence. The Indictment contains two counts, or charges. In a few moments, I will instruct you on each of these charges in more detail. At the outset, however, let me instruct you that in your deliberations and in reaching your verdict, you must consider each count separately. You must return a separate verdict as to each count.

The charges in the Indictment relate to violations of the Commodity Exchange Act. That statute was amended after the financial crisis of 2008, to strengthen its rules against fraudulent and manipulative practices.

Both counts charge the defendant with engaging in a market manipulation scheme, which is a form of commodities fraud. As you have heard throughout trial, the defendant purchased a one-touch option that entitled his hedge fund to $20 million if the dollar-rand exchange rate fell below 12.50 at any point before January 2, 2018. Count One charges the defendant with conspiring to commit commodities fraud by manipulating the dollar-rand exchange rate, so that the exchange rate would fall below 12.50 rand per dollar, triggering that one-touch option. Count Two charges the defendant with committing commodities fraud, through that same scheme to manipulate the dollar-rand exchange rate to trigger payment under the one-touch option.

REQUEST NO. 3: Multiple Counts

Each count charges a different crime. You must consider each count of the Indictment separately, and you must return a separate verdict as to each Count. The case on each count stands or falls upon the proof or lack of proof with respect to that count. Your verdict on one count should not control your decision as to any other count. I am now going to discuss the counts of the Indictment.

Adapted from Sand, Modern Federal Jury Instructions, Instr. 3-8.

REQUEST NO. 4: Conspiracy and Substantive Crimes Explained

As I have told you, Count One of the Indictment charges the defendant with the crime of conspiracy. The other count—Count Two—charges what we call a substantive crime. The crime of conspiracy is different from a substantive crime. A conspiracy charge, generally speaking, alleges that two or more persons agreed together to accomplish some unlawful objective. The focus of a conspiracy count, therefore, is on whether there was an unlawful agreement. A substantive count, on the other hand, charges a defendant with the actual commission or attempted commission, or with causing someone else to engage in certain actions necessary for the actual commission, of an offense. A substantive offense therefore can be committed by a single person. It need not involve any agreement with anyone else.

A conspiracy to commit a crime is an entirely separate and different offense from a substantive crime, the commission of which may be an objective of a conspiracy. And since the essence of the crime of conspiracy is an agreement or an understanding to commit a crime, it does not matter if the crime that was the objective of the conspiracy was ever actually committed. In other words, if a conspiracy exists and certain other requirements are met, the conspiracy is punishable as a crime even if its purpose is not established or accomplished. Consequently, in a conspiracy charge, there is no need to prove that the crime or crimes that were the objective or objectives of the conspiracy actually were committed. By contrast, conviction on a substantive count requires proof that the crime charged actually was committed or attempted, but it does not require proof of an agreement.

Now, for the sake of convenience, in organizing my instructions to you, I'm going to instruct you first with respect to the count that charges a substantive crime, Count Two. Then, I will instruct you on the conspiracy count, which is Count One.

> Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

REQUEST NO. 5: Count Two – Commodities Fraud – General Instruction

As I said, Count Two charges NEIL PHILLIPS with committing commodities fraud. As you have heard throughout trial, the defendant purchased a one-touch option in October 2017, which entitled his hedge fund to a $20 million payment if the dollar-rand exchange rate fell below 12.50 at any point before January 2, 2018. Count Two charges that, in December 2017, the defendant engaged in a scheme to manipulate the dollar-rand exchange rate, so it would fall below 12.50 and trigger the $20 million payment under the one-touch option.

REQUEST NO. 6: Count Two – Commodities Fraud – Elements

To sustain its burden of proof with respect to the offense charged in Count Two, the Government must prove beyond a doubt the following three elements:

*First*, the defendant did any one or more of the following: (a) employed a manipulative device, scheme, or artifice to defraud; or (b) made an untrue statement of a material fact or omitted to state a material fact which made what said, under the circumstances, misleading; or (c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit.

*Second*, the scheme, untrue statement, act, practice, or course of conduct was in connection with a swap.

*Third*, that the defendant acted knowingly, willfully, and with an intent to defraud.

> Adapted from 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1, as well as from the Honorable Jack B. Weinstein's statement of the elements in Commodity Futures Trading Comm'n v. McDonnell, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018).

REQUEST NO. 7: Count Two – Commodities Fraud – First Element – Manipulative Scheme

The first element of commodities fraud is that the defendant did any one or more of the following: employed a manipulative device, scheme, or artifice to defraud; made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading; or engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit.

In proving a fraudulent act, it is not necessary for the Government to prove all three types of unlawful conduct. Any one will be sufficient to satisfy this element of the offense. You must, however, be unanimous as to which type of unlawful conduct the defendant committed.

As is pertinent here, the defendant is accused of engaging in "manipulation." Manipulation refers to intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting some type of price—here, the dollar-rand exchange rate. Market participants ordinarily assume that prices, such as exchange rates, are determined by the natural interplay of supply and demand. Consequently, any conduct that is designed to deceive or defraud others by controlling or artificially affecting those prices is prohibited.

An act can be manipulative even if it is conducted on the open market or through ordinary market activity, such as by placing an order to buy or sell, or by actually buying and selling. In some cases, a defendant's "scienter," that is, a defendant's intent to manipulate a price, is all that distinguishes legitimate trading from manipulative trading. Similarly, in some cases, the determination of whether activity is manipulative can only be made by placing the activity in context and considering whether it is part of a pattern of trading activity. What matters is whether the defendant intended to inject a false price signal into the market or to mislead others by artificially affecting market activity.

It is not necessary for the Government to prove that a manipulative scheme actually succeeded, that any person was actually deceived, or that any person lost money or property. Nor do you need to find that the defendant profited from the manipulation. You must focus on whether there was such a manipulative scheme, not the consequences of the scheme, although proof concerning accomplishment of the goals of the scheme may be persuasive evidence of the existence of the scheme itself.

> Adapted from the charge of the Honorable Denise L. Cote in SEC v. Vali Management Partners, 17 Cv. 1789 (S.D.N.Y. Nov. 7, 2019).
>
> "[O]pen-market trades that are with willing counterparties" can be "manipulative." Dkt. 36, at 28. See, e.g., Set Capital LLC v. Credit Suisse Group AG, 996 F.3d 64, 77 (2d Cir. 2021) (""Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent."); ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ("The deception arises from the fact that investors are misled to believe that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."); United States v. Royer, 549 F.3d 886, 899 (2d Cir. 2008) (affirming jury instruction that "any conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities is prohibited"). See also Loginovskaya v. Batratchenko, 764 F.3d 266, 272 (2d Cir. 2014) ("[C]ourts have looked to the securities laws when called upon to interpret similar provisions of the Commodity Exchange Act.").

REQUEST NO. 8: Counts Two – Commodities Fraud – Second Element – In Connection With

The second element of commodities fraud is that the defendant committed his scheme in connection with a "swap." Let me define that term for you. For purposes here, the term "swap" means any agreement between parties that requires payment based on the occurrence, or non-occurrence, of an event. Options based on foreign currencies and foreign exchange rates are swaps.

The requirement that the defendant's scheme be "in connection with" a "swap" is satisfied so long as there was some nexus or relation between the allegedly manipulative conduct and the swap. A manipulative scheme may be "in connection with" a swap if you find the scheme coincides with a swap or the scheme's accomplishment necessarily involves a swap. The manipulative scheme need not relate to the value of the swap, or the purchase or sale of the swap.

> Adapted from the definitions of "swaps" as defined in 7 U.S.C. § 1a. The Commodity Exchange Act and its implementing regulations specify that "swaps" include options based on foreign currencies and exchange rates. See 7 U.S.C. §§ 1a(47)(i), 2(c)(2)(A)-(B); 17 C.F.R. § 240.3a69-2.
>
> Interpreting the "in connection with" language in Rule 10b-5, Courts have repeatedly held that there is such a connection with a scheme "coincides" with, or "necessarily" involves, a purchase or sale of securities. See S.E.C. v. Zandford, 535 U.S. 813, 322 (2002) (Stevens, J.) ("It is enough that the scheme to defraud and the sale of securities coincide."); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 89 (2006) (Stevens, J.) ("Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else."); United States v. O'Hagan, 521 U.S. 642, 655-56 (1997) (holding that, in misappropriation theory insider trading case, the "in connection with" element is "satisfied because the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities."); see also S.E.C. v. Pirate Investor LLC, 580 F.3d 233, 244 (4th Cir. 2009) ("Of course, to say that a fraud is 'in connection with' a securities transaction where it 'coincides' with that transaction hardly clarifies the matter. We find direction in several factors. . . . Those factors include, but

are not limited to . . . whether a securities sale was necessary to the completion of the fraudulent scheme[.]"); Rowinski v. Salomon Smith Barney Inc., 398 F.3d 294, 302 (3d Cir. 2005) ("For this purported scheme to work, investors must purchase the misrepresented securities."). This case law is persuasive in the context of the Commodity Exchange Act, with the exception that there is no purchase or sale requirement under the Commodity Exchange Act. Loginovskaya v. Batratchenko, 764 F.3d 266, 272 (2d Cir. 2014) ("[C]ourts have looked to the securities laws when called upon to interpret similar provisions of the Commodity Exchange Act."); see 76 Fed. Reg. 41, 398, 41,406 (recognizing the lack of a purchase and sale requirement).

REQUEST NO. 9: Count Two – Commodities Fraud – Third Element – Intent

The third element of commodities fraud is that the defendant participated in the manipulative scheme knowingly, willfully, and with the intent to defraud.

To act "knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently.

To act "willfully" means to act voluntarily and with a wrongful purpose.

To act with "intent to defraud" means to act knowingly and with an intent to deceive.

Because the defendant must have acted willfully and with intent to defraud, it follows that good faith on the part of a defendant is a complete defense to the charge. As I have instructed you, the Indictment alleges that the defendant engaged in manipulation, which is conducted designed to deceive or defraud investors by controlling or artificially affecting some type of price—here, the dollar-rand exchange rate. If the defendant honestly believed that his actions were not to control or artificially affect that exchange rate, but were instead solely for some other, lawful purpose, that would be acting in good faith, which is a complete defense to the charge of commodities fraud. The defendant has no burden to establish good faith. The burden is on the Government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt. However, in considering whether or not the defendant acted in good faith, you are instructed that an honest belief on the part of the defendant, if such a belief existed, that ultimately everything would work out does not necessarily mean the defendant acted in good faith. If the defendant knowingly and willfully participated in the scheme with intent to deceive, even if only for a period of time, then no amount of honest belief on the part of the defendant that others ultimately would not be harmed will excuse his conduct. In addition, the Government need not

prove that the intent to defraud was the only intent of the defendant. A defendant may have the required intent to defraud even if the defendant was motivated by other lawful purposes as well.

Direct proof of knowledge and fraudulent intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he committed an act with fraudulent intent. Such direct proof is not required. Instead, the ultimate facts of knowledge and intent, though subjective, may be established by circumstantial evidence, based upon a person's words, his conduct, his acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them. You may also infer, but are not required to infer, that people intend the natural and probable consequences of their actions. As I instructed you earlier, circumstantial evidence, if believed, is of no less value than direct evidence.

> Adapted from the charges of the Honorable Edgardo Ramos in United States v. Milton, 21 Cr. 478 (Sept. 12, 2022); the Honorable Paul G. Gardephe in United States v. Tuzman, 15 Cr. 536 (Dec. 22, 2017); and the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).
>
> See United States v. Litvak, 808 F.3d 160, 178 (2d Cir. 2015) (intent element for securities fraud is "intent to deceive, manipulate or defraud" not "intent to harm"); United States v. Kaiser, 609 F.3d 556, 569 (2d Cir. 2010) (holding that willfulness for purposes of Title 15 securities fraud "do[es] not require a showing that a defendant had awareness of the general unlawfulness of his conduct, but rather, that he had an awareness of the general wrongfulness of his conduct").
>
> For specific intent crimes, such as those charged in the Indictment, a defendant forms the requisite intent if the intent to commit the crime was any of his objectives. Anderson v. United States, 417 U.S. 211, 225-26 (1974). The forbidden "specific intent need not be the actor's sole, or even primary, purpose." United States v. Technodyne LLC, 753 F.3d 368, 385 (2d Cir. 2014) (collecting cases); accord United States v. Gatto, 986 F.3d 104, 129 n.12 (2d

Cir. 2021); United States v. Pizarro, 7 Cr. 151 (AJN), 2019 WL 3406603, at *10 (S.D.N.Y. July 29, 2019).

See Loginovskaya v. Batratchenko, 764 F.3d 266, 272 (2d Cir. 2014) ("[C]ourts have looked to the securities laws when called upon to interpret similar provisions of the Commodity Exchange Act"); Commodity Futures Trading Comm'n v. Oystacher, 203 F. Supp. 3d 934, 950 (N.D. Ill. 2016) (applying the *scienter* standard for securities fraud to Rule 180.1).

REQUEST NO. 10: Count One – Conspiracy to Commit Commodities Fraud

I will now turn to the conspiracy charge, and specifically the charge of conspiracy to commit commodities fraud, which is the crime charged in Count One of the Indictment. As I told you, a conspiracy is a kind of a criminal partnership – a combination or agreement of two or more persons to join together to accomplish some unlawful objective. Count One charges that the defendant conspired with others to commit commodities fraud by manipulating the dollar-rand exchange rate, so it would trigger a $20 million payment under a one-touch option.

REQUEST NO. 11: Count One – Conspiracy to Commit Commodities Fraud – Elements

Count One charges NEIL PHILLIPS with conspiring to commit commodities fraud.

In order to sustain its burden of proof with respect to the conspiracy alleged in Count One, the Government must prove beyond a reasonable doubt each of the following three elements:

*First*, that there was an agreement or understanding to accomplish the unlawful objective alleged in Count Two of the Indictment, specifically commodities fraud through market manipulation;

*Second*, that the defendant knowingly and willfully became a member of and joined the conspiracy;

*Third*, that at least one person who was a member of the conspiracy committed some overt act in furtherance of the conspiracy.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018).

REQUEST NO. 12: Count One – Conspiracy to Commit Commodities Fraud – Existence of Agreement

Starting with the first element, a conspiracy is a combination, an agreement or an understanding of two or more people to accomplish by concerted action a criminal or unlawful purpose. Count One charge that the criminal or unlawful purpose was to commit commodities fraud through market manipulation.

To establish a conspiracy, the Government is not required to show that two or more persons sat down around a table and entered into a solemn pact, orally or in writing, stating that they had formed a conspiracy to violate the law and setting forth the details of the plans and the means by which the unlawful project is to be carried out, or the part to be played by each conspirator. Your common sense will tell you that when people, in fact, undertake to enter into a criminal conspiracy, much usually is left to unexpressed understanding. Conspirators do not usually reduce their agreements to writing or acknowledge them publicly, nor do they broadcast their plans. From its very nature, a conspiracy almost invariably is secret in its origin and in its execution. It is sufficient if two or more persons in some way or manner come to a common understanding to violate the law. Express language or specific words are not required to indicate that someone has joined in a conspiracy.

Because conspiracy by its very nature is characterized by secrecy, it is rare that a conspiracy can be proved by direct evidence of that explicit agreement. You may infer the existence of a conspiracy from the circumstances and the conduct of the persons involved. The adage "actions speak louder than words" may be applicable here. Usually, the only evidence available with respect to the existence of a conspiracy is that of disconnected acts on the part of the alleged individual co-conspirators. When taken together and considered as a whole, however, such acts may show a conspiracy or agreement as conclusively as would direct proof. In determining whether a

conspiracy actually existed, you may consider all the evidence of the acts, conduct, and statements of the alleged conspirators and the reasonable inferences to be drawn from those matters.

As I instructed you earlier, the essence of the crime of conspiracy is an agreement or an understanding to commit a crime. So it does not matter if the crime, the commission of which was the objective of the conspiracy, ever was committed. A conspiracy to commit a crime is an entirely separate and distinct offense from the actual commission of the illegal act that is the object of the conspiracy. The success or failure of a conspiracy is not material to the question of guilt or innocence of an alleged conspirator.

Now, the conspiracy charged in Count One allegedly had one objective – that is, it had a single illegal purpose that the co-conspirators are alleged to have hoped to accomplish. Specifically, that was conspiring to commit commodities fraud by manipulating the dollar-rand exchange rate, so it would trigger a $20 million payment under a one-touch option. I explained the elements of commodities fraud to you already in charging you on Count Two. You will apply those instructions when you consider whether the Government has proved beyond a reasonable doubt that the conspiracy charged in Count One existed. However, because Count One charges a conspiracy, the Government does not need to prove that anyone committed the substantive crime of commodities fraud. It need prove beyond a reasonable doubt only that there was an agreement to do so.

The Indictment alleges that the conspiracy charged in Count One occurred in or about December 2017. It is not necessary for the Government to prove that the conspiracy lasted through the entire period, but only that it existed for some time within that time frame.

In sum, in order to find that the conspiracy charged in Count One existed, the Government must prove beyond a reasonable doubt that there was a mutual understanding, either spoken or unspoken, between two or more people to commit commodities fraud.

> Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018), and in United States v. Jones, 17 Cr. 791 (Dec. 16, 2019).

REQUEST NO. 13: Count One – Conspiracy to Commit Commodities Fraud – Second Element – Membership

If you conclude that the Government has proven beyond a reasonable doubt that the conspiracy charged in Count One existed, you next must determine whether the defendant willfully joined and participated in the conspiracy with knowledge of its wrongful purpose, and with an intent to aid in the accomplishment of its unlawful objective – that is, the commission of commodities fraud through market manipulation.

A defendant's participation in the conspiracy may be established by independent evidence of his own acts or statements, as well as those of the other alleged conspirators, and the reasonable inferences that may be drawn from it. Now, science has not yet devised a manner of looking into a person's mind and knowing what the person is thinking. To make that determination, you may look to the evidence of certain acts alleged to have taken place by or with the defendant or in his presence. As I instructed you earlier with respect to determining a defendant's knowledge and intent, you may consider circumstantial evidence based upon the defendant's outward manifestations, his words, his conduct, his acts, and all of the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

To become a member of the conspiracy, the defendant need not have known the activities of each and every other member. Moreover, the defendant does not need to be fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part.

Nor is it necessary that the defendant receive any monetary benefit from participating in the conspiracy, or that the defendant have a financial stake in the outcome, so long as he, in fact, participated in the manner in which I have described. Although proof of a financial interest in the

outcome or another motive is not essential, if you find that the defendant had such an interest or other motive, that's a factor you may consider in determining whether the defendant was a member of the conspiracy. The presence or absence of motive is, however, a circumstance that you may consider as bearing on the intent of the defendant.

The duration and extent of the defendant's participation has no bearing on the issue of a defendant's guilt. Each member of a conspiracy may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, others play only minor parts in a conspiracy. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of a conspiracy. Moreover, the defendant need not have joined the conspiracy at the outset. He may have joined at any time, and if he joined, still will be held responsible for the acts done before or after he joined.

I want to caution you, however, that the mere association by one person with another does not make that person a member of the conspiracy even when coupled with knowledge that a conspiracy is taking place. Similarly, mere presence at the scene of a crime, even coupled with knowledge that a crime is taking place, is not sufficient to support a conviction. In other words, knowledge without participation is not enough. What is necessary is that the defendant participated in the conspiracy with knowledge of the unlawful purpose of the conspiracy, in this case, to commit commodities fraud through market manipulation, and with an intent to aid in the accomplishment of its unlawful objective.

In sum, the defendant, with an understanding of the unlawful nature of the alleged conspiracy, must intentionally have engaged, advised or assisted in the conspiracy for the purpose of the illegal undertaking. A defendant thereby becomes a knowing and willing participant in the lawful agreement: in other words, a defendant thereby becomes a conspirator.

A conspiracy, once formed, is presumed to continue until either its objectives are accomplished or there is some affirmative act of termination by its members. So, too, once a person is found to be a member of a conspiracy, that person is presumed to continue being a member in the venture until the venture is terminated, unless it is shown by some affirmative proof that the person withdrew and disassociated himself from it. You may find that the conspiracy existed even if there were changes in personnel or activities over time, so long as you find that at least two of the conspirators continued to act for the duration of the conspiracy for the purpose charged in the Indictment, that is, committing commodities fraud through market manipulation.

Adapted from the charges of the Honorable Lewis L. Liman in United States v. Ray, 20 Cr. 110 (Apr. 5, 2022), and from the charges of Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018) and in United States v. Jones, 17 Cr. 791 (Dec. 16, 2019).

REQUEST NO. 14: Count One – Conspiracy to Commit Commodities Fraud – Third Element – Overt Act

The third and last element with respect to Count One is that the Government must prove beyond a reasonable doubt that at least one of the co-conspirators, not necessarily the defendant, committed at least one overt act in furtherance of the conspiracy. In other words, there must have been something more than an agreement, some overt step or action must have been taken by at least one of the conspirators in furtherance of the conspiracy. The overt act element, to put it another way, is a requirement that any agreement in relation to Count One went beyond the mere talking stage, the mere agreement stage.

It is not required or necessary for the Government to prove any particular overt act. It is enough if the Government proves at least one overt act was committed in furtherance of the conspiracy regardless of whether it is alleged in the Indictment. Although you must find unanimously that some overt act in furtherance of the conspiracy has been proved, you do not have to be unanimous as to which act. Similarly, you need not find that the defendant committed the overt act. It is sufficient for the Government to show that one of the alleged conspirators knowingly committed an overt act in furtherance of the conspiracy, since such an act becomes, in the eyes of the law, the act of all the members of the conspiracy.

You should bear in mind that the overt act standing alone may be an innocent lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding or assisting a conspiratorial scheme. You are therefore instructed that the overt act does not have to be an act which in and of itself is criminal or constitutes an objective of the conspiracy.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018) and the

Honorable J. Paul Oetken in United States v. Parnas, 19 Cr. 725 (JPO) (Oct. 13, 2021).

REQUEST NO. 15: Coconspirator Statements

Certain evidence was admitted during trial concerning acts and statements of others because such acts were committed and such statements were made by a person who, the Government claims, was also a co-conspirator of the defendant. The reason for allowing this evidence to be received against the defendant has to do with the nature of the crime of conspiracy. A conspiracy is often referred to as a partnership in crime. Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent of the other conspirators in carrying out the conspiracy. In determining the factual issues before you, you may consider against the defendant any acts or statements made by any of the people that you find, under the standards I have already described, to have been co-conspirators, even though such acts or statements were not made in his presence, or were made without his knowledge.

Adapted from the charge of the Honorable Lewis L. Liman in United States v. Ray, 20 Cr. 110 (Apr. 5, 2022), and the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

REQUEST NO. 16: Presence of Counsel
(If Applicable)

You have heard evidence that Glen Point and the defendant had lawyers. A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case. The defense has not claimed, and cannot claim, that the defendant's conduct was lawful because he acted in good faith on the advice of a lawyer.

Adapted from the charges of the Honorable Edgardo Ramos in United States v. Milton, No. 21 Cr. 478 (Sept. 12, 2022), and the Honorable Analisa Torres in United States v. Shea, No. 20 Cr. 412 (May 23, 2022).

REQUEST NO. 17: Extraterritoriality

In addition to the elements that I have described, the Government must also prove a sufficient relationship between the offenses charged in Count One and Count Two and the United States. The Government may satisfy this burden in two ways: The Government may show that some conduct relevant to the offenses occurred in the United States, or the Government may show that some conduct relevant to the offenses had a direct and significant connection with activities in, or effect on, commerce in the United States.

I will explain each of those further. One way the Government may prove a sufficient connection to the United States is by showing that some conduct relevant to the offenses charged in Count One and Count Two occurred in the United States. Conduct is relevant to those crimes if it furthered the alleged scheme to manipulate the dollar-rand exchange rate, so the defendant's hedge fund would receive a $20 million payment under the one-touch option. It is not necessary that all or most of the conduct relevant to those crimes happened in the United States, although the conduct in the United States must be more than incidental to the scheme. The Government also does not have to prove that the defendant was ever in the United States, just that conduct relevant to the offenses occurred in the country. This could include, for example, the occurrence of manipulative trades in the United States or the transmission of communications or funds through the United States.

A second way the Government may prove a sufficient connection to the United States is by showing that some conduct relevant to the offenses charged in Count One and Count Two had a direct and significant effect on, or connection with, commerce in the United States. Here, there is no need for any conduct to have occurred in the United States. All the Government needs to prove is that the offenses involved conduct that had an effect on, or connection with, commerce in

the United States, and that the effect or connection was direct and significant. Conduct that causes people or entities in the United States to make payment pursuant to a swap has a direct and significant effect on, or connection with, commerce in the United States. In assessing this issue, you may also consider whether conduct in furtherance of the crimes charged in Count One and Count Two caused trading, money transfers, and communications to occur in the United States, or otherwise affected commerce in the country.

In proving the existence of a connection to the United States, it is not necessary to prove both conduct in, and an effect on, the United States. Either will be sufficient to satisfy the Government's burden.

> With respect to a domestic application of the statute, the question is "whether conduct relevant to [the focus of the Commodity Exchange Act] occurred in United States territory." Dkt. 36 at 12 (quoting Abitron Austria GmbH v. Hetronic Int'l, Inc., 143 S. Ct. 2522, 2528 (2023)); Prime Int'l Trading, Ltd. v. BP P.L.C., 937 F.3d 94, 102 (2d Cir. 2019) ("[C]ourts must evaluate whether the domestic activity implicates the 'focus' of the statute."). The focus of Section 6(c)(1) and Rule 180.1 is "rooting out manipulation and ensuring market integrity." Id. at 107. Conduct relevant to the focus of the offense can include wires. See United States v. Napout, 963 F.3d 163, 179-81 (2d Cir. 2020) (recognizing that use of the wires can be part of a "scheme to defraud").
>
> With respect to a permissibly extraterritorial application of the statute, the question is whether the defendant's activities had a "direct and significant connection with activities in, or effect on, commerce in the United States." Dkt. 36 at 12-14 (quoting 7 U.S.C. § 2(i)(1)). Manipulation related to swaps involving U.S. persons satisfies this standard. See 78 Fed. Reg. at 45,308-09; 85 Fed. Reg. at 56,940; see also S.I.F.M.A. v. C.F.T.C., 67 F. Supp. 3d 373, 391 (D.D.C. 2014); Cf. United States v. Antonius, 73 F.4th 82, 87 (2d Cir. 2023) ("When individuals who are not United States citizens act on foreign soil, nexus [to the country] is present where the aim of [the] activity is to cause harm inside the United States or to U.S. citizens or interests.").

REQUEST NO. 18: Venue

Finally, you must separately decide whether an act in furtherance of each alleged crime occurred within the Southern District of New York. The Southern District of New York includes Manhattan, the Bronx, and Westchester. This requirement is called "venue." Venue refers to the fact that the Government must prove that a charge was properly brought in this court as opposed to a different federal court. You'll determine the satisfaction of the venue requirement separately for each count.

The Government does not have to prove that a completed crime was committed within the Southern District of New York, or that the defendant was ever in the Southern District of New York. With respect to both Count One and Count Two, it is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred in this district. The act itself need not be a criminal act. It could include, for example, the transmission of a communication or a wire in furtherance of the scheme into or out of the district. And the act need not have been taken by the defendant, so long as the act was part of the crime that you find he committed.

Unlike the elements of the offenses, which must be proven beyond a reasonable doubt, the Government is only required to prove venue by a preponderance of the evidence. A preponderance of the evidence means that it is more probable than not that some act in furtherance of the crime you are considering occurred in this district. Thus, the Government has satisfied its venue obligations if you conclude that it is more likely than not that any act in furtherance of the crime charged occurred within this district, even if other acts in furtherance of the crime charged occurred outside of this district.

> Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Dumitru, 18 Cr. 243 (Nov. 6, 2018), and of the Honorable Edgardo Ramos in United States v. Milton, 21 Cr. 478

(Sept. 12, 2022). See also United States v. Lange, 834 F.3d 58, 70-72 (2d Cir. 2016) ("[W]here a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done.").

REQUEST NO. 19: False Exculpatory Statements
(If Applicable)

You have testimony claiming that the defendant had conversations with others, in which he claimed that his conduct was consistent with innocence and not guilt. The Government claims that those statements in which he exonerated or exculpated himself were false. If you find that the defendant gave a false statement in order to divert suspicion from himself, you may infer that the defendant believed that he was guilty. You may not, however, infer on the basis of this alone that the defendant is, in fact, guilty of the crimes for which he is charged. Whether or not the evidence as to a defendant's statements shows that the defendant believed that he was guilty, and the significance, if any, to be attached to any such evidence, are matters for you the jury to decide.

> Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018) and the Honorable Richard J. Sullivan in United States v. Brennerman, 17 Cr. 337 (Dec. 6, 2017).

REQUEST NO. 20: Other Acts Evidence
(If Applicable)

Now, you also heard evidence that the defendant engaged in misconduct that is not charged in this Indictment including ______. He is not on trial for committing those acts. Accordingly, you may not consider the evidence of other uncharged bad acts as a substitute for proof that he committed the crimes with which he is charged here. Nor may you consider that evidence as proof that he has a criminal personality or bad character. The evidence was admitted for limited purposes, and you may consider it for those purposes alone.

More specifically, you may consider the evidence you have heard regarding _____ as relevant to ________.

Adapted from the charge of the Honorable Lewis A. Kaplan in United States v. Dumitru, 18 Cr. 243 (Nov. 6, 2018).

REQUEST NO. 21: Variance in Dates

As I have described the Indictment, you may have noticed that it refers to various dates or times. It does not matter if the evidence you heard at trial indicates that a particular act occurred on a different date, and it is not essential that the Government prove that the charged offenses started and ended on any specific dates. The law requires only a substantial similarity between the dates alleged in the Indictment and the dates established by the evidence.

Adapted from Sand, et al., Modern Federal Jury Instructions, Instr. 3-12 and the charges of the Honorable Lewis A. Kaplan in United States v. Jones, 17 Cr. 791 (Dec. 16, 2019).

REQUEST NO. 22: Expert Witness

You heard the testimony of certain witnesses who I certified as experts. An expert is a witness who, by education or experience, has acquired knowledge in a specialized area. Such witnesses are allowed to give their opinions as to relevant matters in which they profess to be an expert, and to give the reasons for their opinions. Expert testimony is presented to you on the theory that someone who is experienced and knowledgeable in a field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing expert testimony, you may consider the expert's qualifications, the opinion given, the witness's reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether or not to believe a witness. You may give expert testimony whatever weight, if any, you find it deserves in light of all the evidence before you. You should not, however, accept a witness's testimony merely because he or she is an expert in a field. Nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you, the jury.

Adapted from the charge of the Honorable Lewis L. Liman in United States v. Ray, 20 Cr. 110 (Apr. 5, 2022), the Honorable Richard J. Sullivan in United States v. Brennerman, No. 17 Cr. 337 (Dec. 6, 2017), and from the Honorable J. Paul Oetken in United States v. Middendorf, No. 18 Cr. 36 (Feb. 1, 2022).

REQUEST NO. 23: Law Enforcement Witnesses

You have heard the testimony of law enforcement witnesses and other Government employees. The fact that a witness may be employed by the federal Government as a law enforcement agent or employee does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. As with all other witnesses, it is up to you to decide, after reviewing all the evidence, what weight to give the testimony of law enforcement witnesses.

Adapted from the charges of the he Honorable Lewis L. Liman in United States v. Ray, 20 Cr. 110 (Apr. 5, 2022), the Honorable Jesse M. Furman in United States v. Avenatti, No. 19 Cr. 374 (Feb. 1, 2022), and the Honorable J. Paul Oetken in United States v. Matthews, 18 Cr. 124 (Sept. 24, 2018).

REQUEST NO. 24: Preparation of Witnesses
(If Applicable)

You have heard evidence during the trial that some witnesses have discussed the facts of the case and their testimony with lawyers before the witnesses appeared in court. Although you may consider that fact when you evaluate a witness's credibility, I should tell you that there is nothing unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time. In fact, it would be unusual for a lawyer to call a witness without such consultation. Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

Adapted from the charge of the Honorable Lewis L. Liman in United States v. Ray, 20 Cr. 110 (Apr. 5, 2022), and the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

REQUEST NO. 25: Uncalled Witnesses – Equally Available To Both Sides

There are people whose names you have heard during the course of trial, but who did not appear here to testify. I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. The burden of proof remains at all times with the Government.

> Adapted from the charges of the Honorable Lewis L. Liman in United States v. Ray, 20 Cr. 110 (Apr. 5, 2022), and the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

REQUEST NO. 26: Other Individuals Not on Trial

You may not draw any inference, favorable or unfavorable, toward the Government or the defendant from the fact that any person was not named as a defendant in this case, and you may not speculate as to the reasons why other people are not on trial before you now. Those matters are wholly outside your concern and have no bearing on your function as jurors in deciding the case before you.

Adapted from the charges of the Honorable Lewis L. Liman in United States v. Ray, 20 Cr. 110 (Apr. 5, 2022), and the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

REQUEST NO. 27: Defendant's Testimony
(If Applicable)

As you saw, the defendant took the witness stand and testified. I have already instructed you on how you should evaluate the credibility of the witnesses you have heard in this case. You should evaluate the defendant's testimony the same way that you judge the testimony of the other witnesses in this case.

> See United States v. Gaines, 457 F.3d 238, 240 (2d Cir. 2006) ("[I]f the defendant has testified, the trial court should tell the jury to evaluate the defendant's testimony in the same way it judges the testimony of other witnesses."); but see United States v. Solano, 966 F.3d 184, 197 (2d Cir. 2020) (holding that it was error for the district court to instruct that "any" witness with an interest in the outcome of the case, which included the defendant, necessarily has a "motive to testify falsely").

REQUEST NO. 28: Defendant's Right Not to Testify
(If Requested by the Defense)

The defendant did not testify. Under our Constitution, a defendant never is required to testify or to present any evidence because it is always the Government's burden to prove a defendant guilty beyond a reason doubt. A defendant never is required to prove that he is innocent. You may not attach any significance to the fact that the defendant did not testify. You may not draw any adverse inference against the defendant because the defendant did not take the witness stand. You may not consider this in any way in your deliberations.

> Adapted from the charges of the Honorable Lewis L. Liman in United States v. Ray, 20 Cr. 110 (Apr. 5, 2022), and the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

REQUEST NO. 29: Particular Investigative Techniques Not Required
(If Applicable)

You have heard reference to certain investigative techniques that were used or not used by the Government in this case. There is no legal requirement that the Government prove its case through any particular means. While you are to carefully consider the evidence adduced by the Government, you are not to speculate as to why the Government used the techniques it did or why it did not use other techniques.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

REQUEST NO. 30: Use of Evidence Obtained Pursuant to Searches
(If Applicable)

You have heard testimony about evidence seized, pursuant to search warrants signed by a judge, from electronic accounts. Evidence obtained from these searches was properly admitted in this case and may properly be considered by you. Indeed, searches of online accounts and electronic devices are entirely appropriate law enforcement actions. Whether you approve or disapprove of how it was obtained should not enter into your deliberations because I now instruct you that the Government's use of this evidence is entirely lawful.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

REQUEST NO. 31: Use of Charts and Summaries

There is evidence before you in the form of charts and summaries. Those exhibits purport to summarize the underlying evidence that was used to prepare them. I admitted these charts and summaries into evidence in place of or in addition to the underlying documents that they represent in order to save time and avoid unnecessary inconvenience. They are no better than the documents upon which they are based. Therefore, you are to give no greater consideration to these charts or summaries than you would give to the evidence upon which they are based. It is for you to decide whether they correctly present the information contained in the testimony and in the exhibits on which they were based.

> Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Dumitru, 18 Cr. 243 (Nov. 6, 2018), and the Honorable Jesse M. Furman in United States v. Avenatti, No. 19 Cr. 374 (Feb. 1, 2022).

REQUEST NO. 32: Stipulations
(If Applicable)

You have heard some stipulations in this case. Generically speaking, there are two kinds.

A stipulation of fact is an agreement between the parties that a certain fact is true. You must regard such agreed-upon facts as true, but it is still for you to determine the weight to be given to that evidence, to that fact.

A stipulation of testimony is an agreement between the parties that, if called as a witness, the person would have given certain testimony. You must accept as true the fact that the witness would have given that testimony. However, it is for you to determine the weight to be given to that testimony.

Adopted from the charge of the Honorable Richard J. Sullivan in United States v. Brennerman, 17 Cr. 337 (Dec. 6, 2017).

REQUEST NO. 33: Transcripts

Audio and video recordings have been admitted into evidence and transcripts of those recordings were provided to use as aids. I instructed you then, and I remind you now, that the transcripts are not evidence. The transcripts were provided only as an aid to you in listening to the recordings. It is for you to decide whether the transcripts correctly present the conversations recorded on the recordings that you heard.

> Adopted from the charge of the Honorable Richard J. Sullivan in United States v. Brennerman, 17 Cr. 337 (Dec. 6, 2017).

REQUEST NO. 34: Redactions
(If Applicable)

There are, among the exhibits received in evidence, some documents that are redacted. "Redacted" means that part of the document or recording was taken out. You are to concern yourself only with the part of the item that has been admitted into evidence. You should not consider any possible reason why the other part of it has been redacted.

Adapted from the charges of the Honorable Jesse M. Furman in United States v. Avenatti, No. 19 Cr. 374 (Feb. 1, 2022), and from the charge of the Honorable Lewis A. Kaplan in United States v. Sterling, S4 16 Cr. 488 (Apr. 3, 2017).

REQUEST NO. 35: Concluding Remarks

The Government respectfully requests that the Court close by instructing the jurors regarding the selection of a foreperson, communications with the Court during deliberations, provision of copies of the Indictment and jury charge, and the procedures regarding requests for particular exhibits or testimony.

Dated: New York, New York
October 9, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By: /s/
Thomas S. Burnett
Kiersten A. Fletcher
Andrew Thomas
Assistant United States Attorneys
Southern District of New York

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NEIL PHILLIPS,<br>Defendant. | No. 22-cr-138 (LJL) |

**PROPOSED REQUESTS TO CHARGE ON BEHALF OF NEIL PHILLIPS**

Dated: October 9, 2023

**KAPLAN HECKER & FINK LLP**
Sean Hecker
Jenna M. Dabbs
David Gopstein
Anne Yearwood
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883

*Attorneys for Neil Phillips*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1
REQUEST NO. 1—ISSUANCE OF STANDARD INSTRUCTIONS .......... 2
REQUEST NO. 2—SUMMARY OF THE INDICTMENT .......... 4
REQUEST NO. 3—THEORY OF THE DEFENSE .......... 6
REQUEST NO. 4—COUNT ONE—CONSPIRACY: .......... 7
THE NATURE AND ELEMENTS OF THE OFFENSE .......... 7
REQUEST NO. 5—COUNT TWO—COMMODITIES FRAUD: .......... 11
THE NATURE AND ELEMENTS OF THE OFFENSE .......... 11
REQUEST NO. 6—COMMODITIES FRAUD—FIRST ELEMENT: MANIPULATIVE AND DECEPTIVE CONDUCT GENERALLY .......... 13
REQUEST NO. 7—COMMODITIES FRAUD—FIRST ELEMENT: .......... 14
MARKET MANIPULATION .......... 14
REQUEST NO. 8—COMMODITIES FRAUD—SECOND ELEMENT: IN CONNECTION WITH A SWAP .......... 17
REQUEST NO. 9—COMMODITIES FRAUD—THIRD ELEMENT: MATERIALITY .......... 19
REQUEST NO. 10—COMMODITIES FRAUD—FOURTH ELEMENT: STATE OF MIND .......... 21
REQUEST NO. 11—TERRITORIAL APPLICATION .......... 23
REQUEST NO. 12—GOOD FAITH .......... 26
REQUEST NO. 13—COMPLIANCE POLICIES .......... 27
REQUEST NO. 14—VENUE .......... 28

## PRELIMINARY STATEMENT

Pursuant to Rule 30(a) of the Federal Rules of Criminal Procedure, Neil Phillips respectfully requests that the Court give the following jury instructions at trial. These proposed instructions derive principally from three sources: the Federal Jury Practice and Instructions (6th ed., Aug. 2023 update); Second Circuit case law; and recent commodities fraud cases, *see, e.g.*, *CFTC v. Gorman*, No. 21 Civ. 870 (VM), 2023 WL 2632111, at *3 (S.D.N.Y. Mar. 24, 2023); *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018).

These requests focus on the substantive offenses charged in the Indictment: conspiracy and commodities fraud. They do not include proposed language for standard jury instructions—*i.e.*, reasonable doubt, role of the jury, etc.—as outlined in Section 7(A) of Your Honor's Individual Practices in Criminal Cases.

At times, the requests made herein will reiterate Mr. Phillips' position on matters addressed by the Court's September 1, 2023, Opinion and Order. *See United States v. Phillips*, No. 22 Cr. 138 (LJL), 2023 WL 5671227, at *14 (S.D.N.Y. Sept. 1, 2023) (denying Mr. Phillips' Motion to Dismiss the Indictment). Mr. Phillips is not attempting to re-litigate the Court's decision—he merely preserves such issues for any applicable appeal, if necessary.

**REQUEST NO. 1—ISSUANCE OF STANDARD INSTRUCTIONS**

Mr. Phillips requests this Court's standard instructions on:

1. Introductory Instructions
2. Role of the Court and the Jury
3. The Parties
4. The Presumption of Innocence and Burden of Proof
5. Reasonable Doubt
6. The Indictment
7. Variance in Dates and Amounts
8. Guilty Plea by Government Witness [If Applicable]
9. Persons Not on Trial
10. Defendant's Decision Not to Testify [If Applicable]
11. Defendant's Testimony [If Applicable]
12. Evaluation of Evidence: What Is and Is Not Evidence
13. Direct and Circumstantial Evidence
14. Rulings on Evidence and Objections
15. Inferences
16. Credibility of Witnesses
17. Bias of Witnesses
18. Law Enforcement Testimony [If Applicable]
19. Accomplice or Cooperating Witness Testimony; Testimony Pursuant to Immunity Orders [If Applicable]

20. Expert Testimony [If Applicable]

21. Character Evidence [If Applicable]

22. Uncalled Witnesses

23. Number of Witnesses

24. Particular Investigative Techniques

25. Preparation of Witnesses

26. Charts and Summaries [If Applicable]

27. Stipulations

28. Sympathy or Bias

29. Punishment

30. Duty to Deliberate—Unanimous Verdict

31. All Jurors Required for Deliberation

32. Juror Note-Taking

33. Right to See Exhibits and Hear Testimony, Communications with the Court

34. Duties of Foreperson

35. Verdict Form | Special Verdict Form

36. Alternate Jurors

37. Conclusion

## REQUEST NO. 2—SUMMARY OF THE INDICTMENT

The Indictment contains two counts, or charges. By pleading not guilty to these counts, Mr. Phillips has denied that he committed each of the two charged offenses.

The government must show beyond a reasonable doubt that Mr. Phillips is guilty with respect to each count. You must consider each count separately, and you must return a separate verdict of guilty or not guilty on each count. Whether you find the defendant guilty or not guilty as to one offense should not affect your verdict as to any other offense.

The Indictment is not evidence. It merely describes accusations made against Mr. Phillips. It may not be considered by you as evidence of Mr. Phillips' guilt. Only the evidence or lack of evidence introduced at the trial in this case decides that issue.

Count One of the Indictment charges that in December 2017, in the Southern District of New York and elsewhere, Mr. Phillips and others willfully and knowingly agreed to commit an offense against the United States, namely, commodities fraud, and then acted to achieve the goal of the alleged unlawful agreement—commodities fraud—in violation of the general federal conspiracy statute, 18 U.S.C. § 371.[1]

Count Two of the Indictment charges that in December 2017, in the Southern District of New York and elsewhere, Mr. Phillips willfully and knowingly violated a federal regulation prohibiting the employment of manipulative and deceptive devices in connection with a swap, contract of sale of a commodity, or contract for future delivery, by intentionally and artificially manipulating the USD/ZAR exchange rate, in order to trigger payment under a one-touch option,

[1] *See* Indictment ¶¶ 30–31, *United States v. Phillips*, 22 Cr. 138 (LJL) (S.D.N.Y. Mar. 3, 2022), ECF 2.

in violation of the Commodity Exchange Act and its implementing anti-fraud regulation, 7 U.S.C. §§ 9(1), 13(a)(5); 17 C.F.R. § 180.1; 18 U.S.C. § 2.[2]

Again, by pleading not guilty to these counts, Mr. Phillips has denied that he committed the two charged offenses. The government must show beyond a reasonable doubt that Mr. Phillips is guilty with respect to each count. I will next instruct you on each of these charges in more detail.[3]

[2] *See* Indictment ¶ 34, *United States v. Phillips*, 22 Cr. 138 (LJL) (S.D.N.Y. Mar. 3, 2022), ECF 2 (alleging that, "in connection with the $20 Million One Touch Option, [Mr. Phillips] engaged in a scheme involving the intentional and artificial manipulation of the USD/ZAR exchange rate").

[3] *See* Jury Instructions, Tr. 3934:17-36:18, *United States v. Blaszczak*, No. 17 Cr. 357 (LAK) (S.D.N.Y. May 16, 2018), ECF No. 331 (providing similar Summary of the Indictment instruction).

## REQUEST NO. 3—THEORY OF THE DEFENSE

The theory of the defense in this case is that Neil Phillips had entirely legitimate, economic reasons for trading in the spot market to buy rand, including so that Glen Point's investors would continue to have exposure to, and profit from, an expectation of further appreciation of the rand versus the U.S. dollar. He therefore did not trade for the sole purpose of triggering the one-touch option. As a result, he did not agree with anyone to, and did not himself, act knowingly and willfully to commit commodities fraud.[4]

[4] *See* Kevin F. O'Malley et al., 1A *Fed. Jury. Prac. & Instr.* § 19:01 (6th ed., Aug. 2023 update) (outlining "theory of the defense" instruction).

## REQUEST NO. 4—COUNT ONE—CONSPIRACY: THE NATURE AND ELEMENTS OF THE OFFENSE

Count One of the Indictment charges that in December 2017, in the Southern District of New York and elsewhere, Mr. Phillips and others willfully and knowingly agreed to commit an offense against the United States, namely, commodities fraud, and then acted to achieve the goal of the alleged unlawful agreement—commodities fraud—in violation of the general federal conspiracy statute, 18 U.S.C. § 371.[5]

In order to meet its burden of proof for a conspiracy charge, the Government must prove each of the following three elements beyond a reasonable doubt:

> First, that Mr. Phillips and at least one other person entered the particular agreement charged in the Indictment, with the object of this agreement being commodities fraud, an offense against the United States;
>
> Second, that Mr. Phillips knowingly and willfully joined this agreement, with the specific intent to further the unlawful object of the agreement—commodities fraud;
>
> Third, that Mr. Phillips or another person in the conspiracy committed an overt act in furtherance of the conspiracy.[6]

These three elements require elaboration. The first element requires that the government prove, beyond a reasonable doubt, that at least two persons had a meeting of the minds,[7] which means that they consciously agreed to work together to accomplish the specified object of the

[5] *See* Indictment ¶¶ 30–31, *United States v. Phillips*, 22 Cr. 138 (LJL) (S.D.N.Y. Mar. 3, 2022), ECF 2.
[6] *See United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003) (articulating the "three essential elements" of § 371 conspiracy); Kevin F. O'Malley et al., 2 *Fed. Jury. Prac. & Instr.* § 31.03 (6th ed., Aug. 2023 update) (providing similar elements).
[7] *See United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977) ("A 'meeting of minds' is required." (internal citation omitted)).

charged conspiracy.[8] The existence of an agreement is key.[9] Merely associating or communicating with another does not make someone a member of a conspiracy.[10] Nor does sharing a common goal with another. The alleged co-conspirators must agree, together, to commit a crime,[11] and they must agree on the particular crime to commit.[12] Each of the distinct members of the conspiracy—at least two people in total—must agree to join in and further the object of the agreement.[13]

The unlawful agreement between alleged co-conspirators need not have been openly expressed, either orally or in writing. But there must be sufficient evidence, from the circumstances and conduct of the parties and others involved, to conclude, beyond a reasonable doubt, that Mr. Phillips and at least one other person entered into an agreement to accomplish an unlawful act. You may consider all of the evidence before you, and the reasonable inferences that may be drawn from that evidence.[14]

---

[8] *See United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) (explaining that co-conspirators must agree to participate in a "joint venture," which involves "concerted effort" (internal citations and quotation marks omitted)); *United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) (explaining that "general agreement to engage in unspecified criminal conduct is insufficient" and that the defendant must "know what kind of criminal conduct" is contemplated (internal citation omitted and quotation marks omitted)).

[9] *See United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003) ("'The gist of conspiracy is, of course, agreement.'" (internal citation omitted)).

[10] *See United States v. Lorenzo*, 534 F.3d 153, 159–60 (2d Cir. 2008) ("'[A] defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy.'" (internal citation omitted)).

[11] *See United States v. Kapelioujnyj*, 547 F.3d 149, 155 (2d Cir. 2008) (explaining that the government must prove that the defendant "'agreed to participate in what he knew to be a collective venture directed toward a common goal.'" (internal citation omitted)).

[12] *See United States v. Provenzano*, 615 F.2d 37, 44 (2d Cir. 1980) (requiring proof of "a conspiracy to commit a particular offense and not merely a vague agreement 'to do something wrong'" (internal citation omitted)).

[13] *See United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004) ("'[T]he government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.'" (internal citation omitted)).

[14] *See United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) ("Direct evidence is not required; "[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" (internal citation omitted)).

The second element requires that the government prove, beyond a reasonable doubt, that Mr. Phillips knowingly and willfully joined the conspiracy, with the specific intent of furthering its object.[15]

> "Knowingly" means Mr. Phillips acted purposefully and voluntarily, and not because of ignorance, mistake, accident, coincidence, or carelessness. The government must prove that Mr. Phillips acted knowingly by his conduct and by all of the facts and circumstances surrounding the case.[16]
>
> "Willfully" means Mr. Phillips acted with bad purpose, and with knowledge that his conduct was unlawful. The government must prove that Mr. Phillips acted with the intent to do something the law forbids, meaning that he was aware of the general wrongfulness of his acts. You must carefully consider all the evidence before you to determine whether you can reasonably infer that Mr. Phillips entered into the alleged conspiracy both knowingly and willfully. In making this determination, you must determine whether Mr. Phillips participated in the conspiracy with knowledge of its purpose and with the specific intention of furthering one or more of its objectives.[17]

---

[15] *See United States v. Landesman*, 17 F.4th 298, 321 (2d Cir. 2021) ("To sustain the conspiracy charge, the government was required to prove that [the defendant] 'willfully and knowingly became a member of the conspiracy, with intent to further its illegal purposes – that is, with the intent to commit the object of the charged conspiracy.'" (internal citation omitted)).

[16] *See* 1 *Modern Federal Jury Instructions-Criminal* P 3A.01 (2023) (defining 'knowingly'); Kevin F. O'Malley et al., 1A *Fed. Jury. Prac. & Instr.* § 17.04 (6th ed., Aug. 2023 update).

[17] *See* 1 *Modern Federal Jury Instructions-Criminal* P 3A.03 (2023) (defining 'willfully'); *United States v. Kukushkin*, 61 F.4th 327, 332 (2d Cir. 2023) ("'[W]hen used in the criminal context, a willful act is one undertaken with a bad purpose. In other words, in order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" (internal citation omitted)).

The third element requires that the government prove, beyond a reasonable doubt, that Mr. Phillips or another person in the conspiracy took an overt act in furtherance of the object of the conspiracy.

An overt act is an outward, objective action that evidences the existence of the conspiracy.[18] The overt act must further the goals of the conspiracy, but it need not be a crime in itself.[19] To establish venue, a topic I will discuss later, Mr. Phillips or another person in the conspiracy must have committed an overt act in the Southern District of New York.[20]

[18] *See* Kevin F. O'Malley et al., 2 *Fed. Jury Prac. & Instr.* § 31:07 (6th ed., Aug. 2023 update) (defining 'overt act').
[19] *See United States v. Kozeny*, 667 F.3d 122, 132 (2d Cir. 2011) ("[T]he overt act taken in furtherance of the conspiracy need not be a crime.").
[20] *See United States v. Rutigliano*, 790 F.3d 389, 395–96 (2d Cir. 2015) (discussing venue and overt act requirements).

**REQUEST NO. 5—COUNT TWO—COMMODITIES FRAUD: THE NATURE AND ELEMENTS OF THE OFFENSE**

Count Two of the Indictment charges that in December 2017, in the Southern District of New York and elsewhere, Mr. Phillips willfully and knowingly violated a federal regulation prohibiting the employment of manipulative and deceptive devices in connection with a swap, contract of sale of a commodity, or contract for future delivery, by intentionally and artificially manipulating the USD/ZAR exchange rate, in order to trigger payment under a one-touch option, in violation of the Commodity Exchange Act and its implementing anti-fraud regulation, 7 U.S.C. §§ 9(1), 13(a)(5); 17 C.F.R. § 180.1; 18 U.S.C. § 2.[21] I have already instructed you on the meaning of "willfully" and "knowingly."

In order to meet its burden of proof, the Government must prove each of the following four elements beyond a reasonable doubt:

First, that Mr. Phillips engaged in manipulative and deceptive conduct. Specifically, that he:

(1) employed a manipulative device, scheme, or artifice to defraud, or

(2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

(3) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a person.[22]

---

[21] *See* Indictment ¶ 34, *United States v. Phillips*, 22 Cr. 138 (LJL) (S.D.N.Y. Mar. 3, 2022), ECF 2 (alleging that, "in connection with the $20 Million One Touch Option, [Mr. Phillips] engaged in a scheme involving the intentional and artificial manipulation of the USD/ZAR exchange rate").

[22] *See* 7 U.S.C. § 9(1), 17 C.F.R. §§ 180.1(a)(1)-(3); *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018) ("To prove a violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) . . . the Commission must show that Defendants engaged in prohibited conduct (i.e., employed a fraudulent scheme; made a material misrepresentation, misleading statement or deceptive omission; or engaged in a business practice that operated as a fraud); *Teed v. Chen*, No. 22 Civ. 02862 (CRB), 2022 WL 16839496, at *10 (N.D. Cal. Nov. 9, 2022); *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018).

Second, that the prohibited conduct was 'in connection with' a swap, contract of sale of a commodity in interstate commerce, or contract for future delivery on or subject to the rules of a registered entity.[23]

Third, that the prohibited conduct was material to a counterparty to the swap.[24]

Fourth, that Mr. Phillips knowingly and willfully violated the law.[25]

As to the first element, the government is not asserting a theory that Mr. Phillips made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading. Therefore, you need only consider the remaining two subparts of the first element: whether Mr. Phillips employed a device, scheme, or artifice to defraud, or whether he engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchase or seller. It is not necessary for the government to establish both types of unlawful conduct. You may find this element satisfied if you determine that the government has proven any one fraudulent act. However, you must be unanimous as to which type of conduct, if any, has been proven beyond a reasonable doubt. That is, to convict Mr. Phillips, you must all agree that the same type of conduct described above has been proven.[26]

---

[23] *See* 7 U.S.C. § 9(1), 17 C.F.R. § 180.1(a).

[24] *See CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325, 1327 (11th Cir. 2018) (requiring and discussing materiality); *United States v. Rybicki*, 354 F.3d 124, 146 n.20 (2d Cir. 2003) (en banc) (explaining that materiality is embedded in "the phrase 'scheme or artifice to defraud'" (internal citation omitted); Gov't Request to Charge, Request No. 27, *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Aug. 21, 2023), ECF 214 ("[A] scheme to defraud, false statement, misleading omission, or deceptive act, practice, or course of conduct must be material under the circumstances.").

[25] *See* 7 U.S.C. § 13(a)(5) (stating that felony violations of the Commodity Exchange Act require willfulness); *cf. CFTC v. Gorman*, No. 21 Civ. 870 (VM), 2023 WL 2632111, at *8 (S.D.N.Y. Mar. 24, 2023) (explaining that, in civil cases, the *mens rea* requirement is scienter).

[26] *See also* Jury Instructions, No. 19, *United States v. Coscia*, No. 14 Cr. 551 (HDL) (N.D. Ill., Nov. 3, 2015), ECF 85 (instructing the jury on the elements of commodities fraud); Def.'s Request to Charge, Request No. 10, *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Aug. 21, 2023), ECF 215 (discussing the elements of commodities fraud, as part of conspiracy to commit commodities fraud charge); Gov't Request to Charge, Request Nos. 26–31, *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Aug. 21, 2023), ECF 214 (same); *cf. United States v. Coscia*, 866 F.3d 782, 799 (7th Cir. 2017) (explaining that there is no "pattern jury instruction for commodities fraud" and that district courts may look to "pattern jury instructions for mail, wire, and carrier fraud" for guidance); *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41,398, 41,399 (July 14, 2011) (explaining that Rule 180.1 is modeled on SEC Rule 10b-

**REQUEST NO. 6—COMMODITIES FRAUD—FIRST ELEMENT: MANIPULATIVE AND DECEPTIVE CONDUCT GENERALLY**

As previously stated, for the first element, the government must prove, beyond a reasonable doubt, that Mr. Phillips engaged in manipulative and deceptive conduct. Specifically, that he:

(1) employed a manipulative device, scheme, or artifice to defraud, or

(2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

(3) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon another.

As just stated, the government is not asserting a theory that Mr. Phillips made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading. Therefore, you need only consider the remaining two subparts of this element.

A 'manipulative device, scheme, or artifice to defraud' is a term of art. But generally, it refers to an invention, contrivance, plan, or design to trick or deceive.[27]

An act, practice, or course of business that operates as a fraud or deceit upon another means, simply, a lie or a trick that would cause reliance on the part of a reasonable person.[28]

---

5); Kevin F. O'Malley et al., 2B *Fed. Jury. Prac. & Instr.* § 62:07 (6th ed., Aug. 2023 update) (providing model jury instructions for Rule 10b-5 charge).

[27] *See* Kevin F. O'Malley, 2 *Fed. Jury. Prac. & Instr.* §§ 62:09, 13 (6th ed., Aug. 2023 update); *Lorenzo v. SEC*, 587 U.S. --, 139 S. Ct. 1094, 1101 (2019) (defining similar terms and phrases).

[28] *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 136 (2d Cir. 2021) (explaining that this phrase is "very similar" to devices, schemes, and artifices to defraud); Kevin F. O'Malley, 2 *Fed. Jury. Prac. & Instr.* §§ 62:09, 13 (6th ed., Aug. 2023 update).

**REQUEST NO. 7—COMMODITIES FRAUD—FIRST ELEMENT: MARKET MANIPULATION**

For the first element, the government must prove, beyond a reasonable doubt, that Mr. Phillips engaged in manipulative and deceptive conduct.

In Mr. Phillips' case, the manipulative and deceptive conduct alleged is price manipulation. Manipulation is a term of art when used in connection with financial markets. Manipulation refers to intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of commodities. Because market participants ordinarily assume that the price at which they purchase or sell commodities is determined by the natural interplay of supply and demand, an act is manipulative if it sends a false pricing signal to the market.

Here, the government alleges that Mr. Phillips' manipulated the USD/ZAR exchange rate in the foreign exchange spot market. This market is not covered by the Commodity Exchange Act. Nevertheless, because the government alleges that the manipulative and deceptive conduct took the form of price or, in this case, exchange rate manipulation,[29] the government must also establish the elements of price manipulation.[30] They are:

First, that Mr. Phillips possessed the ability to influence market prices of USD/ZAR;

Second, that an artificial price existed in the market for USD/ZAR;

Third, that Mr. Phillips caused this artificial price; and

Fourth, that Mr. Phillips specifically intended to cause this artificial price.[31]

---

[29] *See* Indictment ¶ 34, *United States v. Phillips*, 22 Cr. 138 (LJL) (S.D.N.Y. Mar. 3, 2022), ECF 2 (alleging that Mr. Phillips engaged in "the intentional and artificial manipulation of the USD/ZAR exchange rate).

[30] *See CFTC v. Gorman*, 21 Civ. 870 (VM), 2023 WL 2632111, at *4 (S.D.N.Y. Mar. 24, 2023) ("[I]nsofar as the Commission alleges price manipulation as the underlying manipulative act, the Commission will need to also allege a specific intent to create an artificial price.").

[31] *See generally In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (explaining that, under 7 U.S.C. § 9(1), commodities manipulation requires proof of an "artificial price" and that the defendant "specifically intended to cause the artificial price").

With respect to the first element, you must find that Mr. Phillips, through his conduct, had the ability to intentionally alter, change, or influence the USD/ZAR exchange rate. The ability to influence prices can be evaluated by determining whether Mr. Phillips held a dominant market position in the FX market and whether such a market position would allow him to manipulate prices.[32]

With respect to the second element, a price is 'artificial' if it is set by some mechanism other than free competition—that is, the basic forces of supply and demand.[33] For a price to be artificial, it must therefore send a 'false signal' to the market.[34] A price is not artificial merely because it differs from a price on an earlier or later day.[35] Nor is a price artificial merely because it has been affected by a market participant's trading: price movements in the market are expected to be affected by orders and trades that occur in the marketplace, and the fact that market prices may have changed as a result of orders or trades at issue in this case does not necessarily mean that those resulting prices were artificial.[36] Likewise, a trader's intent to affect market prices or awareness that their orders could affect market prices does not, on its own, make any resulting change in market prices artificial.[37] What matters is whether or not the price reflects the basic

---

[32] *See CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 245 (S.D.N.Y. 2012) (explaining that a "controlling [] position in the market" can establish "the requisite ability to direct the market price" (internal citation omitted)).
[33] *See CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012) ("An artificial price is a price that 'does not reflect basic forces of supply and demand.'" (internal citation omitted)).
[34] *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) (explaining that an artificial price must send a "false signal"), *aff'd*, 730 F.3d 170 (2d Cir. 2013).
[35] *See CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012) (noting that "proof of artificiality is not found solely in comparing one day's price to another." (internal citation omitted)).
[36] *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 209 (3d Cir. 2001) ("[S]hort selling, even in large volumes, is not in and of itself unlawful and therefore cannot be regarded as evidence of market manipulation. That short selling may depress share prices, which in turn may enable traders to acquire more shares for less cash (or in this case, for less debt), is not evidence of unlawful market manipulation, for they simply are natural consequences of a lawful and carefully regulated trading practice.").
[37] *See CFTC v. Wilson*, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) (Sullivan, J., sitting by designation) ("[T]he mere intent to affect *prices* is not enough; rather, the CFTC must show that Defendants intended to cause *artificial* prices – i.e., prices that they understood to be unreflective of the forces of supply and demand. The CFTC itself acknowledged that if Defendants made bids with an honest desire to transact at those posted prices, then there could be no liability." (emphasis in original)).

forces of supply and demand. When determining if an artificial price existed, you may consider typical market dynamics in the market for USD/ZAR, historical prices both before and after the relevant period of the alleged conduct, and supply and demand factors, including whether or not the defendant's own trading reflected genuine supply or demand.[38]

With respect to the third element, the government must prove that Mr. Phillips' conduct in fact caused an artificial price. This means that the government must prove that the artificial nature of the price can specifically be attributed to something Mr. Phillips did. Again, it is not enough that Mr. Phillips' conduct caused the USD/ZAR exchange rate to move or change: he must have caused it to move or change in a manner that is artificial, or that reflects the injection of false pricing information into the market.

On the fourth element, a trader acts with specific intent in this context if he acts knowingly and with the unlawful intent of purposely causing or effecting a price that does not reflect the basic forces of supply and demand.[39] This unlawful intent is necessary for a conviction. A trader that enters a transaction simply knowing it will distort a price has acted only with knowledge, not necessarily with intent to alter a price.[40] Nor is the mere intent to affect a price sufficient. In order to find this element met, you must determine that Mr. Phillips intended to create a price that is artificial, meaning one that incorporated false information or otherwise did not reflect the natural

---

[38] *See n re Platinum & Palladium Antitrust Litig.*, No. 14 Civ. 9391 (GHW), 2017 WL 1169626, at *31 (S.D.N.Y. Mar. 28, 2017) ("'When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue.'" (internal citation omitted)).

[39] *See United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009) (affirming similar specific intent instruction in other context); Jury Instructions at 39, Intent to Create an Artificial Price, *United States v. Smith*, 19 Cr. 669 (EEC) (N.D. Ill. July 27, 2022), ECF 654.

[40] *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 539 (S.D.N.Y. 2008) ("[E]ntering into a legitimate transaction knowing that it will distort the market is not manipulation—only intent, not knowledge, can transform a legitimate transaction into manipulation"), *aff'd,* 730 F.3d 170 (2d Cir. 2013).

forces of supply and demand. The mere fact that a trader acquires a large position does not, in itself, imply specific intent to manipulate a price.[41]

**REQUEST NO. 8—COMMODITIES FRAUD—SECOND ELEMENT: IN CONNECTION WITH A SWAP**

For the second element, the government must prove, beyond a reasonable doubt, that Mr. Phillips' conduct was in connection with a swap, contract of sale of a commodity in interstate commerce, or contract for future delivery on or subject to the rules of a registered entity.

A swap includes any agreement, contract, or transaction that provides a payment of delivery that is dependent on the occurrence or non-occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.[42]

Conduct is 'in connection with' a swap, contract of sale of a commodity in interstate commerce, or contract for future delivery if it has some meaningful relationship to, or coincides with, a swap, contract of sale of a commodity in interstate commerce, or contract for future delivery on or subject to the rules of a registered entity.[43] This, however, does not mean that every act of alleged fraud has a sufficient nexus. The 'in connection with' requirement is not so broad to convert every single instance of fraud into a violation of the commodities laws.[44] Here, the

---

[41] *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 184 (2d Cir. 2013) ("[L]arge positions do not necessarily imply manipulation. A trader may indeed acquire a large position in order to manipulate prices. But a trader may also acquire a large position in the belief that the price of the future will, for reasons other than the trader's own activity, move in a favorable direction."); *United States v. Mulheren*, 938 F.2d 364, 371 (2d Cir. 1991) (noting that significant trading over short period of time "alone . . . does not make the investor a manipulator").

[42] *See* 7 U.S.C. § 9(1); 7 U.S.C. § 1a(47)(A) (defining 'swap' in this context).

[43] *See* Kevin F. O'Malley et al., 2B *Fed. Jury Prac. & Instr.* § 62:11 (6th ed., Aug. 2023 update) (requiring "some relationship" or connection between the alleged fraud and the financial product); *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 421 (2d Cir. 2014) (explaining that the phrase "in connection with" means "related to" or "associated with"); *Prohibition on Manipulative and Deceptive Devices*, 76 Fed. Reg. 41,398, 41,405 (July 14, 2011) (explaining that Rule 180.1 reaches "all manipulative or deceptive conduct in connection with the purchase, sale, solicitation, execution, pendency, or termination of any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity.").

[44] *See United States v. McLellan*, 959 F.3d 442, 458 (1st Cir. 2020) (explaining that the "'in connection with' element should not be read 'so broadly as to convert every common-law fraud that happens to involve securities into a violation of [federal law]'" (internal citation omitted)); *Prohibition on Manipulative and Deceptive Devices*, 76 Fed. Reg. 41,398, 41,405 (July 14, 2011) ("[T]he elasticity of the 'in connection with' language is not limitless.").

government has charged Mr. Phillips with commodities fraud based on the alleged use of manipulative spot trades in the foreign exchange market to trigger the one touch option. The government therefore has to prove that the one touch option is a swap as defined by the statute, and that the alleged deceptive trading was activity that has a relationship or nexus to the one touch option. If you find that Mr. Phillips' trading had no relationship to the one touch option, you must find him not guilty even if you find that the manner of his spot trades was manipulative.[45]

Interstate commerce means commerce between any State, territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, territory, or possession, or the District of Columbia, but through any place outside thereof, or within any territory or possession, or the District of Columbia.[46]

---

[45] *See Dunn v. CFTC*, 519 U.S. 465, 473 (1997) (noting that "Congress' broad purpose" was to "provide a general exemption from CFTC regulation for sophisticated off-exchange foreign currency trading"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *17 (S.D.N.Y. Sept. 20, 2016) (quoting *Dunn*, 519 U.S. at 473)).
[46] *See* 7 U.S.C. § 9(1); 7 U.S.C. § 1a(30) (defining "interstate commerce" in this context).

**REQUEST NO. 9—COMMODITIES FRAUD—THIRD ELEMENT: MATERIALITY**

For the third element, materiality, the government must prove, beyond a reasonable doubt, that Mr. Phillips' conduct was "material." Because the alleged deceptive scheme, misrepresentation, or omission in this case must be in connection with a swap under the Commodity Exchange Act, the deceptive conduct must be material to Morgan Stanley, the counterparty to the swap that the Indictment alleges was part of the manipulative scheme.[47] In this case, that refers to the one touch option that the Indictment alleges was triggered as a result of Mr. Phillips' trading.

'Materiality' refers to the nature of the allegedly unlawful conduct. It distinguishes between conduct a reasonable person would consider important, and that which has no real importance. The deceptive or manipulative conduct, or misrepresentation or omission, must be substantially likely to be important to a counterparty to the one touch option in making some decision in connection with the option. In other words, the deceptive or manipulative conduct must be of the type that would make a significant difference to a decision by Morgan Stanley relating to the option.[48]

Materiality is an objective standard.[49] This means that you need not decide that the evidence showed Morgan Stanley in fact found the deceptive conduct to be significant to a decision that it made. Rather, you must find beyond a reasonable doubt that the conduct would be

---

[47] *See United States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018) (explaining that victim's "point of view" on materiality is relevant, but it must fall "within the parameters of the thinking of reasonable investors in the particular market at issue").

[48] *See United States v. McLellan*, 959 F.3d 442, 458 (1st Cir. 2020) ("The 'in connection with' element requires the government to prove that the alleged misrepresentation was 'material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.''" (internal citation omitted)); *see also id.* (explaining that this requirementis "satisfied only 'where the misrepresentation [would make] a significant difference to someone's decision to purchase or to sell a covered security.'" (internal citation omitted)).

[49] *See United States v. Litvak*, 889 F.3d 56, 59 (2d Cir. 2018) ("[T]he applicable materiality test is an objective one.").