# 24-1908

*To Be Argued By*:
THOMAS S. BURNETT

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 24-1908

➤➤➤

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

NEIL PHILLIPS, also known as Sealed Defendant 1,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DANIELLE R. SASSOON,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

THOMAS S. BURNETT,
ANDREW M. THOMAS,
NATHAN REHN,
  *Assistant United States Attorneys,
  Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The Government's Case . . . . . . . . . . . . . . . . . 2

        1.  Foreign Exchange Markets and Options 3

        2.  Neil Phillips and Glen Point Capital . . . 4

        3.  The One-Touch Option . . . . . . . . . . . . . . 4

        4.  Phillips's Fraudulent Scheme . . . . . . . . 5

        5.  Phillips Dumps His Position . . . . . . . . . 9

    B.  The Defense Case and Verdict . . . . . . . . . . . 10

    C.  The District Court's Post-Trial Order . . . . . 11

    D.  The Sentencing . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT:

POINT I—Phillips's Challenges to the
Extraterritoriality Instruction
Are Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  Jury Instructions . . . . . . . . . . . . . . . . . . 12

        2.  Reach of the Commodity Exchange
Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.  The Extraterritoriality Instruction . . . . . . . 15

ii

PAGE

1. Relevant Facts. . . . . . . . . . . . . . . . . . . . . 15

2. Discussion . . . . . . . . . . . . . . . . . . . . . . . 18

    a. The District Court Properly Did Not Give a Systemic-Risk Instruction . 18

    b. Phillips Cannot Show Plain Error Through His Challenges to the Extraterritoriality Instructions. . . 26

POINT II—Sufficient Evidence Supported the Jury's Conclusion That the CEA Applied to Phillips's Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

A. Applicable Law. . . . . . . . . . . . . . . . . . . . . . 29

B. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 30

C. The Evidence Supported an Extraterritorial Application of the CEA . . . . . . . . . . . . . . . . . 32

    1. Applicable Law . . . . . . . . . . . . . . . . . . . . . 33

    2. Discussion . . . . . . . . . . . . . . . . . . . . . . . 34

        a. There Was a Sufficient Connection with the Activities of Morgan Stanley and JPMorgan in the United States . . . . . . . . . . . . . . . . . . 36

        b. There Was a Sufficient Connection with Other Activities in the United States. . . . . . . . . . . . . . . . . . . . . . . 44

iii

PAGE

D. The Evidence Supported a Domestic
Application of the CEA . . . . . . . . . . . . . . . . . 47

1. Applicable Law . . . . . . . . . . . . . . . . . . . . 47

2. Discussion . . . . . . . . . . . . . . . . . . . . . . . 48

POINT III—Phillips's Challenge to the Intent
Instructions Are Meritless. . . . . . . . . . . . . . . . . 51

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 52

B. Phillips's "Sole-Intent" Instruction Is Legally
Erroneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

C. Any Error Was Harmless . . . . . . . . . . . . . . . 59

POINT IV—The District Court Was Correct to Not
Require Proof of an Artificial Price. . . . . . . . . . . 63

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 64

B. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . 64

POINT V—Sufficient Evidence Supported the Jury's
Finding of Materiality . . . . . . . . . . . . . . . . . . . . 69

POINT VI—Phillips Received Due Process . . . . . . . . 72

A. Applicable Law. . . . . . . . . . . . . . . . . . . . . . . 72

B. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . 73

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

iv

# TABLE OF AUTHORITIES

*Cases*:

*Abitron Austria GmbH v. Hetronic Int'l Inc.*,
  600 U.S. 412 (2023) . . . . . . . . . . . . . . . . . . . . . . . 47

*Absolute Activist Value Master Fund v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) . . . . . . . . . . . . . . . . 41, 42

*Amgen Inc. v. Conn. Ret. Plans*,
  568 U.S. 455 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 71

*Atlantica Holdings v. Sovereign Wealth Fund*,
  813 F.3d 98 (2d Cir. 2016) . . . . . . . . . . . . . . . . 37, 38

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . 58

*Buscanan v. Elsaca*,
  927 F.3d 108 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 48

*CFTC v. Kraft Food Grp.*,
  153 F. Supp. 3d 996 (N.D. Ill. 2015) . . . . . . . . . . 68

*CFTC v. Southern Trust Metals, Inc.*,
  894 F.3d 1313 (11th Cir. 2018) . . . . . . . . . . . . . . 56

*City of Chicago v. Envt'l Def. Fund*,
  511 U.S. 328 (1994) . . . . . . . . . . . . . . . . . . . . . . . 23

*EIG Energy Fund XIV v. Petroleo Brasileiro, S.A.*,
  894 F.3d 339 (D.C. Cir. 2018) . . . . . . . . . . . . . . . 47

v

PAGE

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . 56, 62

*FAA v. Cooper,*
    566 U.S. 284 (2011) . . . . . . . . . . . . . . . . . . . . . 66

*Ford Motor Co. v. Montana Eight Judicial Dist. Ct.,*
    592 U.S. 351 (2021) . . . . . . . . . . . . . . . . . . . . . 39, 44

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) . . . . . . . . . . . . . . . . 70

*GFL Advantage Fund v. Colkitt,*
    272 F.3d 189 (3d Cir. 2001) . . . . . . . . . . . . . . . . 57

*Hartford Fire Ins. v. California,*
    509 U.S. 764 (1993) . . . . . . . . . . . . . . . . . . . . . 21

*In re Amaranth Nat. Gas Commodities Litig.,*
    730 F.3d 170 (2d Cir. 2013) . . . . . . . . . . . . . . 65, 66

*In re Platinum & Palladium Antitrust Litig.,*
    61 F.4th 242 (2d Cir. 2023) . . . . . . . . . . . . . . . . 48

*Lotes Co. v. Hon Hai Precision Indus.,*
    753 F.3d 395 (2d Cir. 2014) . . . . . . . . . . . . *passim*

*Markowski v. SEC,*
    274 F.3d 525 (D.C. Cir. 2001) . . . . . . . . . . . . . . . 57

*Maynard v. Cartwright,*
    486 U.S. 356 (1988) . . . . . . . . . . . . . . . . . . . . . 73

*Minn-Chem Inc. v. Agrium Inc.,*
    683 F.3d 845 (7th Cir. 2012) . . . . . . . . . . . . . . . . 21

*Morrison v. Nat'l Australia Bank,*
    561 U.S. 247 (2010) . . . . . . . . . . . . . . . . . . . . . 25, 50

vi

PAGE

*Musacchio v. United States,*
    577 U.S. 237 (2016) . . . . . . . . . . . . . . . . . . *passim*

*Neder v. United States,*
    527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Ortiz v. N.Y.S. Parole in Bronx, N.Y.,*
    586 F.3d 149 (2d Cir. 2009) . . . . . . . . . . . . . . 72, 74

*Pasquantino v. United States,*
    544 U.S. 349 (2005) . . . . . . . . . . . . . . . . . . . . . . . 57

*Perez v. United States,*
    402 U.S. 146 (1971) . . . . . . . . . . . . . . . . . . . . . . . 33

*Ponnapula v. Spitzer,*
    297 F.3d 172 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 72

*Prime Int'l Trading v. BP PLC,*
    937 F.3d 94 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . 48

*Psimenos v. E.F. Hutton & Co.,*
    722 F.2d 1041 (2d Cir. 1983) . . . . . . . . . . . . . 49, 50

*Rubin v. Garvin,*
    544 F.3d 461 (2d Cir. 2008) . . . . . . . . . . . . . . 72, 73

*SEC v. Masri,*
    523 F.Supp.2d 361 (S.D.N.Y. 2007) . . . . . . . . 60, 61

*SEC v. Obus,*
    693 F.3d 276 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 56

*SEC v. Vali Mgmt. Partners,*
    2022 WL 2155094 (2d Cir. 2022) . . . . . . . . *passim*

*Set Capital LLC v. Credit Suisse Grp., A.G.,*
    996 F.3d 64 (2d Cir. 2021) . . . . . . . . . . . . . . . 58, 62

vii

PAGE

*SIFMA v. CTFTC,*
    67 F. Supp. 3d 373 (D.D.C. 2014) . . . . . . 13, 14, 25

*Soliman v. Subway Franchisee Adv. Fund Trust,*
    101 F.4th 176 (2d Cir. 2024) . . . . . . . . . . . . . . . . . 22

*Southwest Airlines Co. v. Saxon,*
    596 U.S. 450 (2022) . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Al Kassar,*
    660 F.3d 108 (2d Cir 2011) . . . . . . . . . . . . . . . . . 27

*United States v. Anderson,*
    326 F.3d 1319 (11th Cir. 2003) . . . . . . . . . . . . . . 21

*United States v. Aquart,*
    912 F.3d 1 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . 29

*United States v. Archer,*
    977 F.3d 181 (2d Cir. 2020) . . . . . . . . . . . . . . 32, 33

*United States v. Cornelson,*
    609 F. Supp. 3d 258 (S.D.N.Y. 2022) . . . . . . . 45, 48

*United States v. Crowley,*
    318 F.3d 401 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 13

*United States v. Dai,*
    99 F.4th 136 (2d Cir. 2024) . . . . . . . . . . . . . . . . . 66

*United States v. Facen,*
    812 F.2d  (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . 29

*United States v. Frady,*
    456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Harriss,*
    347 U.S. 612 (1954) . . . . . . . . . . . . . . . . . . . . . . . . 72

viii

PAGE

*United States v. Helmsley*,
   941 F.2d 71 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . 68

*United States v. Heras*,
   609 F.3d 101 (2d Cir. 2010) . . . . . . . . . . . . . . . 29, 42

*United States v. Hunt*,
   82 F.4th 129 (2d Cir. 2023) . . . . . . . . . . 13, 18, 55

*United States v. Kim*,
   246 F.3d 186 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 49

*United States v. Lange*,
   834 F.3d 58 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 49

*United States v. Marcus*,
   560 U.S. 258 (2010) . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Moseley*,
   980 F.3d 9 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . . 74

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991) . . . . . . . . . . . . . . 57, 59

*United States v. Napout*,
   963 F.3d 163 (2d Cir. 2020) . . . . . . . . . . . . . . 45, 48

*United States v. Regan*,
   490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 69

*United States v. Roy*,
   783 F.3d 418 (2d Cir. 2015) . . . . . . . . . . . . . . 12, 55

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008) . . . . . . . . . . . . . . 49, 58

*United States v. Rutigliano*,
   790 F.3d 389 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 51

ix

PAGE

*United States v. Sabhnani,*
 599 F.3d 215 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 27

*United States v. Technodyne LLC,*
 753 F.3d 368 (2d Cir. 2014) . . . . . . . . . . . . . . . 56, 59

*United States v. Trapilo,*
 130 F.3d 547 (2d Cir. 1997) . . . . . . . . . . . . . . . . . 67

*United States v. Veliz,*
 800 F.3d 63 (2d Cir. 2015) . . . . . . . . . . . 30, 31, 44

*United States v. Vilar,*
 729 F.3d 62 (2d Cir. 2013) . . . . . . . . 45, 49, 51, 69

*United States v. Weintraub,*
 273 F.3d 139 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 18

*Virtual Countries, Inc. v. Rep. of S. Afr.,*
 300 F.3d 230 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 35

*Zepeda-Lopez v. Garland,*
 38 F.4th 315 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 19

*Statutes, Rules & Other Authorities:*

7 U.S.C. § 1a(33) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

7 U.S.C. § 1a(49) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

7 U.S.C. § 2(i) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

7 U.S.C. § 6r . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

7 U.S.C. § 9 . . . . . . . . . . . . . . . . . . . . . . . 50, 65, 66, 73

7 U.S.C. § 9(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . 47

x

PAGE

7 U.S.C. §§ 9(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

7 U.S.C. § 13(a)(2) . . . . . . . . . . . . . . . . . . . . . 65, 66, 68

Dodd-Frank Wall Street Reform and Consumer
    Protection Act, Pub. L. No. 111-203, 124 Stat.
    1376 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Crim. P. 30(d) . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Crim. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17 C.F.R. § 180.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

17 C.F.R. § 23.23(b)(2)(i) . . . . . . . . . . . . . . . . . . . . . . 42

17 C.F.R. 180.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . 56, 71

Interpretive Guidance and Policy Statement
    Regarding Compliance With Certain Swap
    Regulations, 78 Fed. Reg. 45,292
    (July 26, 2013) . . . . . . . . . . . . . . . . . . . . . . . *passim*

Cross-Border Application of the Registration
    Thresholds and Certain Requirements
    Applicable to Swap Dealers and Major Swap
    Participants, 85 Fed. Reg. 56,924
    (Sept. 14, 2020). . . . . . . . . . . . . . 14, 15, 33, 36, 42

Prohibition on the Employment, or Attempted
    Employment, of Manipulative and Deceptive
    Devices and Prohibition on Price Manipulation,
    76 Fed. Reg. 41,398
    (July 14, 2011). . . . . . . . . . . . . . . . . . . . . . 66, 67, 73

xi

PAGE

Amendments to Commodity Pool Operator and
    Commodity Trading Advisor Regulations
    Resulting From the Dodd-Frank Act, 77 Fed. Reg.
    54,355 (Sept. 5, 2012). . . . . . . . . . . . . . . . . . . . . . . 22

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-1908

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

NEIL PHILLIPS, also known as Sealed Defendant 1,

*Defendant-Appellant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Neil Phillips appeals from a judgment of conviction entered on June 28, 2024, in the United States District Court for the Southern District of New York, following a jury trial before the Honorable Lewis L. Liman, United States District Judge.

Indictment 22 Cr. 138 (the "Indictment") was filed on March 3, 2022, charging Phillips in four counts. Count One charged Phillips with conspiring to commit commodities fraud, in violation of 18 U.S.C. § 371. Count Two charged Phillips with commodities fraud, in violation of 7 U.S.C. §§ 9(1) and 13(a)(5), 17 C.F.R. § 180.1, and 18 U.S.C. § 2. Count Three charged

2

Phillips with conspiring to commit wire fraud, in violation of 18 U.S.C. § 1349. And Count Four charged Phillips with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

Trial on Counts One and Two commenced on October 16, 2023 and ended on October 25, 2023, when Phillips was acquitted on Count One and convicted on Count Two.

On June 25, 2024, Judge Liman sentenced Phillips to a term of time served, with two years' supervised release and a $1 million fine.

## Statement of Facts

### A. The Government's Case

Neil Phillips was convicted of manipulating the exchange rate between United States dollars and South African rand to trigger a payout on a financial instrument called a one-touch option. His fraudulent manipulation of the dollar-rand exchange rage netted his hedge fund's clients a $20 million profit at the expense of an American bank that held the other side of the option. Phillips perpetrated the fraudulent scheme in the middle of Christmas night, when trading volumes were low and the rate could be more easily manipulated. In less than an hour, Phillips sold 725 million United States dollars for billions of South African rand, to drive the exchange rate below 12.50 rand per dollar, deceiving the option counterparty into believing the option had been triggered based on natural market forces, instead of Phillips's price rigging.

3

### 1. Foreign Exchange Markets and Options

The foreign-exchange market is a global market for trading currencies against each other in pairs. The relative value of the currencies in each pair is expressed as a ratio, commonly referred to as an "exchange rate." For example, traders exchange U.S. dollars and South African rand based on the dollar-rand, or USD/ZAR, exchange rate, which reflects the number of rand needed to purchase one dollar. When the rand strengthens against the dollar, the exchange rate falls because fewer rand are needed to buy a dollar. Conversely, when the rand weakens against the dollar, the exchange rate rises. (SA-76-78).[1]

Trading one currency for another is known as a "spot" trade. Parties in the foreign-exchange market can also trade an array of derivative financial instruments based on exchange rates, which are generally regulated as "swaps" under the Commodities Exchange Act ("CEA"). The swaps that are relevant to this case are known as "one-touch options." In a one-touch option, the buyer pays a premium and the seller agrees to pay a specified amount if a specified exchange rate reaches (or "touches") a specified rate (the

---

[1]  "Br." refers to Phillips's brief on appeal; "A" and "SPA" refer to the appendix and special appendix filed with Phillips's brief; "SA" refers to the supplemental appendix filed with the Government's brief; and "Dkt." refers to an entry on the District Court's docket. Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

4

"barrier") by a certain date. If the option expires without ever touching that barrier, the buyer receives nothing. (SA-5-10).

### 2. Neil Phillips and Glen Point Capital

Phillips was the co-founder and co-Chief Investment Officer of a hedge fund called Glen Point Capital, which focused primarily on trading in the foreign-exchange markets based on global events. Glen Point had offices in London and New York and routinely used J.P. Morgan Chase Bank N.A. ("JPMorgan"), which is based in New York, as the prime broker for its trading. (SA-408-11).

Glen Point managed money for clients, including investors in the United States. (SA-20). As such, both Glen Point and Phillips were registered with regulatory agencies in the country, including the National Futures Association ("NFA"), which is the entity through which people and companies register if they must comply with Commodity Futures Trading Commission ("CFTC") regulations. To obtain that registration, Phillips had to take a test on CFTC regulations, including regulations prohibiting fraud and manipulation. (SA-426, 573-640). Glen Point also trained Phillips and other traders about prohibitions on fraud and market manipulation. (SA-451-98).

### 3. The One-Touch Option

In the fall of 2017, Phillips made a series of investments based on upcoming political events in South Africa. That December, South Africa's leading political party, the African National Congress ("ANC"), was

5

scheduled to hold elections for new leadership. Phillips believed that the reform candidate, Cyril Ramaphosa, would win the election over a candidate backed by the incumbent, Jacob Zuma. Phillips anticipated that, if Ramaphosa won, the rand would rapidly strengthen against the dollar, causing the dollar-rand exchange rate—which was at around 14.00 at the time Phillips made his investment—to fall. (*See* SA-21-23).

The ANC elections were scheduled for the week of December 18, 2017. Phillips made his bet on the election primarily by purchasing options, including one-touch options, that were set to expire shortly after the election. One of those options, which became the focal point of Phillips's crime, was a $20 million one-touch option with a barrier of 12.50 and an expiration date of January 2, 2018 (the "Option"). If the exchange rate dropped to 12.50 or below any time before that date, Glen Point would receive a $20 million payment. (SA-697). The option contract was written by Morgan Stanley International, which is based in London, but Morgan Stanley International transferred that transaction to Morgan Stanley Capital Services ("Morgan Stanley") through an options contract. (SA-35-38). This meant that the economic risk of the transaction on the seller's side was held by Morgan Stanley, which is based in New York. (*Id.*).

### 4. Phillips's Fraudulent Scheme

The ANC elections began on December 18. Ramaphosa won, as Phillips had hoped, and Phillips's attention turned to the Option. As results were coming in, Phillips directed one of his employees, Phil Costa, to

6

keep a "close eye" on the USD/ZAR exchange rate. He explained that, if the exchange rate reached 12.50—the barrier for the Option—Costa should get a confirmation from a bank, adding that the exchange rate "needs to trade thru there." (SA-242). But Phillips did not get the market move he needed: The exchange rate fell from over 13.00 to a low of 12.52, before moving higher. (SA-242, 307, 699).

Over the next two days, the exchange rate stayed above 12.50, so Phillips hatched a criminal plan to manipulate the rate to trigger the Option. (SA-699). On December 20, the ANC was scheduled to hold elections for the National Executive Committee—the party's chief body for setting policy—and success in those elections would strengthen Ramaphosa's hand in the party. (SA-26-27). Phillips saw this as an opportunity to put his scheme into motion. In a call with Costa, Phillips remarked that he might need Costa "to start fucking around in Dollar-Rand" to try to move the exchange rate "lower." Phillips explained that there were about 15 days until the Option expired, but it would be "nice if we could get it done." To that end, Phillips told Costa that, if the exchange rate reached 12.55, they should "go fucking lash it through [12.50] tonight," adding that they might want to wait until Asian market hours, when there was typically less USD/ZAR trading and therefore a better chance to move the exchange rate. (SA-204-07).

This was not a normal trading discussion; it reflected a scheme to manipulate the dollar-rand exchange rate. Glen Point's former head trader testified that he had executed thousands of trades for Phillips

7

during his career. He had never heard Phillips give the kinds of directions he gave to Costa, such as a direction to "lash" an exchange rate through a particular price, to "fuck around" with an exchange rate, or to "trade through" a particular price. (SA-74-75).

Ultimately, the exchange rate did not drop below 12.57 on December 20, so Phillips's did not have an opportunity to execute his plan to "lash it through" 12.50. (SA-204-07). The rate remained above 12.50 over the next several days, despite additional news about the decisiveness of Ramaphosa's victory in the ANC elections. (SA-449-50, 699, 703-07).

Phillips decided to use the holiday weekend to manipulate the exchange rate. Phillips was staying in South Africa, and he began trading around 2:00 in the morning after Christmas, when it was around midnight in London and Christmas evening in New York. (SA-521). The timing was deliberate: Phillips knew that markets in New York and London would be closed, leaving only the Asian market—just as he had proposed in his December 20 call to Costa. This meant that there would be fewer traders—and less liquidity —in the market, giving Phillips the best chance to significantly move the exchange rate by selling dollars to buy rand. (SA-11, 15-16, 700).

Phillips executed his manipulative scheme by logging onto Bloomberg and directing a banker to start selling dollars to buy rand. He was explicit about his objective, telling the banker that his "aim" was to "trade thru 50"—referring to the 12.50 barrier on the Option. Phillips also told the banker he wanted to "giv[e] bids," which meant that Phillips wanted to sell

8

dollars to buy rand at whatever price was being bid in the market. (SA-521-24). Trading by giving bids was highly unusual for Phillips, an indication that he was not trying to get the best price, but rather was trying to drive down the exchange rate. Glen Point's head trader testified that, in all his time at the hedge fund, Phillips had never directed him to trade through a barrier or to "give bids." (SA-74-75).

Phillips sold rapidly, regularly checking to see whether his order had driven the exchange rate through 12.50. At 1:50 a.m., he initiated his trading by directing the sale of $25 million for rand, "giving bids." (SA-521). After hearing that this had caused the market to "trade[ ] down to a low of 12.5675," he directed the banker to sell $50 million for rand in 5 minutes, expressly explaining that "my aim is to trade thru [12.50]." (SA-523-25). That second trade pushed down the exchange rate, but not through the barrier. So Phillips directed the banker to sell another $50 million for rand, reiterating that he needed to push the exchange rate through 12.50. (SA-525). That, too, proved insufficient, so Phillips authorized the banker to sell "up to" $200 million more, but to stop selling once they broke through the barrier. (SA-526). When that did not work, Phillips instructed the banker to "sell ano[ther] 100" to "get it thru." (SA-527). Phillips continued instructing the banker to sell in batches of $100 million, checking the price each time. (SA-528-30).

Ultimately, Phillips sold $725 million for billions of rand in the span of less than one hour, repeatedly exhorting the banker that his goal was to "get it thru" 12.50. (SA-521-30). At around 2:45 a.m. South Africa

9

time, the banker told Phillips that he had "just sold at [12.4990]." (SA-529). Phillips immediately told him to "stop" selling and to "get me proof of print," which was a confirmation that Phillips would need to prove the barrier had been broken. (SA-529, 701).

### 5. Phillips Dumps His Position

Phillips had not anticipated needing to buy $725 million worth of rand to trigger the Option. In the morning, just hours after completing his manipulative trading, Phillips called Costa and said that he was "going to have to start buying this shit back," referring to dumping his position by buying dollars with rand. (SA-208-10). But Phillips could not do that right away: The exchange rate had already rebounded above 12.50 after his manipulative trading ended, so unwinding the trade would saddle him with a loss and move the exchange rate further away from another one-touch option Phillips had purchased, which had a barrier at 12.25 (the "12.25 Option"). (SA-208-10, 698).

Phillips found an opportunity to unload his position two days later, on December 28. But not before manipulating the exchange rate again. On the morning of December 28, the exchange rate had fallen to right above 12.25—slightly higher than the level that would trigger the 12.25 Option. (SA-702). Phillips called Costa to discuss the exchange rate and said, "we might need to do a job on it." (SA-211-13). Shortly thereafter, Phillips had Costa instruct a trader to sell $100 million for rand and "just hit the bids." (SA-214-15). When the exchange rate went through 12.25 after the trader sold only $35 million, Phillips told Costa to "stop,"

10

remarking "[w]e thru"—a reference to having triggered the 12.25 Option. (SA-389.) Phillips then switched from buying rand to selling it, directing Costa and others to sell nearly all of the rand he had purchased the night after Christmas. (SA-220-22, 702).

## B. The Defense Case and Verdict

Phillips presented his defense by cross-examining witnesses and offering the testimony of an expert witness. The defense argued to the jury that Phillips learned news over the Christmas weekend that was positive for Ramaphosa—including a favorable Christmas eve sermon by the Archbishop of South Africa—which Phillips expected to cause the exchange rate to fall below 12.50. (SA-2-3). Every option, including the Option, gives the holder of that option exposure to changes in the exchange rate, which is measured by a metric known as "delta." The defense claimed that, if the exchange rate went through 12.50, triggering the Option, Glen Point would lose exposure to future strengthening of the rand, so Phillips wanted to buy rand to "replace" the exposure, or "delta," that he would lose once the Option was triggered. (SA-80-82).

The evidence at trial undermined that delta-replacement theory. Phillips's expert witness admitted that he had no basis to believe that the Archbishop's speech had spurred Phillips's trading. (SA-123-36). And Phillips's calls and messages before, during, and after his manipulative trading showed that he was focused on triggering the Option, not on replacing delta, a subject that he never raised in the course of perpetrating the scheme. Moreover, Glen Point records

11

showed that Phillips could not have been trying to manage delta because he had removed delta information from the firm's risk trackers, which made it impossible for him to see Glen Point's true exposure to the dollar-rand exchange rate. (SA-70-72). Moreover, an expert for the Government testified that Phillips's trading was not consistent with an economically rational plan to replace delta. (SA-80-108).

On October 25, 2023, the jury convicted Phillips of commodities fraud, while acquitting him on the conspiracy count.

## C. The District Court's Post-Trial Order

At the close of the Government's case-in-chief, Phillips moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Judge Liman reserved decision. After trial, Phillips filed a post-trial brief supporting his Rule 29 motion and, in the alternative, seeking a new trial under Rule 33. On March 27, 2024, Judge Liman denied Phillips's motions in an 82-page memorandum opinion and order. (SPA-35-118).

## D. The Sentencing

On June 25, 2024, Judge Liman sentenced Phillips to time served, two years' supervised release, a $1 million fine, and a $100 mandatory special assessment. Judge Liman emphasized that the sentence was based on the unique facts of Phillips's case, including that Phillips had already "spent a month in a Spanish prison where he was subject to extremely harsh conditions of confinement." (SA-708).

12

# A R G U M E N T

## POINT I

### Phillips's Challenges to the Extraterritoriality Instructions Are Meritless

Contrary to Phillips's claims on appeal, the District Court committed no error by not instructing the jury that the CEA applied extraterritorially only if Phillips's criminal activity posed a systemic risk to the U.S. financial system. (Br. 28). Phillips's systemic-risk instruction is inconsistent with the CEA's text and structure. Indeed, his argument would render the CEA's extraterritoriality provision a nullity—it is difficult to imagine any single transaction that could undermine the entire financial system. Phillips's other challenges to the District Court's extraterritoriality instructions are similarly meritless.

## A.  Applicable Law

### 1.  Jury Instructions

A defendant challenging a jury instruction must demonstrate that he requested a charge that "accurately represented the law in every respect" and that the charge delivered was erroneous and prejudicial. *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015). An "instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.*

Where a defendant fails to make a timely objection to a district court's proposed instructions, those instructions are subject to review for plain error. *See*

13

*United States v. Hunt*, 82 F.4th 129, 138 (2d Cir. 2023). To preserve an objection, a party must "inform the court of the specific objection and the grounds before the jury retires to deliberate." Fed. R. Crim. P. 30(d); *accord United States v. Crowley*, 318 F.3d 401, 412 (2d Cir. 2003). A party cannot "satisfy [this] burden merely by submitting its own proposed language as part of a requested charge," but instead must object to the Court's proposed instructions. *Hunt*, 82 F.4th at 138; *accord Crowley*, 318 F.3d at 412-13.

To establish plain error, the defendant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; [and] (3) the error affected the appellant's substantial rights." *United States v. Marcus*, 560 U.S. 258, 262 (2010). Reversal for plain error should "be used sparingly, solely in circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982).

## 2.  Reach of the Commodity Exchange Act

Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act in the wake of the 2008 financial crisis. Pub. L. No. 111-203, 124 Stat. 1376. The Dodd-Frank Act amended the CEA to regulate "the previously unregulated derivative swaps market." *SIFMA v. CTFTC*, 67 F. Supp. 3d 373, 384 (D.D.C. 2014). That included new prohibitions against fraud and manipulation in connection with swaps. 7 U.S.C. § 9(1).

"Recognizing the interconnected nature of domestic and international swaps trading, Congress …

14

provided for the extraterritorial application of the [new provisions regarding swaps] in certain circumstances." *SIFMA*, 67 F. Supp. 3d at 388. It did so through Section 2(i), which provides that the Dodd-Frank Act's swap provisions apply "to activities outside the United States" when "those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1).

The CFTC issued interpretive guidance regarding the phrase "direct and significant" in Section 2(i) in 2013, *see* Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations, 78 Fed. Reg. 45,292, 45,297 (July 26, 2013), and "restat[ed] its interpretation of Section 2(i)" in a final rule released in 2020, *see* Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, 85 Fed. Reg. 56,924, 56,928 (Sept. 14, 2020). The CFTC interprets the term "direct" to "require a reasonably proximate causal nexus and not to require foreseeability, substantiality, or immediacy." 85 Fed. Reg. at 56,930. In adopting this interpretation, the CFTC relied in part on this Court's interpretation of the word "direct" in the Foreign Trade Antitrust Improvements Act ("FTAIA") as requiring a "reasonably proximate causal nexus." *Lotes Co. v. Hon Hai Precision Indus.*, 753 F.3d 395, 398 (2d Cir. 2014); *see* 85 Fed. Reg. at 56,929 & n.45 (citing *Lotes*).

As for the term "significant" in Section 2(i), the CFTC rejected the idea that there must be a "transaction-by-transaction determination" that specific swaps

15

are covered by the CEA, and instead concluded that the CEA extends to "swap activities that as a class, or in the aggregate, have a direct and significant connection with activities in, or effect on, U.S. commerce." 85 Fed. Reg. at 56,930. In reaching this conclusion, the CFTC noted that a "swap-by-swap approach to jurisdiction would be too complex to prove workable." 85 Fed. Reg. at 56,930 & n.55. Thus, the CFTC has never regulated on the theory that Section 2(i) applies only when a specific activity or transaction poses a systemic risk to the American financial system.

## B. The Extraterritoriality Instruction

### 1. Relevant Facts

Before trial, both parties proposed jury instructions on Section 2(i). Phillips proposed instructing the jury that the Government was required to prove that "activities related to the swap that occurred outside the United States" were "capable of directly undermining the stability of the United States financial system." (A-304-05).

During trial, Judge Liman circulated draft instructions that included an instruction regarding Section 2(i). (A-2419-21). Judge Liman's draft instructions rejected Phillips's proposal but adopted a more defendant-friendly interpretation than the interpretation adopted by the CFTC, stating that, "[f]or a connection or effect to be 'direct,' it must be immediate." (A-2420).

The draft instructions went on to define "significant" as "meaningful or consequential." (*Id.*). Again adopting a more defendant-friendly view than the

16

CFTC's interpretation, Judge Liman took a transaction-by-transaction approach to analyzing significance. The instructions explained that, "[f]or activity outside the United States to have a significant connection with activity in commerce of the United States, the relationship between the activity outside of the United States to the commercial activity in the United States must be of importance," rather than "random, fortuitous, attenuated, or merely incidental." (A-2420-21).

As for the "effect" prong of Section 2(i), the instructions stated that, for activity outside the United States to have "a direct and significant effect on commerce of the United States, the Government must prove that an activity related to the [OT Option] had an initial and immediate financial effect on a United States entity that was of consequence." (A-2421). The instructions gave, as an example, activity that "pose[d] a risk to the financial health of the impacted United States entity that, in turn, would have a meaningful effect on the United States financial system." (*Id.*)

At the charge conference, the Government stated that it did not plan to proceed on the "effect" prong and proposed removing that language from the instructions. (SA-164). The defense consented to that proposal and did not object to any of the Court's proposed extra-territoriality instructions. (*Id.*).

Judge Liman's final jury instruction on extraterritoriality stated, in relevant part:

> [T]he Government can meet its burden by proving that an activity of the defendant

17

. . . outside the United States related to the [OT Option] had a direct and significant connection with activities in commerce of the United States.

For a connection or effect to be "direct," it must be immediate. A connection to an activity in commerce of the United States is direct if the activity outside the United States directly and immediately affected activity in commerce of the United States without deviation or interruption. An indirect or attenuated connection to commercial activity that occurs in the United States is not sufficient to satisfy this element of the test.

"Significant" in this context means meaningful or consequential. For activity outside the United States to have a significant connection with activity in commerce of the United States, the relationship between the activity outside the United States to the commercial activity in the United States must be of importance. It is not sufficient if the relationship between the conduct outside the United States and that inside the United States is random, fortuitous, attenuated, or merely incidental. The conduct in the United States must be integral rather than ancillary.

(SA-202-03).

18

## 2. Discussion

### a. The District Court Properly Did Not Give a Systemic-Risk Instruction

On appeal, Phillips argues that the District Court erred by not instructing the jury that a "significant connection" with domestic commerce requires a finding of a systemic risk to the United States financial system. But Phillips never objected to the District Court's proposed instructions on this issue. On appeal, Phillips points to his initial request to charge, which included a proposed instruction that the Government must prove that his conduct was "capable of directly undermining the stability of the United States financial system." (A-304-05; *see* Br. 22-23). But the District Court's draft instructions did not include this language, and Phillips did not object to the extraterritoriality instruction at the charge conference. Indeed, he consented to removing the instruction on "effect on" the United States, which included a reference to risk to the financial system. (SA-164, 709-12). Because he did not object to Judge Liman's instructions, Phillips must satisfy the plain error standard. *Hunt*, 82 F.4th at 138.

Phillips comes nowhere near showing that Judge Liman's instructions were plainly erroneous. *See id.* at 139 (error not plain where appellant "cites no binding precedent supporting his proposed jury instruction"); *United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001) (no plain error where defendant cannot identify a "prior decision . . . mandating the jury instruction" he "says should have been given"). On the contrary, the

19

instructions were more favorable to the defense than the law requires, and the District Court committed no error in not giving a "systemic-risk" instruction.

Phillips's systemic-risk argument is at odds with the text, structure, and purpose of Section 2(i). To begin with the text, a "significant connection" with activities in the United States does not, as Phillips contends, mean "one that can pose a systemic risk to the U.S. financial system." (Br. 34-35). The plain meaning of the word "significant" is nowhere near so sweeping. Rather, consistent with Judge Liman's instructions, the term means "meaningful" or "consequential." (SA-202); "Significant," Merriam Webster, *available at* https://www.merriam-webster.com/dictionary/significant ("Having or likely to have influence or effect; of a noticeably or measurably large amount"); "Significant," Oxford English Dictionary, *available at* https://www.oed.com/dictionary/significant_adj?tl=true ("Sufficiently great or important to be worthy of attention; noteworthy; consequential; influential."). The dictionaries Phillips cites are not to the contrary, defining "significant" as "important" or "of special importance." (Br. 32).

Further, Phillips's interpretation of "significant" does not fit with the "context in which that language is used." *Zepeda-Lopez v. Garland*, 38 F.4th 315, 321 (2d Cir. 2022). Section 2(i) applies the CEA to activities outside the United States that have a "direct and significant" (1) connection with activities in commerce of the United States, or (2) effect on commerce of the United States. Interpreting significant to mean "meaningful" or "consequential" is sensible under both

20

pathways, while Phillips's systemic-risk interpretation does not work with either.

When Section 2(i) extends the CEA to activities abroad that "have a direct and significant connection with activities in" the United States, the term "significant" measures the relationship between the activities outside the country and those inside the country. The District Court implemented that by instructing the jury to consider whether the activities outside the United States had a meaningful connection to those inside the country, as opposed to a simply incidental connection. Phillips's systemic-risk instruction, by contrast, measures the wrong thing: It focuses on the risk activities outside the United States pose to the financial system, rather than the relationship between activities abroad and those inside the country. This is inconsistent with the text of the statute and collapses the distinction between the "connection" and "effect" prongs. Notably, as the CFTC explains in its interpretive guidance, Section 2(i) is deliberately written to encompass both "effects on" and "connection with" United States commerce, which is broader than a similar statute, the FTAIA, that "solely relies on the 'effects' on U.S. commerce." 78 Fed. Reg. 45,299.[2]

---

[2]  Phillips claims that his interpretation does not collapse the distinction between the "connection" and "effect" prongs by arguing that, under the "connection" prong, "the nature of the risk . . . need not be realized." (Br. 35-36). That argument bears no relationship to

21

Nor does the "effect" prong of Section 2(i) suggest a requirement of systemic risk. Interpreting "significant effect" to mean "capable of undermining the U.S. financial system" goes far beyond the normal meaning of "significant," and is inconsistent with how similar language has been interpreted in the FTAIA, which is "structured similarly" to Section 2(i). 78 Fed. Reg. at 45,298. Under the FTAIA, the antitrust laws apply to conduct abroad that has a "direct, substantial, and reasonably foreseeable effect on domestic . . . commerce." *Lotes*, 753 F.3d at 395. No court has held that, because the "substantial effect" must be on "domestic commerce," the conduct at issue must pose a systemic risk to the economy. Rather, the use of "domestic commerce" means the conduct at issue must "produce some substantial effect in the United States." *Hartford Fire Ins. v. California*, 509 U.S. 764, 796 (1993); *Minn-Chem Inc. v. Agrium Inc.*, 683 F.3d 845, 856 (7th Cir. 2012) (finding supra-competitive prices in country was "substantial" effect); *United States v. Anderson*, 326 F.3d 1319 (11th Cir. 2003) (finding "substantial" effect when scheme deprived people in country of money). Similarly, "significant . . . effect" on "commerce of the United States" in Section 2(i) simply means there must be a meaningful or consequential effect of the conduct in the country, such as a harm to U.S. persons or commerce.

Looking to the statutory and regulatory scheme "as a whole" reveals further, fatal problems with Phillips's

---

the text of Section 2(i), which says nothing about risk or unrealized harms.

22

systemic-risk argument. *Soliman v. Subway Franchisee Adv. Fund Trust*, 101 F.4th 176, 181 (2d Cir. 2024). For one, the systemic-risk interpretation would essentially exclude the CEA's anti-fraud and anti-manipulation provisions from Section 2(i). Under Phillips's interpretation, a single fraudulent or manipulative scheme would have to be capable of undermining the financial system for Section 2(i) to apply. (Br. 34-35 & n.35). It is hard to fathom any scheme could pose such a risk. Large banks in the United States undergo stress tests to ensure their stability "even in a severe recession." Federal Reserve, "2024 Supervisory Stress Test Methodology," at iii-iv (2024). A single criminal scheme could not plausibly inflict more harm than a severe recession, but that is what Phillips would have Section 2(i) require.

A systemic-risk standard is also illogical for the CEA's other swap provisions. Section 2(i) applies broadly to all provisions "relating to swaps" in the Dodd-Frank Act. Those provisions, among other things, "impos[e] clearing and trade execution requirements"; create new "recording" and "reporting" rules; and expand regulation of swaps transactions by regulated entities, such as commodity pool operators and commodity trading advisers. *See* Amendments to Commodity Pool Operator and Commodity Trading Advisor Regulations Resulting From the Dodd-Frank Act, 77 Fed. Reg. 54,355 (Sept. 5, 2012). Over more than a decade, the CFTC has developed a regulatory system around the premise that Section 2(i) extends many of these regulations abroad. For instance, an entity must register as a swap dealer if it routinely sells or makes markets in swaps, above certain thresholds. *See* 7

23

U.S.C. § 1a(49). There is no requirement that the entity pose a systemic risk to the financial system before being required to register and comply with a host of "entity-level requirements" that cover issues such as "capital adequacy," "risk management," and record-keeping and reporting. 78 Fed. Reg. at 45,347-48, 45,331. The CEA also has "transaction-level requirements" that apply to a broader range of swap participants—including commodity pool operators and trading advisors—and regulate issues such as trade clearing and processing, trade execution, margin levels, and portfolio management and reporting. 78 Fed. Reg. at 45,333.

Adopting a systemic-risk rule would nullify Section 2(i) as to these non-fraud swap rules and their implementing regulations. Before any such regulations could apply to offshore entities or transactions, Phillips would require assessing whether activity "can pose a systemic risk to the U.S. financial system." (Br. 34-35). But how could failure to properly clear, record, or execute a trade ever pose such a catastrophic risk? How could non-compliance with recordkeeping and reporting rules "directly undermin[e]" the stability of American finance? The poor fit between Phillips's systemic-risk rule and the CEA as a whole shows that his interpretation of "significant" cannot be squared with the statute.

Phillips's brief also quotes 7 U.S.C. § 1a(33), which provides that an entity must register as a "major swap participant" if it is "systemically important or can significantly impact the financial system of the United States." (Br. 34). That provision, however, undermines

24

Phillips's argument because it confirms that Congress "knew how to" write a standard about systemic risk "when it wanted to." *City of Chicago v. Envt'l Def. Fund*, 511 U.S. 328, 337-38 (1994). The absence of similar language about systemic importance in Section 2(i) demonstrates that no such limitation was intended there. *See Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (when a statute "used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea"). The definition of "major swap participant" also illustrates how Phillips's interpretation of Section 2(i) would render that provision a dead letter: because only "systemically important" entities must register under Section 1a(33), "there are no registered major swap participants." CFTC, "Major Swap Participant (MSP)," *available at* https://www.cftc.gov/IndustryOversight/Intermediaries/MajorSwapParticipantMSP/index.htm.

Not only is Phillips's proposed systemic-risk rule incompatible with the text and structure of Section 2(i), but it would also undermine the purpose of the Dodd-Frank Act. Phillips is wrong to suggest that reducing systemic risk was the only purpose of the Act. (Br. 33). Congress also sought to "increase transparency" and "promote market integrity," among other objectives. 78 Fed. Reg. at 45,293, 45,338. Many of the CEA's swap provisions, including the prohibition on fraud in connection with swaps, are designed to increase transparency and market integrity, and there is no reason to adopt an interpretation of Section 2(i) that excludes those goals.

25

Moreover, Phillips's proposed rule would undermine the objective of reducing systemic risks. Under his interpretation, for Section 2(i) to apply, a specific activity or transaction must pose a systemic risk to the financial system. Such a rule would hobble the CEA's ability to protect American markets. An important lesson of the 2008 financial crisis was that, because global swap markets are interconnected, the risk for swap transactions across the globe can build up in the United States. For example, American International Group "nearly failed because of risk incurred by the swaps trading operations in the London branch of its subsidiary," and Lehman Brothers suffered significant losses, in part, because it "guaranteed nearly 130,000 derivative contracts" held by a foreign subsidiary. *SIFMA*, 67 F. Supp. 3d at 387; *see* 78 Fed. Reg. at 45,294 (identifying other examples). The problem was not that any one of these transactions posed a systemic risk, but that the collective effect of these transactions caused systemic effects on the financial system. It would make little sense for Congress to respond to that crisis by extending the CEA abroad only if an isolated activity or transaction poses a risk to the financial system all by itself. The rule Phillips advocates would leave the nation exposed to the very "build-up of systemic risks" that the Dodd-Frank Act was designed to address. 78 Fed. Reg. at 45,300.

Finally, Phillips's interpretation is also undermined by the history of Section 2(i). As Judge Liman recognized below, "Congress added [Section 2(i)] just three days after the Supreme Court decided [*Morrison v. Nat'l Australia Bank*, 561 U.S. 247 (2010)]." (SPA-61-62). The Solicitor General's brief in *Morrison* had

26

advocated that the securities laws should reach conduct abroad that has a "significant" connection to conduct in the United States. Br. for U.S. as *Amicus Curiae*, *Morrison*, 561 U.S. 247, 2010 WL 719337, at *16. Notably, the brief for the United States did not define "significant" to mean conduct that posed a "systemic risk," but instead as conduct that was "integral, rather than ancillary, to the fraud." *Id.* It would make little sense that Congress, just days after *Morrison*, would use "significant" in a statute extending the CEA abroad to have the dramatically different meaning that Phillips proposes.

Phillips's systemic-risk theory is legally wrong, and the District Court committed no error, much less plain error, in not including a systemic-risk jury instruction.

### b.   Phillips Cannot Show Plain Error Through His Challenges to the Extraterritoriality Instructions.

Phillips's other arguments about the jury instructions are similarly meritless. First, he argues that the District Court wrongly focused on entities, rather than conduct, in its analysis of Section 2(i). (Br. 36-37). Although Phillips houses this argument in his objections to the jury instructions, he does not identify any part of the jury instructions to which he objects. Nor could he, as the instructions focused not on entities but on the connection between activities abroad and activities in the United States. (SA-202-03).

Phillips also claims the extraterritoriality instructions were incorrect because they "failed to require the jury to determine whether the connection was

27

significant by looking solely to its relationship to activities in U.S. commerce." (Br. 28-29, 38-39). Phillips never raised this objection below, and he cannot show error, let alone plain error.

Viewed "as a whole," the instructions directed the jury to assess whether activities abroad had a direct and significant connection to activities in U.S. commerce. *United States v. Al Kassar*, 660 F.3d 108, 127 (2d Cir 2011). Judge Liman instructed that the Government's burden was to show that "activity . . . outside the United States related to the [Option] had a direct and significant connection with activities in commerce of the United States." (SA-202-03). He reiterated this multiple times, requiring the jury to find a direct connection between "activity outside the United States" and "activity in commerce of the United States." (*Id.*). Phillips seizes on the fact that Judge Liman also said that "conduct in the United States must be integral rather than ancillary." (Br. 38-39). But "in the context of the overall charge," it is clear this sentence merely reinforced that activity abroad must have a significant connection with activity in the United States. *United States v. Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010).

Phillips makes three more scattershot challenges to the instruction, none of which are persuasive. First, he claims that the District Court's definition of "significant" would "make no sense" for the "effects" prong of Section 2(i). (Br. 39). That is plainly wrong: Judge Liman read "significant" to mean "meaningful" or "consequential," and it is sensible to read Section 2(i) as applying to activities outside the United States that

28

have a direct and meaningful or consequential effect
on commerce in the country.

Second, Phillips claims that the District Court's in-
struction "take[s] Section 2(i)'s focus entirely away
from requiring a certain level of potential harm or risk
to the United States financial system." (Br. 39). But
that is exactly what the language of the statute con-
templates: as the CFTC has explained, Section 2(i) ap-
plies to activities abroad that have a direct and signif-
icant connection with activities in the country, "re-
gardless of whether a harmful domestic effect has oc-
curred." 78 Fed. Reg. at 45,299. Phillips's argument is
unconnected to the statutory language, which effectu-
ates Congress's goal to prohibit manipulation relating
to swaps with a significant connection to United States
commerce, not to have juries evaluating the degree to
which individual transactions posed a risk to the fi-
nancial system as a whole.

Third, Phillips asserts that the District Court's in-
struction would result in "extraterritorial overreach."
(Br. 40). Yet he presents no evidence of such an over-
reach, instead relying on authority from *Morrison*,
where Congress had not applied the securities laws
abroad. Here, Congress reacted to *Morrison* by delib-
erately applying the CEA's swap provisions overseas,
recognizing that the goals of the Dodd-Frank Act can-
not be fulfilled if "confined to activities strictly within
the territory of the United States." 78 Fed. Reg. at
45,300. Doing so was consistent with principles of in-
ternational law. *See* Rest. (Third) of Foreign Relations
Law § 402(1)(c) (1987) (bases of jurisdiction to pre-
scribe). It is Phillips who is asking this Court to read a

29

limitation into the statute that Congress did not include in the text of Section 2(i).

### POINT II

### Sufficient Evidence Supported the Jury's Conclusion That the CEA Applied to Phillips's Crime

To convict, the jury was required to find that the CEA applied to Phillips's crime, either as a domestic or an extraterritorial application of the statute. Sufficient evidence supported the verdict on both grounds. Phillips's criminal activity involved fraudulent conduct in the United States, and had a direct and significant connection with activity in the United States.

### A. Applicable Law

A defendant challenging the sufficiency of evidence "bears a heavy burden because a reviewing court must sustain the jury's guilty verdict if . . . *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010). This Court "view[s] the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Aquart*, 912 F.3d 1, 17 (2d Cir. 2018).

This Court's "determination on sufficiency review . . . does not rest on how the jury was instructed," but rather on the actual elements of the offense.

30

*Musacchio v. United States*, 577 U.S. 237, 243 (2016); *accord United States v. Facen*, 812 F.2d 280 (2d Cir. 2016). A conviction "may [be] affirm[ed] on any grounds for which there is a record sufficient to permit conclusions of law" and is not limited to the District Court's reasons for upholding the verdict. *United States v. Veliz*, 800 F.3d 63, 73 (2d Cir. 2015).

## B.    Relevant Facts

The case revolved around Phillips's purchase of the Option through his hedge fund, Glen Point, and his manipulative trading in relation to the Option. Glen Point consisted of two companies that acted as investment managers. One of these, Glen Point Capital LLP, was based in London, and the other, Glen Point Capital Advisors LP, was based in New York. (SA-410-11). Both entities were registered with the CFTC as commodity pool operators and were members of the NFA. (SA-116-22, 426). Phillips was also individually registered with the NFA. (SA-628). Glen Point maintained a CFTC compliance manual and gave employees, including Phillips, regular trainings on the CEA. (SA-451, 470).

Glen Point managed two pools of money. One was the Glen Point Master Fund, which included a fund incorporated in Delaware that held money from American investors. (SA-19-20, 426). The other belonged to Quantum Partners LP, which was incorporated as a Cayman Islands entity but headquartered in Manhattan. (SA-56-59, 667-68, 688-92, 694).

Two parties bore the primary economic risk associated with the Option. On the buyer's side was the U.S.-

31

registered and regulated Glen Point, which purchased the Option for the Delaware-incorporated Glen Point Master Fund and the New York-headquartered Quantum Partners, who collectively stood to gain $20 million if the Option triggered. (SA-645, 651). The option contract was written by Morgan Stanley International, which is based in London, but Morgan Stanley International transferred that transaction to New York-based Morgan Stanley, meaning that the seller's side risk was held by a New York entity. (SA-35-38).

Glen Point used J.P. Morgan Securities LLC ("JPMorgan") as the prime broker its purchase of the Option. When a hedge fund trades through a prime broker, the prime broker takes the trade onto its own books and manages trading logistics, such as settlement and payment. (SA-12-13, 30, 53-55). JPMorgan was headquartered in the United States (SA-111), and Glen Point used JPMorgan's New York office for prime brokerage services, which included maintaining a bank account with JPMorgan in New York. (SA-641.). This meant Glen Point's contracts creating the Option were not with Morgan Stanley, but were with JPMorgan. (SA-645, 651). Those contracts were booked through JPMorgan's London office, but Glen Point's actual counterparty under the agreements was one of JPMorgan's American entities. (*Id.*; SA-112). Glen Point paid for the OT Option by transferring JPMorgan approximately $2 million from Glen Point Master Fund's and Quantum Partner's bank accounts in New York. (SA-59-61, 693-95).

Phillips's fraudulent trading to manipulate the dollar-rand exchange rage and trigger the Option also

32

had extensive ties to the United States. Phillips committed the fraud by directing a banker to sell huge quantities of U.S. dollars for South African rand. (SA-521). He gave those orders over Bloomberg messenger, which involved the messages traveling through Bloomberg's servers in the United States. (SA-29, 521). And the execution of many of Phillips's trades occurred in the United States. Foreign-exchange trading occurs on matching engines, which are electronic platforms that match orders from buyers and sellers and execute the actual trade. (SA-45). Many of Phillips's manipulative trades occurred on a matching engine in New Jersey, run by a company called FastMatch. (SA-42-50).

When Phillips's trading caused the exchange rate to break through the barrier, Morgan Stanley was obligated to pay $20 million, and did so through its bank account in New York. (SA-38-40, 696). That payment flowed to JPMorgan, which was itself obligated to pay $20 million to Glen Point's clients because, as prime broker, it had the direct OT Option contract with those clients. (SA-645, 651). JPMorgan made the payments by sending money to two bank accounts in New York: one for Glen Point Master Fund at JPMorgan (SA-67-68), and the other for Quantum Partners at Bank of America (SA-62-63).

## C.  The Evidence Supported an Extraterritorial Application of the CEA

Phillips argues that the evidence was insufficient to support an extraterritorial application of the CEA. (Br. 42). Viewing the record "as a whole," there was ample evidence for the jury to conclude otherwise.

33

*United States v. Archer*, 977 F.3d 181, 189 (2d Cir. 2020).

### 1. Applicable Law

As relevant here, the CEA applies extraterritorially when "activities outside the United States . . . ha[d] a direct and significant connection with activities in . . . commerce of the United States." Judge Liman instructed the jury that they should focus on whether Phillips's activity "outside the United State related to the [Option] had a direct and significant connection with activities" in U.S. commerce. (SA-202). He defined "direct" as "immediate" and "significant" as "meaningful or consequential." (*Id.*).

Those instructions set a higher bar than what Section 2(i) requires. The term "direct" in the statute "require[s] a reasonably proximate causal nexus," not "immediacy." 78 Fed. Reg. at 45,300; *cf. Lotes*, 753 F.3d at 398 (defining "direct" as a "proximate causal nexus"). Similarly, whether activity abroad is "significant" does not depend on a "transaction-by-transaction" analysis, but rather looks to "swap activities . . . as a class." 78 Fed. Reg. at 45,300. Fraud involving people or activities in the United States poses a risk to market integrity. 78 Fed. Reg. at 45,337 (stating the "anti-manipulation provisions" protect "market integrity" and that it is "essential that they apply"); 85 Fed. Reg., at 56,961 (explaining that when "any aspect of swap transactions" are "within the U.S.," those swaps are "subject to" anti-fraud prohibitions). So manipulation relating to foreign exchange derivatives, as a class, is significant under Section 2(i), and courts

34

should not "excise, as trivial, individual instances of the class." *Perez v. United States*, 402 U.S. 146, 154 (1971).

## 2. Discussion

At every step of the crime, Phillips's activities outside the United States had a direct and significant connection with activities in the country. From when he purchased the Option through consummating the fraud, Phillips was acting as a CFTC registrant, managing his hedge fund that was co-located in the United States and London, and investing on behalf of United States investors. The counterparty to the Option, and victim of Phillips's crime, was Morgan Stanley in the United States. (*See* SA-36-40). Phillips used JPMorgan's prime brokerage services to purchase the Option, which included entering into a contract with JPMorgan's entity in the United States and routing payments through a JPMorgan bank account in New York. (SA-59-61, 112, 408-11, 645-57).

In addition, Phillips's manipulative trading to trigger the Option took place, in part, in the United States, spurred on by trading orders he sent through Bloomberg's servers in the country to a trading engine in New Jersey that executed his trades. (SA-42-50). And when his manipulative trading drove the exchange rate through 12.50, that fraudulent signal that the Option's barrier had been broken went to Morgan Stanley in the United States, causing that entity to pay $20 million from its bank account in New York, (SA-38-40, 696), and the profit was received by Glen Point's

35

clients when JPMorgan sent the payment to their bank accounts in New York, (SA-62-63, 67-68).

Under the District Court's instructions, these connections to activities in the United States were direct and significant. The relationship between the crime and the country was neither "attenuated" nor "random." (SA-202-03). That type of separation arises when a defendant's foreign activities merely send "ripples" that "eventually . . . reach the [country's] shores." *See Virtual Countries, Inc. v. Rep. of S. Afr.*, 300 F.3d 230, 236-37 (2d Cir. 2002). Here, by contrast, Phillips's business was based in large part in the United States, through its U.S. arm and even its London arm which was registered and regulated in the United States; he managed money for American investors using a prime broker and bank accounts in New York; he traded on American markets; and the counterparty to the Option was in the United States. So while Phillips himself was in South Africa when he engaged in the manipulative trading, it was logical for the jury to conclude there was an immediate and consequential connection between those activities abroad and activities in commerce of the United States.

The evidence was more than sufficient for the jury's verdict under the instructions given by the District Court, and even more so under a proper reading of Section 2(i), which requires only that activities abroad have a "reasonably proximate causal nexus" to activities in the United States and be of class of swap-related activities that are important. *See Lotes*, 753 F.3d at 398. There is no question that Phillips's misconduct had such a nexus to activities in the United States for

36

the reasons given above. And the proper measure of "significant" under Section 2(i) is to look at the relevant class of activity, rather than just the individual conduct at issue in the case. Fraud and market manipulation in the exchange rates between United States dollars and foreign currencies is plainly significant because such conduct poses direct risks to counterparties and market integrity, as it did in this case. 78 Fed. Reg. at 45,300, 45,337; 85 Fed. Reg., at 56,961. Because the evidence was plainly sufficient under the correct legal standard, the conviction should be affirmed. *See Musacchio*, 577 U.S. at 243 ("[A] sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction.").

### a.     There Was a Sufficient Connection with the Activities of Morgan Stanley and JPMorgan in the United States

The District Court affirmed the verdict on the grounds that Phillips's activities abroad had a direct and significant connection to the activities of Morgan Stanley and JPMorgan in the United States. (SPA-72-78). Phillips's challenges to that decision do not justify overturning his conviction.

The District Court correctly concluded that there was a sufficient connection between Phillips's activities and Morgan Stanley's activities in the United States. (SPA-74-78.) That connection was direct and significant because, as the counterparty to the Option, Morgan Stanley bore the risks from the Option in the United States, which is part of its business activities

37

in the country. (*Id.*). The risk came to fruition when Phillips fraudulently triggered the Option by making it appear that the exchange rate had naturally dropped below 12.50. Morgan Stanley received that false price signal in the United States, which prompted Morgan Stanley to pay $20 million from its New York bank account, all of which involves domestic activity. (*Id.*).[3]

Phillips contends that, because there were intermediaries between Glen Point and Morgan Stanley, the connection was not "direct." (Br. 46-47, 51). This argument is factually and legally wrong. Factually, Phillips's claim is wrong because it elides the relationship between his fraud and Morgan Stanley's activities in the country. True, Glen Point and Morgan Stanley used intermediaries to set up the Option. But those arrangements were complete by the time of the crime. When Phillips fraudulently manipulated the exchange rate, the holder of the other side of the Option was Morgan Stanley in New York, and his unlawful activity made it appear to Morgan Stanley that the barrier had been reached, directly triggering Morgan Stanley's obligation to pay $20 million, which it fulfilled from its bank account in New York. (SA-38-40, 696).

Legally, Phillips's argument is wrong because the presence of intermediaries does not mean a connection

---

[3]  Phillips argues that the "only evidence" of the connection between his conduct and Morgan Stanley in the United States came from one witness (Br. 44-45), but the jury was entitled to credit that testimony.

38

is not "direct." In *Atlantica Holdings v. Sovereign Wealth Fund*, this Court rejected the argument that, under the Foreign Sovereign Immunities Act of 1976, misrepresentations made outside the United States lacked an "immediate"—and, therefore, a "direct"— connection to the country when the misrepresentations traveled through "intermediaries." 813 F.3d 98, 108, 113-14 (2d Cir. 2016). The presence of intermediaries did not defeat a "direct" connection because the intermediaries distributed the materials that contained the misrepresentations, rather than taking "independent action" in response to those falsehoods, so the lies outside the country "acted directly" on investors inside the country. *Id.* at 114-15.

Here, the connection between Phillips's misconduct and Morgan Stanley's activities in the United States was not based on "independent action" of intermediaries. *Id.* at 114. The intermediaries between Glen Point and Morgan Stanley helped facilitate the creation of the Option and the payments. But the fraud, on its own, sent the misleading price information to, and triggered Morgan Stanley's payment in, the United States.

Phillips is also wrong to argue that the connection between his conduct abroad and Morgan Stanley's activities in the United States was not "significant." (Br. 45). The crux of his claim is that it was "random" that Morgan Stanley in the United States was the counterparty to the Option. (*Id.*) But that argument is irrelevant because it goes to whether it was foreseeable that Phillips's activities would have a connection with activities in the United States, and foreseeability

39

is not part of the test under Section 2(i). (*See* SPA-76-77); *cf. Atlantica*, 813 F.3d at 114 n.8 (finding foreseeability of connection to the United States irrelevant). What matters is whether there was, in fact, an important or meaningful connection between his conduct abroad and the activities that took place in the country. There was such a connection because the point of the fraud was to trigger the Option, which was connected to activity in the United States because of Morgan Stanley's role as the counterparty. (*See* SPA-75-76).[4]

The District Court also correctly affirmed the verdict on the grounds that Phillips's conduct had a direct and significant connection to JPMorgan's activities in the United States. (SPA-72-74). A sufficient connection existed for three reasons: First, Phillips used JPMorgan as the prime broker for the Option. As a result, Glen Point's option contracts were with JPMorgan's United States entity, and that entity took on the obligation to pay Glen Point if the Option triggered,

---

[4] The law of personal jurisdiction does not help Phillips's argument. (Br. 45). Contrary to his claim, the Supreme Court has held that, when a defendant does substantial business in a forum, the defendant is subject to suit there even when the events underlying that lawsuit occurred in the forum because of actions by others. *See Ford Motor Co. v. Montana Eight Judicial Dist. Ct.*, 592 U.S. 351, 354 (2021). That supports jurisdiction here because Phillips conducted extensive business in the country, and his crime related to that business.

40

even if Morgan Stanley failed to pay. (*See id.*). Second, Phillips made and received the payments under the Option through bank accounts with JPMorgan's prime brokerage in New York. (SA-59-60, 67-68). And third, Phillips also used JPMorgan as the prime broker for his manipulative trading. When he finished that trading, he "g[a]ve up" the trade to JPMorgan, which meant that he used JPMorgan's prime brokerage services to handle all of the "downstream processes" for "settling the trade[s]." (SA-30, 530).

Focusing on the creation of the Option, Phillips argues that, because the Option was booked through JPMorgan's London branch, his conduct lacked a connection to the United States. (Br. 47-48). But the involvement of the London branch does not mean there was no connection with domestic activity. The evidence showed that the JPMorgan "office serving" Glen Point's prime brokerage services was in New York (SA-411, 641); that JPMorgan in the United States was Glen Point's counterparty on the Option contracts, giving it an independent obligation to pay if the Option triggered (SA-658-86); and that Glen Point used a bank account at JPMorgan in New York to pay for, and receive payment under, the Option, (SA-59-60, 67-68). It was reasonable to conclude from this evidence that Phillips's conduct was connected to JPMorgan's business activities in the United States, not just in its London branch. (*See* SPA-72-73; SA-53-55). The jury was not required to accept Phillips's claim that "all of JPMorgan's commercial activities related to the Option occurred abroad" (Br. 47), which is contrary to the abundant evidence of JPMorgan activity in the United States relating to the Option.

41

Phillips is not helped by his argument that, "when determining where a given transaction occurred, a party's residence or citizenship is irrelevant." (Br. 49). That assertion rests on cases about private claims under the CEA and securities laws. In that context, plaintiffs must allege a "domestic transaction," and courts have found that a transaction does not happen in the United States simply because one party is legally incorporated in, or a resident of, the country. *See Absolute Activist Value Master Fund v. Ficeto*, 677 F.3d 60, 68-70 (2d Cir. 2012).

But that is neither the right law, nor an analogous set of facts. The question under Section 2(i) is not where a transaction occurred in the United States, but whether activity abroad was connected with activity in the country. This distinction is important because a transaction with a United States company can be connected with the domestic activities of that company, even if the transaction itself is not domestic. Here, for example, the London branch of JPMorgan was not a legally separate entity, so JPMorgan bore the risk of the Option in the United States, which is part of the bank's domestic activity. (*See* SPA-73-74). Moreover, as explained above, the evidence at trial was not just that JPMorgan is incorporated in the United States, but that Glen Point used JPMorgan's domestic services in connection with the Option. Ironically, it is Phillips who is seeking to focus on the residence of one entity involved in the transaction, JPMorgan's London branch, rather than looking at the overall transaction to determine whether it was connected with JPMorgan's activity in the United States.

42

There is also no merit to Phillips's claim that the CFTC's regulations about foreign branches of domestic banks supports his position. (Br. 49-50). The CFTC's position is that a "foreign branch of a U.S. person is itself a 'U.S. Person'" because "a branch does not have a legal identity separate from that of its principal." 85 Fed. Reg. at 45,315. As a result, the CEA generally extends to activities involving foreign branches. *Id.* The CFTC has made adjustments to "calibrate[ ]" how its regulations apply including, as Phillips notes, a limited carveout about how a non-U.S. person counts swaps with foreign branches when deciding if it is a "swap dealer." *Id.*; 17 C.F.R. § 23.23(b)(2)(i). But that limited carveout underscores that the general rule is that transactions involving foreign branches are subject to Section 2(i). Indeed, the Option contracts in this case show that the parties understood that the Option was subject to the CEA because the contracts state that "data of this transaction has been reported pursuant to applicable U.S. law to [a] swap data repository." (SA-646); *see* 7 U.S.C. § 6r.

Finally, the record does not support Phillips's argument that the District Court turned Section 2(i) into a test about entities, rather than activity in the United States. (Br. 36-37, 50). For one, Phillips is wrong to focus on the District Court's Rule 29 decision for purposes of his sufficiency challenge. The District Court instructed the jury that it needed to find a direct and significant connection with activity in the United States, and did not suggest in any way that the question turned on the domicile of entities involved in the transaction. (SA-202-03). The question on appeal is whether "*any* trier of fact could have" found that

43

connection "beyond a reasonable doubt." *Heras*, 609 F.3d at 105.

Neither the evidence at trial, nor the District Court's analysis of that evidence, focused solely on the fact that JPMorgan and Morgan Stanley were U.S. banks. As explained above, that was only one aspect of a constellation of facts showing that Phillips's activity had a direct and significant connection with the domestic business activities of JPMorgan and Morgan Stanley, which is precisely what Section 2(i) requires. To be sure, the U.S. status of those banks was a relevant fact. But that makes perfect sense: An important part of analyzing whether a fraud was connected to activity in the United States involves asking whether the victim and other parties involved in the transaction were American financial institutions.[5]

---

[5]   Phillips's observation that other statutes confer jurisdiction over conduct by, or harming, U.S. persons, (Br. 36), is a red herring. That Congress passed such statutes does not mean that a company's presence in the United States is not a relevant factor in applying Section 2(i). Indeed, the fact that Section 2(i) does not focus solely on U.S. persons indicates that Congress wanted Section 2(i) to be *broader* than other statutes. 78 Fed. Reg. at 45,299 n.71 (describing enactment history).

44

### b.  There Was a Sufficient Connection with Other Activities in the United States

While the District Court was correct to affirm Phillips's conviction, it was wrong to find that only the connections to Morgan Stanley and JPMorgan could sustain the verdict. Phillips's activities abroad were also connected to Glen Point's business activity in the United States, and the commission and completion of the fraud occurred, in part, in the United States. Both connections were sufficient to convict, and this Court "may affirm" on those grounds. *Veliz*, 800 F.3d at 73.

Phillips's crime had direct and significant connections with Glen Point's domestic activities. He and both arms of his hedge fund were registered with the CFTC, and one of those arms was incorporated in Delaware and based in New York. (SA-410, 573-640). Glen Point managed money for American investors through the Glen Point Master Fund, (SA-19-20, 426) and managed funds for Quantum Partners, which operated out of the United States, (SA-56-59, 667-68, 688-92, 694). And Glen Point used American offices of American banks as its prime brokers and traded with American counterparties. (SA-411).

When Phillips committed his crime, he was managing money for his American investors, through his American prime broker, with an American counterparty, and using an American bank account. This created a direct connection between his activity and Glen Point's activities in the United States because the crime was part and parcel of his hedge fund's domestic business activity. The connection was significant

45

because the goal of the fraud was to benefit his hedge fund's domestic clients, with money going straight to their New York bank accounts. *Cf. Ford*, 592 U.S. at 361, 364-65 (finding, for personal jurisdiction, a "connection" to a forum when a company "regularly conducts" business there and that business "relates to" the claim). The District Court found these connections insufficient by remarking that Section 2(i) is not a blanket extension of the CEA to all U.S. persons or "all persons registered in the United States." (SPA-70-71). But even taking that as a correct statement of law, it fails to account for all the facts proven at trial. The basis for the jurisdiction was not merely that Glen Point and its clients were U.S. persons or CFTC registrants, but rather that Glen Point's domestic business activities had a direct and significant connection with the crime.

What is more, Phillips's market manipulation also had a direct and significant connection with activity in the United States. Phillips sent his manipulative trading orders using Bloomberg messages that went through servers in the United States. (SA-29); *see United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020) (holding "use of the . . . wires" in the United States is conduct in the country). Many of the actual manipulative trades were executed on a matching engine located in New Jersey. (SA-48-50); *see United States v. Cornelson*, 609 F. Supp. 3d 258, 264-67 (S.D.N.Y. 2022) (collecting cases holding that trade matching in the United States is domestic conduct). And when Phillips succeeded in breaking through the barrier, the false price signal went to Morgan Stanley in New York, which directly caused it to pay $20

46

million from its domestic bank account to settle the Option. (SA-38-40, 696). Glen Point's clients then received the fraud proceeds at bank accounts in New York. (SA-59-60, 67-68); *see United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013) (finding receipt of proceeds is conduct in the country). In short, the fraud was connected with domestic activity from beginning to end.

These activities in the United States were sufficient, both under the District Court's jury instructions and the correct interpretation of Section 2(i). The connections were direct because Phillips's fraudulent orders immediately led to messages going through Bloomberg and trades being executed in the United States, and because his success in breaking the barrier immediately conveyed fraudulent price information to Morgan Stanley, triggering the $20 million payment. These connections were significant because the manipulative trading, false price signal, and receipt of money were all essential parts of the criminal scheme.

It was wrong for the District Court to find these connections lacking. With respect to the Bloomberg messages and domestic trading, the District Court erroneously found these activities insufficient because they "could have [occurred] in any number of locations." (SPA-68-69). That analysis is faulty. Section 2(i) does not turn on whether activities could, theoretically, happen outside the United States. Almost any fraud could happen somewhere else. Rather, the question is where the activity actually took place, which in this case was in the United States.

The District Court's analysis of the false price signal and payments was also wrong. The District Court

47

found the payments "indirect" because multiple banks were involved. (SPA-69-70). But that is of no moment. Phillips's crime immediately triggered a contractual requirement for Morgan Stanley to pay $20 million and JPMorgan to send Glen Point's clients $20 million, all of which involved money transferring in the United States. That is a direct connection to domestic activity, regardless of whether the banks also moved money between themselves overseas.[6]

In short, Phillips's crime had direct and significant connections with domestic activities beyond those of Morgan Stanley and JPMorgan, which form an independent basis for finding that the evidence was sufficient.

## D. The Evidence Supported a Domestic Application of the CEA

Setting Section 2(i) aside, there was also ample evidence for the jury to conclude that Phillips's crime gave rise to a domestic application of the CEA.

### 1. Applicable Law

The CEA's prohibition on fraud "in connection with any swap," 7 U.S.C. § 9(a)(1), applies domestically

---

[6] Indeed, the primary opinion the District Court cited in finding an insufficient connection was a *dissent* from a decision finding a flow of funds between companies to be a sufficiently direct for jurisdiction. *See EIG Energy Fund XIV v. Petroleo Brasileiro, S.A.*, 894 F.3d 339 (D.C. Cir. 2018).

48

whenever "conduct relevant to th[e] focus [of the statute] occurred in United States territory." *Abitron Austria GmbH v. Hetronic Int'l Inc.*, 600 U.S. 412, 418 (2023). The focus of the CEA "is on rooting out manipulation and insuring market integrity," so the statute applies to schemes that involve domestic conduct relevant to those ends. *Prime Int'l Trading v. BP PLC*, 937 F.3d 94, 107 (2d Cir. 2019).

Fraud that "involve[s] both foreign and domestic activity" satisfies this standard. *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 268 (2d Cir. 2023). In *Platinum*, for example, this Court concluded that a CEA claim against a London-based conspiracy to manipulate prices for certain metals fell within the domestic reach of the statute. *Id.* at 254-55, 267-68. The Court reasoned that the market manipulation was not "entirely foreign" because the scheme included trading and communications in the United States. *Id.* at 267-68.

## 2. Discussion

Notwithstanding the District Court's conclusion to the contrary, there was sufficient evidence for the jury to reasonably conclude that Phillips's market manipulation "involved both foreign and domestic activity" such that this case was a domestic application of the CEA. *Platinum*, 61 F.4th at 268.

Sufficient conduct occurred in the United States because, as in *Platinum*, Phillips's fraudulent trading took place in the country, and his manipulative orders went through the United States via Bloomberg. *See* 61 F.4th at 267-68. Trading in, and electronic

49

communications through, the United States consti-
tutes conduct within the country. *See, e.g.*, *Napout*, 963
F.3d at 179 ("use of the . . . wires" in the United States
is conduct in the country); *Buscanan v. Elsaca*, 927
F.3d 108, 122 (2d Cir. 2019) (same); *Cornelson*, 609 F.
Supp. 3d at 264-67 (trade matching in the United
States is domestic conduct). And committing fraud us-
ing American markets and American communication
systems goes to the heart of the CEA's goal of preserv-
ing market integrity. *See Psimenos v. E.F. Hutton &
Co.*, 722 F.2d 1041, 1044-48 (2d Cir. 1983) (finding suf-
ficient domestic conduct under the CEA based on trad-
ing activities in American markets).[7]

Phillips also engaged in sufficient domestic conduct
because, as discussed above, his fraudulent trading
sent a false price signal to Morgan Stanley in New
York and the proceeds of his fraud went to his clients'
accounts in New York. The false price signal was do-
mestic conduct because sending a misrepresentation
constitutes conduct where that content arrives. *See,
e.g.*, *United States v. Lange*, 834 F.3d 58, 70 (2d Cir.
2016) (act in furtherance of fraud occurred where
fraudulent content received); *United States v. Royer*,
549 F.3d 886, 894-95 (2d Cir. 2008) (same). Similarly,
Phillips's receipt of the proceeds of his fraud in the
United States was domestic conduct in furtherance of

---

[7]   That Phillips directed the domestic conduct
from abroad does not render it foreign. *See United
States v. Kim*, 246 F.3d 186, 190 (2d Cir. 2001) (finding
wire fraud domestic when defendant abroad caused
third parties to transmit domestic wires).

50

the scheme. *See Vilar*, 729 F.3d at 95. Causing the manipulated price to be sent, and receiving payment on the Option based on that manipulated price, are not only relevant to the CEA's goal of ensuring market integrity, but go to the very core of the statute because they were the direct means by which a swap counterparty in this country was defrauded and harmed.

Judge Liman discounted the domestic nature of Phillips's manipulative trading on the ground that the CEA regulates swaps rather than spot trading (SPA-49-50), but that is an overly cramped reading of the statute. The CEA prohibits fraud "in connection with" swaps. 7 U.S.C. § 9. Phillips's manipulative spot trading was the means of committing the fraud, which puts it fully within the statutory prohibition. The District Court's reasoning is akin to saying that domestic misrepresentations about a swap cannot establish jurisdiction because the CEA does not regulate speech.

Judge Liman also reasoned that domestic trading was insufficient on the theory that *Morrison* abrogated this Court's CEA decisions holding that domestic trading was sufficient for jurisdiction. (*See* SPA-50-51). That, too, is wrong. *Morrison* dealt with the securities laws, where the focus of the statute was on "purchases and sales of securities," not the location of fraudulent conduct. 561 U.S. at 266-67. Because the CEA's focus is, instead, on protecting market integrity, it remains true that domestic fraudulent conduct confers jurisdiction. *See Psimenos*, 722 F.2d at 1046. For the same reason, the District Court erred in finding Bloomberg messages insufficient due to the "ubiquity" of the system. (SPA-51-52). The wide use of American markets

51

and systems is all the more reason the CEA must apply to preserve the integrity of the swaps markets.

The District Court's reasons for discounting the false price signal and receipt of fraud proceeds were also wrong. Judge Liman found this conduct insufficient on the theory that it occurred after Phillips successfully completed his fraudulent trading. (SPA-54-55, 57). That misapprehends the law. It is well established that a fraudulent scheme "is not complete until the proceeds have been received," so all conduct up to that point is relevant to the jurisdictional analysis. *Vilar*, 729 F.3d at 95; *accord United States v. Rutigliano*, 790 F.3d 389, 397-98 (2d Cir. 2015). Judge Liman also erred in expressing a concern that basing jurisdiction on the false price signal and domestic payment would lead to a domestic application of the CEA "whenever foreign fraud has some effect" on Americans. (SPA-54-55). Phillips's crime was domestic because he traded domestically, sent a fraudulent price signal here, and received the proceeds of his crime here; not simply because there was "some effect" on Americans. (SPA-56). This domestic activity was sufficient to support the jury's verdict.

## POINT III

### Phillips's Challenge to the Intent Instructions Are Meritless

Contrary to Phillips's claims on appeal, the District Court committed no error by not instructing the jury that it must find that his sole intent in trading was manipulation. (Br. 52). This Court has never held that sole intent is a requirement for a market manipulation

52

claim and has repeatedly affirmed jury instructions with no such instruction, and Phillips's argument is unsupported by the text of the CEA.

## A. Relevant Facts

Before trial, Phillips submitted a request for the District Court to instruct the jury that it must acquit Phillips unless the Government proved that "manipulative purpose is the sole reason for the trading." (A-302). On the morning that the trial began, Judge Liman sent the parties a draft jury charge and invited the parties to discuss the charge, while also noting that he "intend[ed] to have a full charge conference later." (Dkt. 78 at 2, 34). In response, the defense noted that it had requested a "sole intent instruction," which was not in the District Court's draft charge, and said that "we will discuss this at the charge conference more fully." (Dkt. 78 at 36). During the trial, Judge Liman circulated a revised draft charge that did not include a "sole intent" requirement but instead stated that a transaction was manipulative if the defendant would not have conducted it "but for the intent to deceive." (A-2411). At the charge conference, the defense did not raise this issue or indicate any objection to the District Court's proposed instruction. (SA-137-94).

With respect to intent, the District Court instructed the jury that it was the Government's burden to prove that "the defendant acted knowingly, willfully, and with an intent to defraud." (A-1549). "To act 'willfully'," the Court explained, "means to act voluntarily and with a wrongful purpose, that is, with a purpose to disobey or disregard the law." (A-1553). The

53

Court further instructed that "intent to defraud" means "to act knowingly and with an intent deceive," adding that "it is not sufficient that the defendant knew his transactions would affect the dollar-rand exchange rate; instead, he must have made those transactions for the purpose of affecting the exchange rate and defrauding a counterparty to the barrier option contract." (A-1553-54) Finally, the District Court informed the jury that "[a] defendant does not act willfully or with intent to defraud if he honestly believes that his actions were proper." (A-1554)

In addition to instructing on intent, the District Court also instructed the jury on the Government's burden to prove a manipulative scheme, stating:

> Here, the defendant is accused of employing a manipulative device, scheme, or artifice to defraud. Manipulation is a term of art when used in connection with financial markets. Manipulation refers to intentional or willful conduct designed to deceive or defraud by controlling or artificially affecting some type of price, in this case, the dollar-rand exchange rate. Because market participants ordinarily assume that prices, such as exchange rates, are determined by the natural interplay of supply and demand—that is, the prices determined by available information and market forces—an act is manipulative if it is designed to deceive or defraud others by sending a false pricing signal to the market. Consequently, a

54

transaction is not manipulative when the market is fully aware of the terms of and purposes behind a transaction, as that transaction will not mislead or deceive the market. Keep in mind that the mere fact that a transaction affected market prices does not render it manipulative.

An act can be manipulative even if it is conducted on the open market or through ordinary market activity, such as by placing an order to buy or sell, or by actually buying and selling. In some cases a defendant's intent to manipulate a price is all that distinguishes legitimate trading from manipulative trading. Similarly, in some cases, the determination of whether an activity is manipulative can only be made by placing the activity in context and considering whether it is part of a pattern of trading activity. What matters is whether the defendant has an intent to inject a false price signal into the market or to mislead others by artificially affecting the price. The question you should ask is whether the defendant acted with the intent to deceive or defraud others by sending a false pricing signal into the market. If there are two purposes for a transaction, one of which is legitimate, and if the transaction would have been done at the same time and in the same manner for the legitimate purpose, it is not manipulative even if the defendant

55

> also had an intent to deceive or to send a false price signal into the market. On the other hand, if the transaction would not have been done at the same time and in the same manner, except for the intent to mislead, then the transaction is manipulative. Thus, if but for an intent to deceive, the defendant would not have conducted the transactions in the dollar-rand foreign exchange spot market at the times and in the amounts he did, then those transactions were manipulative.

(SA-197-99).

## B. Phillips's "Sole-Intent" Instruction Is Legally Erroneous

Phillips challenges the "but for" language in the instruction defining a manipulative scheme, arguing that the District Court should have required proof that Phillips's "sole intent was to move the exchange rate." (Br. 52-53). In the District Court, Phillips filed a requested charge containing this instruction, and told the District Court that he intended to discuss the issue "at the charge conference," (Dkt. 78 at 36), but he did not actually raise the issue at the charge conference. Accordingly, Phillips must show plain error, *Hunt*, 82 F.4th at 138-39, which he had manifestly failed to do. Indeed, there was no error at all because Phillips's proposed sole-intent instruction did not "accurately represent[] the law in every respect." *Roy*, 783 F.3d at 420.

Phillips's "sole-intent" instruction is inconsistent with the text of the CEA and its implementing

56

regulations. The CEA makes it a crime to "knowingly" engage in any "manipulative deceptive device or contrivance" in violation of CFTC rules. 7 U.S.C. § 9(1). Those rules prohibit using "any manipulative device, scheme, or artifice to defraud." 17 C.F.R. 180.1(a)(1). Nothing in the text of the statute or the implementing rule suggests that the Government must prove that the defendant's "sole reason" for acting was to defraud or manipulate. Instead, the text of 7 U.S.C. § 9(1) and Rule 180.1 is nearly identical to language in the securities laws that the Supreme Court and this Court have held requires proof of "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 189, 206-208 (1976); *accord SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012); *see also CFTC v. Southern Trust Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018) (describing scienter under the CEA). This Court has never interpreted this language to impose a sole-intent requirement.

Imposing such a requirement would be at odds not only with the text, but also with basic criminal-law principles. Even in the context of specific-intent crimes, "a specific intent need not be the actor's sole, or even primary, purpose." *United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014) (collecting cases). The logic is obvious: "It is commonplace that . . . there may be multiple motives for human behavior," and it would be remarkable if a defendant could escape criminal liability for fraud or other intentional wrongdoing whenever he could come up with another, noncriminal reason for his conduct. *Id.* Accordingly, "when Congress has meant to impose a sole-intent limitation,

57

it has done so expressly," and courts do not read such requirements into statutes. *Id.*

Phillips's sole-intent instruction would also create two unjustifiable inconsistencies. First, it would create an inconsistency between the CEA and the securities laws. In the context of fraudulent manipulation claims under the Securities Exchange Act, this Court has held that "open-market transactions may constitute manipulative activity when accompanied by manipulative intent," without a requirement that manipulation is the sole reason for the transactions. *SEC v. Vali Mgmt. Partners*, 2022 WL 2155094, at \*1-2 (2d Cir. 2022). Creating a sole-intent requirement for fraudulent manipulation under the CEA—which has nearly identical language—would have no legal basis. Second, Phillips's proposed interpretation would create an internal inconsistency, wherein "intent to defraud" would require sole-intent in cases of open-market manipulation, but would not require sole-intent in other cases involving fraud or manipulation. "To give these same words a different meaning" when concerning some applications but not others "would be to invent a statute rather than interpret one." *Pasquantino v. United States*, 544 U.S. 349, 358–59 (2005).

Tellingly, Phillips cannot muster a single legal authority holding that the CEA or any similar fraud statute imposes a sole-intent requirement. Instead, he relies almost entirely on the 1991 case of *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991), in which this Court expressed "misgivings" about whether open-market manipulation violates the securities laws.

58

(Br. 60-61).[8] But whatever "misgivings" were expressed in *Mulheren*, there have since been more than three decades of decisions recognizing that "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Set Capital LLC v. Credit Suisse Grp., A.G.*, 996 F.3d 64, 77 (2d Cir. 2021). None of these cases have held that proof that manipulation was a person's sole intent is required. On the contrary, in both criminal and civil cases, this Court has expressly affirmed jury instructions that did not include a sole-intent requirement to find market manipulation, and that did not even include the demanding "but-for" standard that Judge Liman used in this case. *See, e.g.*, *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008) (approving criminal jury instruction that "[t]he essential element of manipulation is the deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand"); *Vali Mgmt.*, 2022 WL 2155094, at *1 (affirming jury instruction that "in some cases, a defendant's 'scienter,' that is, a defendant's intent to manipulate the securities market, is all that distinguishes legitimate trading from manipulative trading"); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87,

---

8    Phillips also cites *Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001), and *GFL Advantage Fund v. Colkitt*, 272 F.3d 189 (3d Cir. 2001), (Br. 61-63), but neither case adopted a sole-intent requirement for market manipulation.

59

102 (2d Cir. 2007) (scienter in market manipulation claim can be proven by showing that "the defendant intended to deceive investors by artificially affecting the market price of securities"). And in *Mulheren* itself, this Court did not adopt a "sole-intent" requirement, but rather accepted that sole intent was the "government's theory" at trial and then evaluated the evidence in light of that theory. *Mulheren*, 938 F.2d at 368.

Not only have none of this Court's decisions adopted a sole-intent limitation, but it would make little sense to do so as a matter of basic statutory interpretation. For most forms of fraud—from check fraud to perjury—what distinguishes criminal conduct from lawful statements is intent to defraud. Open-market manipulation is no different. Those types of frauds do not have sole-intent requirements, except for those rare statutes where Congress has "expressly" imposed a sole-intent limitation. *See Technodyne*, 753 F.3d at 385. There is no reason for the prohibition on market manipulation to be treated differently from these other criminal statutes, and Phillips has failed to show any error, much less plain error, in Judge Liman's instructions.

## C.  Any Error Was Harmless

Even if there were error, it was harmless because the instructions, taken as a whole, ensured the jury concluded that the only reason Phillips traded the way he did was because of his intent to deceive.

Phillips's argument focuses almost entirely on the District Court's "but for" instruction, but he fails to consider the jury charge as a whole. (Br. 54-56). To

60

begin with, Phillips ignores that the District Court gave a separate instruction on fraudulent intent. That instruction explained that the Government had to prove that "the defendant acted knowingly, willfully, and with intent to defraud." (A-1549). The District Court further explained that the Government had to prove that Phillips knew his conduct was unlawful and that Phillips traded "for the purpose of affecting the exchange rate and defrauding a counterparty to the [Option]." (A-1554). This required the jury to find that Phillips's trading was for the purpose of manipulating the market.

Phillips also ignores that, in connection with the "but for" instruction, the District Court specifically instructed the jury that "[i]f there are two purposes for a transaction, one of which is legitimate, and if the transaction would have been done at the same time and in the same manner for the legitimate purpose, it is not manipulative even if the defendant also had an intent to deceive." (A-1551). This required the Government to prove not just that Phillips intended to deceive, but also that there was no "legitimate purpose" that would have led Phillips to do the trades in the absence of fraudulent intent. Thus, contrary to Phillips's claim that a "but for" test is the "lowest standard" of causation, (Br. 53-54), the instructions imposed a much higher standard than the typical instructions in market manipulation cases, which require only a showing of "intent to manipulate," *Vali Mgmt.*, 2022 WL 2155094, at *1, not the additional showing that the

61

defendant would not have traded but for the fraudulent intent.[9]

As applied here, these instructions leave no doubt the jury found that the only reason Phillips traded as he did was to deceive. Phillips argued at trial that he was trading to replace delta, not to manipulate the price and trigger the Option. Under the "but for" instructions, the jury would have been required to acquit if it had a reasonable doubt about whether Phillips would have traded "at the same time and in the same manner" for the purposes of replacing delta, "even if [Phillips] also had an intent to deceive." (A-1551).

Because the District Court's instructions, as a whole, required proof that the only reason Phillips traded as he did was because of his intent to deceive, Phillips's policy arguments against the "but for" language, (Br. 54-59), do not hold water. There is no risk that the District Court's instructions "criminaliz[ed] routine trading practices." (Br. 58). The instructions did not criminalize any particular trading practices at

---

[9] The one case that has articulated a "but for" standard for market manipulation is *SEC v. Masri*, 523 F.Supp.2d 361, 372-73 (S.D.N.Y. 2007), on which the District Court relied in formulating its instructions in this case. Phillips attempts to argue that *Masri* stands for a "sole intent" standard (Br. 63), but what the district court in *Masri* actually held was that the "SEC must prove that but for the manipulative intent, the defendant would not have conducted the transaction." 523 F.Supp.2d at 373.

62

all, but instead helped the jury to evaluate when "open-market transactions . . . constitute manipulative activity" because they are "accompanied by manipulative intent." *Vali Mgmt.*, 2022 WL 2155094, at *1-2. That is consistent with this Court's holding that, in some cases, "scienter is the only factor that distinguishes legitimate trading from improper manipulation." *Id.* at *1.

Moreover, the hypotheticals Phillips floats wrongly confuse price sensitivity with "willful conduct designed to deceive or defraud investors by controlling or artificially affecting" a price. *Ernst & Ernst*, 425 U.S. at 199. For instance, Phillips asserts that trading designed to minimize price impact, such as iceberg orders, fall within the District Court's definition of a manipulative scheme. (Br. 59). But that assertion is wrong: if a trader would execute that trading strategy not because of an intent to deceive, but because of an intent to buy as much as possible at a lower price, that would not be manipulative under the District Court's instructions. (A-1551). Moreover, neither the District Court's instructions, nor this Court's precedents, equate *avoidance* of price impact with a manipulative scheme. To the contrary, evidence that a trader aimed to buy slowly to obtain the lowest possible prices does not, standing alone, show that the trader acted to "control" or "rig" prices. *See Set Capital*, 996 F.3d at 76. The point of that trading strategy is the intent to buy at the lowest price; any price impact is a byproduct, not part of an intent to defraud.

Thus, Phillips's claim that Morgan Stanley "likely committed fraud" under the District Court's

63

instructions is fatally flawed. (Br. 58). Phillips ignores that, as the District Court instructed, fraud requires intent to deceive, not merely trading with the knowledge that trades will affect market prices. There was no evidence at trial regarding whether Morgan Stanley had such intent, nor should there have been: Phillips was on trial, not the bank. And in any event, whether Morgan Stanley engaged in wrongdoing does not help Phillips—two wrongs do not make a right.

Finally, because the District Court actually instructed the jury on a higher standard than required by the statute and this Court's cases, the sufficiency claim should be evaluated under the correct standard, which simply requires a showing of intent to manipulate. There is no question that the jury would have convicted under that standard, and the conviction should be affirmed on that basis. *See Musacchio*, 577 U.S. at 243.

## POINT IV

### The District Court Was Correct to Not Require Proof of an Artificial Price

Phillips next argues that the District Court erred by refusing to instruct the jury that the Government needed to prove Phillips caused an artificial price. There was no error. Phillips was charged with violating the CEA's prohibition on manipulative and deceptive devices, and his proposed instruction wrongly relied on elements from a different statute.

64

## A. Relevant Facts

As with his other challenges to the jury instructions on appeal, Phillips relies on an instruction he proposed in his request to charge, but did not preserve by objecting to the District Court's proposed instructions at the charge conference. (Br. 66). Before trial, Phillips proposed instructing the jury that Count One had four elements, one of which was the use of "manipulative and deceptive conduct." (A-292). He then went on propose that the "manipulative and deceptive conduct" element had four sub-elements: "First, that Mr. Phillips possessed the ability to influence market prices of USD/ZAR; Second, that an artificial price existed in the market for USD/ZAR; Third, that Mr. Phillips caused this artificial price; and Fourth, that Mr. Phillips specifically intended to cause this artificial price." (A-295-96).

During trial, the District Court circulated a draft jury charge with the instruction that "[m]anipulation refers to intentional or willful conduct designed to deceive or defraud by controlling or artificially affecting some type of price, in this case, the dollar-rand exchange rate." (A-2410). Phillips did not raise an objection at the charge conference, and the District Court delivered the instruction as it had proposed. (A-1550-52).

## B. Discussion

There was no error, let alone plain error, in the District Court's rejection of Phillips's proposed instructions about supplemental "artificial price" elements.

65

The key flaw in Phillips's proposed instruction is that it comes from the wrong statute. The Indictment charged Phillips under 7 U.S.C. § 9(1), which prohibits the use, in connection with a swap, of any "manipulative or deceptive device or contrivance" that violates a CFTC rule, and 17 C.F.R. 180.1, the CFTC rule which prohibits, among other things, using any "manipulative device, scheme, or artifice to defraud" in connection with a swap. (A-43-44). Neither provision refers to an "artificial price" or purports to apply only to manipulation by people who have the ability and intent to create artificial prices.

Ignoring the text, Phillips asserts that "this Court has construed market manipulation under Section 6[10] of the CEA" to require proof of, among other things, an "artificial price," relying on *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013). (Br. 66). But *Amaranth* dealt with a different statute. In that case, this Court considered a private lawsuit alleging a violation of the CEA's price-manipulation prohibition in 7 U.S.C. § 13(a)(2) and a *prior* version of 7 U.S.C. § 9(1) that dealt with price manipulation. *Amaranth*, 730 F.3d at 173. In interpreting those statutes, this Court expressly noted that Congress had amended 7 U.S.C. § 9(1) in the Dodd-Frank Act, and the CFTC had accordingly adopted Rule 180.1, and explained

---

[10] The sections of the Commodity Exchange Act do not correspond numerically to the U.S. Code sections where the CEA is codified. Section 6 of the CEA is codified at 7 U.S.C. § 9.

66

that those "significant changes" to the law were not at issue in *Amaranth*. *Id.* at 173 n.1.

It would be wrong to apply the "artificial price" elements from *Amaranth* to the statutes under which Phillips was charged. *Amaranth* dealt with 7 U.S.C. § 13(a)(2), which prohibits "manipulat[ing] [a] price," and the old version of 7 U.S.C. § 9, which also prohibited "manipulating . . [a] market price," 7 U.S.C. § 9 (2008 ed.). *Amaranth* described these statutes as requiring proof of an artificial price, but not proof of fraud. *See* 730 F.3d at 173. Through the Dodd-Frank Act, Congress left in place the price-manipulation prohibition in 7 U.S.C. § 13(a)(2),but amended 7 U.S.C. § 9 to prohibit using "any manipulative or deceptive device or contrivance." It makes little sense to read this new prohibition on manipulative or deceptive devices to require proof of all the same elements as the differently worded price-manipulation rule in 7 U.S.C. § 13(a)(2). *See United States v. Dai*, 99 F.4th 136, 139 (2d Cir. 2024) (courts should avoid "statutory interpretations that render provisions superfluous"); *see* Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,401 (July 14, 2011) (explaining that, in amending 7 U.S.C. § 9(1), Congress intended to "augment the commission's existing authority to prohibit fraud and manipulation," not to replicate 7 U.S.C. § 13(a)(2)).

Further, whereas 7 U.S.C. § 9(1) and Rule 180.1 do not resemble the language of the statutes at issue in *Amaranth*, they are "virtually identical" to Section 10(b) of the Securities Exchange Act and Rule 10b-5.

67

76 Fed. Reg. at 41,399. Those securities laws long pre-date the Dodd-Frank Act's amendment to 7 U.S.C. § 9(1) and have well-developed case law, including in the context of open-market manipulation. "[A] cardinal rule of statutory construction" is that "when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each bor-rowed word in the body of learning from which it was taken." *FAA v. Cooper*, 566 U.S. 284, 292 (2011). So these provisions should be interpreted alongside their counterparts under the Securities Exchange Act, not the statutes in *Amaranth*.

The close connection to the securities laws is fatal to Phillips's argument. This Court has held that an "artificial price" is not an element of an open-market manipulation claim under Section 10(b) and Rule 10b-5. *Vali Mgmt.*, 2022 WL 2155094, at *1-*2. Consistent with that case law, the CFTC rulemaking behind Rule 180.1 stated that the rule was designed to prohibit "fraud-based manipulative devices and contrivances employed intentionally or recklessly, regardless of whether the conduct in question was intended to cre-ate or did create an artificial price." 76 Fed. Reg. at 41,398. Phillips's artificial-price instruction, then, was at odds with Congress's clear intent to have 7 U.S.C. § 9(1) reach the same type of wrongdoing as Section 10(b) in the Exchange Act, and the CFTC's efforts to implement that Congressional command through Rule 180.1.

Separately, Phillips's proposed instruction was also incorrect because it would require the Government to prove a successful scheme. The law has long been clear

68

that statutes prohibiting schemes to defraud do not require proof of success, but rather "condemn[ ] the intent to defraud, that is, the forming of the scheme to defraud, however and in whatever form it may take." *United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997). By requiring proof of the creation of an artificial price, the defense instruction required proof that Phillips accomplished his criminal objective. But the crime is "the *scheme*, not its success," so Phillips's proposed instruction misstated the law. *United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991).

Finally, Phillips makes a number of policy arguments for his "artificial price" rule, none of which warrant reading this requirement into 7 U.S.C. § 9(1). For one, Phillips is wrong to claim that the District Courts decisions would render 7 U.S.C. § 13(a)(2) and Rule 180.2 meaningless because the Government could charge all market manipulation under Rule 180.1. (Br. 67). There is a critical difference: Rule 180.1 requires proof of fraud, whereas 7 U.S.C. § 13(a)(2) and Rule 180.2 do not, leaving an important role for those statutes in non-fraud manipulation cases. *See CFTC v. Kraft Food Grp.*, 153 F. Supp. 3d 996, 1018 (N.D. Ill. 2015). Phillips's claims about "routine trading activity" are also off base. (Br. 67). 7 U.S.C. § 9(1) does not put routine trading at risk because it requires intent to deceive, so adding an atextual artificial-price rule is unnecessary. Phillips counters that scienter alone should not distinguish "legitimate trading form improper trading in a regulated market." (Br. 69). But that is simply how laws prohibiting fraud work, even outside the context of trading. Speech is "unregulated," but if someone makes a false statement in

69

connection with a stock sale, whether that is legal or criminal turns on scienter. Phillips's policy arguments are meritless, and certainly do not warrant his attempt to rewrite the statute that Congress enacted. The District Court correctly declined to add an "artificial price" element to the offense.

## POINT V

## Sufficient Evidence Supported the Jury's Finding of Materiality

There is no merit to Phillips's claim that there was insufficient evidence of materiality. (Br. 70-73). A fraud is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it [is] addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999); *United States v. Vilar*, 729 F.3d 62, 88-89 (2d Ci. 2013) (holding misrepresentation material if it is "important in making an investment decision").

The evidence showed Phillips's fraud was material. Most simply, his fraud had "a natural tendency to influence" the decisions of counterparties to the OT Option because it drove the exchange rate through 12.50 USD/ZAR. *Neder*, 527 U.S. at 16. Manipulating that price signal was the means by which Phillips triggered the OT Option and contractually obligated Morgan Stanley (and JPMorgan, as Glen Point's prime broker) to pay $20 million. (SA-33, 113, 645-86); *see United States v. Regan*, 490 F.3d 208, 236 (2d Cir. 2007) (holding misrepresentation was material where, under contract terms, the lie resulted in a different interest rate). That alone is sufficient to affirm.

70

Moreover, the jury heard testimony that it would be material for a bank to know whether a barrier option had been triggered because of a counterparty's intentional manipulation because it would matter to the bank's decision to pay. A senior compliance officer from JPMorgan, Krista Santoro, testified that it would be "important to . . . know that a counterparty engaged in trading that was intentionally designed to trigger a barrier event," and that such information "[w]ould be an important factor" in JPMorgan's "willingness . . . to pay" under the option. (SA-113-14). A senior banker at Morgan Stanley, Samer Oweida, also testified that it "would be important to know" if a "counterparty engaged in trading that was intentionally designed to trigger" a barrier option, and that the risk of such manipulation is not priced into the option. (SA-32-33). This testimony supported the jury's logical conclusion that Phillips's fraud would have mattered to an option counterparty.

Phillips tries to quibble with this testimony, but his arguments are inconsequential. He asserts, for instance, that Oweida's testimony merely established that manipulation was unexpected. (Br. 70-71). It was reasonable for the jury to infer that, if the bank did not expect manipulation or price it into an option, the bank may not pay a counterparty on the basis of a manipulated price. And Santoro explicitly said that knowing about manipulation would affect a bank's willingness to pay. Phillips seizes on Santoro's statement that manipulation "could" bear on a bank's decision to pay. (Br. 71). But Santoro also testified that manipulation "[w]ould . . . be an important factor" in deciding whether to pay (SA-113-14), and that is all that is

71

required to establish materiality, not proof that a counterparty "would have acted differently if an accurate disclosure was made," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000).

Phillips further faults the Government for not offering testimony from "personally involved counterparties" to the OT Option and claims that it would be of "marginal difference" to a counterparty whether a barrier was triggered by manipulative, as opposed to normal trading. (Br. 72-73). Neither argument holds up. Testimony from a personally involved counterparty was not required because "the question of materiality . . . is an objective one." *Amgen Inc. v. Conn. Ret. Plans*, 568 U.S. 455, 467 (2d Cir. 2013). The question for the jury was whether a reasonable counterparty would have thought Phillips's fraud was material. As for the assertion that Phillips's fraud made only a "marginal difference," (Br. 72), the jury was not required to see things that way. The evidence was more than sufficient to show that it was Phillips's trading that triggered the OT Option, which was, by itself, enough to make the fraud material. And even if it were not, the testimony from Santoro and Oweida gave the jury ample basis to conclude that a reasonable bank deciding to pay on an option contract would find it important to know whether the counterparty had engaged in manipulative trading with the intent to trigger the option.

Finally, although the Government proved materiality, it should not have been required to do so. Phillips was prosecuted under the law prohibiting the use of "any manipulative device, scheme, or artifice to

72

defraud." 17 C.F.R. § 180.1(a)(1). That does not require proof of "material[ity]," unlike other provisions of the same regulation. *See id.* § 180.1(a)(2). This is a separate basis to affirm, *see Musacchio*, 577 U.S. at 243 (evaluating sufficiency based on actual elements).

## POINT VI

### Phillips Received Due Process

Finally, Phillips is wrong to argue that he was denied due process. (Br. 73). The jury found that he knew what he was doing was unlawful, and he has not shown that he lacked fair notice that his conduct was unlawful.

## A. Applicable Law

The Due Process Clause requires criminal statutes to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 617 (1954). "[T]he touchstone of the fair warning requirement is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 157 (2d Cir. 2009). "Due process is not, however, violated simply because the issue is a matter of first impression." *Ponnapula v. Spitzer*, 297 F.3d 172, 183 (2d Cir. 2002). Due process "requires only that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct

73

might be within its scope." *Rubin v. Garvin*, 544 F.3d 461, 469 (2d Cir. 2008).

## B.  Discussion

The evidence at trial proved that Phillips knew his scheme was unlawful. The jury was instructed that it had to find that Phillips was "aware that what he was doing . . . was unlawful." (A-1553); *Rubin v. Garvin*, 544 F.3d 461, 468 (2d Cir. 2008) ("A scienter requirement may mitigate a law's vagueness, especially where the defendant alleges inadequate notice."). That finding had ample support in the record, including from evidence that Glen Point policies prohibited fraud and market manipulation and Phillips specifically received training that fraud and market manipulation were unlawful, including under the CEA. (SA-122). This demonstrated that Phillips "kn[e]w that [his] conduct [was] at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

Moreover, the law prohibiting open-market manipulation was clear at the time of Phillips's crime. By Phillips's offense in 2018, 7 U.S.C. § 9(1) and Rule 180.1 had, for years, prohibited any "manipulative device, scheme, or artifice to defraud" in connection with swaps. It was reasonably clear that this prohibition was coextensive with the "virtually identical" prohibitions in the securities laws, 76 Fed. Reg. at 41,399, which have prohibited fraudulent open-market manipulation for decades. *See supra* at 58-59. This gave Phillips "sufficient warning" to avoid breaking the law. *Rubin*, 544 F.3d at 469.

74

Phillips's arguments that the law of open-market manipulation was unclear with respect to elements like the need to prove "sole intent" or an "artificial price" cannot support his due process claim. (Br. 73-74). As explained above, there was no legal basis to add those elements and, even if there were a reasonable dispute about them, that need for "judicial construction"—which is common in many criminal cases—is not "a violation of the fair notice requirement." *Ortiz*, 586 F.3d at 159.

Phillips's claim that the extraterritorial reach of the CEA was unclear (Br. 74-75), fares no better. It was foreseeable to Phillips that he would be subject to the CEA because he was licensed in the United States, operated a hedge fund in the country, traded for American clients, and used a New York bank account with his American prime broker. Glen Point even maintained a manual on CFTC compliance (SA-122), and the Option contracts stated that they were being reported, pursuant to American law (SA-650, 653). This gave Phillips more than "sufficient warning" to understand that he should not violate federal law by committing fraudulent market manipulation. *United States v. Moseley*, 980 F.3d 9, 24 (2d Cir. 2020).

75

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:     New York, New York
              January 24, 2025

                      Respectfully submitted,

                      DANIELLE R. SASSOON,
                      *United States Attorney for the*
                      *Southern District of New York,*
                      *Attorney for the United States*
                        *of America.*

THOMAS S. BURNETT,
ANDREW M. THOMAS,
NATHAN REHN,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

On October 16, 2024, the Court granted the parties' leave to file oversized principal briefs of no more than 18,000 words. Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation set by the Court in its October 16, 2024 order. As measured by the word processing system used to prepare this brief, there are 17,982 words in this brief.

DANIELLE R. SASSOON,
*United States Attorney for the*
*Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*