# 24-1908

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆▶◆◀◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL PHILLIPS, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

―――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

SEAN HECKER
JENNA M. DABBS
DAVID GOPSTEIN
TREVOR W. MORRISON
ANNE R. YEARWOOD
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................1

ARGUMENT ......................................................................................3

I.  THE CEA DOES NOT APPLY TO PHILLIPS' FOREIGN
    CONDUCT. ..............................................................................3

    A.  There Was Insufficient Evidence for a Domestic Application. ........3

        1.  Legal Standard. ........................................................3

        2.  Application. ..............................................................5

    B.  The District Court's Section 2(i) Instruction Was Error. ..................9

        1.  De Novo Review Applies. .....................................10

        2.  The Government's Mistaken Definition of "Significant." .....12

        3.  A "Significant" Connection Is One That Can Pose
            Systemic Risk. .........................................................15

        4.  The Instruction Below Allowed the Jury to Determine
            Significance from the Wrong Perspective. .............22

    C.  The Evidence Was Insufficient to Satisfy Section 2(i). .................23

        1.  Morgan Stanley. .....................................................24

        2.  JPMorgan. ...............................................................25

        3.  The Connections the District Court Rejected. ........26

i

II.   THE INTENT INSTRUCTION WAS ERROR AND NOT
      HARMLESS...................................................................................28

      A.   De Novo Review Applies.................................................28

      B.   The District Court Erred by Not Requiring Proof of Sole Intent....30

      C.   The Failure to Give a Sole Intent Instruction Was Not Harmless. .34

III.  PHILLIPS' REMAINING ARGUMENTS WARRANT REVERSAL..35

      A.   The Government Should Have Been Required to Prove
           Artificial Price. ...............................................................35

      B.   There Was Insufficient Proof of Materiality....................36

      C.   Phillips' Right to Due Process Was Violated. .................37

CONCLUSION ........................................................................................38

CERTIFICATE OF COMPLIANCE .........................................................39

CERTIFICATE OF SERVICE ...................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
    600 U.S. 412 (2023) ......................................................................4

*Abramski v. United States*,
    573 U.S. 169 (2014) ....................................................................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ..........................................................33

*Bascuñán v. Elsaca*,
    927 F.3d 108 (2d Cir. 2019) ......................................................4, 5

*CFTC v. Gorman*,
    2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) ..................... 8, 16, 35

*CFTC v. S. Tr. Metals, Inc.*,
    894 F.3d 1313 (11th Cir. 2018) ...................................................36

*CFTC v. Wilson*,
    2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ...............................32

*Dunn v. CFTC*,
    519 U.S. 465 (1997) ......................................................................6

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ....................................................................15

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
    592 U.S. 351 ( 2021) ...................................................................25

*Hanly v. Kleindienst*,
    471 F.2d 823 (2d Cir. 1972) ........................................................14

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ....................................................................14

*In re Platinum & Palladium Antitrust Litig.*,
    61 F.4th 242 (2d Cir. 2023).......................................................4, 5

*Kerson v. Vermont L. Sch., Inc.*,
    79 F.4th 257 (2d Cir. 2023).........................................................16

*Laydon v. Coöperatieve Rabobank U.A.*,
    55 F.4th 86 (2d Cir. 2022) ............................................... 5, 6, 7, 9

*Laydon v. Mizuho Bank, Ltd.*,
    2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015) .............................27

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014).........................................................7

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014).......................................................23

*Markowski v. S.E.C.*,
    274 F.3d 525 (D.C. Cir. 2001) ....................................................9

*Microsoft Corp. v. AT & T Corp.*,
    550 U.S. 437 (2007) ...................................................................15

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010) ..................................................................6, 8

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014).......................................................7, 8

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
    937 F.3d 94 (2d Cir. 2019).............................................. 4, 5, 6, 8, 9

*Psimenos v. E.F. Hutton & Co.*,
    722 F.2d 1041 (2d Cir. 1983).......................................................6

*Puckett v. United States*,
    556 U.S. 129 (2009) ...................................................................10

*Rehaif v. United States*,
    588 U.S. 225 (2019) ...................................................................31

*RJR Nabisco v. Eur. Cmty.*,
    579 U.S. 325 (2016) ................................................................4, 9

*Rose v. New York City Bd. of Educ.*,
    257 F.3d 156 (2d Cir. 2001) ........................................................11

*S.E.C. v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007) ...........................................31

*SEC v. Vali Mgmt. Partners*,
    2022 WL 2155094 (2d Cir. 2022) ..................................... 32, 33, 36

*Set Capital LLC v. Credit Suisse Grp., A.G.*,
    996 F.3d 64 (2d Cir. 2021) ..........................................................33

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
    277 F. Supp. 3d 521 (S.D.N.Y. 2017) ...........................................27

*Sullivan v. Barclays PLC*,
    2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) .....................................7

*Truck Ins. Exch. v. Kaiser Gypsum Co.*,
    602 U.S. 268 (2024) ...................................................................16

*United States v. Batato*,
    833 F.3d 413 (4th Cir. 2016) ........................................................31

*United States v. Crowley*,
    318 F.3d 401 (2d Cir. 2003) ........................................................12

*United States v. Grote*,
    961 F.3d 105 (2d Cir. 2020) ............................................... 10, 12

*United States v. Harriss*,
    347 U.S. 612 (1954) ...................................................................37

*United States v. Hunt*,
    82 F.4th 129 (2d Cir. 2023) ......................................................12

*United States v. Mulheren*,
    938 F.2d 364 (2d Cir. 1991) ........................................ 31, 33, 34

*United States v. Napout*,
    963 F.3d 163 (2d Cir. 2020) .......................................................4

*United States v. Pérez-Rodríguez*,
    13 F.4th 1 (1st Cir. 2021) .........................................................10

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006) ............................................. 12, 23

*United States v. Roy*,
    783 F.3d 418 (2d Cir. 2015) ......................................................12

*United States v. Royer*,
    549 F.3d 886 (2d Cir. 2008) ......................................................33

*United States v. Silver*,
    864 F.3d 102 (2d Cir. 2017) ............................................. 22, 34

*United States v. Technodyne LLC*,
    753 F.3d 368 (2d Cir. 2014) ......................................................31

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) .........................................................9

*WesternGeco LLC v. ION Geophysical Corp.*,
    585 U.S. 407 (2018) ...................................................................4

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011) ......................................................32

**STATUTES**

7 U.S.C. § 1a(33)(A) ................................................................20

7 U.S.C. § 1a(33)(B) ................................................................20

7 U.S.C. § 2(c) .........................................................................6

7 U.S.C. § 2(i) ................................................................ *passim*

7 U.S.C. § 6 .................................................................... 19, 20

7 U.S.C. § 9(1) ........................................................................35

7 U.S.C. § 13 ..........................................................................35

12 U.S.C. § 1823 .....................................................................16

15 U.S.C. § 6a .........................................................................23

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010) ............................ 13, 17

**REGULATIONS**

17 C.F.R. § 1.3 .......................................................................20

77 Fed. Reg. 54,355 (Sept. 5, 2012) .........................................21

78 Fed. Reg. 45,292 (July 26, 2013) ............................... *passim*

85 Fed. Reg. 56,924 (Sept. 14, 2020) ..................... 14, 17, 19, 20, 21

**FEDERAL RULES**

Fed. R. Crim. P. 30 ................................................................10

**OTHER AUTHORITIES**

CFTC, Registered Swap Dealers,
    https://www.cftc.gov/LawRegulation/DoddFrankAct/registerswapdealer.ht
    ml ..........................................................................................................20

Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in
    Financial Markets?*, 105 Harv. L. Rev. 503 (1991) ........................................30

*In the matter of JPMorgan Chase Bank, N.A.*,
    CFTC Dkt. No. 14-01 (Oct. 16, 2013) ............................................................18

J. Christopher Giancarlo, *Cross-Border Swaps Regulation Version 2.0: A Risk-
    Based Approach with Deference to Comparable Non-U.S. Regulation* (Oct.
    1, 2018)............................................................................................................21

Jury Charge, *United States v. Tuzman*,
    No. 15 Cr. 536 (S.D.N.Y. Jan. 11, 2018) .........................................................33

Michael Greenberger, *Too Big to Fail-U.S. Banks' Regulatory Alchemy*,
    14 J. Bus. & Tech. L. 197 (2019) ....................................................................22

## PRELIMINARY STATEMENT

Eager to avoid de novo review of jury instructions it does not even defend, the government conjures a world in which a defendant can argue for his proposed jury instruction *four* separate times, have his requested language squarely rejected, and somehow fail to preserve his objection by not raising his position a *fifth* time. That novel notion gives new meaning to elevating form over substance. The district court was fully aware of (and rejected) the parties' positions on disputed, case-dispositive jury instructions. The government's insistence otherwise speaks volumes.

The government fares no better on the merits. *First*, in seeking a domestic application of the Commodity Exchange Act (CEA), it misstates the governing standard and relies on plainly insufficient, incidental U.S. ties. Indeed, the district court asked (before the charge conference) whether there was enough evidence even to instruct the jury on a potential domestic application, and correctly concluded (post-trial) that there was insufficient evidence to satisfy it.

*Second*, in seeking an extraterritorial application of the CEA through Section 2(i), the government does not defend the district court's mistaken instruction on the meaning of "significant," which allowed the jury to determine significance from the perspective of a foreign swap instead of the United States. Instead, it advances a standard that would allow U.S. jurisdiction over all foreign swap activity that links to or affects a U.S. entity. Under that theory, had Appellant Neil Phillips purchased

1

one dollar of Rand, there still would have been a *significant* connection between his foreign conduct and activities in U.S. commerce. Such a standard is incompatible with the purpose of Section 2(i); would render "significant" meaningless; and underscores the error in failing to instruct the jury that a significant connection is one through which foreign swap activities can pose a systemic risk to the U.S. financial system.

*Third*, in arguing that the evidence satisfied Section 2(i), the government relies on the same scattershot U.S. connections; they are neither direct nor significant, even under the district court's instruction. In defending the one connection the court found sufficient—a "false signal" to Morgan Stanley and JPMorgan—the government essentially concedes that its position would bring most foreign swap-related activity within U.S. jurisdiction. If Congress intended to cast such a wide extraterritorial net, it would have drafted Section 2(i) very differently.

*Fourth*, the government does not defend the district court's novel "but for" intent instruction or respond to Phillips' arguments that it was error. Instead, the government claims "no harm no foul" because, in its view, Phillips received a more defense-friendly instruction than he deserved. That is wrong as a matter of law. Where, as here, the only difference between criminal defendant and purported victim was the intent behind otherwise mirror-image trades in an unregulated market, proof of sole intent is required.

2

*Fifth*, the government defends the omission of the required artificial price element by conflating this case with open-market manipulation of regulated markets. There, a false signal to market participants is the crime; here, any signal sent to FX spot market participants was legally irrelevant. If Phillips' trades did not cause an artificial price in the spot market, there was no false price signal to the Option counterparty, and thus no fraud.

*Finally*, the government never explains how a U.K. national in South Africa had fair notice that he could be subject to a novel U.S. prosecution based on a statute whose meaning was so unclear that two branches of the U.S. government had vastly different understandings of it. That Phillips had notice he could be subject to the CEA in general does not mean he had fair notice that *this conduct* could fall within Section 2(i). He plainly did not.

## ARGUMENT

## I.    THE CEA DOES NOT APPLY TO PHILLIPS' FOREIGN CONDUCT.

The government contends that the evidence supported a domestic application of the CEA (a conclusion the district court rejected) and an extraterritorial application under Section 2(i). Both arguments fail.

### A.    There Was Insufficient Evidence for a Domestic Application.

#### 1.    Legal Standard.

The government can overcome the presumption against extraterritoriality when "the conduct relevant to the statute's focus occurred in the United States," and therefore supports a domestic application of the statute. *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). When that conduct occurred abroad, "the case involves an impermissible extraterritorial application regardless of any other [domestic] conduct." *Id.* And if relevant conduct occurred in both, the analysis turns on whether the domestic conduct had "primacy" or was instead "merely incidental." *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 416 (2018)); *see also United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020).

As it did below, the government misapplies the governing standard. Citing *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242 (2d Cir. 2023), it contends that so long as the relevant conduct is not "entirely foreign," a domestic application is permissible. Op.48. That is neither the law nor supported by *Platinum*. There, this Court stated that relevant conduct must not be so "predominantly foreign as to render the claims impermissibly extraterritorial." 61 F.4th at 268 (quoting *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019)). The concept of "predominance" entails a comparative assessment. It presupposes the existence of some domestic conduct that would be insufficient. *See Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 419 (2023) (the presumption "would be

meaningless if any domestic conduct could defeat it"). In *Platinum*, a domestic application was permissible because "*much* of the alleged manipulation was domestic." 61 F.4th at 268 (emphasis added). As the district court found, that was not the case here.

### 2. Application.

The district court correctly concluded that no reasonable jury could find that the facts supported a domestic application of the CEA.

*First*, the conduct relevant to the CEA's focus—"rooting out manipulation and ensuring market integrity" in the swaps markets, *Prime*, 937 F.3d at 107— occurred abroad. Unlike the wire fraud statute, which is focused on the use of U.S. "wires in furtherance of a scheme to defraud," *Bascuñán*, 927 F.3d at 122, or the Securities Exchange Act, which is focused on "purchases and sales of securities in the United States," the CEA is "not [focused] on the geographical coordinates of the transaction." *Prime*, 937 F.3d at 107. The key question for the CEA thus is where the manipulative conduct occurred. *Id.*; *see also* SPA.45.

Here, all the alleged manipulative conduct occurred abroad: Phillips sent instructions from South Africa to a salesperson in Singapore who executed trades in the decentralized FX spot market. A.594, A.918, A.1122-1123, A.2782. As in *Laydon v. Coöperatieve Rabobank U.A.*, manipulative "conduct and communications that occurred overseas on foreign trade desks" targeting a financial

instrument "tied to the value of a foreign asset" cannot support a domestic application of the CEA. 55 F.4th 86, 96-97 (2d Cir. 2022).

*Second*, this foreign conduct undoubtedly had primacy over any domestic conduct. In resisting this conclusion, the government relies on U.S. touchpoints that are irrelevant to the CEA's focus and textbook incidental conduct. Op.48-51.

Take FastMatch, an engine that facilitates matching trades in the FX spot market, A.1006-1010, and on whose U.S. servers some of the Boxing Day Trades matched. This is plainly insufficient to support a domestic application. The CEA does not regulate (let alone focus on) the FX spot market or the means through which participants trade in it. *See* SPA.49. Indeed, Congress exempted the spot market from the CEA. 7 U.S.C. § 2(c)(1)(A); *Dunn v. CFTC*, 519 U.S. 465, 473 (1997) (the spot market is "free from supervision"). Thus, the location of a server that facilitates FX spot trading is not within the CEA's focus of "rooting out" fraud in the swap market. *Prime*, 937 F.3d at 107. But even if the spot market were subject to the CEA, the geographical location of where trades match would still not fall within its focus, *supra* at 5; SPA.49.[1]

---

[1] The government principally cites wire and securities fraud cases. Op.49-50. The outlier was decided pre-*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 261 (2010), which abrogated the test it applied, and the manipulation occurred through "trading domestic futures contracts on American commodities exchanges," which were "created by domestic exchanges and may lawfully be traded only on those exchanges." *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1046-47 (2d Cir. 1983). That is far afield from the unregulated, decentralized, and international spot market.

Moreover, the use of U.S. FastMatch servers was purely incidental: a U.S. server was not necessary for using FastMatch, let alone for the scheme itself.[2] If the matching of a trade in the United States could create primacy over the foreign conduct, "any transaction between two foreign nationals (even between foreign nationals residing in the same country), with no other [U.S.] contacts, would fall within the reach of the CEA based solely on the transmission of a misrepresentation through the United States." SPA.50. That is not the law.

The government's reliance on Bloomberg's decision to "replicate[]" chats on a U.S. server suffers from the same fatal flaws. SPA.52. Indeed, it is difficult to conceive of conduct further afield from the CEA's focus or more incidental to this case than Bloomberg's storage policies. Further, as this Court has recognized, fraudulent statements made abroad that are merely "'accessible in the United States … [or] repeated here' are insufficient to alter the nature of an otherwise 'predominantly foreign' transaction." *Id.* (quoting *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 201 (2d Cir. 2014)); *see also Laydon*, 55 F.4th at 97. So too here.[3]

---

[2] The Boxing Day Trades underscore the randomness of the use of U.S. FastMatch servers. The first $300 million trades matched on a different engine in London. A.1018, A.1021-1023, A.1300, A.2845. Subsequent trades matched on FastMatch, A.1208-1213, some on U.S. servers. A.1754.

[3] The government relies on the same inapt wire and securities fraud cases. Op.49-50. Even there, none solely involved communications between individuals abroad

Next, the government points to a "false price signal" that reached the United States. Op.49. That "signal" also reached every person in the world who can see FX market prices; that it was accessible in the United States cannot establish "primacy" over the foreign conduct. In *Parkcentral*, this Court rejected a domestic application when false statements were "accessible in the United States" and "may have been intended to deceive investors worldwide." 763 F.3d at 201, 216. Other courts have followed suit. *E.g.*, *CFTC v. Gorman*, 2023 WL 2632111, at *12 (S.D.N.Y. Mar. 24, 2023). For good reason: in today's world, the alternative offers no limiting principle. Moreover, as the district court found, such receipt was not a necessary part of the scheme, rendering the signal "incidental." SPA.54-55.[4]

Finally, the government cites payments to and from U.S. bank accounts after the Option triggered. Op.49. Phillips did not make these payments, and they are thus not relevant to the analysis. *See Prime*, 937 F.3d at 105 (requiring domestic "conduct by [the] Defendant[]"). Even if he had, they were the "consequences, rather than components," of his scheme. SPA.56. And as in *Prime*, this kind of "ripple effect"

---

that merely passed through (or were "replicated on") a U.S. wire or server. Such tenuous connections are insufficient for a domestic application. *See Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014); *Sullivan v. Barclays PLC*, 2017 WL 685570, at *33 (S.D.N.Y. Feb. 21, 2017).

[4] The government cites mostly venue cases to argue that the "receipt" of the false price signal is relevant conduct. Op.49. Venue analysis focuses not only on where the conduct occurred, but also on the conduct's effect. SPA.55. The domestic application analysis does not and cannot. *See Morrison*, 561 U.S. at 261.

is too "attenuated" to support a domestic application. 937 F.3d at 107-08; *see also Laydon*, 55 F.4th at 96-97 (same despite U.S. investor purchasing the manipulated product).

Further still, because the government did not have to prove that the scheme succeeded, *Markowski v. S.E.C.*, 274 F.3d 525, 529 (D.C. Cir. 2001), payments *after* the Option triggered are, by definition, not the focus of the statute, SPA.57. The government responds that a "fraudulent scheme is not complete until the proceeds have been received." Op.51. In the wire fraud case it cites, however, bank payments were considered for venue and played no role in the entirely distinct domestic application analysis. *United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013).[5]

At bottom, accepting the government's approach to the domestic application test would turn the presumption against extraterritoriality on its head. It is axiomatic that "United States law governs domestically but does not rule the world." *RJR Nabisco*, 579 U.S. at 335. That principle would be defeated if the Court gave primacy to the incidental conduct upon which the government relies. *See* SPA.48-59.

### B. The District Court's Section 2(i) Instruction Was Error.

Because the evidence did not support a domestic application of the CEA, the government had to satisfy Section 2(i)'s standard for an extraterritorial application.

---

[5] The other cases it cites are also inapposite: each addressed venue or the elements of wire fraud, not extraterritoriality or the CEA. Op.49, 51; SPA.55.

Here, the parties agree the district court's extraterritoriality instruction was error. The government wrongly contends that its proposal accurately states the law. In fact, the court erred by: (i) failing to state that a significant connection is one that can cause systemic risk to the U.S. financial system; and (ii) permitting the jury to assess significance from a non-U.S. perspective.

### 1. De Novo Review Applies.

The government's assertion that Phillips' challenge to the extraterritoriality instruction should be assessed under plain-error review misconstrues the law and grossly distorts the record. Op.18.

The appellate waiver rule aims "to induce the timely raising of claims and objections, which gives the district court the opportunity to consider and resolve them." *Puckett v. United States*, 556 U.S. 129, 134 (2009). Accordingly, even under Federal Rule of Criminal Procedure 30(d), if the party previously objected, made his position clear, and "it was evident in the circumstances that renewal of the objection would be futile because the court had clearly manifested its intention to reject the objection," he need not keep objecting. *United States v. Grote*, 961 F.3d 105, 115 (2d Cir. 2020)[6]; *see United States v. Pérez-Rodríguez*, 13 F.4th 1, 34 (1st Cir. 2021)

---

[6] In *Grote*, the panel rejected a futility argument; there, the defendants objected to proposed language during the charge conference, reminded the court of the objection the next day, and the court left the issue open. 961 F.3d at 115. Here, by contrast, the parties briefed and argued their positions extensively, and the court both

(Lipez, J., concurring) (collecting cases); *Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 160 (2d Cir. 2001) (same for civil equivalent). That is what happened here.

Phillips first argued that Section 2(i) requires a showing of systemic risk in his motion to dismiss the indictment. A.65; *see* SPA.19 (denying that motion). Phillips proposed an instruction that again included a systemic risk standard. A.305-306. In the final pretrial conference, the district court raised several issues related to the charge, including the standard for Section 2(i). A.359-367. Phillips then defended his proposed instruction in a written submission, A.341-351, and at the subsequent oral argument, A.483, A.517-548.

The district court circulated a proposed charge on the morning of jury selection, noting that the parties "all made objections before." A.551, A.583. The court omitted the extraterritoriality instruction because it was still being drafted and later circulated a draft instruction after the close of the government's case. A.1684. That instruction rejected Phillips' systemic risk standard as applied to the connection prong. A.2419-2421. During the charge conference, neither the government nor Phillips renewed their objections to the court's formulation, the government recognizing that the court had "rejected [its] original proposal." A.1748. At that

---

acknowledged and rejected all prior objections when issuing the near-final charge. Presumably that finality is why the government did not object to the court's rejection of its proposed standard for the effect prong (instead forgoing any reliance on it), A.1748, or intent, A.583.

point, the court had rejected Phillips' position too and it would have been futile to raise the issue again.

This situation is far removed from the cases the government cites. In *United States v. Crowley*, the defendant merely submitted a proposed charge and did not object at the charge conference. 318 F.3d 401, 412 (2d Cir. 2003). And in *United States v. Hunt*, the defendant submitted a proposed charge and then raised a "materially different" objection from what he asserted on appeal. 82 F.4th 129, 138-39 (2d Cir. 2023). In neither case was the district court given ample opportunity to consider and reject the defendant's position—through detailed briefing and argument—and to make its disagreement clear. Here, that is precisely what occurred, rendering any further objection futile. The Court's review is therefore de novo. *Grote*, 961 F.3d at 115.[7]

### 2. The Government's Mistaken Definition of "Significant."

The government contends that Section 2(i) applies to conduct related to any foreign swap-related activity if—in the aggregate—that activity has a direct and

---

[7] The government contends that Phillips must demonstrate that the instruction was erroneous, and that his proposed instruction "accurately represented the law in every respect." Op.12 (quoting *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015)). But the latter requirement applies when the court refuses to give any instruction on a given issue, not when it gives an instruction adopting a different legal standard on a disputed issue. *United States v. Quattrone*, 441 F.3d 153, 177-79 (2d Cir. 2006) (drawing this distinction). To Phillips' knowledge, this Court has never found an instruction erroneous and prejudicial but nonetheless upheld the verdict because the objecting party's instruction was also erroneous.

significant connection with activities in, or effect on, U.S. commerce. *See* Op.14-15, 33-34. Though unclear, the government's position appears to be that a class of swap-related conduct is "significant" for the connection prong if it "poses a risk" that the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), was enacted to prevent. *See* Op.33 (connecting "manipulation" to "market integrity"). The government is mistaken, for five reasons.

*First*, this interpretation distorts Section 2(i)'s restrictive presumption into a statute that leaves little, if any, foreign conduct beyond its grasp. *See* 7 U.S.C. § 2(i)(1); Br.30-31. The government's application of Section 2(i) here illustrates why. On appeal, the government argues "manipulation relating to foreign exchange derivatives, as a class, is significant." Op.33. Below, it identified the "significant" class as "[c]onduct that causes people or entities in the United States to make payment pursuant to a swap." A.260.[8] If Section 2(i) is understood these ways, no swap transaction tangentially connected to the United States could fall outside its scope. That transforms the narrow exception to the presumption against extraterritoriality into a "ready tool" for achieving near-universal application of U.S. law to foreign conduct. 78 Fed. Reg. 45,292, 45,372 (July 26, 2013) (Dissenting Statement of Commissioner Scott D. O'Malia).

---

[8] It also identified all "manipulative conduct with respect to swaps." A.221.

*Second*, the government's interpretation deprives "significant" of any meaning. Indeed, its position is that *any* manipulative foreign conduct related to a swap is, by definition, "significant." Op.33; *but see Hanly v. Kleindienst*, 471 F.2d 823, 830-31 (2d Cir. 1972) (construing "significantly affecting" as requiring more than just any effect). That means whether conduct falls within Section 2(i) turns on whether it is direct, not whether it is both direct *and* significant (because significant plays no filtering role). But an interpretation that renders "significant" superfluous fails on its own terms. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

*Third*, the government's interpretation turns Section 2(i) into a statute under which a sufficient connection exists if a U.S. entity is linked to or affected by foreign conduct. In erroneously relying on the aggregation approach, the CFTC has stated that such a connection exists every time a U.S. entity is involved (and does not when one is not). *See* 85 Fed. Reg. 56,924, 56,940, 56,997 (Sept. 14, 2020). But Congress did not adopt an entity-based approach to extraterritoriality here. Br.36-38.

*Fourth*, the government's interpretation is inconsistent with Section 2(i)(2), which authorized the extraterritorial application of the CEA to foreign activities if those activities were undertaken to intentionally evade its requirements or CFTC regulations. 7 U.S.C. § 2(i)(2). Accordingly, Congress provided the government with

14

a mechanism to regulate evasive foreign conduct as a class *without demonstrating that the specific conduct at issue had a direct and significant connection with or effect on U.S. commerce*. It follows that Congress necessarily did not provide a license to reach non-evasive conduct as a class—instead, to prosecute that foreign conduct, the government must satisfy the direct and significant requirements in each case.

*Fifth*, the government's approach is inconsistent with the principle that any ambiguity in an extraterritorial provision must be construed in favor of less extraterritorial application—not more—"to avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffman-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 164 (2004); *accord Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 455 (2007) (the presumption "remains instructive in determining the extent of the statutory exception"). Under the government's interpretation, the opportunities for conflict and interference with the authority of foreign nations are boundless. Congress included the "direct" and "significant" language in Section 2(i) to prevent that outcome. Br.29-32.

### 3. A "Significant" Connection Is One That Can Pose Systemic Risk.

As explained in Phillips' opening brief, a "significant" connection under Section 2(i) is one that can pose a systemic risk to the U.S. financial system. Br.32-

34; *Gorman*, 2023 WL 2632111, at *9 n.9.[9] The government raises meritless interpretive and policy arguments in response.

*First*, the government fails to answer the question posed in Phillips' brief: to whom must a connection under Section 2(i) be significant? Significance requires a reference point. Br.32. A "connection" between foreign swap activities and activities in U.S. commerce, for example, could be significant to the former but not to the latter. And in Section (2)(i), significance is determined from the perspective of the United States. The government, however, rests its argument on the entirely ambiguous proposition that a connection must be generally consequential. Op.19.[10] That evades the critical issue, which, again, goes not to the generic meaning of "significant" but to the question, *significant to whom*?

*Second*, the government presents a false dichotomy between "the risk activities outside the United States pose to the financial system" and "the

---

[9] Systemic risk means risk that "would have serious adverse effects on economic conditions or financial stability," 12 U.S.C. § 1823(c)(4)(G)(i)(I), or as Phillips proposed, is "capable of directly undermining the stability of the United States financial system." A.304-305.

[10] The government also observes that "significant effect" does not require a showing of systemic risk for "similar language" is used in other statutory contexts. Op.21. But the meaning and reference of "significant" depend on the specific context in which it is used and how it was intended. *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 279 n.4 (2024); *Kerson v. Vermont L. Sch., Inc.*, 79 F.4th 257, 265 (2d Cir. 2023); *see* Br.28-41. It is thus no surprise that other statutes may call for a different interpretation.

relationship between activities abroad and those inside the country." Op.20. The correct interpretation of a "significant connection" under Section 2(i) is a combination of the two, namely one that "through such connection present[s] the type of risks to the U.S. financial system and markets that [Dodd-Frank] directed the Commission to address." 85 Fed. Reg. at 56,929-30.

*Third*, the government's interpretation cannot be reconciled with its own position that a class of conduct is "significant" if it "poses a risk" that Dodd-Frank was enacted to prevent. *See* Op.33.[11] If, as the government contends, the significance of a connection is determined by looking at the relationship "between the activities outside the country and those inside the country" in a vacuum, Op.20, there would be no need to evaluate whether those connections in the aggregate present these risks *to the United States*.

*Finally*, the government's contention that a systemic risk inquiry "collapses the distinction" between "connection" and "effect" overlooks how the two terms differ. Op.20. Connections, or "links," can exist regardless of whether they have an effect. *See* 78 Fed. Reg. at 45,299. This principle is the foundation for Dodd-Frank's (and the CFTC's) prophylactic measures—without it, the United States could

---

[11] Phillips' instruction focused on Dodd-Frank's goal of reducing systemic risk. A.305. The Act also sought increased transparency and market integrity, *see* Op.24, but those goals are in service of reducing systemic risk by promoting "financial stability," *see* 124 Stat. 1376.

17

regulate conduct only after it has been harmed. The government argues that the distinction between realized and "unrealized harms" has no support in the text, Op.20 n.2, but it does: in Congress's decision to include separate "connection" and "effect" prongs in Section 2(i), and in the differences in their plain meanings, *see* Br.35.[12]

The government's arguments about the potential ramifications of a systemic risk standard fare no better.

*First*, it starts from the false premise that the CEA must apply to a single fraudulent trade occurring abroad. Op.22. But why? Congress knows how to write a statute that covers any foreign conduct—no matter how small—if it has U.S. ties. Br.36 & n.9. In Section 2(i), however, Congress focused on the significance of a connection to the United States, not just the existence of one. It thus should be no surprise that certain foreign conduct (including manipulative conduct) would not be subject to the statute.

*Second*, the government incorrectly contends that no scheme could be covered if "significant" describes risk to the financial system. Op.22. To be sure, this case would fall short: Phillips' conduct did not have a significant effect on anyone, let alone the U.S. financial system. But other schemes may not. For example, in *In the*

---

[12] Even the CFTC acknowledged this distinction when it explained that a significant connection is one that "present[s]" risks. 78 Fed. Reg. at 45,300.

*matter of JPMorgan Chase Bank, N.A.*, a JPMorgan branch in London engaged in trading activity in connection with a credit default swap that resulted in the bank's parent company "los[ing] more than $6 billion." CFTC Dkt. No. 14-01, 3 (Oct. 16, 2013). The anti-fraud provisions can thus still be used under Section 2(i); a systemic risk standard simply ensures that they apply as Congress intended.

*Third*, the government wrongly suggests that Phillips' proposed standard will eliminate the CFTC's ability to regulate foreign conduct. Op.21-25. As a preliminary matter, it is Congress—not the CFTC—that sets the boundaries for CFTC regulation. That the agency may have, in some cases, construed its authority too broadly has no bearing on the proper interpretation of Section 2(i). It simply means that the CFTC must keep its regulation of foreign conduct within the limits set by Congress moving forward.[13]

In all events, the application of some of Dodd-Frank's requirements (and the CFTC's related regulations) to foreign conduct already falls within Section 2(i)'s limits. Take registration requirements. Congress required entities that engage in a certain amount of swap activities to register as swap dealers with the CFTC and abide by various entity-level requirements. *See* 7 U.S.C. § 6s; 78 Fed. Reg. at

---

[13] Over dissent, the CFTC adopted rules explaining the application of the CEA's swap provisions to foreign conduct based on the aggregation approach. 85 Fed. Reg. at 56,930. That is mistaken, *supra* at 12-15, and an agency's understanding of its own jurisdiction does not receive deference, especially in a criminal proceeding, *Abramski v. United States*, 573 U.S. 169, 191 (2014).

45,331-33. Importantly, these entities have high levels of swap activities. In other words, their swap-related activities are more likely to pose a systemic risk to the financial system. The threshold for registration is $8 billion in swap dealing with sophisticated counterparties, and $25 million in swap dealing with "special entit[ies]," which include "Federal agenc[ies]," and a "State, State agency, city, county, [or] municipality," among others. 17 C.F.R. § 1.3; 7 U.S.C. § 6s(h)(2)(c). The threshold levels reflect commonsense differences in the ability of the counterparties to tolerate risk.

Entities that engage in de minimis swap activities, however, generally do not pose a systemic risk through those activities and therefore need not register as swap dealers under Dodd-Frank. But those entities must register as major swap participants—and abide by entity-level regulations, 78 Fed. Reg. at 45,331—if, for example, their de minimis activities otherwise pose systemic risk to the U.S. financial system, 7 U.S.C. §§ 1a(33)(A)(i), 1a(33)(B).[14]

Taken together, Congress's registration requirements capture situations where regulating at the entity level is arguably necessary to address systemic risk. And

---

[14] That no entities are currently registered as major-swap participants does not mean that a systemic risk standard is unworkable. Op.24. Entities need not register as such if they are registered as swap dealers. 7 U.S.C. § 1a(33)(A). As of 2020, there were over 100 registered, with more than half of them operating abroad. 85 Fed. Reg. at 57,010; *see* CFTC, Registered Swap Dealers, https://www.cftc.gov/LawRegulation/DoddFrankAct/registerswapdealer.html. Such risky conduct is therefore already covered.

because those requirements rely on systemic risk as the distinguishing factor, they can apply under Section 2(i) to entities engaged in foreign swap activity.

Dodd-Frank also enacted transparency and clearinghouse measures. *See* 77 Fed. Reg. 54,355, 54,355 (Sept. 5, 2012). The government wrongly suggests that these requirements could never satisfy a systemic risk standard. Op.22-23. For one, the CFTC has rightfully applied some of them on an entity basis, including various measures designed to "increase market efficiency, orderliness, and transparency." 85 Fed. Reg. at 56,963. That the CFTC has enacted some transaction-level requirements that do not meet the systemic risk standard means that the regulation is wrong, not the statute. *See* 78 Fed. Reg. at 45,372 (Dissenting Statement of Commissioner Scott D. O'Malia) (noting examples). And if the entity-based regulations apply through a systemic risk standard, so too should the transaction-level requirements.

*Finally*, the government contends that a systemic risk standard will prevent the CFTC from addressing the build-up of systemic risk. Op.25.[15] Not so. The CFTC

---

[15] Ironically, the CFTC's current application of Section 2(i) has created more systemic risk, not less. *See* J. Christopher Giancarlo, *Cross-Border Swaps Regulation Version 2.0: A Risk-Based Approach with Deference to Comparable Non-U.S. Regulation*, ii (Oct. 1, 2018) (observing how it has created "[f]ragmented markets," which "are shallower, more brittle, and less resilient to market shocks, thereby increasing systemic risk rather than diminishing it").

can prevent such a build-up through the entity-based regulations, transaction-level requirements, and especially Section 2(i)(2), described above.

Evasion of the CEA's requirements can lead to systemic risks. For instance, in the wake of the CFTC promulgating dozens of regulations addressing swap transactions, U.S. entities evaded them by assigning their swaps to foreign subsidiaries. *See* Michael Greenberger, *Too Big to Fail-U.S. Banks' Regulatory Alchemy*, 14 J. Bus. & Tech. L. 197, 313-18 (2019) (collecting examples of changes in swap-related activities). By no longer "guaranteeing" these transactions, U.S. entities did not have to follow the regulations, but the risks stayed with them as the foreign subsidiaries' parent. *Id.* Section 2(i)(2) provides a mechanism for addressing the associated build-up of systemic risk.

All told, the government's reasons for rejecting a systemic risk standard are meritless. Because it does not argue that the district court's failure to adopt a systemic risk instruction was harmless (and it was not, *see* Br.41-42), this Court must vacate the conviction, *United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017).

### 4. The Instruction Below Allowed the Jury to Determine Significance from the Wrong Perspective.

The district court's instruction also incorrectly defined a significant connection as one that is "integral rather than ancillary." A.1564-1565. This failed to inform the jury that significance must be determined from the perspective of the United States. *Supra* at 16-17. The error is not hypothetical: when applying this

22

instruction in deciding Phillips' post-trial motion, the court incorrectly assessed significance from the perspective of the foreign swap activity. SPA.72-73.

The government waves its hands at the challenged language, pointing to other places where the court told the jury it must find a "direct and significant connection to activities in U.S. commerce." Op.27. But those other words merely repeated the statutory language instead of instructing what it means. And the "integral" language was the *only* place where the court explained the reference point for assessing what significant to whom meant. A.1564-1565. That reference should have been the United States. *Supra* at 16-17; Br.38-41. And that error was not harmless, *Quattrone*, 441 F.3d at 178—as any connection with U.S. commerce was plainly not significant to it, A.2306, A.2329, A.2345.

## C. The Evidence Was Insufficient to Satisfy Section 2(i).

Phillips' conviction should be overturned for the independent reason that, even under the district court's mistaken instruction, there was insufficient evidence of a direct and significant connection.[16]

---

[16] The government's requested standard should not govern the sufficiency analysis, Op.33, because its definition of "significant," and "direct" (which required a "reasonably proximate casual nexus") were wrong, *supra* at 12-15. That direct language comes from a statute that requires a "direct, substantial, and reasonably foreseeable effect." 15 U.S.C. § 6a. In *Lotes Co. v. Hon Hai Precision Indus. Co.*, this Court relied on the inclusion of "reasonably foreseeable" to limit "direct" to require that nexus. 753 F.3d 395, 411 (2d Cir. 2014). In statutes without such language, "direct" requires an "immediate consequence" of the defendant's activity. *Id.* So too here.

### 1. Morgan Stanley.

To start, the government continues to conflate MS Capital (the U.S. entity) and MS International (the U.K. subsidiary). It says that the connection to Morgan Stanley was significant because it made the payment on the Option. Op.37. But it was MS International that did so, initiating a chain of payments from its bank account in London that ultimately reached Glen Point. SA.38-40, SA.696.

Next, the government's statement that Phillips' orders in the FX spot market "directly trigger[ed] Morgan Stanley's obligation to pay" under the Option is factually wrong. Op.37. Other market participants made independent decisions to place bids in the spot market. A.2573. Phillips instructed a salesperson to fulfill those bids; those hundreds of individual transactions (and other market activity) impacted the exchange rate; the rate hit 12.50; and Morgan Stanley subsequently made a payment under the Option. If Phillips' trading activity had a direct connection with anything, it was with the FX spot market that Congress declined to regulate. It is no surprise that the relationship between trading in one market and activity in another is inherently indirect.

Finally, the government does not dispute that the relationship between Phillips' trading and Morgan Stanley's having transferred risk on the Option to a U.S. entity was "random," but rather contends that the randomness was "irrelevant."

24

Op.38. Not so: even under the mistaken instruction, a "significant connection" could be neither "random" nor "fortuitous." A.1564.[17]

### 2. JPMorgan.

The government's reliance on JPMorgan also falls short. *First*, it cites the general proposition that JPMorgan, as prime broker, took on the obligation to pay under the Option. Op.39. But as with MS Capital, there was not a direct connection between the spot trading from South Africa and the facilitation of payment by JPMorgan.

*Second*, JPMorgan was an "intermediary" that did not hold the ultimate risk on any payout, A.1032; it also held sufficient collateral from Phillips to cover the payment in the event of a dispute, Br. 42 n.13; A.2753-54. The connection between Phillips' conduct and JPMorgan cannot be "significant" when JPMorgan bore no risk on the Option regardless of outcome.

*Third*, as the district court correctly held, "[n]o reasonable jury could find that [the] sinuous set of funds transfers," from MS International, to its prime broker, to JPMorgan, and then to Glen Point, "constituted a [sufficient] direct connection."

---

[17] The government misapplies *Ford Motor Co. v. Montana Eighth Judicial District Court*, which declared personal jurisdiction proper over a claim concerning one of Ford's cars because Ford sold such cars in the state, even though the plaintiff purchased the car from a third-party. 592 U.S. 351, 355 (2021). There, Ford had an initial connection to the car sold—it manufactured and produced it. *Id.* at 356-57. Here, Phillips had no connection to the independent contract entered between MS Capital and MS International, rendering any connection to MS Capital "fortuitous."

SPA.70. And what Phillips did *after* he "finished" the trading—*i.e.* "give up" the trade to JPMorgan for "downstream process[ing]"—renders anything that followed inherently indirect.

Ultimately, if these connections to Morgan Stanley and JPMorgan satisfy Section 2(i), then virtually no case will escape the CEA's extraterritorial reach. In the government's view, this "makes perfect sense" given the involvement of "American financial institutions." Op.43. If Congress had enacted an entity-based statute, the government may be right. But Congress did not.

### 3.  The Connections the District Court Rejected.

As a fallback position, the government relies on evidence that the district court found insufficient. Op.30-32; SPA.70-72. None comes close to meeting Section 2(i).

*First*, the fact that Glen Point was a CFTC registrant, had a U.S. office and U.S. investors, and traded on U.S. markets is irrelevant. Op.44. As the district court explained, Congress could have made all U.S.-registered persons subject to the substantive provisions of the CEA, no matter where the underlying conduct occurs. *See* SPA.71. It did not. This is reason alone to reject the government's position.

In any event, these connections were "ancillary" to the scheme and far too remote. Phillips' CFTC registration and U.S. office had no connection to activities relating to the Option. And, as the district court concluded, the receipt of funds after the fact by a U.S. client is far too attenuated to provide the necessary direct

26

connection between Phillips' spot trades and U.S. commerce. *See* SPA.71. The government's argument effectively is that if an individual has any domestic presence, his foreign activity is necessarily connected to it. That is incompatible with Section 2(i)'s text and purpose.

*Second*, the government cites the insignificant fact that Bloomberg "replicates" all global chats on servers in the United States, and that FastMatch has a server here too. Op.32. But sheer "happenstance that the electronic communications of defendants acting abroad were routed through a server in the United States" constitute "random, fortuitous, or attenuated contacts." *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 590 (S.D.N.Y. 2017). The alleged "fraud would have been committed in precisely the same manner if the Bloomberg chats had not been duplicated on" U.S. servers and had the FastMatch trades not matched in the United States. SPA.69. These are thus "passive" and "highly attenuated" connections, *see Sonterra*, 277 F. Supp. 3d at 590; *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015), not direct and significant ones within the meaning of Section 2(i).

\*     \*     \*

Throughout, the government weaves in a theme undergirding this prosecution: because FX spot trading necessarily impacts derivative markets, the CEA regulates that conduct. *See, e.g.*, Op.36, Op.50. Under this view, there is no limitation to the

U.S. government's regulation of the "unregulated" spot market. Although here it focuses on dollar-denominated exchange rates, rates that do not reference the U.S. dollar also underlie large volumes of derivatives, including those held by U.S. financial institutions. If the Court accepts this view, the executive branch will have overturned, via prosecution, Congress's careful decision to leave the FX spot market unregulated.

## II. THE INTENT INSTRUCTION WAS ERROR AND NOT HARMLESS.

The district court erred by not instructing the jury under a sole intent standard, and instead using a novel "but for" instruction that not even the government defends.

### A. De Novo Review Applies.

The government's claim that plain-error review applies, Op.55, ignores the full airing of Phillips' proposed standard and the district court's clear rejection of it.

Before trial, Phillips proposed a sole intent instruction. A.302. He defended that instruction in briefing requested by the court, A.333, A.361, A.383, and again during argument the following day, A.485-490. During this argument, Phillips also explained why a "but for" analysis was wrong. A.488-490.

On the morning of jury selection, the court circulated a draft charge, which lacked a sole intent standard and included the "but for" language to which Phillips had objected. A.551, A.2370-2373. Here, the court observed that "you all have made objections before," "this is the charge I intend to give," and it "obviously reflect[ed]

28

a fair amount of thought in response to the arguments that you all have made," but the court was still "prepared to keep an open mind." A.582-583. Although the government responded that it did not "have any large substantive issues to raise" given that "the Court ha[d] [its] prior objections," A.583, Phillips reiterated his objection to the intent instruction and stated that he would "discuss" the instruction "at the charge conference." A.584-585.

The government appears to take the remarkable position that this statement somehow negated all the arguments and objections immediately preceding it. Op.55. The government's position is frivolous. In any event, intervening events poured cold water on the utility of objecting to the "but for" instruction again.

During trial, Phillips argued that certain evidence should be admitted only if the sole intent standard applied. A.933. The court explained that "that's not the charge that I intend to give." A.933-934. But the court went further, adding: "The government is not happy with that charge. You're not happy with it. But that's the way I read the law. So understanding that that's how I read the law, you're not going to bargain with me over my charge." A.934. The parties proceeded as if the court's proposed intent instruction governed. A.952, A.1892.

Against this backdrop, it would have been futile—and obviously so—for Phillips to renew his objection at the final charge conference. At that point, the court had received briefing, heard argument, considered those arguments, rejected the

parties' positions, stated that any further attempts to change his mind would be of no use, and the parties had adapted the presentation of their cases to the court's charge. De novo review thus applies. *Supra* at 10-11.

### B.    The District Court Erred by Not Requiring Proof of Sole Intent.

The government neither defends the district court's "but for" instruction nor disputes the multiple reasons why it was error. *See* Br.52-59. Instead, it contends that the court was right to reject a sole intent instruction. That is wrong, for four reasons.

*First*, the government is incorrect that intent "distinguishes" criminal from lawful conduct for "most forms of fraud." Op.59. The examples it cites prove the point: both perjury and check fraud "involve a bad act"—a false statement—*in addition to* "an intent to defraud." Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*, 105 Harv. L. Rev. 503, 511 (1991). Those offenses are comparable to wash sales or matched orders, Br.60, in that the trader who matches orders, and the person who lies under oath or submits a fake check, has engaged in conduct that is objectively problematic.

Open market manipulation is different. Br.60; Op.57. It involves willing market participants and no independent, objective bad act. Intent, therefore, is the *only* thing that distinguishes criminal from legitimate open market trades. And, contrary to the government's suggestion, it is "unusual" for criminal offenses to be

"based solely on the intent of the actor." *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007). This factor distinguishes other forms of fraud, manipulation, and specific-intent crimes, Op.56-59; *United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014) (listing others), and explains why this Court has expressed "misgivings" about the criminalization of open market trades, *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991).

*Second*, a sole intent standard ensures that otherwise legitimate or desirable open market activity is not captured by the criminal law and thus helps "separate wrongful from innocent acts." *Rehaif v. United States*, 588 U.S. 225, 231-34 (2019). Courts have read different levels of scienter into statutes for this reason—even where the text was "silent on the question" or a "grammatical reading" of the statute did not support one. *Id.* (collecting cases).

For the fugitive disentitlement statute at issue in *Technodyne*, where this Court declined to apply a sole-intent standard, 753 F.3d at 384-86, doing so would have been self-defeating: "the statute must apply to people with no reason to come to the United States other than to face charges, … and the reason such a person remains outside the United States will typically be that they live elsewhere." *United States v. Batato*, 833 F.3d 413, 430 (4th Cir. 2016). Here, the opposite is true: "'[t]he laws that forbid market manipulation should not encroach on legitimate economic decisions lest they discourage the very activity that underlies the integrity of the

31

markets they seek to protect.'" *CFTC v. Wilson*, 2018 WL 6322024, at \*15 (S.D.N.Y. Nov. 30, 2018) (Sullivan, J.). Only a sole intent standard separates manipulative from legitimate trading activities, thereby facilitating the purpose of criminalizing unlawful open market trades without undermining that market in the process. *See* Br.58-59.

On this, the government offers a meritless explanation for why the court's "but for" standard (or its specific intent standard) would not capture legitimate trading activity. Op.61-62. It draws an imaginary line between "trading designed to minimize price impact" and trading designed to "control or rig" prices. Op.62. But "[m]anipulation" occurs when market prices do not reflect the "natural interplay of supply and demand" because of trading patterns or fraudulent devices. *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011). And a trader who would not trade "but for" her intent to *prevent* a price from reflecting true market forces necessarily would be covered by the district court's instruction. Br.58.

*Third*, a sole intent standard is not foreclosed by caselaw. Rather, in the civil cases the government identifies, this Court held that intent can be the only difference between lawful and unlawful conduct in open market manipulation; in no case did this Court address the correct standard courts should apply for assessing what level of intent is sufficient. *See SEC v. Vali Mgmt. Partners*, 2022 WL 2155094, at \*1 (2d

Cir. 2022); *Set Capital LLC v. Credit Suisse Grp., A.G.*, 996 F.3d 64, 77 (2d Cir. 2021); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).[18]

In fact, when this Court had occasion to address a criminal open market manipulation case that rested on intent alone, it applied a sole intent standard. *Mulheren*, 938 F.2d at 368. That the legality of trades can turn on intent has since been approved by this Court. But it has not endorsed a standard that should govern that intent. Without that guidance, just as courts have mistakenly applied a specific intent standard, Op.57, they have rightfully applied sole intent too, *see United States v. Tuzman*, No. 15 Cr. 536 (S.D.N.Y. Jan. 11, 2018), ECF 706.

*Finally*, a sole intent instruction was particularly necessary here, where the open market manipulation of the spot market *is not even a crime* and the trading activity in the spot market was expected and replicated by the alleged victim, Morgan Stanley. The government's refrain that Morgan Stanley was not on trial and "two wrongs do not make a right" should give this Court pause. Op.63. More must distinguish lawful from unlawful conduct than the line between the knowledge and hope that one's trades will move the price and the intent that they do.

---

[18] Where this Court affirmed jury instructions, neither party disputed the intent standard. *Vali Mgmt. Partners*, 2022 WL 2155094, at *1-2; *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008).

**C.     The Failure to Give a Sole Intent Instruction Was Not Harmless.**

The jury plainly would not have convicted Phillips had it been instructed correctly. *See Silver*, 864 F.3d at 119.

The government counters by arguing that the evidence supported the "but for" instruction, and that instruction required it to prove "sole intent" by demonstrating that Phillips had no "legitimate purpose" for trading the way he did. Op.59-61. But a sole intent standard does not ask whether Phillips would have traded at the same time and in the same manner had he been motivated by a legitimate economic purpose. *See* A.1551-1552. It asks whether those transactions were at all "effected for an investment purpose." *Mulheren*, 938 F.2d at 368. And there was extensive evidence at trial that they were.

For example, there was ample evidence that at least one of Phillips' goals was to replace the delta that would disappear after the Option triggered—a legitimate investment strategy. Br.11-19. This is at least one reason to purchase an additional $100 million in Rand even after the Option had triggered. Br.14, 18-19. Phillips also held onto his position, representing $700 million in market risk, for nearly two full days. Once again, if triggering the Option was the sole reason for his trading, Phillips would not have waited to close his position. Finally, the fact that spot trades around the barrier were routine and expected is powerful evidence that there was, in fact, a

legitimate investment purpose. No jury could have found beyond a reasonable doubt that achieving these legitimate economic purposes was not one of Phillips' goals.

## III.   PHILLIPS' REMAINING ARGUMENTS WARRANT REVERSAL.

### A.   The Government Should Have Been Required to Prove Artificial Price.

The government's assertion that Phillips failed to preserve his objection regarding artificial price is again based on an incomplete record. Op.64. Phillips argued that proof of artificial price was required in his motion to dismiss, A.72-74, proposed an artificial price instruction, submitted a brief in support, and argued for its inclusion, A.423-425, A.441-442, A.496-498, A.510-512. The court disagreed, A.497, and later circulated a charge without this element, A.2370-2372. By then, Phillips' position was clear, emphasized in both briefing and argument, and the court had considered and rejected it. Any further objection would have been futile. *Supra* at 10-11.

Turning to the merits, the government contends that Phillips wrongly imports elements of the CEA's price manipulation provision, 7 U.S.C. § 13(a)(2), into the "manipulative or deceptive device" provision, *id.* at § 9(1); *see* Op.65. But where, as here, the alleged scheme is open market manipulation, it should have to prove those elements, including artificial price. *Gorman*, 2023 WL 2632111, at *4-6.

The government responds that price manipulation requires proof of an artificial price, not fraud. Op.66. When the manipulative device is open market

trading in a different, unregulated market, however, the creation of an artificial price *is* the fraud—there is no false price signal in the absence of an artificial price. Br.67.[19] Importantly, the government did not (and could not) charge Phillips with defrauding spot market participants, but rather with defrauding Morgan Stanley *by creating an artificial price*. SPA.27 (noting the indictment "allege[d] that Defendant caused an artificial price using deceptive conduct"). Thus, if Phillips' trades did not cause an artificial price, there was no false signal and no fraud.

Finally, the government wrongly asserts that proposed instruction would require proof of a successful scheme. Op.67. Phillips' conduct could have created an artificial price without successfully triggering the Option.

### B.    There Was Insufficient Proof of Materiality.

The district court properly required a showing of materiality,[20] which has been consistently required in commodities fraud cases, *see, e.g.*, *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325, 1327 (11th Cir. 2018); Br.70-73.

On the merits, the government points to Oweida's and Santoro's testimony about banks' generic expectations around market manipulation. Op.70. But that testimony did not prove that a market participant would have acted differently

---

[19] *Vali Management* is not to the contrary. Op.67. There, false information was "inject[ed]" directly into a regulated market, 2022 WL 2155094, *2; here, only an artificial price could have injected false information into the swaps market.

[20] By the government's own standard, it failed to preserve its argument to the contrary when it did not object at the final charge conference. A.1740-1741.

relating to the Option if Phillips' conduct was known. Br.71-73. This requires evidence that an objective counterparty would have found the specific conduct Phillips engaged in to be material, not that manipulation is relevant generally. Op.71. The government did not make this showing. Br.72.

### C.    Phillips' Right to Due Process Was Violated.

The government offers an entirely non-responsive answer to the fair notice issues raised in Phillips' brief. Br.73-75. Pointing to the fact that Phillips had a U.S. license, operated an office there, and had American clients, the government states that it was "foreseeable to Phillips that he would be subject to the CEA." Op.74. That is not the question. Phillips, of course, knew that certain conduct was subject to the CEA. The relevant question is whether he had fair notice that *this conduct* could support an extraterritorial application of Section 2(i). The answer is clearly no.

If a party's general understanding that he is subject to the laws of a jurisdiction were sufficient to give him fair warning of all possible applications of the law against him, it is difficult to see how any due process objection based on the unforeseeable application of a statute could succeed. *See, e.g.*, *United States v. Harriss*, 347 U.S. 612, 617 (1954) (due process requires "fair notice that *his contemplated conduct* is forbidden by the statute" (emphasis added)).

## CONCLUSION

For the reasons stated above and in Phillips' opening brief, the Court should vacate the sole count of conviction.

Date: February 14, 2025

Respectfully submitted,

*/s/ Sean Hecker*

Sean Hecker
Jenna M. Dabbs
David Gopstein
Trevor W. Morrison
Anne Yearwood
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
shecker@heckerfink.com
jdabbs@ heckerfink.com
dgopstein@heckerfink.com
tmorrison@heckerfink.com
ayearwood@heckerfink.com

*Counsel for Defendant-Appellant Neil Phillips*

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits requirements of Local Rule 32.1(a)(4)(B) and this Court's order granting Phillips' motion for leave to file an oversized reply, ECF 48.1, because this brief contains 8,998 words, excluding the parts of the document excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.

Dated:  February 14, 2025

*/s/ Sean Hecker*
Sean Hecker

*Counsel for Defendant-Appellant Neil Phillips*

## CERTIFICATE OF SERVICE

I, Sean Hecker, counsel for Defendant-Appellant and a member of the Bar of this Court, certify that, on February 14, 2025, copies of the foregoing brief were filed with the Clerk through the Court's electronic filing system, which will send notice of such filing to all counsel of record.

Dated: February 14, 2025

*/s/ Sean Hecker*
Sean Hecker

*Counsel for Defendant-Appellant Neil Phillips*