24-1908-cr
*United States v. Phillips*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2024

(Argued:  April 2, 2025    Decided:  September 3, 2025)

Docket No. 24-1908-cr

———————————————————

UNITED STATES OF AMERICA,
Appellee,

v.

NEIL PHILLIPS,
Defendant–Appellant.

———————————————————

Before:      SACK, BIANCO, AND MERRIAM, *Circuit Judges*.

Defendant-Appellant Neil Phillips appeals from a conviction for commodities fraud.  Phillips, a U.K. citizen and former hedge fund manager, was confident that the South African rand would strengthen against the United States dollar after the results of a South African election.  Based on that prediction, he purchased a one-touch barrier option on behalf of his hedge fund that would pay out $20 million if, at any point before the option's expiration date, the rand-to-dollar exchange rate dropped below 12.50 rand to 1 dollar.  About a week before the option's expiration date, Phillips, while in South Africa, instructed a banker in Singapore to sell dollars to buy rand until the exchange rate dropped below the 12.50 needed to trigger the option; the banker obliged, and Phillips's hedge fund was paid the $20 million.  The government indicted Phillips in the Southern District of New York for commodities fraud in violation of the Commodity Exchange Act ("CEA"), which regulates derivative financial instruments such as the one-touch barrier option, based on a theory that Phillips traded with the intent to deceive the counterparty to the option into paying out the $20 million.

After Phillips was convicted following a jury trial, he moved for acquittal or new trial. The district court (Lewis J. Liman, *Judge*) denied Phillips's motion.

On appeal, Phillips contends that the district court erred by (1) failing to instruct the jury on the proper standard for whether Phillips's foreign conduct had a "direct and significant connection with activities in, or effect on, commerce of the United States," as required for the United States to have extraterritorial jurisdiction under the CEA, 7 U.S.C. § 2(i)(1); (2) concluding that there was sufficient evidence of such a connection; (3) failing to properly instruct the jury on Phillips's intent; (4) failing to require the jury to find that Phillips created an artificial price in the dollar-rand exchange market; (5) concluding that there was sufficient evidence that Phillips's fraud was material to a counterparty to the option; and (6) convicting Phillips even though his case presented multiple issues of first impression, in violation of his due process rights. We conclude that Phillips failed to meet his burden to show that the district court's extraterritoriality instruction was erroneous and that there was sufficient evidence that his conduct had a "direct and significant connection with activities in . . . [U.S.] commerce" because the two financial institutions who had obligations to pay out the option were based in the United States—the sort of connection that, based on the language and context around the enactment of the Dodd-Frank amendments to the CEA, Congress intended to regulate. We also conclude that Phillips failed to meet his burden to show that the district court erred regarding its instruction on intent, its decision not to include an instruction requiring proof of an artificial price, and its conclusion that there was sufficient evidence that Phillips's fraud would have been material to a reasonable investor. Finally, we conclude that Phillips had fair notice that his conduct was unlawful, and his due process rights therefore were not violated. Accordingly, the district court's judgment is AFFIRMED.

FOR APPELLEE:  THOMAS S. BURNETT, Assistant United States Attorney (Andrew M. Thomas, Nathan Rehn, Assistant United States Attorneys, *on the brief*), *for* Jay Clayton, United States Attorney for the Southern District of New York, New York, NY;

2

No. 24-1908
*United States v. Phillips*

FOR DEFENDANT-APPELLANT: SEAN HECKER
(Jenna M. Dabbs, David Gopstein, Trevor
W. Morrison, Anne R. Yearwood, *on the
briefs*), Hecker Fink LLP, New York, NY, *for*
Defendant-Appellant Neil Phillips.

SACK, *Circuit Judge*:

Neil Phillips, a former hedge fund manager, appeals from his conviction

for commodities fraud based on his conduct related to a foreign-exchange

derivative. *See United States v. Phillips*, No. 22-cr-138, 2024 WL 1300269 (S.D.N.Y.

Mar. 27, 2024). On appeal, he challenges the district court's conclusion that the

Commodity Exchange Act ("CEA") applied extraterritorially to his foreign

conduct, the court's instructions to the jury on the elements of commodities

fraud, the sufficiency of the evidence that his fraud would have been material to

a reasonable investor, and the court's conclusion that his conviction did not

violate his right to due process.

For the reasons set forth below, we **AFFIRM** the district court's judgment.

## BACKGROUND

### A. Glen Point Capital's One-Touch Barrier Option

Phillips, a citizen of the United Kingdom, was the co-founder and co-Chief

Investment Officer of a U.K.-based hedge fund, Glen Point Capital. He and his

3

hedge fund operated in the foreign-exchange market, the global market for trading national currencies.  The most basic trade in the foreign-exchange market is a "spot" trade, which is simply trading one currency for another—for example, selling South African rand to buy U.S. dollars.  The relative value of one currency to another on the spot market—for example, how many rand it costs to buy one dollar—is the "exchange rate" between the two currencies.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 586–87 (S.D.N.Y. 2015); *Exchange Rate*, Black's Law Dictionary (12th ed. 2024).  A litany of derivative financial instruments based on exchange rates are also traded in global financial markets.  *See, e.g., Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 142–43 (S.D.N.Y. 2018).

Phillips purchased one such derivative instrument on behalf of Glen Point Capital in October 2017.  At the time, one U.S. dollar was worth about 14 rand.  Phillips was confident that in December 2017, Cyril Ramaphosa would be elected the new leader of South Africa's ruling party, and if so, the rand would strengthen against the dollar.  Based on that prediction, Phillips purchased an option that would pay out if, at some point between October 30, 2017, and January 2, 2018, the exchange rate dropped below 12.50 rand to 1 dollar.  This

4

type of option is called a "one-touch barrier option"—if 1 dollar were worth less than 12.50 rand (the "barrier") at any moment ("one touch") during that period, the option would be triggered.  Phillips's bet was a long shot:  Glen Point Capital paid only about $2 million for the one-touch barrier option, but it would receive $20 million if the option were triggered.

The option that Glen Point Capital purchased was the product of a series of transactions.  The London office of Morgan Stanley International—a subsidiary of Morgan Stanley, a financial company headquartered in the United States—wrote and sold the option to a United Kingdom-based broker, JB Drax Honoré ("JB Drax"), through JB Drax's account at the Royal Bank of Scotland ("RBS"), a U.K.-based bank.  Glen Point Capital purchased the option through its broker, the London branch of JPMorgan, a bank headquartered in the United States.  JPMorgan, functioning as the intermediary between Glen Point Capital and RBS, entered into an identical offsetting option with RBS.  JPMorgan, as Glen Point Capital's prime broker, also guaranteed that it would pay $20 million to Glen Point Capital if the option triggered.

JB Drax keeps the counterparties anonymous when it brokers a trade.  As a result, Glen Point Capital was unaware that Morgan Stanley International was on

the other side of the option.  After writing and selling the option to JB Drax, Morgan Stanley International also entered into an identical offsetting option with a different, U.S.-based Morgan Stanley legal entity—Morgan Stanley Capital Services ("Morgan Stanley Capital").

The upshot of this series of transactions was that Morgan Stanley Capital Services—rather than Morgan Stanley International—was the counterparty that ultimately bore the risk of paying out $20 million if Glen Point Capital's option were triggered.  And, whether or not RBS had first fulfilled its obligation to pay JPMorgan the $20 million from Morgan Stanley Capital, JPMorgan would be obliged to pay Glen Point Capital $20 million.

## B.  Phillips's Trades Trigger the Option

Phillips almost nailed his bet.  On December 18, 2017, as Phillips predicted, Cyril Ramaphosa was elected party leader.  That day, the value of the rand soared, moving the exchange rate as low as 1 dollar to 12.52 rand—a whisker from 12.50 but not quite enough to trigger the option.  The rate soon went back up to around 12.80 and fluctuated between 12.70 to 12.90 for the next couple of days.

Then Phillips decided to take matters into his own hands. On December 20, he told one of his employees, Phil Costa, that Costa might need "to start fucking around in Dollar-Rand" to "lower" the exchange rate. Supp. App'x at 205–06. Phillips acknowledged that the option would not expire for a couple more weeks, but that "it'd be really nice if we could get it done." Supp. App'x at 206. So, Phillips told Costa that if the exchange rate hit 12.55, they should "lash it through [12.50] tonight." Supp. App'x at 206. But the rate never dropped to 12.55, and Costa did not act. Over the next several days, the rate continued to hover above the 12.50 threshold.

Around the Christmas holiday, Phillips tried again. He was in South Africa at the time. On December 26, around 2:00 a.m. local time—midnight in the United Kingdom, and still Christmas Day in the United States—Phillips logged onto Bloomberg's online trading platform. Because of the holiday and the late hour, American and European markets were closed; with only Asian markets open, the foreign-exchange market was far less liquid than usual, as Phillips acknowledged on a phone call with Costa. Supp. App'x at 209 ("[T]here's no liquidity now in dollar-rand because it's Boxing Day."). On Bloomberg, Phillips directed a banker in Singapore working on behalf of a

7

Japanese bank to begin selling dollars for rand.  Just as Phillips had instructed Costa several days earlier, he told the banker that his "aim" was to "trade thru" the 12.50 barrier.  Supp. App'x at 524.  Phillips specifically asked the banker to "giv[e] bids," Supp. App'x at 521, which meant he was willing to sell dollars to buy rand at whatever price was being bid in the market without trying to get the best price.  This was uncommon behavior for Phillips; a trader who worked under Phillips at Glen Point Capital would later testify that Phillips had never told him to "give bids."  App'x at 1081–82.

Phillips started by instructing the banker to sell $25 million dollars for rand.  That inched the exchange rate down from around 12.58 to 12.5675.  He told the banker to sell another $50 million.  The price inched down further, but not enough.  He told the banker to sell another $200 million—again, not enough.  So he told the banker to sell in as many batches of $100 million as would be needed to "get it thru" 12.50.  Supp. App'x at 527–30.  Ultimately, in less than an hour, Phillips sold $725 million dollars for around 9 billion rand before the exchange rate finally dropped to 12.499.[1]   Phillips immediately told the banker to "stop"

---

[1] Of course, for Phillips to buy that much rand, someone had to be selling it.  One of those sellers was Morgan Stanley, which was selling to hedge its exposure to Phillips's option triggering.

selling and get him "pro[o]f of the print," so that Phillips could verify that the exchange rate had dipped below 12.50 and cash in on the option. Supp. App'x at 529.

Mission accomplished—except now Glen Point Capital was holding nearly 9 billion in rand that Phillips did not want. On the morning of December 26, a few hours after completing the trades that triggered the option, Phillips told Costa that "at some point we['re] going to have to start buying this shit back," that is, selling rand to buy dollars. Supp. App'x at 209. But because the exchange rate had quickly rebounded to 12.545 after Phillips stopped his overnight trading, Glen Point Capital would be selling most of its rand at a loss. So, Phillips told Costa to wait and see "[i]f [the exchange rate] starts coming down" before selling, but that he did not "want to put any pressure on it." Supp. App'x at 210.

Two days later, on December 28, the exchange rate had dropped to 12.2678, which meant Phillips could sell off the rand at a profit—but before doing so, he saw another opportunity. In addition to the option at 12.50, Glen Point Capital was holding another one-touch barrier option at 12.25. With that option so close to triggering, Phillips told Costa: "[W]e might need to do a job on it."

Supp. App'x at 212.  A couple of hours later, Costa instructed a trader to sell up to $100 million dollars for rand to "just hit the bids."  Supp. App'x at 214–19.  The exchange rate dipped below 12.25 after the trader had sold $35 million.  Phillips told Costa to stop because "[w]e thru"—that is, through the threshold to trigger the option.  Supp. App'x at 389.  A few hours after this second one-touch barrier option was triggered, Phillips told Costa to sell off most of the several billion in rand that the fund had purchased on December 26 and 28.

## C.  Procedural History

In March 2022, a grand jury in the Southern District of New York indicted Phillips for commodities fraud and conspiracy to commit commodities fraud based on his conduct related to the one-touch barrier option.[2]  He was arrested while on a family vacation in Spain and spent a month in a maximum-security Spanish prison, where he was physically assaulted multiple times.  He was eventually extradited to the United Kingdom and then signed a waiver of extradition to the United States.  After his arraignment in the United States, he posted bond and returned to the United Kingdom.

---

[2] Phillips was also indicted for wire fraud and conspiracy to commit wire fraud.  However, the government did not elect to try those charges at trial.

No. 24-1908
*United States v. Phillips*

The case went to a jury trial.  Before trial, Phillips filed proposed jury instructions, which included, as relevant here, an instruction about whether the CEA reached his conduct, which primarily occurred abroad; an instruction on the proper standard to prove his intent to deceive; and an instruction informing the jury that it could not convict him of commodities fraud without proof that his trading caused an artificial dollar-rand exchange rate.  The district court declined to adopt these instructions proposed by Phillips in its ultimate jury charge.

At trial, the government presented fourteen witnesses.  Most were not directly involved in the trades but instead spoke generally about the global commodities market, regulatory requirements for commodities traders, and the types of trades that Phillips executed.  The government also introduced transcripts of phone calls and records of online chats in which Phillips and his subordinates at Glen Point Capital instructed bankers to make the trades at issue.

At the close of the government's case, Phillips moved for acquittal; the court reserved decision.  Phillips then put on his own expert witness, who testified that Phillips could have been buying rand not to influence the dollar-rand exchange rate, but to gain additional exposure to further strengthening of the rand that the fund would lose if the one-touch barrier option was triggered—

11

a strategy referred to as "replacing delta." App'x at 1920–33. This testimony conflicted with testimony from one of the government's experts, who testified that Phillips's trading was inconsistent with a strategy to replace delta, not to mention the phone calls and online chats in which Phillips said he was buying rand to trigger the option.

The jury convicted Phillips of one count of commodities fraud and acquitted him of the conspiracy count. Phillips moved for acquittal again and, in the alternative, for a new trial. In support of his motion for acquittal, he argued that the jury instruction on whether the CEA gave the United States jurisdiction over his foreign conduct was erroneous and that, even if the jury instruction correctly stated the law, there was insufficient evidence of extraterritorial jurisdiction. He also argued that there was insufficient evidence that he had fraudulent intent or that his fraud was material to Morgan Stanley Capital, the ultimate counterparty to the option. In support of his motion for a new trial, Phillips argued, among other things, that allowing the verdict to stand would cause manifest injustice because he lacked adequate notice that his actions were unlawful.

12

The district court (Lewis J. Liman, *Judge*) denied Phillips's post-trial motions.  *See Phillips*, 2024 WL 1300269, at *33.  The court sentenced Phillips to time served, two years of supervised release, and a $1 million fine.  Although the court had calculated a 78-to-97-month guidelines range, it varied substantially downward in light of the time Phillips spent in harsh conditions in the Spanish prison and because the recommended sentencing enhancements based on the calculated loss of $18 million overstated the seriousness of Phillips's offense.

## DISCUSSION

On appeal, Phillips raises six issues with his conviction: (1) whether the district court properly instructed the jury on the standard for whether Phillips's conduct was directly and significantly connected to activities in United States commerce, as required to determine whether the United States had jurisdiction over Phillips's activities under the CEA; (2) whether, even if that standard was correct, the court erred by determining that it was met here when Phillips's conduct took place abroad; (3) whether the court properly instructed the jury on Phillips's intent to deceive; (4) whether the court erred by not requiring the jury to find that Phillips created an artificial price in the dollar-rand exchange market; (5) whether there was sufficient evidence that Phillips's fraud was material to a counterparty to the option; and (6) whether Phillips's due process rights were

13

violated by lack of fair notice that his conduct was unlawful.  We discuss the

CEA's framework for regulating financial instruments like the one-touch barrier

option before addressing Phillips's arguments.

## I.      Swaps Regulation under the CEA and Dodd-Frank Act

The Commodity Exchange Act, as administered by the Commodity

Futures Trading Commission (CFTC), regulates trades of derivatives in

commodities.  *See generally* 7 U.S.C. §§ 1–27f.  Derivatives, such as futures and

options, are contracts that derive their value from the underlying commodities,

*Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013); commodities, as defined

by the CEA, include everything from corn to copper to currencies, *see* 7 U.S.C.

§ 1a(9).[3]  Trades in commodity derivatives must be made on exchanges

designated and regulated by the CFTC.  7 U.S.C. §§ 2, 6.  In contrast, the CEA

gives the CFTC relatively limited jurisdiction over "'spot' transactions

---

[3] The CEA's definition of "commodity" enumerates a long list of agricultural products, which for several decades were the only goods covered under the CEA.  *See Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970–72 (4th Cir. 1993).  The CEA's definition of "commodity" was later expanded to include "all other goods and articles, except onions . . . and motion picture box office receipts."  7 U.S.C. § 1a(9); *see Salomon Forex*, 8 F.3d at 971–72.  That catch-all language has been applied to metals, currencies, and much more.  *See, e.g., Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 477 (2d Cir. 2002) (copper); *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1248–49 (2d Cir. 1986) (currencies).

(transactions for the immediate sale and delivery of a commodity) [and] 'cash forward' transactions (in which the commodity is presently sold but delivery is, by agreement, delayed or deferred)." *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993). That differential treatment is by design. The CEA was enacted during the Great Depression[4] in response to concerns about "manipulation, speculation, and other abuses that could arise" from trading derivatives; spot and forward transactions were seen as posing less market risk than derivatives. *Id.* at 970–71; *see also* Lynn A. Stout, *Derivatives and the Legal Origin of the 2008 Credit Crisis*, 1 Harv. Bus. L. Rev. 1, 27–29 (2011) (explaining how "speculative trading in derivatives . . . can magnify shocks in underlying markets and amplify them into risks that are many times larger than the underlying market itself").

For many years, however, the CFTC lacked authority under the CEA to regulate a form of derivative called a "swap." Rena S. Miller, Cong. Rsch. Serv., R48451, *Introduction to Derivatives and the Commodity Futures Trading Commission* 3–4 (2025). Contrary to futures and traditional options, which contemplate delivery of or performance related to a commodity at some future time, swaps are "pure financial instrument[s] . . . based on the difference between two

---

[4] *See* Commodity Exchange Act, ch. 545, 49 Stat. 1491 (1936).

fluctuating values." *Hershey v. Energy Transfer Partners*, *L.P.*, 610 F.3d 239, 243 (5th Cir. 2010). An example of a swap is the type of one-touch barrier option at issue here: The parties entered into a contract based on their expectations about the relative value of dollars to rand.

Trading in swaps exploded in the early 2000s leading up to the 2008 financial crisis. Miller, *supra*, at 2. When that crisis occurred, many saw the previous lack of regulation in swaps as a contributing cause. *See id.* at 3; Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report*: *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* at xxiv–xxv (2011), https://perma.cc/rsb2-vz2z (concluding that unregulated swaps "contributed significantly" to the 2008 financial crisis, including being at the "center of the storm" when the housing bubble burst).

In response, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act" or the "Act"). Pub. L. 111-203, 124 Stat. 1376 (2010). The Act's goal was to "promote the financial stability of the United States by improving accountability and transparency in the financial system." *Id.* at 1376. Among other sweeping regulatory changes, the Act brought much of the swaps market within the CFTC's purview for the first time.

No. 24-1908
*United States v. Phillips*

*See id.* § 722, 124 Stat. at 1672 (amending 7 U.S.C. § 2(a)(1)(A) to extend CFTC

jurisdiction to swaps).  It defined "swap" broadly to encompass "any agreement,

contract, or transaction . . . that provides for any purchase, sale, payment, or

delivery (other than a dividend on an equity security) that is dependent on the

occurrence, nonoccurrence, or the extent of the occurrence of an event or

contingency associated with a potential financial, economic, or commercial

consequence."  *Id.* § 721, 124 Stat. at 1666 (amending  7 U.S.C. § 1(a)(47)).[5]  The

Act requires "swap dealers" and "major swap participants" to register with the

CFTC, centralizes risk management of certain swaps, and imposes extensive

reporting requirements on swap market participants.  *See Sec. Indus. & Fin. Mkts.*

*Ass'n v. CFTC*, 67 F. Supp. 3d 373, 387 (D.D.C. 2014) (summarizing various

requirements added by the Dodd-Frank Act).  The Act also amended the CEA to

prohibit not only price manipulation, but also fraudulent behavior related to

commodity derivatives and the underlying commodities more broadly.  Pub. L.

111-203 § 753, 124 Stat. at 1750 (amending 7 U.S.C. § 9(1)); *see, e.g., CFTC v.*

*McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018) (recognizing that "the

amendments to the CEA under the Dodd-Frank Act permit the CFTC to exercise

---

[5] There is no dispute that the one-touch barrier option at issue here is a "swap" under this definition.

17

its jurisdiction over fraud that does not directly involve the sale of futures or derivative contracts").

Relevant here, however, the CEA still expressly excludes much of the foreign-exchange spot market from direct regulation by the CFTC. *See* 7 U.S.C. § 2(c)(1)(A). In other words, Phillips's spot market sales of dollars to buy rand were not subject to CEA regulation. But *swaps* based on the foreign-exchange market, like the one-touch barrier option, *are* regulated by the CEA after the Dodd-Frank amendments.

In short, the Dodd-Frank amendments to the CEA corralled what had been a Wild West of swaps trading, imposing extensive registration and reporting requirements and civil and criminal penalties for conduct such as fraud, manipulation, and false reporting.

## II.    Extraterritorial Application of the CEA to Phillips's Conduct

Swaps' "contributions to the 2008 financial crisis were not limited to swaps executed on U.S. soil between U.S. counterparties." *Sec. Indus. & Fin. Mkts. Ass'n*, 67 F. Supp. 3d at 386. Instead, "[t]he swaps market is truly global." *Id.* (citation omitted). Against that backdrop, the Dodd-Frank Act applied the CEA's regulation of swaps not only to domestic conduct, but also to any activities outside the United States that "have a direct and significant connection with

18

activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1).

Whether that extraterritoriality provision extends to Phillips's conduct is the crux

of Phillips's appeal.

Phillips contends that the district court erred in two ways in its rulings

about whether the CEA gave the government jurisdiction over his conduct. First,

he argues that the district court improperly charged the jury on the

extraterritorial reach of the CEA because its instruction misinterpreted the

standard set by 7 U.S.C. § 2(i)(1). He also argues that, even if the jury instruction

correctly stated the legal standard, there was insufficient evidence that his

conduct had a direct and significant connection with activities in U.S. commerce.

### A. Extraterritoriality Doctrine

"Congress has the authority to enforce its laws beyond the territorial

boundaries of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248

(1991) (superseded by statute on other grounds). "Whether Congress has in fact

exercised that authority," however, "is a matter of statutory construction." *Id.*

Because regulation of foreign conduct can cause "clashes between our laws and

those of other nations which could result in international discord," *id.*, we

presume that statutes apply only to domestic conduct unless Congress evinces a

clear intent for the statute to reach foreign conduct, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010).  Such intent is most obvious, of course, when Congress expressly states that a statute applies to foreign conduct.  *See RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 340 (2016).

Congress did just that in the Dodd-Frank amendments to the CEA.  By the CEA's own terms, its regulation of swaps extends to "activities outside the United States" that have a "direct and significant connection with activities in, or effect on, commerce of the United States."  7 U.S.C. § 2(i)(1); *see Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 103 (2d Cir. 2019) (recognizing that § 2(i) "contains, on its face, a clear statement of extraterritorial application" (quotation marks and citation omitted)).  But even "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms."  *Morrison*, 561 U.S. at 265.

## B.  Jury Instruction on the CEA's Standard for Extraterritorial Jurisdiction

As the district court acknowledged, "there is a paucity of precedent interpreting Section 2(i)(1)."  *Phillips*, 2024 WL 1300269, at *11; *see* Gina-Gail S. Fletcher, *Foreign Corruption as Market Manipulation*, 2020 U. Chi. L. Rev. Online 15, 23 (2020) ("To date, the CEA's manipulation and fraud provisions have not

20

No. 24-1908
*United States v. Phillips*

been extended extraterritorially . . . .").  This is only the second case of which we are aware that addresses the extent of foreign conduct covered by § 2(i)(1), and the first appeal to do so.[6]  So, beyond the statute's plain language, the district court was left to draft the jury instruction interpreting § 2(i)(1) on a mostly blank slate.

The court's instruction explained that the government must "prove beyond a reasonable doubt" that "an activity of the defendant . . . outside the United States related to the barrier option contract had *a direct and significant connection with activities in commerce of the United States*."  App'x at 1563–64 (emphasis added).  That emphasized language comes directly from the CEA's extraterritoriality provision, 7 U.S.C. § 2(i)(1).  The instruction explained that a connection is "direct" only if "the activity outside the United States directly and immediately affected activity in commerce of the United States without deviation or interruption," and that "[a]n indirect or attenuated connection to commercial

---

[6] The first case was *CFTC v. Gorman*, No. 21-cv-870 (VM), 2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023), in which the district court summarily concluded that the defendant's misstatements to a Japanese counterparty lacked a "direct or significant connection with activities in, or effect on, commerce of the United States," *id.* at *10–11 (quoting 7 U.S.C. § 2(i)(1)).  Also, in *Prime International Trading v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019), a civil plaintiff argued that § 2(i)(1) applied to the defendant's activities abroad, but we did not reach the issue because the plaintiff had failed to raise that argument in the district court, *id.* at 103–04.

21

activity that occurs in the United States is not sufficient to satisfy this element of the test." App'x at 1564. The instruction then explained that a connection is "significant" only if it is "meaningful or consequential":

> For activity outside the United States to have a significant connection with activity in commerce of the United States, the relationship between the activity outside the United States to the commercial activity in the United States must be of importance. It is not sufficient if the relationship between the conduct outside the United States and that inside the United States is random, fortuitous, attenuated or merely incidental. The conduct in the United States must be integral rather than ancillary.

App'x at 1564–65.

### C. Phillips's Challenges to the Extraterritoriality Instruction

Phillips argues that the court's instruction misinterpreted 7 U.S.C. § 2(i)(1) in two ways. First, Phillips contends that conduct in the swaps market has a "direct and significant connection with activities in . . . [U.S.] commerce" under § 2(i)(1) only when the conduct "pose[s] a systemic risk to the U.S. financial system." Appellant's Br. at 28. Second, Phillips claims that the court should have clarified that the jury must find that Phillips's foreign trading activities were significant to activities in U.S. commerce—not that the activities in U.S.

commerce have some significance to Phillips's foreign trading activities—for

§ 2(i)(1) to apply.

>    i.      *Legal Standard and Standard of Review*

"A jury instruction is erroneous if it misleads the jury as to the correct legal

standard or does not adequately inform the jury on the law." *United States v.*

*Zheng*, 113 F.4th 280, 298 (2d Cir. 2024) (quotation marks and citation omitted).

Phillips bears the burden to show that "his requested instruction accurately

represented the law in every respect and that, viewing as a whole the charge

actually given, he was prejudiced." *Id.* (quotation marks and citation omitted).

The parties dispute the applicable standard of review for Phillips's

challenges to the extraterritoriality instruction.  Phillips says that we should

review *de novo* the district court's interpretation of § 2(i)(1) as reflected in its

instruction.  *See, e.g., United States v. Applins*, 637 F.3d 59, 72 (2d Cir. 2011)

(explaining that challenges to jury instructions are reviewed *de novo*).  The

government counters that Phillips forfeited all challenges to the jury instruction

on extraterritoriality because he did not renew his objections after the court

rejected his preferred instruction, and that we should therefore review for plain

No. 24-1908
*United States v. Phillips*

error.  *See, e.g.*, *United States v. Hunt*, 82 F.4th 129, 138 (2d Cir. 2023) (explaining

that unpreserved objections to jury instructions are reviewed for plain error).

Phillips preserved his argument that the instruction should have defined

"significant" to require proof of systemic risk.  When a party objects and explains

his objection, he need not keep objecting to preserve an issue for appeal if "it was

evident in the circumstances that renewal of the objection would be futile

because the court had clearly manifested its intention to reject the objection."

*United States v. Grote*, 961 F.3d 105, 115 (2d Cir. 2020).  That is what happened

here.  Phillips offered his own instruction on extraterritoriality that would have

required proof that Phillips's "activities related to the swap . . . pose[d] a

systemic risk to the United States financial system in order for them to have a

direct and significant connection with activities in, or effect on, commerce of the

United States," App'x at 305–06.  The court orally expressed skepticism about

Phillips's instruction but did not immediately reject it.  Phillips then offered a

written and oral explanation for his position.  When the court circulated a

proposed charge on the morning of jury selection, it recognized that the parties

had "made objections [to the jury instructions] before."  App'x at 583.  Under

these circumstances, even though Phillips did not renew his objection after the

24

court's final extraterritoriality instruction lacked the language he had proposed, any further objection "would have been a mere formality[] with no reasonable likelihood of convincing the court to change its mind" because Phillips had already "argued [his] position to the district judge, who rejected it." *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 30 (2d Cir. 1997); *see also Girden v. Sandals Int'l*, 262 F.3d 195, 202 (2d Cir. 2001) ("[A] failure to object after a charge is given is excused where . . . a party makes its position clear . . . and the trial judge is not persuaded.").

Conversely, Phillips failed to preserve his argument that the court's instruction should have clarified that, to satisfy § 2(i)(1)'s "significant connection" requirement, the jury must find that Phillips's swap-related activities were "integral rather than ancillary" to activities in U.S. commerce, App'x at 1565, not that some U.S. commercial activities were integral to Phillips's swap-related activities. Phillips never presented this argument before the district court by way of either his proposed jury instruction or an objection at the charge conference after reviewing the district court's intended charge. The district court lacked notice of Phillips's argument, so the argument is forfeited and plain error review applies. *See United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (explaining

25

that when a defendant "fails to make a specific and timely objection to a district court's jury charge," plain error review applies).  Under plain error review, we may reverse only when "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  *United States v. Miller*, 954 F.3d 551, 557–58 (2d Cir. 2020) (quotation marks and citation omitted).

### ii.    Meaning of "Significant" in § 2(i)(1)

Again, the CEA's jurisdiction extends to foreign activities that "have a direct and significant connection with activities in, or effect on, commerce of the United States."  7 U.S.C. § 2(i)(1).  Phillips theorizes that because the word "significant" modifies both "connection with activities in" and "effect on" "commerce of the United States," and it would take a lot for a fraudulent commodity trade to have a "significant . . . effect on" the entire system of U.S. commerce, it should also take a lot—as Phillips puts it, a "systemic risk" to the U.S. economy—for a "connection with activities in the United States" to be "significant."  Appellant's Br. at 32–36.

No. 24-1908
*United States v. Phillips*

Phillips's proposed instruction is divorced from the plain meaning of § 2(i)(1). First, the ordinary meaning of the word "significant" is expansive; it is not limited to magnitudes as large as "systemic." *See, e.g.*, Black's Law Dictionary (12th ed. 2024) (defining "significant" as "[o]f special importance; momentous, as distinguished from insignificant"). The ordinary meaning is not altered by the context of § 2(i)(1). § 2(i)(1) is disjunctive: it covers activities that have a "direct and significant connection with activities in . . . [U.S.] commerce" *or* a "direct and significant . . . effect on [U.S.] commerce." Phillips's efforts to trigger the one-touch barrier option may have lacked a significant *effect on* U.S. commerce writ large; he committed a $20 million fraud in a multi-trillion-dollar industry. But contrary to Phillips's interpretation, that does not mean his activities lacked a significant *connection with* activities in U.S. commerce. Congress's choice of wording suggests that it intended to regulate commodities trading abroad that has a direct and significant connection with commercial activities occurring in the United States, but when there is no such connection, to regulate only trading with a direct and significant effect on the U.S. economy. In other words, Congress set a far higher bar for the government to clear before it may regulate conduct that lacks direct and important ties to the United States.

27

Phillips's interpretation would collapse the distinction such that "significant connection" and "significant effect" mean essentially the same thing—a systemic risk to U.S. commerce—despite Congress's decision to use two different words in disjunctive clauses. *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning and different terms usually have different meanings.").

Language in other provisions of the CEA further undercuts Phillips's preferred instruction. When Congress wants to limit the CEA's reach to "systemically important" activities, it says so: Another section of the CEA requires an entity to register as a "major swap participant" if it is "systemically important or can significantly impact the financial system of the United States." 7 U.S.C. § 1a(33). When a statute "use[s] one term"—significant—"in one place, and a materially different term"—systemically important—"in another, the presumption is that the different term denotes a different idea." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)). Congress could have limited the CEA's jurisdictional scope to activities that are "systemically important to the financial system of the United States," but it chose not to.

28

Phillips has failed to show that his requested instruction accurately represents the law. *See Zheng*, 113 F.4th at 298.

Unlike Phillips's proposed instruction, the district court's instruction was consistent with § 2(i)(1). The instruction informed the jury that the government could "meet its burden" for an extraterritorial application of the CEA "by proving that an activity of the defendant . . . outside the United States related to the barrier option contract had a direct and significant connection with activities in commerce of the United States," App'x at 1564—the exact standard stated in § 2(i)(1). The instruction explained that a connection is "direct" only if it "directly and immediately affected activity in [U.S.] commerce . . . without deviation or interruption," and "significant" only if "meaningful or consequential" and "of importance" to "commercial activity in the United States." App'x at 1564. These definitions are consistent with the typical meanings of "direct" and "significant." *See, e.g.*, Black's Law Dictionary (12th ed. 2024) (defining "direct" as "[f]ree from extraneous influence; immediate" and "significant" as "[o]f special importance; momentous, as distinguished from insignificant").

29

The court's interpretation of § 2(i)(1) as reflected in the jury instruction is also consistent with customary principles of international law.  Courts presume that Congress drafts statutes so as not to conflict with international law unless the statute's text or broader context suggests otherwise.  *See United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945) (L. Hand, *J.*) (explaining that courts interpret statutory language in light of "the limitations customarily observed by nations upon the exercise of their powers").  Here, international law treatises suggest that nations customarily regulate foreign conduct when "there is a genuine connection between the subject of the regulation and the state seeking to regulate," such as "conduct . . . being committed . . . against its nationals."  Restatement (Fourth) of Foreign Relations Law § 407 & cmt. c.; *see also* Restatement (Third) of Foreign Relations Law § 403(2) & cmt. h (1987) (noting that nations customarily regulate foreign activities such as commodities trading that "has [a] substantial, direct, and foreseeable effect upon *or in* the [country]" and when there are "connections, such as nationality, residence, or economic activity . . . between that state and those whom the regulation is designed to protect" (emphasis added)); *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) (deriving international law principles from the

30

Restatement (Third) of Foreign Relations Law when interpreting a statute's meaning). For example, the European Union prohibits fraud and manipulation related to "financial instruments . . . the price or value of which depends on or has an effect on the price or value of a financial instrument" listed or traded on EU markets even for "actions and omissions" that occur outside the EU. Reg. EU No. 596/2014, art. 2, 2014 O.J. (L 173) 1, 17.

The district court's instruction regarding § 2(i) properly "limit[ed] that provision to its terms." *Morrison*, 561 U.S. at 265. Phillips has failed to meet his burden of showing that his proposed instruction was right and the district court's instruction was wrong. *See Zheng*, 113 F.4th at 298; *United States v. Jimenez*, 96 F.4th 317, 322 (2d Cir. 2024) (holding that the defendant "fail[ed] to meet his burden of establishing error because the district court's jury instruction . . . was a correct statement of the law").

### iii.     *"Significant" to Whom?*

As explained above, unlike for his challenge about systemic risk, Phillips forfeited his argument that the instruction on extraterritoriality should have more clearly defined "significant connection" to mean that the connection must be important to U.S. commercial activities, not just to Phillips's foreign swaps

31

activities.  Plain error review therefore applies.  *See Vilar*, 729 F.3d at 88.  To establish plain error, Phillips must demonstrate, among other things, that the alleged error was "clear or obvious, rather than subject to reasonable dispute," and that there is "a reasonable probability that the jury would not have convicted him absent the error."  *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010) (quotation marks and citation omitted).

Phillips cannot show that the alleged error is clear or obvious because the district court's jury instructions as a whole demonstrate that the connection must be significant and important to activities in U.S. commerce.  *See United States v. Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010) ("We emphatically do not review a jury charge on the basis of excerpts taken out of context, but in its entirety." (quotation marks and citation omitted)).  Phillips focuses only on the portion of the district court's jury instruction stating that the "[t]he conduct in the United States must be integral rather than ancillary," App'x at 1564–65, which he contends "does not clearly identify to whom or to what the conduct must be 'integral,'" Appellant's Br. at 39 n.11.  However, he ignores the context in which that instruction was given.  The district court first instructed the jury that it must find that Phillips's activities related to the one-touch barrier option must have "a

32

direct *and* significant connection with activities in commerce of the United States." App'x at 1564 (emphasis added). It then immediately explained that a connection is "direct" "if the activity outside the United States *directly and immediately affected* activity in commerce of the United States without deviation or interruption." App'x at 1564 (emphasis added). With that context, the district court then explained that "significant" means "meaningful," "consequential," "of importance," and "integral." App'x at 1564–65. Because the district court already made clear that the "direct" prong of the conjunctive test is measured by its effect on U.S. commercial activities, a reasonable juror would surely understand that the "significant" prong of that test does the same. In addition, the alleged error could not be plain because the district court's interpretation of 7 U.S.C. § 2(i)(1) was an issue of first impression and not contrary to its plain text. See *United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001) (explaining that a reviewing court "typically will not find [plain] error where the operative legal question is unsettled" (quotation marks and citation omitted)). Accordingly, we cannot conclude that the extraterritoriality instructions as a whole were clearly or obviously erroneous.

No. 24-1908
*United States v. Phillips*

Moreover, even if the district court had more specifically stated that significance must be determined from the perspective of U.S. commercial activities, there is not "a reasonable probability that the jury would not have convicted him absent the error." *Marcus*, 628 F.3d at 42 (quotation marks and citation omitted). As discussed below, there was sufficient evidence for the jury to conclude that Phillips's foreign swap activities were of significance to commercial activities in the United States.

### D. Sufficiency of the Evidence that the Court Had Extraterritorial Jurisdiction under the CEA

Phillips next asserts that, even if the court's instruction correctly described the CEA's extraterritorial reach, the evidence at trial was insufficient to support a finding that his conduct had "a direct and significant connection with activities in . . . [U.S.] commerce" under § 2(i)(1). For this sufficiency challenge, we must affirm "if, viewing all the evidence in the light most favorable to the prosecution, . . . *any* rational trier of fact could have found . . . beyond a reasonable doubt" that Phillips's conduct had a direct and significant connection with activities in U.S. commerce. *United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000) (quotation marks and citation omitted); *see also Applins*, 637 F.3d at 76 (noting that because "we must credit every inference that could have been drawn in the

34

government's favor," a defendant bringing a sufficiency challenge "bears a heavy burden" (quotation marks and citation omitted)).

In its opinion on Phillips's post-trial motions, the district court concluded that the connection was direct and significant.  The court first rejected as insufficient several purported "connections" alleged by the government: that some of the trades matched on servers located in the United States, that copies of Phillips's Bloomberg chats were saved onto servers located in the United States, that the payout of the option was ultimately transferred to a Glen Point Capital account in New York after several intervening steps, and that Glen Point Capital's American clients received some of that paid-out money in New York. *See Phillips*, 2024 WL 1300269, at *14–15 (explaining that these "incidental and insubstantial ties to the United States" could not meet, individually or collectively, the § 2(i)(1) standard).  But the court concluded that the jury could have found that two connections to "activities in . . . [U.S.] commerce" were "direct and significant":  (1) JPMorgan, Glen Point Capital's prime broker that facilitated the sale of the option, is a U.S. financial institution and (2) Morgan Stanley Capital, the substantive counterparty to the option, is also a U.S. financial institution.  *Id.* at *16–17.  We agree.

### i.     Evidence of a Direct Connection

A rational jury could have found that Phillips's conduct related to the one-touch barrier option was directly connected to activities in U.S. commerce based on the conduct's relationship with JPMorgan.  Phillips, on behalf of Glen Point Capital, purchased the option directly from its broker, JPMorgan.  To be sure, Phillips purchased the option through JPMorgan's London branch, but a branch of a bank is not typically considered a separate legal entity from the parent bank. *See Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 51 (2d Cir. 2012).  Even setting that aside, though, Glen Point Capital entered into its contract to purchase the option with "JPMorgan Chase Bank, N.A.," which the contract expressly noted is a U.S. bank.  Supp. App'x at 653–57 (contract terms detailing the "Transaction entered into between JPMorgan Chase Bank, N.A. . . . and Glen Point Capital" and noting that JP Morgan Chase Bank, N.A. is organized "under the laws of USA" with its main office in "Columbus, Ohio").  A jury could rationally find that manipulation related to an agreement entered into with a U.S. bank is directly connected to activities in U.S. commerce under § 2(i)(1).

36

There was also sufficient evidence, drawing all inferences in favor of the government as we are required to do, to allow the jury to find a direct connection with Morgan Stanley Capital, another U.S. financial institution. As the district court properly instructed the jury, a connection is "direct" if "the activity outside the United States directly and immediately affected activity in commerce of the United States without deviation or interruption." App'x at 1564; *see also Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108 (2d Cir. 2016) (interpreting a "direct effect" in the Foreign Sovereign Immunities Act's extraterritoriality provision as one that "follow[s] as an immediate consequence of the defendant's activity" (citation modified)). Morgan Stanley Capital was required to pay $20 million as an immediate consequence of Phillips's actions that triggered the option.

Phillips claims the connection to Morgan Stanley Capital was indirect because it occurred only through a series of transactions and Glen Point Capital lacked a contractual relationship with Morgan Stanley Capital. But even though Glen Point Capital purchased the option through a broker, the relationship between a defendant and a fraud victim is usually not rendered indirect just because a broker facilitated the transaction. *See Atlantica Holdings*, 813 F.3d at

37

103, 113–14 (holding that the defendant's misrepresentations about the value of securities had a "direct effect" on the securities' buyers in the United States even though the securities were bought through a broker). And, although Phillips could not have known that Morgan Stanley Capital was on the other side of the option because JB Drax shielded the counterparties' identities, a connection "need not be foreseeable to be direct." *Id.* at 115. There was sufficient evidence for a rational jury to find that the connection was direct.

### ii. Evidence of a Significant Connection

A rational jury could also have concluded that these direct connections between Phillips's trading and activities in U.S. commerce were "significant" to those U.S. commercial activities under 7 U.S.C. § 2(i)(1). As further discussed in the next section, the evidence at trial showed that Phillips manipulated the dollar-rand exchange rate to defraud the counterparty to the one-touch barrier option out of $20 million. The ultimate counterparty forced to pay the $20 million was Morgan Stanley Capital. If Morgan Stanley Capital had not paid the option, JPMorgan would have been on the hook as Glen Point Capital's prime broker. Because the actual and potential victims of Phillips's manipulative scheme were U.S. financial institutions, a rational jury could have found that the

38

No. 24-1908
*United States v. Phillips*

connection between Phillips's conduct and activities in U.S. commerce was "of importance" and "integral." App'x at 1564–65 (jury instructions on the meaning of "significant" in 7 U.S.C. § 2(i)(1)).

Our conclusion that the victim of fraud being a U.S. financial institution can render the connection between foreign activity and U.S. commerce "significant" is consistent with the purposes of the Dodd-Frank amendments and customary international law. The Dodd-Frank Act's stated goal was to "improve accountability and transparency in the financial system." Pub. L. 111-203, 124 Stat. at 1376. In support of that goal, Congress amended the CEA to "augment the [CFTC's] existing authority to prohibit fraud and manipulation." *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41398, 41401 (July 14, 2011) (CFTC explaining amendments to 7 U.S.C. § 9(1)); *see also* 7 U.S.C. § 5(b) (stating as a purpose of the CEA to "deter and prevent price manipulation or any other disruptions to market integrity" and "to ensure the financial integrity of all transactions subject to this chapter"). Congress added an extraterritoriality provision that would apply those expanded anti-fraud protections to at least some foreign conduct. *See* 7 U.S.C. § 2(i). And it is entirely within the bounds of

39

customary international law for such an extraterritoriality provision to regulate "conduct . . . being committed . . . against [a country's] nationals." Restatement (Fourth) of Foreign Relations Law § 407 & cmt. c. *See also* Restatement (Third) of Foreign Relations Law § 403 & cmt. h (noting that nations customarily regulate foreign activities such as commodities trading when there are "connections, such as nationality, residence, or economic activity . . . between that state and those whom the regulation is designed to protect"). As the district court put it, "Phillips acted to defraud the ultimate counterparty to [the one-touch barrier option], whoever that may be, but the United States does not share his indifference to his victim's identity." *Phillips*, 2024 WL 1300269, at *17.

Phillips cautions that finding a direct and significant connection here sends us careening down a slippery slope in which every swap purchased by a non-U.S entity that uses a U.S. bank as its broker or has a U.S. entity as its ultimate counterparty "necessarily creates a direct and significant connection to U.S. commercial activities under Section 2(i)." Appellant's Br. at 51–52. Direct, perhaps. But significance depends on context. A run-of-the-mill swap between a foreign and U.S. entity may not in all circumstances be "significant" to activities in U.S. commerce under the CEA. However, a reasonable juror may well

40

understand the $20 million amount at issue in *this* case to be of significance to the U.S. financial institutions' commercial activities. Although Phillips points out that certain registration and reporting requirements under the CEA do not kick in unless a swaps trader is trading billions of dollars in swaps, none of those cited provisions use the word "significant," and Phillips advances no arguments as to why the extraterritoriality provision and the substantive provisions in the CEA (and the CFTC's regulations interpreting those provisions) must be coextensive. *See* 7 U.S.C. § 1a(49)(D) (defining "swap dealer" to exclude entities that "engage in a de minimis quantity of swap dealing"); *id.* § 6s (imposing registration and reporting requirements on "swap dealers"); 17 C.F.R. § 1.3 (setting the de minimis exception for certain requirements at $8 billion daily average exposure from swaps trades). In short, just because the CEA does not concern itself with all foreign swap activities in which a broker or ultimate counterparty is a U.S. entity does not mean that it is unconcerned with *this* connection.

Phillips submits that if Congress intended for the CEA's extraterritorial reach to turn on whether a U.S. entity was a victim of a crime, it would have worded § 2(i)(1) differently. In support, he points to statutes that expressly apply

extraterritorially when a U.S. citizen is harmed. *See, e.g.*, 18 U.S.C. § 37(b)(2) (criminalizing violence at airports abroad when the victim is a U.S. national). We disagree. That the CEA covers any swaps-related conduct that has a "direct and significant connection with activities in . . . [U.S.] commerce" suggests that the statute is meant to cover a *broader* range of activities than just those in which a U.S. entity is harmed. Harm to a U.S. entity is a relevant factor in whether the connection is significant, but not the only consideration. Indeed, that Congress drafted a broad extraterritoriality provision makes sense in light of the swaps market's global nature and the context in which the Dodd-Frank amendments were enacted: Foreign swaps, including swaps engaged in by foreign subsidiaries of U.S. financial services companies, were considered a driving factor in the 2008 financial crisis. *See Sec. Indus. & Fin. Mkts. Ass'n*, 67 F. Supp. 3d at 386.

On a different tack, Phillips argues that the connection to Morgan Stanley Capital was "random," "attenuated," and "incidental"—which, according to the jury instructions' own terms, would mean that the connection was not "significant," App'x at 1564–65. He asserts that because U.K-based Morgan Stanley International sold the option that Glen Point Capital purchased through

42

JPMorgan, and a separate U.S.-based Morgan Stanley entity only took on the risk of the one-touch barrier option because it chose to enter an offsetting option with Morgan Stanley International as part of Morgan Stanley's risk management policy, the connection between Phillips's trading and activities in U.S. commerce was necessarily "attenuated." Appellant's Br. at 44–45.

But, as a witness from Morgan Stanley testified at trial, such arrangements are "standard practice in the business." App'x at 988. U.S.-based financial services companies often "operate in global swaps markets not only as direct counterparties, but also through relationships with their foreign branches, affiliates, and subsidiaries." *Sec. Indus. & Fin. Mkts. Ass'n*, 67 F. Supp. 3d at 386. These risk-shifting operations "are an integral part of the swap because they assuage counterparty concerns that the foreign affiliate or subsidiary will be unable to meet its swap obligations." *Id.* (quotation marks and citation omitted). And, again, the risks created by these sorts of relationships were widely considered a cause of the 2008 financial crisis. *Id.* When Congress responded to that crisis by bringing swaps under the CEA's purview through the Dodd-Frank Act, we can assume it knew that this is how swaps typically work. It is unlikely that Congress intended for the meaning of a "significant connection" to U.S.

commerce in § 2(i)(1) to turn on whether the foreign conduct was connected to a U.S. company – as opposed to a subsidiary of a U.S. company – when the risks to U.S. commerce are the same either way based on standard industry practice.

Nor was the jury required to conclude that the relationship was insignificant merely because Phillips was unaware that Morgan Stanley Capital was the true counterparty to the option. Section 2(i)(1) focuses on whether Phillips's "activities outside the United States" had a "significant connection with activities in . . . [U.S.] commerce." The connection between Phillips's intentional fraudulent activity abroad and his victim's activities in U.S. commerce is no less "integral" or "important" because Phillips was unaware of the connection. "[W]e have repeatedly refused to find knowledge of the jurisdictional fact to be an essential element in prosecutions under various criminal statutes requiring, for instance, that the criminal acts affect interstate or foreign commerce" unless "the statute itself requires knowledge of the jurisdictional element." *United States v. Epskamp*, 832 F.3d 154, 167 (2d Cir. 2016) (citation modified) (collecting cases). Just as in statutes in which the "element of interstate transportation is merely a jurisdictional element, for which proof of the fact of transportation is proof enough," without an "additional requirement of knowledge," *United States v.*

*Eisenberg*, 596 F.2d 522, 526 (2d Cir. 1979), proof of a direct and significant connection with activities in U.S. commerce is proof enough under 7 U.S.C. § 2(i)(1).

In sum, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Phillips's actions related to the one-touch barrier option had a direct and significant connection with activities in U.S. commerce.[7]

### III.    Commodities Fraud under the CEA

Having concluded that Phillips's actions fell within U.S. jurisdiction, we turn to the substantive elements of commodities fraud.  Phillips was convicted of commodities fraud in violation of 7 U.S.C. §§ 9(1) and 13(a)(5) and 17 C.F.R. § 180.1.  Section 9(1) prohibits the "use or employ[ment]" of "any manipulative or deceptive device or contrivance" "in connection with any swap" in violation of CFTC regulations.  Section 13(a)(5) provides that any such fraudulent scheme is a felony if done "willfully to violate" the CEA or any CFTC regulations promulgated thereunder.  The CFTC regulation under which Phillips was

---

[7] Because we conclude that there was sufficient evidence that the CEA applied extraterritorially to Phillips's conduct, we need not and do not address the government's alternative argument that there was sufficient evidence that Phillips's conduct occurred domestically in the United States.  *See* Gov't Br. at 47–51; *Phillips*, 2024 WL 1300269, at *3–10 (rejecting the government's argument).

charged, 17 C.F.R. § 180.1(a)(1), makes it "unlawful for any person, directly or indirectly, in connection with any swap, . . . to intentionally or recklessly . . . [u]se or employ . . . any manipulative device, scheme, or artifice to defraud."

So, the three elements for liability under those statutory and regulatory provisions are (1) misrepresentation or deception, (2) materiality, and (3) scienter. *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018). Applying those elements here, the district court charged the jury that it must find the following beyond a reasonable doubt to convict Phillips of felony commodities fraud: "(1) that Phillips employed a manipulative device, scheme, or artifice to defraud; (2) that the scheme, untrue statement, act, practice, or course of conduct was in connection with a swap, in that it would be material to a decision by a counterparty to the swap; and (3) that Phillps acted knowingly, willfully, and with an intent to defraud and, in particular, with an intent to defraud a counterparty to the One Touch Option." *Phillips*, 2024 WL 1300269, at *18 (summarizing elements charged to the jury); *see also* App'x at 1549–50 (jury charge explaining the elements).

On appeal, Phillips raises three issues related to the elements of commodities fraud.

46

## A. Jury Instruction on Phillips's Manipulative Intent

Phillips first challenges the jury instruction on whether he had the
requisite manipulative intent to satisfy the first element of commodities fraud.
We review the legal standard stated in the jury instruction *de novo*.[8]  *See Applins*,
637 F.3d at 72.

The government's theory of commodities fraud in this case turned on
trades Phillips made on the open foreign-exchange market—selling several
hundred million dollars to buy around 9 billion rand.  When trades in
commodities or securities are made on an open market, it is often difficult to
distinguish lawful trading from fraudulent or manipulative trading.  For
example, "short selling [stocks]—even in high volumes—is not, by itself,
manipulative . . . .  To be actionable as a manipulative act, short selling must be
willfully combined with something more to create a false impression of how
market participants value a security."  *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493
F.3d 87, 101 (2d Cir. 2007).  That something more is fraudulent intent.  "In some

---

[8] Once again, the government argues that Phillips forfeited any challenge to the jury
instruction on intent, so we should therefore review for plain error.  We disagree;
Phillips consistently argued that the district court should adopt a "sole intent"
instruction, *see* App'x at 302, 333, 361, 383, 485–90, which the district court declined to
do in fashioning its own jury charge.  Under the circumstances apparent in the record,
any further objection would have been futile, *see Grote*, 961 F.3d at 115.

cases," such as Phillips's, the intent to deceive or manipulate "is the only factor that distinguishes legitimate trading from improper manipulation." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021) (quotation marks and citation omitted).

To that end, the court instructed the jury that "an act is manipulative if it is designed to deceive or defraud others by sending a false pricing signal to the market," but a transaction is not manipulative "when the market is fully aware of the terms of and purposes behind a transaction." App'x at 1550. The instruction went on to explain:

> What matters is whether the defendant has an intent to inject a false price signal into the market or to mislead others by artificially affecting the price. The question you should ask is whether the defendant acted with the intent to deceive or defraud others by sending a false pricing signal into the market. If there are two purposes for a transaction, one of which is legitimate, and if the transaction would have been done at the same time and in the same manner for the legitimate purpose, it is not manipulative even if the defendant also had an intent to deceive or to send a false price signal into the market. On the other hand, if the transaction would not have been done at the same time and in the same manner, except for the intent to mislead, then the transaction is manipulative.

App'x at 1551. Applying those principles to Phillips's case, the court instructed the jury: "[I]f but for an intent to deceive, [Phillips] would not have conducted

48

the transactions in the dollar-rand foreign exchange spot market at the times and in the amounts he did, then those transactions were manipulative." App'x at 1551–52. The court then reiterated that it would "not [be] sufficient that the defendant knew his transactions would affect the dollar-rand exchange rate; instead, he must have made those transactions for the purpose of affecting the exchange rate and defrauding a counterparty to the barrier option contract." App'x at 1553–54. Finally, the court explained that a defendant does "not act willfully or with intent to defraud if he honestly believes that his actions were proper," and that the government bore the burden of proving Phillips's fraudulent intent beyond a reasonable doubt. App'x at 1554.

Phillips bristles at the court's invocation of a but-for causation standard. He argues that a "but-for" standard—whether Phillips would have traded in the same manner but for his intent to deceive—is too relaxed a causation standard to support a criminal conviction. He contends that the court should have instead required the jury to find that Phillips's *sole* intent was to deceive the counterparty to the option. In Phillips's view, that matters because he intended not only to manipulate the dollar-rand exchange rate, but also to "replace delta"—that is, to

49

gain additional exposure to any further strengthening of the rand that the fund would otherwise lose once the option was triggered.

We find Phillips's arguments unpersuasive. For one, he cherry-picks parts of the court's instruction to suggest that it set too relaxed an intent standard. *See Jones v. United States*, 527 U.S. 373, 391 (1999) ("[I]nstructions must be evaluated not in isolation but in the context of the entire charge."). Phillips ignores the limiting role of the court's separate scienter charge, which made clear that the government bore the burden of proving beyond a reasonable doubt "that the defendant acted knowingly, willfully, and with an intent to defraud." App'x at 1549. The court explained that to act willfully means to act "with a purpose to disobey or disregard the law." App'x at 1553. And, as to the intent to defraud, the court explained that Phillips "must have made th[e] transactions for the purpose of affecting the exchange rate and defrauding a counterparty to the barrier option contract." App'x at 1554. Taken as a whole, the court's instruction charged the jury with an intent standard virtually indistinguishable from the sole-intent standard Phillips requested. *United States v. Banki*, 685 F.3d 99, 105 (2d Cir. 2012) ("If the substance of a defendant's request is given by the court in

50

its own language, the defendant has no cause to complain." (quoting *United*

*States v. Han*, 230 F.3d 560, 565 (2d Cir. 2000))).[9]

In any event, Phillips's challenge fails because his proposed sole-intent

instruction is inaccurate. The intent element for specific intent crimes, such as

commodities fraud, can usually be satisfied even if the defendant has multiple

reasons for taking an action, so long as one reason is the intent to deceive. *See*

*United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014) (collecting cases).

Instead, "when Congress has meant to impose a sole-intent limitation, it has

done so expressly." *Id.* (citing 18 U.S.C. § 227(a), which prohibits certain

government officials from influencing private entities' employment decisions

"with the intent to influence[] *solely* on the basis of partisan political affiliation").

The statutes and regulation under which Phillips was convicted make no

mention of sole intent. And we are unaware of any case in which a court has

---

[9] At oral argument, Phillips insisted that the instruction's reference to but-for causation would sweep in "agreed-upon legitimate trading" that his proposed sole-intent instruction would not reach. Oral Argument at 32:38–33:53. He offered the example of iceberg orders, in which a trader disguises the true amount of demand or supply by making a series of small trades rather than one large trade. But even if one purpose of the typical iceberg order is to obfuscate the trader's true intentions, the court's instructions as a whole make clear that such "agreed-upon legitimate trading" would not be criminal in the absence of fraudulent intent and willfulness, that is, a purpose to disobey the law. *See United States v. Vorley*, No. 10CR00035 (JJT), 2021 WL 1057903, at *6 (N.D. Ill. Mar. 18, 2021) (describing legitimate, non-manipulative purpose for iceberg orders). An iceberg order, like any other open-market transaction, is criminal only in light of affirmative evidence of fraudulent intent and willfulness beyond a reasonable doubt.

applied a sole-intent standard for commodities or securities fraud. The district court therefore did not err to the extent that its instruction did not require proof of sole intent.

Phillips's remaining arguments on the intent instruction fare no better. First, he suggests that by instructing the jury that "if the transaction would not have been done at the same time and in the same manner, except for the intent to mislead, then the transaction is manipulative," App'x at 1551, the court impermissibly "'creat[ed] a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent'" by "encourag[ing] the jury" to "find manipulative intent if Phillips traded at particular times and amounts," Appellant's Br. at 55 (quoting *Francis v. Franklin*, 471 U.S. 307, 325 (1985)). For one, that portion of the instruction does not say that the jury must find Phillips guilty if he traded at certain times in certain amounts, nor does it say anything about the burden of persuasion. Conversely, in *Francis*, the Supreme Court held that the defendant's due process rights were violated by an instruction that directed the jury to "presume" that a defendant of sound mind and discretion "intend[s] the natural and probable consequences of his acts but the presumption may be rebutted." 471 U.S. at 315 (quoting jury instruction).

52

That instruction, unlike the district court's here, erroneously suggested that the defendant bore the burden to rebut a presumption of intent when the government in fact bore the burden to prove intent beyond a reasonable doubt. *Id.* at 315–25. And here, just a few lines after the language Phillips challenges, the court's instruction made clear that "[t]he burden is on the government to prove fraudulent intent and thus a lack of good faith, beyond a reasonable doubt." App'x at 1554; *see Jones*, 527 U.S. at 391 (explaining that "instructions must be evaluated not in isolation but in the context of the entire charge").

Phillips also contends that the court's instruction on intent "improperly invited the jury to determine [his] motive for trading, rather than his intent." Appellant's Br. at 56. To be sure, motive and intent are distinct concepts. *See United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011) ("Motive is what prompts a person to act . . . . Intent refers only to the state of mind with which the particular act is done." (quotation marks and citation omitted)). But motive can be probative of criminal intent. *See United States v. Landesman*, 17 F.4th 298, 323 (2d Cir. 2021). And, once again, the court explained throughout its instruction on intent that it was Phillips's willful intent to deceive, not merely any nefarious

53

motive for trading, that the jury must find beyond a reasonable doubt.  *See* App'x at 1552–54; *see also Jones*, 527 U.S. at 391.

Finally, Phillips suggests that the district court's instruction cannot have stated the correct standard because, if it allowed the jury to find that he intended to deceive Morgan Stanley through his trades, then it just as easily could have supported a finding that *Morgan Stanley* intended to deceive *him* through *its* trades.  Phillips grounds that argument in the evidence that, at the same time that he was selling dollars to buy rand to drop the exchange rate, Morgan Stanley was selling rand to buy dollars—quite likely much of the rand that Phillips bought.  But Phillips has not suggested that such conduct was willful in that Morgan Stanley acted with "a purpose to disobey or disregard the law."  App'x at 1553.  And in any event, his argument is a non sequitur.  Even if one could find that Morgan Stanley's conduct was culpable according to the intent instruction, it would not matter for our analysis because Phillips was on trial, not Morgan Stanley.  *See United States v. Shapiro*, 29 F. App'x 33, 35 (2d Cir. 2002) (summary order) ("It is no defense to a criminal charge to say that one's victim is also a criminal."); *see also Wayte v. United States*, 470 U.S. 598, 607–08 (1985) (explaining that we may not second guess the government's broad discretion over whom and

whether to prosecute, so long as the government has probable cause that the accused committed an offense and does not base its decision on constitutionally impermissible factors).

In short, Phillips once again fails to meet his burden to show that "his requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." *Zheng*, 113 F.4th at 298 (quotation marks and citation omitted).[10]

---

[10] Phillips does not challenge the sufficiency of the evidence of his intent to deceive—only the legal standard the court applied. That is no surprise, because there was ample evidence that he acted with intent to deceive the counterparty to the one-touch barrier option by manipulating the exchange rate. Witness testimony and phone and chat records showed that Phillips traded with the intent to trigger the 12.50 and then 12.25 one-touch barrier options, bolstered by the fact that he dumped the billions in rand he had purchased soon after the second option triggered. *See, e.g.*, Supp. App'x at 205–06 (Phillips suggesting to a colleague that they "start fucking around in Dollar-Rand" to "lower" the exchange rate), 209 (Phillips telling a colleague that "at some point we['re] going to have to start buying this shit back," that is, selling dollars to buy rand), 521–25 (Phillips telling a banker that his "aim" was to "trade thru 50" and instructing the banker to "give bids"). A government witness also testified that Phillips's trades were inconsistent with a strategy of "replacing delta." Supp. App'x at 80–108; *see United States v. Coscia*, 866 F.3d 782, 798 (7th Cir. 2017) (noting that the defendant's trading patterns were "highly unusual" compared to "those of legitimate traders," which "support[ed] the jury's conclusion of fraudulent intent"). Phillips presented his theory of innocence—that he was actually trading for the legitimate purpose of "replacing delta"—and we can assume the jury rejected it. *See Phillips*, 2024 WL 1300269, at *22 ("The Jury readily could have found that Phillips's sole objective was to move the exchange rate, and not to acquire a particular position in [rand]."); *United States v. Willis*, 14 F.4th 170, 182 (2d Cir. 2021) (holding that "the jury was not required to accept [the defendant's] alternative explanation of innocence" when there was evidence to convict beyond a reasonable doubt).

## B. Lack of Jury Instruction on Phillips's Creation of an Artificial Price

Phillips next contends that the district court's recitation of the elements of commodities fraud was incomplete.  According to Phillips, the jury should also have been instructed that it could not convict him of commodities fraud without proof that his trading created an artificial dollar-rand exchange rate.  Once again, we review this challenge to the jury instructions *de novo*.[11]  *See Applins*, 637 F.3d at 72.

Phillips's theory is that, even though he was convicted of a scheme to defraud in violation of 17 C.F.R. § 180.1 instead of price manipulation under 17 C.F.R. § 180.2, his scheme involved open-market manipulation—manipulation by using otherwise lawful transactions on an open market to unlawfully influence the market or market participants.  *See* App'x at 1550 (instructing the jury that "the defendant is accused of employing a manipulative device, scheme, or artifice to defraud" and that "[m]anipulation refers to intentional or willful conduct designed to deceive or defraud by controlling or artificially affecting

---

[11] The government once again argues that we should review for plain error.  We disagree. Phillips proposed the artificial price instruction to the district court, the court rejected it, and any further objection would have been unlikely to change the court's position.  *See Grote*, 961 F.3d at 115 (holding that once the district court makes clear its position on an objection, further objections are unnecessary to preserve an issue for appellate review).

some type of price, in this case, the dollar-rand exchange rate"). According to Phillips, the court therefore should have required the government to prove the traditional elements of open-market manipulation. Those elements are: "(1) [the defendant] possessed an ability to influence market prices; (2) an artificial price existed; (3) [the defendant] caused the artificial prices; and (4) [the defendant] specifically intended to cause the artificial price." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (quotation marks and citation omitted).

Phillips's proposed instruction fails to grapple with how the Dodd-Frank amendments expanded the CEA's anti-fraud measures. *Amaranth* involved a previous version of the CEA that was in effect before the Dodd-Frank Act amended 7 U.S.C. § 9(1) and before the CFTC promulgated 17 C.F.R. § 180.1. *See Amaranth*, 730 F.3d at 173 n.1 (acknowledging that the Dodd-Frank amendments did not apply). The Dodd-Frank amendments made it "unlawful for any person, directly or indirectly, to use or employ . . . in connection with any swap . . . any manipulative or deceptive device or contrivance, in contravention of [CFTC] rules and regulations." 7 U.S.C. § 9(1) (2010). Before the Dodd-Frank Act, there was no such provision, so the government's only option would have been a

market-manipulation theory.  *See* 7 U.S.C. § 9 (2000) (making it unlawful to

"manipulat[e] or attempt[] to manipulate . . . the market price of any commodity,

in interstate commerce, or for future delivery on or subject to the rules of any

registered entity").  We presume Congress added the new language for a reason.

*See United States v. Dai*, 99 F.4th 136, 139 (2d Cir. 2024).

The reason seems to be that Congress, consistent with the Dodd-Frank

Act's purposes, intended to cover a broader swath of fraudulent and

manipulative activity in swaps markets.  *See* 76 Fed. Reg. at 41401 (CFTC

recognizing that Congress intended, by amending § 9(1), to "augment the

[CFTC's] existing authority to prohibit fraud and manipulation").  That intent is

apparent from Congress's choice to model the new § 9(1) on the Securities

Exchange Act's § 10(b).  *Compare* 7 U.S.C. § 9(1) ("It shall be unlawful for any

person . . . to use or employ, or attempt to use or employ, in connection with any

swap . . . any manipulative or deceptive device or contrivance, in contravention

of [CFTC] rules and regulations . . . ."), *with* 15 U.S.C. § 78j(b) ("It shall be

unlawful for any person . . . [t]o use or employ, in connection with the purchase

or sale of any security . . . or any securities-based swap agreement any

manipulative or deceptive device or contrivance in contravention of [SEC] rules

58

and regulations . . . .").[12]  *See also* 76 Fed. Reg. at 41399 (July 14, 2011) (CFTC

noting that 7 U.S.C. § 9(1) is "virtually identical" to 15 U.S.C. § 78j(b)).

"Traditionally, courts have looked to the securities laws when called upon

to interpret similar provisions of the CEA."  *Loginovskaya v. Batratchenko*, 764 F.3d

266, 272 (2d Cir. 2014) (quoting *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 109 (2d

Cir. 1986)).  Looking to § 10(b) of the Securities Exchange Act and the

corresponding regulations, we have held that creation of an artificial price is not

an element of an anti-fraud or anti-manipulation claim so long as the defendant

had fraudulent or manipulative intent.  *See Set Capital*, 996 F.3d at 77–78

(concluding that the plaintiff in a private civil action for securities fraud plausibly

alleged a "manipulative act" despite an absence of allegations that the

defendant's trades artificially affected the security's price); *see also SEC v. Vali

Mgmt. Partners*, 2022 WL 2155094, at *2 (2d Cir. June 15, 2022) (summary order)

(rejecting defendants' argument that SEC's manipulation theory of liability

required proof of an artificial price).  Other circuits have held the same.  *See Koch*

---

[12] The corresponding CFTC regulations authorized by § 9(1) were likewise modeled on the SEC regulations authorized by § 10(b) of the Securities Exchange Act.  *Compare* 17 C.F.R. § 180.1(a)(1) ("It shall be unlawful for any person . . . in connection with any swap . . . to [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud . . . ."), *with* 17 C.F.R. § 240.10b-5(a) ("It shall be unlawful for any person . . . [t]o employ any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security.").

*v. SEC*, 793 F.3d 147, 153–54 (D.C. Cir. 2015) ("[I]ntent—not success—is all that must accompany manipulative conduct to prove a violation of the Exchange Act and its implementing regulations."); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 206 (3d Cir. 2001) (holding that § 10(b) of the Securities Exchange Act does not require proof that the "allegedly unlawful activities had an effect on the price of the stock"); *Chemetron Corp. v. Bus. Funds, Inc.*, 718 F.2d 725, 728 (5th Cir. 1983) (same).

We see no reason to interpret the CEA's language differently from nearly identical language in the Securities Exchange Act. As the CFTC recognized when promulgating Rule 180.1—under which Phillips was convicted—"a violation of [17 C.F.R. § 180.1] may exist in the absence of any market or price effect." 76 Fed. Reg. at 41401.

That conclusion is buttressed by reading 7 U.S.C. § 9 in full. Another subsection, § 9(3), provides: "In addition to the prohibition in [§ 9(1)], it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap . . . ." That subsection, unlike § 9(1), does not require proof of fraudulent intent. Instead, it preserves the prohibition against manipulation that lacks fraudulent intent from the pre-Dodd-Frank version of

§ 9—but only when the defendant's actions in fact created an artificial price, as determined by the four elements set out in *Amaranth*. *See Amaranth*, 730 F.3d at 173 n.1 (noting that interpretation of CFTC Rule 180.2, which uses language identical to § 9(3),[13] "'will be guided' by existing law on commodities manipulation" (quoting 76 Fed. Reg. at 41407)). Under § 9(3), if the government can prove the *Amaranth* elements, it can still punish, for example, manipulation "based on the abuse of market power, rather than fraud." *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244–46 (S.D.N.Y. 2012). But here, because the government pursued its case based on § 9(1) rather than § 9(3), it did not need to prove artificial price so long as it proved fraudulent intent.

Based on the language of the CEA and corresponding regulations, the context surrounding their enactment, and our interpretation of analogous provisions in the Securities Exchange Act, we conclude that Phillips has not met his burden to show that his proposed instruction requiring proof of an artificial price accurately represented the law. *See Zheng*, 113 F.4th at 298.

---

[13] *See* 17 C.F.R. § 180.2 ("It shall be unlawful for any person . . . to manipulate or attempt to manipulate the price of any swap . . . .").

61

### C. Materiality of Phillips's Misrepresentation

Phillips next asserts that the evidence at trial was insufficient to prove beyond a reasonable doubt that his deception was material to the victims of his fraud. His sufficiency challenge fails if any rational jury could have found beyond a reasonable doubt that his conduct was material to the victims. *See Middlemiss*, 217 F.3d at 117. A "misrepresentation is material if it is capable 'of influencing the intended victim,'" *United States v. Johnson*, 945 F.3d 606, 614 (2d Cir. 2019) (quoting *Neder v. United States*, 527 U.S. 1, 24 (1999)), or "important in making an investment decision," *Vilar*, 729 F.3d at 89. The standard is whether a reasonable investor would have been influenced by the misrepresentation, not whether the targets of the misrepresentation—here, Morgan Stanley Capital and JPMorgan—were in fact influenced. *See United States v. Litvak*, 889 F.3d 56, 66 (2d Cir. 2018) (explaining that "materiality is judged according to an objective standard" (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013))); *see also Vilar*, 729 F.3d at 89 (noting that a showing of materiality requires that the misrepresentation be "important" in decision-making, but does not require a showing of "actual reliance").

There was sufficient evidence for a rational jury to find beyond a reasonable doubt that Phillips's efforts to manipulate the dollar-rand exchange

62

rate would have been material to a reasonable financial institution in deciding whether to pay out the one-touch barrier option. Witnesses employed by both Morgan Stanley and JPMorgan testified that if their company knew a counterparty to their option was trading with the intent to trigger the option, they might not pay out the option. *See* App'x at 976–77 (Morgan Stanley banker testifying that it "would be important to know" if a "counterparty engaged in trading that was intentionally designed to trigger" a barrier option); App'x at 1368–69 (JPMorgan banker testifying that it is "important to . . . know that a counterparty engaged in trading that was intentionally designed to trigger a barrier event" and that such knowledge "would be an important factor" in JPMorgan's "willingness . . . to pay" out the option). Phillips counters that these witnesses were not actually involved in the transactions in question. But that is irrelevant because materiality is an objective standard. *See Litvak*, 889 F.3d at 66.

\*     \*     \*

We have yet to address a point that Phillips raises throughout his challenges on the elements of commodities fraud, and elsewhere in his briefs: that because the government's theory of fraud was based on his trades in the foreign-exchange spot market, his prosecution and conviction were somehow an

63

impermissible backdoor attempt to defy Congress's decision not to directly regulate that market, 7 U.S.C. § 2(c)(1)(A). We find his stance to be meritless.

Recall that, under 17 C.F.R. § 180.1(a)(1), it is "unlawful for any person, directly or indirectly, in connection with any swap, . . . to intentionally or recklessly . . . [u]se or employ . . . any manipulative device, scheme, or artifice to defraud." Nothing in the text of the CEA or corresponding CFTC regulations suggests that trades made in the foreign-exchange spot market cannot constitute a "manipulative device, scheme, or artifice" used for the purpose of defrauding a counterparty to a foreign-exchange swap. It is enough that the CEA regulates swaps, the one-touch barrier option is a swap, and there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Phillips's trades were a "manipulative device, scheme, or artifice" intended to defraud the counterparty to the option.

In sum, the district court did not err regarding any of Phillips's challenges as to the elements of commodities fraud.

## IV.    Due Process and Fair Notice

Finally, Phillips argues that, even if the district court got the law right at every step, his conviction violated his due process rights because he lacked fair notice that the CEA's anti-fraud provisions applied to his conduct related to the

64

one-touch barrier option.  Phillips suggests that he lacked notice of the legal standard on each issue discussed above, but he focuses on the application of the CEA's extraterritoriality provision to his conduct.  Phillips is correct that, at the time of his actions, no court had addressed whether conduct like his involved a "direct and significant connection with activities in . . . [U.S.] commerce" under 7 U.S.C. § 2(i)(1); as the district court acknowledged, this was a "first of its kind" prosecution under § 2(i)(1), App'x at 2336, with a "paucity of precedent" interpreting the statute, *Phillips*, 2024 WL 1300269, at *11.  We review the factual determinations related to Phillips's due process claims for "clear error" but review the "ultimate determination of whether due process has been violated" *de novo*.  *Epskamp*, 832 F.3d at 160 (quotation marks and citation omitted).

The Fifth Amendment's Due Process Clause requires that a criminal statute "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute."  *United States v. Harriss*, 347 U.S. 612, 617 (1954).  This "requires only that the law . . . not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within [the] scope" of criminal law.  *Rubin v. Garvin*, 544 F.3d 461, 469 (2d Cir. 2008) (citation modified).  Under this standard, due process is not "violated

65

simply because the issue is a matter of first impression." *Ponnapula v. Spitzer*, 297 F.3d 172, 183 (2d Cir. 2002). Even for issues of first impression, a defendant has fair notice so long as the applicable statutes "made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Extraterritorial application of a statute also does not necessarily vitiate fair notice. When Congress "expressly intends for a statute to apply extraterritorially," as it did in the CEA, "the burden is a heavy one for a defendant seeking to show that extraterritorial application of the statute violates due process." *Epskamp*, 832 F.3d at 168 (citation modified). Fair notice "does not require that . . . defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Id.* at 169 (emphasis in original) (quoting *United States v. Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011)).

A jury instruction that requires the government to prove scienter can mitigate concerns that a defendant lacked fair notice. *See Rubin*, 544 F.3d at 467-69. Here, the district court instructed the jury that it must find beyond a

66

reasonable doubt that Phillips was "aware that what he was doing . . . was unlawful." App'x at 1553. Such an instruction was a prerequisite for a felony conviction under 7 U.S.C. § 13(a)(5), which requires proof of a "willful[]" violation of the CEA or its corresponding regulations and specifies that a person may not be convicted if he "proves that he had no knowledge of such rule or regulation."

There was sufficient evidence for the jury to find that Phillips knew his actions were unlawful. It was presented with evidence that Glen Point Capital's policies prohibited fraud and market manipulation, and that Phillips and Glen Point Capital were licensed commodities traders in the United States subject to training about the CEA. *See Phillips*, 2024 WL 1300269, at *32 (summarizing evidence on Phillips's knowledge about commodities fraud, including that Phillips passed an examination as part of becoming a registered commodities trader in the U.S. that covered the CEA's fraud and manipulation provisions). It would be disingenuous to contend that Phillips, a registered U.S. commodities trader and sophisticated market participant, had "no reason even to suspect" that his deceptive trading "might be within [the] scope" of the CEA, as would be required to prove a due process violation. *Rubin*, 544 F.3d at 469. Instead, the

jury found that he knowingly violated the CEA and that he acted with the intent to defraud the counterparty to the one-touch barrier option, whoever and wherever that counterparty may be.

The evidence shows that Phillips, at minimum, should have known that his actions constituted commodities fraud in the United States. When he took those actions, he accepted the risk that he might be subject to prosecution in the United States. Phillips's prosecution and conviction therefore did not violate his right to due process.

## CONCLUSION

We have considered Phillips's remaining arguments and conclude that they lack merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.